CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
TRACY M. O'STEEN, ESQ.
Nevada Bar No. 10949
CLARK HILL PLC
3800 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone:    (702) 862-8300
Facsimile:    (702) 862-8400
CCarlyon@ClarkHill.com
TOSteen@ClarkHill.com
*[Proposed] Counsel for Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| In re | Lead Case No.: BK-19-50102-btb |
|---|---|
| DOUBLE JUMP, INC. | Chapter 11 |

Proposed Joint Administration with:

| | |
|---|---|
| 19-50103-btb | Dora Dog Properties, LLC |
| 19-50104-btb | Dog Blue Properties, LLC |
| 19-50105-btb | Brandy Boy Properties, LLC |
| 19-50106-btb | 475 Channel Road, LLC |
| 19-50108-btb | Park Road, LLC |
| 19-50109-btb | 140 Mason Circle, LLC |
| 19-50130-btb | DC Solar Solutions, Inc. |
| 19-50131-btb | DC Solar Distribution, Inc. |

Debtor.

__X__  Affects ALL Debtors
_____  Affects Double Jump, Inc.
_____  Affects Dora Dog Properties, LLC
_____  Affects Dog Blue Properties, LLC
_____  Affects Brandy Boy Properties, LLC
_____  Affects 475 Channel Road, LLC
_____  Affects Park Road, LLC
_____  Affects 140 Mason Circle, LLC
_____  Affects DC Solar Solutions, Inc.
_____  Affects DC Solar Distribution, Inc.

**OMNIBUS DECLARATION OF SETH R. FREEMAN IN SUPPORT OF FIRST DAY MOTIONS**

Hearing Date: OST to be Requested
Hearing Time: OST to be Requested

I, Seth Freeman, hereby declare under penalty of perjury of the laws of the United States of America that the following is true to the best of my knowledge, information, and belief:

1.     I am the proposed Chief Restructuring Officer ("CRO") of Double Jump, Inc. ("Holdings"), DC Solar Solutions, Inc. ("Solutions"), DC Solar Distribution, Inc. ("Distribution"), and DC Solar Freedom, Inc. ("Freedom")[1] (collectively, the "Company," or "DC Solar"), certain of

---

[1]  The Debtors in the above-captioned cases anticipate that Freedom will file its own chapter 11 petition promptly, and will seek joint administration of its chapter 11 case together with the above-captioned cases.

1   the debtors and debtors-in-possession in the above-captioned cases.  I am the independent manager
2   of debtor entities Brandy Boy Properties, LLC, Dog Blue Properties, LLC,  Dora Dog Properties
3   LLC,  475 Channel Road, LLC, Park Road, LLC, and 140 Mason Circle, LLC (together, the "Real
4   Estate Debtors," and together with the Company, the  "Debtors"), and I am familiar with the assets,
5   liabilities, background, and operations of the Real Estate Debtors as a result of assembling
6   information assisting in preparation of their respective Chapter 11 filings.

7          2.     To minimize any business disruption caused by the commencement of these Chapter
8   11 Cases (as defined below) and to ensure a smooth transition into chapter 11, the Debtors seek
9   various types of relief through "first day" applications and motions filed contemporaneously
10  herewith (collectively, the "First Day Pleadings").[2]  I submit this declaration (this "Declaration") in
11  support of (a) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United
12  States Code (the "Bankruptcy Code") and (b) the relief requested in the First Day Pleadings.  I am
13  over the age of 18, competent to testify, and authorized to submit this Declaration on behalf of the
14  Debtors.

15         3.     I have more than 30 years of diverse insolvency and restructuring experience
16  including financial advisory, operational and financial restructuring, controlled wind-downs,
17  transaction management, arranging new financing, fiduciary, litigation support, insolvency and debt
18  resolution, market-entry strategies, compliance, fraud investigation and recovery and complex
19  dispute negotiation.    I am a director of the Bay Area Bankruptcy Forum, a member of the CTP
20  Certification Oversight Committee of the Turnaround Management Association and a past director of
21  the Turnaround Management Association, Northern California Chapter.   I hold an MBA in
22  International Management from Thunderbird School of Global Management and a Bachelor of Arts
23  in Management from St. Mary's College of California, and am a Certified Insolvency &
24  Restructuring Advisor (CIRA), a Certified Turnaround Professional (CTP) and a licensed California
25  real estate broker and general building contractor.

26         4.     As a result of my tenure with the Company, my involvement in the Debtors' chapter

27  _____

28  [2]   Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the
       relevant First Day Pleadings.

-2-

11 filings, my review of the Debtors' available business records, and my discussions with members of the Debtors' management teams, all in the ordinary course of my regular duties, I am familiar with the Debtors' current day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.  Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and staff and my review of available relevant documents in the ordinary course of my regular duties, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my supervision, at my direction, and for my use in preparing this Declaration. My reliance on such information is routine in connection with my financial advisory services and background.  However, my access and the access of the Debtors, their personnel, and their advisors to relevant information and materials has been limited due to the seizure by the federal government of the Debtors' assets that remains in the possession of the federal government, as further described below.

5.    This Declaration is divided into two parts.  Part I of this Declaration provides background information about the Debtors, their business operations, their corporate and capital structures, and the circumstances surrounding the commencement of these Chapter 11 Cases (as defined below).  Part II sets forth the relevant facts in support of each of the First Day Pleadings.

## I.

### BACKGROUND

**A.    Overview**

6.    As discussed in detail below, DC Solar Solutions, Inc. designs, manufactures and sells portable solar technology, including mobile solar power generators, light towers, communications charging devices, and electric vehicle chargers that provide electric power at such locations as concert venues, construction sites, and disaster areas.  Historically, the Company has sold its mobile solar power generators ("MSG") in multi-unit packages to single investor special

purpose investor funds that purchased the units with a combination of a cash payment and a long-term promissory note payable to  DC Solar Solutions.  DC Solar Distribution master leases the MSGs from the investment funds and is responsible for managing these assets and sub-leasing  or renting the MSGs to third parties.  Distribution is responsible for the master lease payments to the Funds.  While this strategy allows the investors significant tax benefits related to solar energy credits, the Internal Revenue Service initiated proceedings in 2017 challenging certain of the Debtors' practices.  In December of 2018, the FBI and the IRS seized substantial assets of the Company, effectively causing a closing of the Company.

7.      Ultimate majority ownership of Freedom, and 100% ownership of the other Debtors, lies with Jeffrey and Pauline Carpoff.  To facilitate the reopening of the Company with a goal of maximizing the value of the assets for sale, the Carpoffs have agreed, for no consideration, (1) to pledge the assets of the Real Estate Debtors to fund Debtor in Possession financing to support the reorganization of the Debtors, and (2) to step back from day to day management and engage the services of a CRO and a nationally recognized professional restructuring advisor to lead the Company through the reorganization.

8.      The Company, through its various entities, designs, manufactures, sells, and leases mobile renewable energy products.  The Company's primary focus is the development and commercialization of solar photovoltaic power systems designed specifically for mobile deployment.  Mobile solar generators can be used to replace diesel generators and provide a clean source of mobile lighting or electricity.  The Company has produced over 13,000 units, which are located in approximately 20 states nationally.  In addition, over the last year the Company, through DC Solar Freedom has established relationships with well-known marketing and advertising companies to utilize the mobile solar generators to power large video monitors mounted on the units as a new source of revenue from digital advertising, security, and data analytics.

9.      Just days before Christmas, on December 18, 2018, the federal government seized funds from all bank accounts associated with the DC Solar businesses (as well as other accounts unrelated to the Company's core businesses), based on an *ex parte* "probable cause" showing in connection with the government's investigation into alleged unspecified violations of 18 U.S.C. §§

1343, 371, and 1957 and 26 U.S.C. §§ 7201 and 7206.[3]   On the same day, agents from the FBI and the IRS executed sweeping search and/or seizure warrants of the DC Solar business headquarters located in Benicia, California.  Agents seized hundreds of items essential for the Company to conduct and operate its ongoing businesses, including, but not limited to, computer servers, computers, and hard copy files containing corporate books and records, investment agreements, lease agreements, vendor agreements, communications with investors and customers, invoices for insurance and utility providers, as well as numerous vehicles required for the Company's business. Before the raid, the Company was not aware of the government's views.  Left without liquid assets to fund the Company's business or basic communications and record-keeping infrastructure, the Company was forced to lay off nearly its entire workforce the week before Christmas. Approximately 100 employees were laid off, and the Company was unable to pay wages owed to those employees.  The Company, through its advisors, immediately engaged in dialogue with the government in an attempt to continue the Company's business operations.  Although the Company proposed the appointment of an independent fiduciary (under court supervision if necessary) to oversee the Company and to avoid a bankruptcy filing, the government rejected such proposals.

10.     Buoyed by the support of its key constituencies, the Company is in the process of finalizing debtor-in-possession financing and commenced these Chapter 11 Cases in order to reopen its business operations so that it may continue to serve its customers and other stakeholders, compensate its employees, and continue to deliver and develop its best-in-class products and services for the benefit of all constituencies including investors in its various Funds.

B.     **Background and History**

11.     Established by Jeffrey Carpoff in 2009, Solutions designs and constructs mobile power systems, which are comprised of solar panels mounted on trailers, and can be combined with light towers, telecom equipment, electric vehicle charging stations, and a number of additional "smart" technologies (collectively, "MSG Systems").  MSG Systems can be deployed to both temporary and long-term locations for a variety of uses without incurring the high cost of permanent

---

[3]     The Debtors do not have copies of all relevant warrants, and therefore the Debtors' understanding of the underlying rationale for the seizures is derived from subsequent conversations with the government.

1  or semi-permanent infrastructure.    The MSG Systems have been deployed in approximately 20

2  states to flexibly serve off-grid needs in a diverse range of industries.  The Company has provided

3  clean mobile energy to private enterprises and government agencies, powering sporting events for

4  NASCAR, entertainment events like Coachella, as well as helping to restore power to cell towers

5  accessed by firefighters during the recent historic 2018 California wildfires.[4]  Solutions has become

6  the largest manufacturer of MSG Systems over the last decade, creating a reputation for excellence

7  in both quality and versatility.  Notwithstanding, strong interest in the Company's products from a

8  number of key counterparties, including the Department of Transportation and the Department of

9  Energy has found that maintaining sustainable long-term commercial sublease arrangements has

10  proved to be challenging.

11        12.      Having identified a novel use of the Company's technology and mobile solar power

12  generation units, Distribution is working together with ISM Connect and its "network of 100 venues

13  and 10,000 retail locations reaching an audience of over 100 million consumers", to build and power

14  a new platform for security, public safety, and connectivity using the Company's mobile solar power

15  generating units.    Branded as the "Sunshine Network," this initiative combines the Company's

16  MSGs with high-definition LCD smart screens with integrated cameras.   The Sunshine Network of

17  mobile solar-powered smart screens will offer two-way interactive features, letting advertisers reach

18  audiences while simultaneously capturing data from surrounding conditions to better inform

19  advertisers regarding consumer engagement.   The Sunshine Network is working on additional

20  features to boost its application beyond the advertising space into security and surveillance,

21  including ISM's "Fanguard," a new facial recognition engine designed for low-lighting and other

22  sub-optimal conditions.  Fanguard technology allows private security and local law enforcement to

23  effectively identify and proactively address numerous potential security risks.[5]  Fanguard has been

---

25  [4]    The units' rugged design allows them to be deployed in remote areas.

26  [5]    Mr. Carpoff and his wife were destined to attend the fateful October 1, 2017, outdoor concert where a lone gunman
27  injured or killed over 500 people outside the Mandalay Bay Hotel and Resort in Las Vegas, Nevada.  Ultimately,
   they skipped the concert, but several Company employees and family members were in attendance.  It is this
   experience, among others, that has spurred DC Solar to devote one of their business lines to enhancing the ability of
28  private security and law enforcement to utilize their innovative products to protect the public.

tested at some of the biggest events and venues in the world; it was recently deployed in the summer of 2018 across the United States during Taylor Swift's "Reputation" tour. The Company believes that the Sunshine Network and its advertising and marketing revenue (further described below) has the potential to grow rapidly and will be a substantial driver of future profitability. The Company has expanded operations in Nevada over the past year in order to support this key initiative.

13.    The Company has both a distribution center and a corporate office in Las Vegas, Nevada. Prior to the government seizure, the Company was in the process of acquiring commercial real estate space in Nevada for its new global headquarters. Furthermore, the Company has been building relationships with advertising agencies, cutting-edge technology companies, and others in the branding, marketing, and digital advertising spaces, many of whom have a substantial presence in Nevada.

C.    **The Debtors' Products and Business**

14.    <u>Products</u>.  The DC Solar business offers five basic configurations of MSG Systems with the following options: (i) mobile solar generators; (ii) mobile solar electric vehicle charging stations; (iii) mobile light towers; (iv) personal device charging stations; and (v) telecommunications products. Mobile solar generators combine a photovoltaic power system with a battery backup to deliver uninterrupted power at 24KW and 200 amps for 24 hours a day. Mobile solar electric vehicle charging stations convert existing models of mobile solar generators to add chargers from ChargePoint, the world's largest charging network, to provide electric vehicle charging without costly infrastructure. Mobile light towers provide up to 20 hours of state-of-the-art LED lighting with retractable light towers, without noise or emissions, and can provide 97,520 lumens of light capable of reaching distances up to two acres away. Finally, personal device charging stations are completely solar-powered and include user seating areas with eight outlets each, where users can charge devices using solar power. The Company also supplements its products with video surveillance systems to monitor the surrounding areas, which include standard 120-volt power outlets and WiFi capabilities. DC Solar's telecommunications product line, "Solar Com," enables rapid deployment of a cell site in areas where coverage has been disrupted or does not exist. Solar Com products have been used to provide relief in disaster and emergency situations, and have been

1  deployed in the agricultural, construction, and entertainment industries.

2  15.  Solutions designs and manufactures the mobile solar power generators which form

3  the base of the MSG Systems, and holds two process patents in connection with its innovative

4  designs.  Solutions generates revenue by selling the completed MSG Systems to investment funds or

5  investors in two types of transactions, financed sale transactions or cash sale transactions, each as

6  further described below.

7  16.  Financed Sale Transactions.  A diagram showing the structure of financed sale

8  transactions is attached hereto as Exhibit A.  The Company's MSG Systems are typically sold to

9  investment funds comprised of a managing member and a single investor member. [6]  There are

10  currently 34 such investment funds.

11  17.  The transactions have generally followed a model under which a newly formed,

12  special purpose investment fund purchases a multi-unit package of MSG Systems, valued at

13  $150,000 per unit, with a combination of cash and a 20-year promissory note payable to Solutions.

14  18.  To date, Solutions has sold over 13,000 MSG Systems to investment funds,

15  generating a total of more than $2 billion in sale proceeds (in the form of cash and notes).

16  19.  Investor members include banks and financial institutions, insurance companies, and

17  Fortune 500 companies.  Many investor members have engaged in multiple investment transactions

18  with Solutions from 2011 through 2018.

19  20.  The managing member in those transactions is one of four entities: Solarmore

20  Investments, Inc., Solarmore Management Services, Inc., Renewable Management Services Inc., and

21  Halo Management Services LLC.  Solarmore Investments, Inc., owned by Jeffrey Carpoff  (79%)

22  and Patrick Moore (21%), manages five of the existing investment funds.  Renewable Management

23  Services Inc., owned and controlled by Jeffrey Carpoff, manages one of the remaining investment

24  funds.  The remaining 28 investment funds are managed by entities which are owned and controlled

25  by third parties unaffiliated with Jeffrey Carpoff.  In certain cases, managing members have

26  _____

27  [6]  Typically, at the inception of the transaction, the investor member holds a 99% interest and the investor member

28  holds a 1% interest; these ratios flip at the end of the tax recapture period such that, typically, the investor member
    then holds an approximate 5% interest and the managing member holds an approximate 95% interest.

-8-

executed guarantees in favor of the investment fund's investor member.

21.     Under section 48 of the Internal Revenue Code, the investment funds are entitled to claim an investment tax credit equal to 30% of the purchase price of each MSG System in the portfolio.   The Internal Revenue Code also provides for accelerated five-year depreciation for qualifying solar energy property, but if the property is disposed of (or retired from service) before the fifth anniversary of the date the property is initially placed in service, then the taxpayer is required to recapture a portion of the investment tax credit.   At the end of a five-year term, given an initial purchase price of $150,000 per MSG System, an investment fund would have received tax benefits of $89,625 with respect to each MSG System purchased by the fund.   Following the conclusion of the five-year investment tax credit recapture period, the investment fund can sell the generators to provide cash to satisfy remaining obligations, including the remaining balance on the promissory notes owed to Solutions, and make distributions to investor members.   For example, two of these sales, involving over 400 MSG Systems, were completed in 2017, and the new owners of such MSG Systems leased them back to Distribution for further deployment as described below. Alternatively, at the end of the recapture period, the managing member may exercise a call option to acquire the outstanding membership interests in the investment fund, or in certain cases the investor member may put its membership interests to the managing member.

22.     The structure of the sale transactions and tax attributes is supported by analysis and opinions of several nationally recognized valuation, legal and accounting firms.   For example, Alvarez & Marsal Valuation Services LLC performed appraisals of Solutions' MSG Systems pricing.   Law firm Nixon Peabody LLP provided a tax opinion.   Financial modeling was provided by nationally prominent accounting firms Novogradac & Company LLP and CohnReznick LLP.

23.     The investment funds, as the owners of a portfolio of MSG Systems, typically enters into a lease agreement with Distribution to manage and sub-lease the MSG Systems.   Each investment fund receives lease payments from Distribution.   Prior to the government seizure, Distribution made all lease payments due to the investment funds.

24.     Distribution, as the Lessees of the MSG Systems portfolio, has subleased MSG Systems to a diverse group of third party end-users, such as music festivals and sporting events

(including NASCAR), equipment rental companies, cellular telephone service providers, and construction companies for deployment at sites across the United States. Distribution would utilize any revenues from the subleases to satisfy its monthly payment obligations under lease agreements with the investment funds and also to maintain, store, and transport the MSG Systems. Units which have not yet been deployed are subleased to Solutions and stored in one of six distribution centers nationwide. Distribution also subleases MSG Systems to Freedom, to be used in the Freedom program (as further described below).

25.    The lease payments received by the investment fund from Distribution have been used to make monthly payments to Solutions on the outstanding promissory note, pay Distribution for certain back-office and accounting services provided by Distribution personnel for the benefit of the investment fund, pay managing member fees, and make annual or semi-annual distributions to its investors.

26.    Cash Sale Transactions. Solutions has also sold a limited number of MSG Systems in cash sale transactions. Solutions completed sales of approximately 576 MSG Systems through cash sale transactions in 2017 and 2018, for a total cash purchase price of over $86,000,000. In these sales, the investor purchasing the portfolio of MSG Systems leased the MSG Systems to Distribution for sublease and deployment as described above. The lease terms range from five to ten years, and Distribution makes monthly payments under the leases to the lessor counterparties. A diagram showing the structure of cash sale transactions is attached hereto as Exhibit B.

27.    The Freedom Program. Freedom leases MSG Systems from Distribution and works with ISM, which provides advertising content, and generates revenue through a revenue-sharing arrangement with ISM. EV Charging Stations are anticipated to be deployed at numerous higher education campuses in 2019 through the "DC Solar Freedom Placement Program." Freedom offers MSG Systems to colleges and universities for use on campus at no cost to the university community.

28.    As noted above, the Company intends to expand the Freedom Program and the "Sunshine Network" in 2019 as a strategy to exploit the capacity to provide solar powered video advertising using the MSG Systems. Before the raid, the Company ordered approximately 250 high-

end display screens[7] through an equipment lease finance arrangement with First American Equipment Finance ("First American"), which required an $8 million up-front deposit paid by Solutions.  It is my understanding that the $8 million deposit from Solutions was intended to be reimbursed from the proceeds of the First American financing upon delivery of the display screens, which was anticipated to occur in approximately February of 2019.  Once the screens are delivered, the Company intended to mount them onto existing MSG systems and to immediately locate and commission the units at third-party site hosts.  Given the necessity of chapter 11, the First American equipment lease arrangement may be at risk, unless the Company is successful in re-negotiating an acceptable post-petition agreement, which would be subject to notice and approval of the Bankruptcy Court.

D.    **The Debtors' Corporate and Capital Structure**

29.    A corporate organization chart depicting the ownership structure of the Debtors is filed concurrently herewith as Exhibit C.  DC Solar operates through the Debtors as follows:

30.    Double Jump Inc. ("Holdings") was incorporated on May 29, 2013, as a Nevada corporation.  Holdings owns all of the issued and outstanding equity of Solutions and Distribution, and it has no other assets, operations, or liabilities.  The shareholders of Holdings are Jeffrey Carpoff (50%) and Paulette Carpoff (50%).

31.    Solutions, formerly known as DC Solar Solutions MFG, Inc., was incorporated on July 30, 2009, as a California corporation.  As the Company's business has grown, Solutions has expanded its operational presence.  In 2017, Solutions registered to do business in Nevada.  Solutions maintains offices in Benicia, California, and Las Vegas, Nevada.  Solutions designs and manufactures the MSG Systems and has historically provided accounting and other back-office functions for affiliated entities. The sole shareholder of Solutions is Holdings.

32.    Distribution was incorporated on September 29, 2010, as a California corporation, and has been registered to do business in Nevada as a foreign corporation since 2017.  Distribution leases the MSG Systems, repairs and maintains the leased MSG Systems, and markets and deploys

---

[7]    A photograph of the high end-display screens referenced in paragraph 28 is attached hereto as Exhibit E.  The dimensions are approximately 11'11" wide, 22' long, and 5'9" to 8'4" in height.

the MSG Systems to third-party customers through subleasing arrangements. Distribution also handles certain accounting and back-office functions for the investment funds. Debtors lease five distribution centers and warehouses, located in Buena Park, California; Las Vegas, Nevada; Tempe, Arizona; Concord, North Carolina; and Orlando, Florida. The sole shareholder of Distribution is Holdings.

33. Freedom was incorporated on June 12, 2015, as a California benefit corporation. Freedom subleases MSG Systems from Distribution and contracts with colleges and universities to place MSG Systems equipped with electric vehicle charging stations, personal device chargers, and lighting at various locations at no cost to the university community. The shareholders of Freedom include Jeffrey Carpoff (39.475%), Paulette Carpoff (39.475%), Ryan Guidry (5.26%), Ron Roach (5.26%), Julie Muraco (5.26%), and Ari Lauer (5.26%).

34. After building the DC Solar businesses for a decade, Jeffrey and Paulette Carpoff and their family continue to support the businesses, and they believe strongly in the potential of both the core business and future advertising relationships that offer exciting untapped potential for the next stage of the DC Solar enterprise. In order to enhance the success of the Company's restart following the government seizure, Jeffrey and Paulette Carpoff and entities owned by them have agreed, for no consideration, to pledge certain real property assets located in Nevada and California (the "Real Property Collateral") in order to allow the Company to obtain more favorable DIP financing terms during these Chapter 11 Cases. Each of Brandy Boy Properties, LLC, Dog Blue Properties, LLC, Dora Dog Properties LLC, and 475 Channel Road, LLC are California limited-liability companies, and each of them is jointly owned by Jeffrey and Paulette Carpoff.

35. Secured Debt. The Company has not issued any funded debt, nor does the Company have any revolving or term loan credit facilities. The only secured debt incurred by the Company is certain equipment and vehicle financing. The Company has approximately 24 vehicles which are subject to vehicle financing agreements between Solutions and Ally Financial, Inc., with an outstanding balance of approximately $690,000[8]. In addition, the Company has 6 equipment lease

---

[8]    Balances estimated as of December 31, 2018.

financing arrangements with Toyota Industries Commercial Finance, Inc., with an outstanding balance of approximately $170,000. There are two other secured loan agreements with respect to recreational vehicles, financed by Translease Inc., with an outstanding balance of approximately $760,000. The Company is generally in default in payments for January and some of the December payments with respect to the equipment and vehicle financing arrangements. Finally, as described above, the Company has secured an approved equipment lease financing arrangement with First American in connection with certain LG screens, but the arrangement will not close until the screens are delivered.

36.    <u>Real Property Secured Debt</u>. A list of the real property owned by the Real Estate Debtors and known pre-petition obligations secured by such real property will be attached to a subsequent declaration in support of proposed debtor-in-possession financing.

**E.    Events Leading to the Chapter 11 Filing**

37.    <u>IRS Investigation</u>. The IRS has conducted civil tax examinations of returns filed by Jeffrey Carpoff, Paulette Carpoff, Solutions, and three of the investment funds (Solar Eclipse Investment Fund LLC, Solar Eclipse Investment Fund III LLC, and USB DC Solar Fund I LLC).[9] In the audit of Solutions, the IRS auditors argued that Solutions was required to use the accrual method of accounting, which would require acceleration of a significant amount of income that had not yet been realized in cash (due to the promissory note structure of the financed sale transactions). In the audits of the three investment funds, the IRS made two general types of challenges. First, the IRS asserted that the funds did not constitute "bona fide partnerships," and thus the investor members' interests should be disregarded and the managing member should be treated as the sole owner of each fund. Second, the IRS argued that the sales prices for the MSG Systems were overstated, thus reducing the amount of claimed investment tax credits.

38.    A settlement conference was held on October 10, 2018, with IRS Appeals. At the end of the conference, a tentative settlement agreement was reached that would resolve each of the

---

[9]    The IRS investigated (a) the returns of Solutions and the Carpoffs for the years 2011 through 2014; (b) the returns of Solar Eclipse Investment Fund LLC and Solar Eclipse Investment Fund III LLC for the year 2011; and (c) the return of USB DC Solar Fund I for the year 2013.

foregoing disputes, two of which are docketed in the United States Tax Court. The parties are in the process of finalizing and documenting the settlement agreement.

39.    Separately, on July 30, 2018, the IRS notified a fourth investment fund (Solar Eclipse Investment Fund XVI, LLC) that its 2015 partnership return would be examined. The examination process is continuing.

40.    <u>Government Seizure</u>.    The genesis of the government seizure is unknown to the Company. Nonetheless, the Company can offer the following facts. In March 2017, Solutions extended an offer to a prospective employee (the "<u>Employee</u>") for an at-will project finance position with the Company. Solutions had been introduced to this Employee through certain of the previously completed financed sales transactions, and the Employee had been affiliated with certain investor members in the investment funds. The offer contemplated a salary of $200,000 per year, plus commissions based on the value of closed transactions. With no notice or warning, the Employee left the Company less than one year after commencing his employment, after earning approximately $2 million in compensation during the term of his employment. On February 16, 2018, the Company received a letter from an attorney purporting to represent the Employee, demanding a payment of $5 million in settlement of alleged claims of fraudulent inducement. The demand letter alleged that the Employee had uncovered a "fraudulent financial scheme." Counsel for the Company responded in writing on February 26, 2018, denying and refuting the allegations in their entirety. Neither the Employee nor the Employee's counsel responded with any further correspondence or contact.

41.    As described above, several months later, on December 18, 2018, agents from the FBI and the IRS Criminal Investigation Division conducted simultaneous raids on Company headquarters and the Carpoffs' personal residence. The agents also seized all funds from the Company's operating accounts, personal bank accounts belonging to the Carpoffs, operating accounts belonging to the Carpoffs' other non-DC Solar businesses, and accounts belonging to the investment funds. It remains unclear whether the Employee contacted the government and whether such contact, if it did occur, was the cause of the government's ill-timed raid. Although the government has returned certain servers, the government has not returned many other key

documents, books and records, and items of personal property have not been returned, nor has the government provided an inventory of all items seized, despite repeated requests by representatives of the Company.  On the same day as the raid, the U.S. Securities and Exchange Commission issued subpoenas to Solutions, Distribution, and certain other parties.  The Company reserves its rights to seek to obtain such property of its chapter 11 estate through the bankruptcy process.

42.    The Company immediately retained counsel and began discussions with the government in an effort to protect the economic viability and maintain business operations of the Company.  The Department of Justice (the "DOJ") informed the Company's counsel that the asset seizures related to an alleged "investment fraud" and that the government had seized the assets in order to prevent them from being dissipated and to compensate any victims of the alleged fraud.  But to date, the government has declined to share any evidence reflecting the purported support for its allegations.  The Company offered to retain an experienced fiduciary (under court supervision, if necessary) as a consultant to oversee the finances and operations of the Company in a manner mutually agreed upon by the government and the Company, but ultimately the government declined to release any of the seized assets until the completion of the investigation.  The Company commenced these Chapter 11 Cases in order to restart its business, absent the cooperation of the government, in order to maximize value for all creditors and parties in interest and to get its employees back to work.

43.    Impact of Government Seizure.  The Company has been unable to pay operating expenses such as rent associated with its warehouses and distribution centers, utility and internet bills, health and property insurance costs, and equipment and vehicle lease payments.  The Company has likewise been unable to deposit business revenues.  Since December 18, 2018, the Company has received numerous default notices from contract counterparties, landlords, and insurance providers, and a landlord for one of the Company's warehouses has commenced eviction proceedings against the Company for failure to pay rent.

44.    As previously discussed, the Company was also forced to lay off approximately 100 employees the week before Christmas.  Former employees are owed approximately $310,000 in unpaid back wages, which the Company was unable to pay due to its inability to access any accounts

or funds to pay these amounts. The Company's health insurance and dental insurance payments, which were due on December 20, 2018, were not paid, and the insurers have notified the Company that unless the missed payments are tendered by January 30, 2019, the plans will be retroactively cancelled as of January 1, 2019, potentially adding further costs for the Company's former employees. The Company's employees are critical to the Company's ability to restart operations. The senior management team has been working nonstop without pay since December 18, 2018 to resolve the seizure issues, but the longer the Company's operations are dormant, the more likely it is that the Company's former employees will find other employment and further impede any remaining ability of the Company to operate.

45. Furthermore, without funds to pay utility bills, the Company will lose the ability to conduct basic business operations, as well as the ability to remotely monitor the MSG Systems, by the end of January 2019. Should any MSG System malfunction, the Company will be unable to retrieve the unit, conduct maintenance, or otherwise service the end customer as required under the terms of the relevant sublease agreement.

46. Finally, the Company's ability to receive payments from customers to Distribution, Distribution's ability to make lease payments to the investment funds and the cash sale counterparties, the investment funds' ability to make payments to Solutions, and Solutions' ability to receive payments from the investment funds has been disrupted at every step due to the seizure of funds from the Company's operating bank accounts as well as the investment funds' bank accounts, impacting December and January payments. As of the Petition Date, Distribution is owed approximately two months of payments from customers, and has missed approximately two months of payments to the investment funds, totaling approximately $22,000,000. Distribution has also failed to make approximately two months of payments to cash sale transaction counterparties, totaling approximately $1,600,000. In turn, the investment funds have missed approximately two months of payments to Solutions, totaling approximately $18,000,000, and certain of the investment funds have been unable to make scheduled annual or semi-annual investor distributions due in December, 2018, totaling approximately $3,300,000. Distribution has received default notices from some of the financed sale transaction counterparties and the cash sale transaction counterparties

1  based on nonpayment of monthly lease payments.

2       47.    The Company has commenced these Chapter 11 Cases in an effort to garner a "fresh

3  re-start" for their sub-leasing business and advertising customer opportunities, for the benefit of all

4  parties in interest, including creditors, investors, and customers.  Distribution has a significant

5  number of generators on hand, ready and available for sublease opportunities.  Going forward, the

6  Company will refocus its efforts on subleasing its fleet of available units to generate revenue, and on

7  launching its capabilities in the advertising space to add an additional revenue stream.  The

8  Company has secured new financing to support their go-forward business operations, and are in the

9  early stages of evaluating an exit transaction, which may include a potential sale of the Company or

10  substantially all of the Company's assets.  As a first step, the Company is requesting authorization to

11  offer a break-up fee to a potential Stalking Horse Bidder.

12       48.    In respect of corporate governance, the Company seeks to hire an independent chief

13  restructuring officer (the "<u>CRO</u>") to assist the senior management team in day-to-day operations.  A

14  new independent director has been appointed for each of the DC Solar debtors, and the same

15  independent fiduciary will serve as a manager for each of the Real Estate Debtors.  The Carpoffs

16  have stepped back from day-to-day management and decision-making for which the CRO and

17  independent director would be responsible.  The equity owners will continue to support the

18  Company's day-to-day operations under the CRO's supervision, including by providing collateral,

19  for no consideration, to secure the new financing that will permit the Company to continue to help its

20  customers develop mobile and green digital advertising strategies and provide top-flight service to

21  its customers.

22  **II.**

23  **<u>FIRST DAY MOTIONS</u>**

24       49.    In furtherance of the Company's restructuring efforts, the Debtors are filing

25  substantially contemporaneously herewith the First Day Motions, each as listed on <u>Exhibit D</u> filed

26  concurrently with this Declaration.  The Debtors respectfully request that the Court consider entering

27  the proposed orders granting such First Day Motions.  I have reviewed each of the First Day Motions

28  and proposed orders (including the exhibits thereto) and the facts set forth therein are true and

1  correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief

2  sought in each of the First Day Motions (a) is vital to enable the Debtors to make the transition to,

3  and operate in, chapter 11 with minimal interruption or disruption to their businesses or loss of

4  productivity or value and (b) constitutes a critical element of restarting the Company's operations,

5  which is necessary to maximize value during these Chapter 11 Cases for the benefit of all

6  stakeholders.

7  **A.     Administrative and Procedural Pleading**

8       50.    Joint Administration.  The Debtors are requesting that their Chapter 11 Cases be

9  jointly administered, for procedural purposes only.  As set forth above, each of the Debtors is

10  affiliated with each other Debtor through their operations and/or common indirect ownership.  Each

11  of the Debtors is also a party to the proposed debtor-in-possession financing (discussed below).

12  Joint administration of these Chapter 11 Cases will avoid the unnecessary time and expense of the

13  duplicative motions, applications, other pleadings, orders, and related notices that would otherwise

14  need to be filed in each separate case absent joint administration.  Accordingly, I believe that joint

15  administration will save considerable time and expense for the Debtors, the Clerk of the Court, the

16  United States Trustee, and other parties in interest, which will, in turn, result in substantial savings

17  for the Debtors' estates.

18       51.    Motion to Extend Deadline to File Schedules and Statements.  The Debtors are

19  seeking a 30-day extension of time by which the Debtors must file their schedule of assets and

20  liabilities, schedule of current income and current expenditures, schedule of executory contracts and

21  unexpired leases, and statement of financial affairs (the "Schedules and Statements"), without

22  prejudice to the Debtors' ability to request additional time should it become necessary.  The request

23  for an extension of time to file the Schedules and Statements is appropriate given the facts in this

24  case.  These cases involve eight Debtors, hundreds of creditors, and assets and liabilities located

25  across the country.  Debtors' business has come to a virtual standstill as a result of the government

26  seizure, leaving the Debtors without the resources to commence preparation of the schedules and

27  statements prior to the Petition Date.  Debtors anticipate that, in the early days of the reorganization,

28  much of the efforts of its professionals and any employees will be devoted to handling emergency

1  matters, both with regard to the business and with regard to the bankruptcy proceedings.  Further, the

2  government seizure included financial records as well as physical and monetary assets.  While the

3  Debtors have recovered at least copies of computerized records, there are still physical records

4  which were taken in the government seizure without providing access or copies to the Debtors.  The

5  Debtors have not even been provided with a complete inventory of what has been seized.  While

6  Debtors hope that the government will comply with the turnover requirements of Bankruptcy Code

7  section 542, it is possible that Debtors will be required to seek court assistance in this regard.  All of

8  these reasons support the request for an extension of time to file schedules and statements.

9  **B.**    **Operational Pleadings**

10        52.    <u>Motion to Approve Appointment of CRO and Retention of Financial Advisor</u>.

11  Debtors appreciate that the IRS investigation and government seizure are likely to raise concerns

12  with regard to management and operations.  In order to provide additional assurance to the Court and

13  parties in interest, as well as needed assistance to the Debtors, Debtors have engaged Seth R.

14  Freeman, CTP, CIRA/GlassRatner as the Debtors' Chief Restructuring Officer, in order to assist the

15  Debtors with evaluating their restructuring options and otherwise help maximize the value of the

16  Debtors' business and estates for the benefit of their constituents.  I am the Senior Managing

17  Director of GlassRatner's San Francisco office.  Further, I am a bankruptcy, insolvency and

18  restructuring consultant, crisis and turnaround manager and asset manager with over 30 years of

19  diverse consulting experience including financial advisory, operational and financial restructuring,

20  controlled wind-downs, transaction management, arranging new financing, fiduciary and litigation

21  support, and cross-border due diligence, insolvency and debt resolution, market-entry strategies,

22  compliance, fraud investigation and recovery and complex dispute negotiation.  My practice also

23  includes serving as independent advisor to significant investors and directors of companies

24  undergoing change.  The terms of the proposed retention are set forth in the Debtors Emergency

25  Motion for Interim and Final Orders (i) Authorizing the Retention and Employment of Glass Ratner

26  Advisory & Capital Group LLC ("<u>GlassRatner</u>") to Provide the Debtors with a Chief Restructuring

27  Officer and Certain Additional Personnel, (ii) Designating Seth R. Freeman, CIRA, CTP as CRO

28  Effective January 28, 2019, pursuant to that certain engagement letter agreement by and between

1  Debtors and Glass Ratner, (iii) Setting a Final Hearing, and (iv) Granting Related Relief, and the

2  supporting Declaration of Seth R. Freeman, filed herewith.

3      53.    <u>Utilities</u>.  Debtors are filing herewith an Emergency Motion for Order (i) prohibiting

4  utility companies from altering, refusing, or discontinuing service to the Debtors and (ii) establishing

5  procedures for determining requests for additional adequate assurance of payment (the "<u>Utility</u>

6  <u>Motion</u>").  Uninterrupted utility services are critical to the Debtors' ability to sustain their property

7  and continue business operations during the pendency of the Chapter 11 Cases.  In the normal

8  conduct of their businesses, the Debtors rely upon access to internet, electric, telephone, data, and

9  other services provided by the Utilities.  The Utility Motion requests authority to continue to pay

10  utility providers, including any prepetition invoices, in order to provide for protection of the utility

11  providers while also safeguarding the reorganization effort.  To the extent that any utility provider

12  seeks additional assurances of performance, Debtors seek approval of the following procedures by

13  which utility providers can request additional adequate assurance:

14      a.    The Utility must serve a written request setting forth the location(s) for which

15  utility services are provided, the account number(s) for such location(s), the outstanding balance for

16  each account, and an explanation of why adequate assurance of payment is necessary (a "<u>Request</u>");

17      b.    The Request must actually be received by the Debtors' counsel, Clark Hill

18  PLC, 3800 Howard Hughes Parkway, Suite 500, Las Vegas, NV 89169, within thirty (30) days of

19  the date of entry of the order granting the relief requested herein (the "<u>Request Deadline</u>");

20      c.    Without further order of the Court, the Debtors may enter into agreements

21  granting additional adequate assurances to a Utility serving a timely Request, if the Debtors, in their

22  discretion, determines that the Request is reasonable;

23      d.    If the Debtors believe that a Request is unreasonable, the Debtors, within

24  thirty (30) days after the Request Deadline, shall file a motion pursuant to section 366(c)(2) of the

25  Bankruptcy Code (a "<u>Determination Motion</u>"), seeking determination from the Court that the

26  additional consideration offered by the Debtors constitutes adequate assurance of payment. Pending

27  notice and hearing on the Determination Motion, the Utility that is the subject of the Request may

28  not alter, refuse, or discontinue services to the Debtors;

e.    Any Utility that makes a timely Request shall be deemed to have adequate assurance of payment until the Court enters a final order in connection with such a Request finding that the Utility is not adequately assured of future payment; and

f.    Any Utility that fails to make a timely Request shall be deemed to be satisfied of adequate assurance of payment.

54.    <u>Insurance</u>.  Debtors are filing herewith an Emergency Motion For Entry Of Interim And Final Orders Authorizing Debtors To (I) Maintain Existing Insurance Policies And Pay All Insurance Obligations Arising Thereunder And (II) Renew, Revise, Extend, Supplement, Change, Or Enter Into New Insurance Policies.  Maintaining insurance coverage is critical to the Debtors' operations and reorganization, and is required by the U.S. Trustee Guidelines.  The Debtors have defaulted on their payment obligations under certain insurance policies, placing those policies at risk of termination, and other payments will be due to insurers in the near term.  The Debtors require the relief requested in order to fulfill their payment obligations for the benefit of the estate and all parties-in-interest, and in order to comply with applicable law and the U.S. Trustee Guidelines.

55.    <u>Wages</u>.  Debtors are filing herewith a Motion to Approve Payment of Prepetition Wages, authorizing, but not directing, the Debtors to pay prepetition back wages to rank-and-file non-insider and non-executive employees, which the Company was unable to pay due to its inability to access any accounts or funds as a result of the government seizures described above.  These employees provide essential services to the Company, and their skills and understanding of the Company's operations, infrastructure and customer base are essential to the effective operation of the DC Solar businesses.  Payment to these employees on account of already accrued and unpaid wages is necessary to minimize the risk that the employees will find other employment, which could have devastating consequences on the Debtors' ability to restart and operate their businesses.

56.    <u>Motion to Approve Stalking Horse Bid Protections</u>.  As noted above, the Debtors are focused on maximizing the value of their assets for the benefit of all creditors and stakeholders.  The Debtors have determined that the most effective way to do so is to explore a sale process for all or substantially all of the Company's assets, within a limited timeframe following the Petition Date.

57.    In order to incentivize bidders to move towards a binding offer as quickly as possible,

the Debtors request that this Court permit the Debtors to offer a cash break-up fee and expense reimbursement (the "Bid Protections"), in an aggregate amount not to exceed 3% of the base purchase price offered by a Stalking Horse Bidder.  The Bid Protections would be earned upon the Debtors' termination of any stalking horse agreement based on the Company signing a definitive agreement with respect to a sale transaction representing a higher or better bid for the sale assets (a "Competing Transaction").  Each of the Break-Up Fee and Expense Reimbursement shall be payable in cash within two business days of consummation of a Competing Transaction.  Any Competing Transaction would have to increase the base purchase price offered by the Stalking Horse Bidder by at least 3%, to cover the Bid Protections.  The Debtors anticipate that any Stalking Horse Bidder will expect these protections as a condition precedent to signing a stalking horse agreement for the purchase of the Company or the Company's assets.

58.    Motion to Approve DIP Financing.  As discussed above, as a result of the government seizure, Debtors have been left without funds to operate.  The Company's operations are at a critical juncture; in order to continue to generate revenue it is crucial that the Company has the resources to market the assets (including leased units) for sublease and/or sale.  The Real Estate Debtors likewise require access to immediate funding to ensure that they can continue to satisfy their lease obligations to tenants and lessees.  Securing immediate financing to support these objectives will result in greatly enhanced distributions to all creditors.

59.    Due to the government's seizure of substantially all of the Company's assets, the Company was unable to raise financing on an unsecured basis, and the Company lacks any available cash which it may utilize to fund these Chapter 11 Cases or the Debtors' operations on an out-of-court basis.  Without access to seized assets, and without cash available to fund operations, the Company's available financing options are practically non-existent.  In order to support the reorganization effort, the Carpoffs have agreed to pledge millions of dollars of real estate to secure the post-petition financing.

60.    Prior to the Petition Date, the Debtors and their professionals approached seven (7) potential financing sources in order to secure financing that would support the Company's go-forward operations.  Ultimately the Debtors secured multiple indications of interest, and after

evaluating the proffered terms, the Debtors focused on four actionable proposals, each of which would provide the Debtors with at least $10 million in total DIP financing, and a substantial initial draw on an interim basis.  The DIP Financing Motion will contain the highest and best of the proposals received by the Debtors.  In advance of any hearing on the Debtors' first-day relief, Debtors intend to file an emergency motion for entry of interim and final orders (i) authorizing debtors to obtain postpetition secured financing, (ii) scheduling final hearing, and (iii) granting related relief.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: February 3, 2019.

By:
Name:    SETH R. FREEMAN
Title:    Chief Restructuring Officer

-24-

**EXHIBIT A**
**STRUCTURE OF FINANCED SALE TRANSACTIONS**

## STRUCTURE OF FINANCED SALE TRANSACTIONS



**EXHIBIT B**
**STRUCTURE OF CASH SALE TRANSACTIONS**

## STRUCTURE OF CASH SALE TRANSACTIONS



**EXHIBIT C**
**CORPORATE ORGANIZATIONAL CHART**



**Notes**:
1) DC Solar Solutions, Inc. is also registered to do business in Nevada and Florida.
2) DC Solar Distribution, Inc. is also registered to do business in Nevada.
3) Each of the following Minority Investors holds approximately 5.26% of the outstanding shares of DC Solar Freedom, Inc.:
   (i) Ryan Guidry; (ii) Ron Roach; (iii) Julie Muraco; (iv) Ari Lauer.

1

**EXHIBIT D**
**LIST OF FIRST DAY MOTIONS**

2

3      1.   Emergency Motion for Order Directing Joint Administration of Cases Under Bankruptcy
            Rule 1015(b)

4      2.   Emergency Motion for Order Extending Time to File Bankruptcy Schedules and Statements
            of Financial Affairs

5      3.   Emergency Motion to Establish Notice Procedures and to Limit Notice

       4.   Emergency Motion for Order (i) Prohibiting Utility Companies from Altering, Refusing, or
6           Discontinuing Services and (ii) Establishing Procedures for Determining Requests for
            Additional Adequate Assurance of Payment

7      5.   Emergency Motion for Entry of Interim and Final Orders Authorizing Debtors to (i)
            Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder
8           and (ii) Renew, Revise, Extend, Supplement, Change, or Enter Into New Insurance Policies

9      6.   Emergency Motion for Entry of Interim and Final Orders (i) Authorizing the Retention of
            Glass Rather Advisory & Capital Group, LLC to Provide Chief Restructuring Officer and
            Certain Additional Personnel, (ii) Designating Seth Freeman as Debtors' Chief
10          Restructuring Officer Effective as of the Petition Date, (iii) Setting a Final Hearing, and (iv)
            Granting Related Relief

11     7.   Motion of Debtors for Order Authorizing and Approving Certain Stalking Horse Bidder
            Protections

12     8.   Motion to Approve Payment of Prepetition Wages

13     9.   Debtors' Motion to Employ Clark Hill PLC As Bankruptcy Counsel *Nunc Pro Tunc* to the
            Petition Date

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**EXHIBIT E**

2

3

4



5

6

**Mobile Solar Power Generator**

7

**Solar Eclipse SCT20 Hybrid**

8

**The Solar Eclipse line of mobile solar generators has been developed to meet the off-grid power needs of environmentally conscious customers across a variety of industries including agriculture, construction, emergency/disaster relief, entertainment, events, and telecommunications.**

9

10

11

**The Solar Eclipse SCT20 Hybrid LT from DC Solar offers superior lighting coverage. This battery-based diesel hybrid light tower provides 97,520 lumens of light by using eight independently directed LED lights. The Solar Eclipse SCT20 LT Hybrid has an optional video surveillance system to monitor the surrounding areas; standard 120-volt power outlets; and WiFi capabilities.**

12

13



14

15

16

17

18

19

20

**Outfitted with Mobile Light Towers**

21

22

23

24

25

26

27

28

834964-LACSR01A - MSW