HOLLEY DRIGGS WALCH
FINE PUZEY STEIN & THOMPSON
Richard F. Holley, Esq. (NV Bar No. 3077)
Email: rholley@nevadafirm.com
Mary Langsner, Ph.D. (NV Bar No. 13707)
Email: mlangsner@nevadafirm.com
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:   702/791-0308
Facsimile:    702/791-1912

STEVENS & LEE, P.C.
Robert Lapowsky (Admitted *Pro Hac Vice*)
Email: rl@stevenslee.com
620 Freedom Business Center, Suite 200
King of Prussia, Pennsylvania 19406
Telephone:   215-751-2866
Facsimile:    610-371-7958

*Attorneys for SolarSense DCS I, LLC*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>DOUBLE JUMP, INC.<br><br>    Debtor.<br><br>☑ Affects DC Solar Solutions, Inc.<br>☑ Affects DC Solar Distribution, Inc.<br>☑ Affects DC Solar Freedom, Inc.<br>☑ Affects Double Jump, Inc. | Case No. BK-N-19-50102-GS<br>Chapter 7<br><br>Jointly Administered with:<br><br>\| 19-50130-gs \| DC Solar Solutions, Inc. \|<br>\| 19-50131-gs \| DC Solar Distribution, Inc. \|<br>\| 19-50135-gs \| DC Solar Freedom, Inc. \|<br><br>Date of Hearing:   December 9, 2019<br>Time of Hearing:   9:30 a.m.<br><br>Judge: Hon. Gary Spraker |

**OMNIBUS DECLARATION OF CHRISTOPHER FRAGA**

I, Christopher D. Fraga, declare and state as follows:

1. I am over the age of 18 and mentally competent. Except where stated on information and belief, I have personal knowledge of the facts in this matter, and, if called upon to testify, could and would do so.

2. I am the Managing Member of SolarSense DCS I LLC, a member of Alternative Energy Development Group LLC, the manager of AEIPI GP I, LLC, which is the general partner of Alternative Energy Infrastructure Projects Fund I, LP, a member of SolarSense DCS I, LLC ("SolarSense").

3. I make this Declaration in support of SolarSense's opposition to the Motion for Order Approving Consensual Liquidation of Estate's Interest in Property and Approving

1. Compromise of Disputed Claims ("Solarmore Motion") [ECF No. 1391]¹ filed by chapter 7 trustee Christina Lovato (the "Trustee"), trustee of the bankruptcy estates of debtors Double Jump, Inc. ("Double Jump"), DC Solar Solutions, Inc. ("Solutions"), DC Solar Distribution, Inc. ("Distribution"), and DC Solar Freedom, Inc. ("Freedom")² (the "Opposition to Solarmore Motion").

4. I also make this Declaration in support of SolarSense's opposition to the Trustee's Motion for Orders: (1) Authorizing Consensual Sale of Personal property by Auction, (2) Approving Sale of Estate-owned MSGs, and (3) Ratifying Continuing Employment of CA Global As Auctioneer ("USB Motion") [ECF No. 1395] (the "Opposition to USB Motion") (collectively with the Opposition to Solarmore Motion, the "Oppositions").

5. I have personal knowledge of the facts in this Declaration based upon my personal knowledge as well as based upon my review of the books and records maintained by SolarSense in its regular course of business. If called as a witness, I could testify competently to those matters, except as to those matters based upon information and belief, and, as to those matters, I believe them to be true and correct.

6. As part of my duties for SolarSense, I supervise and manage its operations. In that capacity, I am personally familiar with SolarSense's documents, books, files, and record transactions.

7. It is SolarSense's practice and procedure to maintain records and to record transactions, acts, conditions, and events concerning SolarSense at or about the time such transactions, acts, conditions, or events occur (collectively, the "Business Records"). SolarSense relies on these Business Records in connection with its business dealings.

. . .

. . .

---

¹ Unless otherwise noted, all references to "ECF No." are to the numbers assigned to the documents filed in the lead jointly administered bankruptcy case, Bankr. D. Nev. Case No. 19-50102-GS ("Lead Case"), as they appear on the docket ("Lead Case Docket") maintained by the Clerk of the Court of the United States Bankruptcy Court for the District of Nevada.

² Double Jump, Solutions, Distribution, and Freedom are referenced collectively as the "Debtors".

- 2 -

13430-01/2327113
11/27/2019 SL1 1617029v2 108952.00050

8.   I have personally reviewed SolarSense's documents, books, and records relating to the below described transactions with Solutions and Distribution. The exhibits that are attached to this Declaration are true and correct copies of SolarSense's Business Records.

**SEIF MSGs Purchase Transaction**

9.   On or about July 31, 2017, SolarSense entered into an Asset Purchase Agreement ("SEIF APA") with Solar Eclipse Investment Fund, LLC, a California limited liability company ("SEIF"), for the purchase of two hundred twenty-four (224) mobile solar generators ("SEIF MSGs"), which SEIF MSGs are described in the SEIF APA.

10.   SolarSense paid to SEIF the sum of eighteen million four hundred-eighty thousand dollars ($18,480,000.00) (the "SEIF Purchase Price"). The portion of the SEIF Purchase Price allocated to each of the SEIF MSGs was eighty-two thousand five hundred dollars ($82,500.00).

11.   SolarSense received original certificates of title for each of the SEIF MSGs it purchased from SEIF.

12.   Simultaneously with the SEIF APA, SolarSense leased the SEIF MSGs to Distribution, pursuant to a Solar Generators Lease dated July 31, 2017 ("Distribution Lease"). The SEIF MSGs were purportedly subleased by Distribution to T-Mobile USA, Inc. ("T-Mobile Lease") pursuant to a Solar Generators Lease dated September 11, 2015, as amended.

13.   On or about August 15, 2018, SolarSense and Distribution entered into a First Amendment to the Distribution Lease (the "Amendment"), amending Distribution's payment obligations to SolarSense to remit monthly installments of base rent in the amount of $109,000.00 (the "Monthly Rent").

14.   The obligations of Distribution to SolarSense under the Distribution Lease with respect to the SEIF MSGs were secured by liens on the proceeds of the SEIF MSGs, including rents.

15.   The obligations of Distribution under the Distribution Lease with respect to the SEIF MSGs are guaranteed by Solutions.

. . .

. . .

- 3 -

**SEIF III MSGs Purchase Transaction**

16. On or about July 31, 2017, SolarSense also entered into an Asset Purchase Agreement ("SEIF III APA") with Solar Eclipse Investment Fund III, LLC, a California limited liability company ("SEIF III"), for the purchase of one hundred ninety-two (192) mobile solar generators ("SEIF III MSGs") described in the SEIF III APA.

17. SolarSense paid SEIF III the sum of fifteen million eight hundred forty thousand dollars ($15,840,000.00) (the "SEIF III Purchase Price"). The portion of the SEIF III Purchase Price allocated to each of the SEIF III MSGs was eighty-two thousand five hundred dollars ($82,500.00).

18. SolarSense received original certificates of title for each of the SEIF III MSGs it purchased from SEIF III.

19. SolarSense also leased the SEIF III MSGs to Distribution pursuant to Distribution Lease and the SEIF III MSGs were also purportedly subleased by Distribution to TMobile pursuant to the TMobile Lease.

20. The obligations of Distribution to SolarSense under the Distribution Lease with respect to the SEIF III MSGs were secured by liens on the proceeds of the SEIF III MSGs, including rents.

21. The obligations of Distribution under the Distribution Lease with respect to the SEIF III MSGs were also guaranteed by Solutions.

**Right of First Refusal Agreement**

22. At the time that SolarSense purchased the SEIF MSGs and the SEIF III MSGs, SolarSense also negotiated and entered into a Right of First Refusal Agreement ("ROFR") with Solarmore Investments, Inc., a California corporation ("Solarmore Investments"), the manager of SEIF and SEIF III, and with Solarmore Management Services, Inc., a California corporation ("Solarmore"), the manager of numerous other funds. The ROFR expressly states it is made as of July 31, 2017. Upon information and belief, Solarmore Investments, SEIF, SEIF III and Solarmore Management were affiliated entities A true and correct copy of the ROFR is attached hereto as **Exhibit "1"**.

- 4 -

23. Pursuant to the ROFR, among other things, if any investment fund which owns mobile solar generators managed by Solarmore Management (which would include the Subject Funds) receives an offer to purchase a mobile solar generator or otherwise intends to sell an mobile solar generator, it must give SolarSense a written notice (the "ROFR Notice") of its intention to sell, which ROFR Notice must include among other things the sales price of the unit to be sold. SolarSense then has thirty (30) days after receiving the ROFR Notice (the "ROFR Exercise Period") to exercise its option to match the offer and buy the unit.

24. The thirty-day ROFR Exercise Period was a critical element of the ROFR because, by definition, SolarSense anticipated purchasing used mobile solar generators which would have differing features and be in varying condition. As a result, SolarSense needed time to perform inspections before deciding whether to match any offer.

25. Being advised of the sale price before the ROFR Exercise Period started to run was also a critical element of the ROFR because, if the price was above a certain level, SolarSense would likely have no interest in matching the offer and, so, would not incur the inspection costs.

26. The ROFR was a condition to SolarSense's agreement to pay over $34,000,000 for the SolarSense MSGs and was very important to SolarSense. In fact, the ROFR was a critical factor to SolarSense's decision to purchase the SEIF MSGs and SEIF III MSGs.

27. The purchase of the SEIF MSGs and the SEIF III MSGs was the first acquisition of MSGs after the expiration of the five-year tax credit and was important for a number of other reasons, including the creation of a market for and establishing the precedential value of post-tax-credit MSGs for all of the funds bound to be able to show a market and have a potential customer.

28. The ROFR was an important component of the overall purchase of the SEIF MSGs and the SEIF III MSGs. Having set the initial market price for post-tax-credit MSGs, it was important for SolarSense to have the opportunity to purchase additional MSGs with a right of first refusal.

29. Solarmore Management and the Trustee are now attempting to deprive SolarSense of its bargained for rights under the ROFR. Instead of giving SolarSense thirty (30) days to decide whether to match an offer after being notified of a proposed sale (including the sale price),

- 5 -

1   Solarmore proposes to give SolarSense twenty-four hours. Given the number of MSGs, it is impossible for SolarSense to perform inspections in twenty-four hours.

30. I am informed and believe that Solarmore Investments and Solarmore expressly recognized the benefits of, and therefore the consideration of, the SEIF APA and the SEIF III APA, in realizing their ability to market and sell post-tax-credit MSGs and thus recapture even more of their initial investment, and for these reasons voluntarily and willingly entered into the ROFR.

31. Neither Solutions nor Distribution were parties to the ROFR.

**STAY RELIEF, AND THE SEARCH FOR SOLARSENSE MSGS[3]**

32. On February 12, 2019, SolarSense filed a Motion for Relief from the Automatic Stay [ECF No. 101].

33. On March 20, 2019, the Court entered an Order approving a stipulated resolution which ultimately granted SolarSense relief from the automatic stay as to the SolarSense MSGs [ECF No. 387] (the "Order").

34. Upon entry of the Order granting stay relief, SolarSense immediately began searching for the SolarSense MSGs. It (along with other parties in interest) engaged GA Global to assist with locating MSGs throughout the country. This has been a challenging, difficult, and expensive task. SolarSense has expended approximately $1,250,000 in storage, verification, transportation, refurbishing and legal costs to recover its MSGs and anticipates incurring another $500,000.

35. Determining which MSGs belonged to which lessor or owner has also been a challenging and difficult task. In the course of conducting inspections, SolarSense (and others) discovered that, in many instances, Vehicle Identification Numbers ("VINs") had been removed, altered, were illegible, or had been duplicated and placed on more than one of the MSG trailers.

36. SolarSense has been able to locate 316 of its 416 SolarSense MSGs. In order to confirm and verify that each of the 316 recovered MSGs did in fact belong to SolarSense,

---

[3] The SEIF MSGs and the SEIF III MSGs are collectively referenced herein as the "SolarSense MSGs".

SolarSense utilized a process consisting of cross-checks involving an inspection of the forward frame number ("Forward Frame Number") welded on to the underside of each trailer frame by the manufacturer, Carson Trailer. SolarSense has also verified that Carson Trailer was the manufacturer of all of the SolarSense MSGs. Carson Trailer, as the manufacturer of the trailers, was the only entity that was authorized by the California Department of Motor Vehicle to affix a VIN tag to each of its trailers (the "OEM VIN"). After the Forward Frame Number was identified for each of the recovered MSGs, SolarSense contacted Carson Trailer to provide and verify the assigned OEM VIN for each such MSG trailer. In addition, a further identifier is (now) the identification "tag" number placed by GA Global on each trailer it located and identified in the post-petition search and recovery efforts.

37. Problematically, VINs that were not OEM VINs appear to have been used or created in connection with the Debtors and certificates of title for MSGs, which appear unrelated to OEM VINs and are not accurate.

38. Finally, another "identifier" used by SolarSense where possible, is a license plate affixed to a trailer.

39. For all of the SolarSense MSGs (which were purchased by SolarSense), SolarSense is in possession of State of California-issued Certificates of Title for MSGs trailers (each bearing a unique VIN), as well as make, model, and plate information along with an "issue date" for the Certificate of Title.

40. As of this writing, SolarSense has not been able to locate one hundred of the SolarSense MSGs (the "Missing MSGs"). SolarSense continues to search for these Missing MSGs.

41. In the process of verifying the SolarSense MSGs, SolarSense has found a limited number of MSGs that belong to other entities. When this occurs, SolarSense has shared this information with other funds or managers of funds and cooperated in transporting these MSGs to the rightful owner.

42. SolarSense has born the cost of storage and repair for each of the SolarSense MSGs it has located.

43. I have also had numerous conversations and communications with Nathan Kanute, counsel for Solarmore ("Mr. Kanute"), regarding the verification process used by SolarSense to verify ownership of its MSGs. In the course of those conversations, Mr. Kanute has agreed that use of the Carson Trailer Forward Frame Number and the corresponding Carson Trailer applied VIN number (OEM VIN) is the most appropriate, consistent, reliable, truthful, and effective verification process. Mr. Kanute has also agreed that SolarSense's verification process is the most effective, appropriate, reliable, and effective verification protocol.

**REPAIRING AND REFURBISHING MSGS**

44. With respect to the MSGs recovered by SolarSense, these MSGs were in various states of disrepair. SolarSense's service provider prepared a checklist to thoroughly inspect and check each MSG for fitness, function, and performance. A true and correct copy of this approximately sixty-point checklist is attached hereto as **Exhibit "2"**.

45. Just the inspection of each MSG takes approximately two hours, at a cost of between $100 and $200 per MSG. Thus, the time it would take to inspect the 478 MSGs subject of the Solarmore Motion is at least 956 professional service hours (two hours per MSG, *plus* time to log and report all data on MSG condition back to SolarSense, so that SolarSense could estimate the value of the MSG in light of its fit and function and the cost of repairs needed).

46. In the Solarmore Motion, the time the Trustee and Solarmore have allotted for SolarSense to perform such an analysis is twenty-four hours, which would require 96 FTEs, each working a ten-hour day. It is not tenable to find such a quantity of FTEs in such a short timeframe, considering the level of training and specialized skills needed to perform a thorough inspection of MSGs that each contain at least four major electrical/generation/storage components integrated into a functional system—components which include solar photovoltaic panels, solar inverters, battery charge controller, battery storage, generators (on some), and other electrical and mechanical components.

47. In anticipation of repairs and replacement of parts needed for recovered MSGs, SolarSense purchased approximately $483,000.00 in parts earlier this year at a parts auction.

. . .

- 8 -

13430-01/2327113
11/27/2019 SL1 1617029v2 108952.00050

**MSGs Proposed to be Sold and Verification**

48. Regarding MSGs that are the subject of the pending Solarmore Motion and the pending USB Motion (collectively, the "Motions"), the MSGs are subject to the ROFR.

49. SolarSense is also concerned that some of the MSGs subject of the Motions may include the Missing MSGs belonging to SolarSense.

50. To my knowledge, the Trustee has not conducted an owner verification process similar to that conducted by SolarSense or otherwise sufficient to verify ownership of the MSGs sought to be sold pursuant to the Solarmore Motion, or the USB Motion. To the extent the Court grants the pending Motions, and before any of the subject MSGs are permitted to be sold, at a minimum, either the Trustee or Solarmore should be required to (i) cross-check the forward frame number welded on to each trailer with the assigned OEM VIN for each trailer to confirm whether the subject MSG actually belongs to the Solarmore fund that professes ownership, (ii) produce documentary proof the MSG units being sold are the units purchased in their respective agreements, and (iii) produce either originals or copies of titles reflecting ownership of these specific MSG units.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 27th day of November 2019.

    /s/ Christopher D. Fraga
CHRISTOPHER D. FRAGA

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of Holley Driggs Walch Fine Puzey Stein & Thompson, and that on the 27th day of November 2019, I caused to be served a true and correct copy of OMNIBUS DECLARATION OF CHRISTOPHER FRAGA in the following manner:

☒ (ELECTRONIC SERVICE) Under Local Rule 5005 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

☐ (UNITED STATES MAIL) By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date above written.

☐ (OVERNIGHT COURIER) By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

☐ (FACSIMILE) That I served a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those persons listed on the attached service list, on the date above written.

*/s/ OBSwitzer*
An employee of Holley Driggs
Walch Fine Puzey Stein & Thompson

13430-01/2327113
11/27/2019 SL1 1617029v2 108952.00050