# EXHIBIT A

1  McGREGOR W. SCOTT
   United States Attorney
2  ANDRÉ M. ESPINOSA
   KEVIN KHASIGIAN
3  Assistant United States Attorneys
   501 I Street, Suite 10-100
4  Sacramento, CA 95814
   Telephone: (916) 554-2700
5
   Attorneys for Plaintiff
6  United States of America

**FILED**

JAN 2 4 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

7
8                     IN THE UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10
11  UNITED STATES OF AMERICA,               CASE NO. 2;20-cr-17 JAM

12                          Plaintiff,      PLEA AGREEMENT

13              v.                          DATE:   JANUARY 24, 2020
                                            TIME:   10:00 AM
14  JEFF CARPOFF,                           COURT:  HON. JOHN A. MENDEZ

15                          Defendant.

16
17                          I.     **INTRODUCTION**

18       A.     **Scope of Agreement.**

19          The Information in this case charges the defendant with violations of Title 18, United States

20  Code, Section 1349—Conspiracy to Commit Wire Fraud ("Count One"), and Title 18, United States

21  Code, Section 1957(a)— Money Laundering ("Count Two"). This document contains the complete plea

22  agreement between the United States Attorney's Office for the Eastern District of California (the

23  "government") and the defendant regarding this case. This Plea Agreement is limited to the United

24  States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or

25  local prosecuting, administrative, or regulatory authorities.

26       B.     **Court Not a Party.**

27          The Court is not a party to this Plea Agreement. Sentencing is a matter solely within the

28  discretion of the Court, and the Court may take into consideration any and all facts and circumstances

PLEA AGREEMENT                              1

1  concerning the criminal activities of the defendant, including activities which may not have been

2  charged in the Information.  The Court is under no obligation to accept any recommendations made by

3  the government, and the Court may in its discretion impose any sentence it deems appropriate up to and

4  including the statutory maximum stated in this Plea Agreement.

5       If the Court should impose any sentence up to the maximum established by the statutes, the

6  defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all

7  of the obligations under this Plea Agreement.  The defendant understands that neither the prosecutor,

8  defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will

9  receive.

10                    **II.**    **DEFENDANT'S OBLIGATIONS**

11       A.    **Guilty Plea.**

12       The defendant will plead guilty to violating Title 18, United States Code, Section 1349—

13  Conspiracy to Commit Wire Fraud ("Count One"), and Title 18, United States Code, Section 1957(a)—

14  Money Laundering ("Count Two").  The defendant agrees that he is in fact guilty of those charges and

15  that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

16       The defendant agrees that this Plea Agreement will be filed with the Court and become a part of

17  the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw his

18  plea should the Court not follow the government's sentencing recommendations.

19       The defendant agrees that the statements made by him in signing this Agreement, including the

20  factual admissions set forth in the factual basis and those made on January 17, 2020, during the process

21  of negotiating this Agreement, shall be admissible and useable against the defendant by the United

22  States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea

23  pursuant to this Agreement.  The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R.

24  Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement

25  generally.

26            1.    Waiver of Indictment.

27       The defendant acknowledges that under the United States Constitution he is entitled to be

28  indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed. R. Crim.

PLEA AGREEMENT                    2

1  P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of Indictment to the

2  charges set forth in the Information.  The defendant agrees that at a time set by the Court, he will sign a

3  written waiver of prosecution by Indictment and consent to proceed by Information rather than by

4  Indictment.

5          1.      Package Agreement.

6         The defendant acknowledges and understands that the plea offer made to him here by the

7  government is a "package offer."  That is, the defendant understands that the offer made to him is

8  conditioned on co-defendant Paulette Carpoff pleading guilty according to the terms of her respective

9  plea offer.  The defendant understands that if this co-defendant declines, refuses or fails to plead guilty

10  according to her respective offer, then, at the option of the government, the defendant will not be

11  allowed to enter a plea of guilty to the offer made to him by the government.  Additionally, if co-

12  defendant Paulette Carpoff fails or refuses to enter her plea according to her respective offer and the

13  defendant has already entered his plea, then this Plea Agreement is voidable at the option of the

14  government.  Should that occur, in its sole discretion, the government has the ability to withdraw from

15  the Plea Agreement with the defendant and pursue the original charges as to this defendant.  However,

16  the defendant's waiver of his rights under Rule 11(f) and Fed. R. Evid. 410, as set forth in Section II.A

17  herein, will not operate.

18         Recognizing that this is a package offer, the defendant confirms that he has not been threatened,

19  pressured, or coerced by any other person, including the co-defendant, to enter into this plea agreement.

20  The defendant also confirms that he enters into this plea agreement voluntarily because he is in fact

21  guilty of the offenses to which he is pleading guilty.

22      **B.**    **Restitution.**

23         The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of

24  certain offenses.  The defendant agrees that his conduct is governed by the Mandatory Restitution Act

25  pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims

26  affected by this offense, including, but not limited to, the victims covered in the factual basis, victims

27  covered in those counts to be dismissed as part of the Plea Agreement pursuant to 18 U.S.C. §

28  3663A(a)(3), and other victims as a result of the defendant's conduct for the offenses charged from the

PLEA AGREEMENT            3

1  periods through in or about March 2011 and in or about December 2018. The amount of restitution has
2  not yet been determined but will likely be between approximately $800 million and $1.6 billion.

3      Restitution payments shall be by cashier's or certified check made payable to the Clerk of the
4  Court.

5      The defendant further agrees that he will not seek to discharge any restitution obligation or any
6  part of such obligation in any bankruptcy proceeding.

7      **C.**    **Fine.**

8      The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a
9  fine, and that no fine should be imposed. The defendant understands that it is his burden to affirmatively
10  prove that he is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury
11  to the Probation Officer and the government in advance of the issuance of the draft Presentence
12  Investigation Report, along with supporting documentation. The government retains the right to oppose
13  the waiver of a fine. If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered
14  by the Court, up to the statutory maximum fine for the defendant's offense.

15      **D.**    **Special Assessment.**

16      The defendant agrees to pay a total special assessment of $200 (comprised of $100 per count of
17  conviction) at the time of sentencing by delivering a check or money order payable to the United States
18  District Court to the United States Probation Office immediately before the sentencing hearing. The
19  defendant understands that this Plea Agreement is voidable at the option of the government if he fails to
20  pay the assessment prior to that hearing.

21      **E.**    **Violation of Plea Agreement by Defendant/Withdrawal of Plea.**

22      If the defendant violates this Plea Agreement in any way, withdraws his plea, or tries to
23  withdraw his plea, this Plea Agreement is voidable at the option of the government. If the government
24  elects to void the Agreement based on the defendant's violation, the government will no longer be
25  bound by its representations to the defendant concerning the limits on criminal prosecution and
26  sentencing as set forth herein. A defendant violates this Plea Agreement by committing any crime or
27  providing or procuring any statement or testimony which is knowingly false, misleading, or materially
28  incomplete in any litigation or sentencing process in this case, or engages in any post-plea conduct

PLEA AGREEMENT                           4

1   constituting obstruction of justice. Varying from stipulated Guidelines application or agreements

2   regarding arguments as to 18, United States Code, section 3553, as set forth in this Agreement,

3   personally or through counsel, also constitutes a violation of the Plea Agreement. The government also

4   shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to

5   reinstate any counts that may be dismissed pursuant to this Plea Agreement; and (3) to file any new

6   charges that would otherwise be barred by this Plea Agreement. The defendant shall thereafter be

7   subject to prosecution for any federal criminal violation of which the government has knowledge. The

8   decision to pursue any or all of these options is solely in the discretion of the United States Attorney's

9   Office.

10           By signing this Plea Agreement, the defendant agrees to waive any objections, motions, and

11   defenses that the defendant might have to the government's decision. Any prosecutions that are not

12   time-barred by the applicable statute of limitations as of the date of this Plea Agreement may be

13   commenced in accordance with this paragraph, notwithstanding the expiration of the statute of

14   limitations between the signing of this Plea Agreement and the commencement of any such

15   prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect

16   to such counts including, but not limited to, any statutes of limitation or any objections based on the

17   Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-

18   barred as of the date of this Plea Agreement. The determination of whether the defendant has violated

19   the Plea Agreement will be under a probable cause standard.

20           In addition, (1) all statements made by the defendant to the government or other designated law

21   enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,

22   whether before or after this Plea Agreement, shall be admissible in evidence in any criminal, civil, or

23   administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no

24   claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal

25   Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by

26   the defendant before or after this Plea Agreement, or any leads derived therefrom, should be suppressed.

27   By signing this Plea Agreement, the defendant waives any and all rights in the foregoing respects.

28

PLEA AGREEMENT                              5

**F.    Forfeiture.**

The defendant agrees to forfeit to the United States voluntarily and immediately all of his right, title,

and interest to any and all assets subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C.

§ 2461(c).  Those assets include, but are not limited to, the following:

1.  Seagrape Villa 1722 at the Four Seasons Resort Estate Nevis, "1722 Stewart's Estate," Federation of St Kitts-Nevis, West Indies, Lot 12, Clarks/Jessups (Stewarts Estate), Parish of St. Thomas, Island of Nevis;
2.  All funds maintained at Deltec Bank and Trust, account number 1001021, held in the name of DC Solar International, Inc.;
3.  All funds maintained at JP Morgan Chase, account number 371767515, held in the name of Jocarbo, LLC;
4.  Any and all interests held by Jeffrey Carpoff in Whetstone Winery, Inc.;
5.  Any and all interests held by Jeffrey Carpoff in JPC Group Investments;
6.  Any and all interests held by Jeffrey Carpoff in Shift Solutions LLC;
7.  Any and all interests held by Jeffrey Carpoff in Panda Bear International Ltd.;
8.  Any and all interests held by Jeffrey Carpoff in MTO Cafe;
9.  Any and all interests held by Jeffrey Carpoff in JMFC, Inc.;
10. Any and all interests held by Jeffrey Carpoff in PMFC Enterprises LLC;
11. Any and all interests held by Jeffrey Carpoff in LITV Entertainment Group, LLC;
12. Any and all interests held by Jeffrey Carpoff in Yountville Live;
13. 1969 Plymouth Roadrunner, VIN: RM23H9E119339;
14. 2018 Bentley Bentayga, VIN: SJAAC2ZV2JC016871;
15. 1969 Plymouth Roadrunner, VIN: RM21H9G224046;
16. 2015 Dodge Ram 5500 Chassis, VIN: 3C7WRMBL4FG594873;
17. 2018 Dodge Ram 2500 Tradesman, VIN: 3C6UR5CL1JG169183;
18. 2018 Dodge Ram 2500 Tradesman, VIN: 3C6UR5CL7JG169186;
19. 2014 Dodge Ram, VIN: 3C6UR5CL3EG291677;
20. 2014 Dodge Ram, VIN: 3C6UR5CL1EG147612;
21. 2018 Dodge Ram, VIN: 3C6UR5CL9JG169190;
22. 2000 Porsche Boxster, VIN: WP0CA2982YU626068;
23. 2017 Centurion Vessel, VIN: FINS1554F717;
24. Approximately $580,000 in U.S. Currency held by Terry L. Davis and Susan Rush in Las Vegas, Nevada, and described in Case No. A-19-803784-C, filed in Clark County District Court, Jeff and Paulette Carpoff v. Terry L. Davis and Susan Rush;
25. Approximately $200,000 in the form of a promissory note and deed of trust, extended to Terry L. Davis and Susan Rush, residents of Las Vegas, Nevada; and
26. Any and all sales proceeds from the vehicles sold in United States v. 2011 BMW 328I, VIN: WBAPH7C53BE460537, et al., 2:19-MC-00053-TLN-CKD, in the Eastern District of California.

The defendant agrees that the listed assets constitute or are derived from proceeds traceable to a

violation of 18 U.S.C. § 1349.

PLEA AGREEMENT                                 6

1    The defendant agrees to fully assist the government in the forfeiture of the listed assets and to take

2    whatever steps are necessary to pass clear title to the United States. The defendant also agrees to

3    execute any and all paperwork required to forfeit additional assets connected to the charges to which he

4    pleaded guilty. The defendant shall not sell, transfer, convey, or otherwise dispose of any of his assets,

5    including but not limited to, the above-listed assets.

6    The defendant agrees not to file a claim to any of the listed property in any civil proceeding,

7    administrative or judicial, which may be initiated. The defendant agrees to waive his right to notice of

8    any forfeiture proceeding involving this property, and agrees to not file a claim or assist others in filing a

9    claim in that forfeiture proceeding.

10    The defendant knowingly and voluntarily waives his right to a jury trial on the forfeiture of

11    assets. The defendant knowingly and voluntarily waives all constitutional, legal and equitable defenses

12    to the forfeiture of these assets in any proceeding. The defendant agrees to waive any jeopardy defense,

13    and agrees to waive any claim or defense under the Eighth Amendment to the United States

14    Constitution, including any claim of excessive fine, to the forfeiture of the assets by the United States,

15    the State of California or its subdivisions. The defendant waives oral pronouncement of forfeiture at the

16    time of sentencing, and any defenses or defects that may pertain to the forfeiture.

17    The defendant agrees to sign a Stipulation for Final Judgment of Forfeiture in United States v. 725

18    Main Street, Martinez, California, et al., Case 2:19−CV−00247-JAM-DB, United States v.

19    Approximately $6,567,897.50 Seized From CTBC Bank, Account Number 3800191916, et al., Case

20    2:19-cv-00485-JAM-DB, United States v. 5383 Stonehurst Drive, Martinez, California, et al., Case

21    2:19-cv-00636-JAM-DB, and a Consent Judgment of Forfeiture in United States v. 2011 BMW 328I,

22    VIN: WBAPH7C53BE460537, et al., Case 2:19-MC-00053-TLN-CKD. The stipulations must be

23    signed concurrently with the signing of this plea agreement.

24    The parties agree that if any portion of the net proceeds from the forfeited assets are paid to victims

25    through the remission or restoration process, that amount will be credited to the defendant's restitution

26    obligation.

27    **G.    Asset Disclosure.**

28    The defendant agrees to make a full and complete disclosure of his assets and financial

PLEA AGREEMENT                                   7

1  condition, and will complete the United States Attorney's Office's "Authorization to Release

2  Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change

3  of plea, including supporting documentation. The defendant also agrees to have the Court enter an order

4  to that effect. The defendant understands that if he fails to complete truthfully and provide the described

5  documentation to the United States Attorney's office within the allotted time, he will be considered in

6  violation of the Agreement, and the government shall be entitled to the remedies set forth in section II.E

7  above, above.

8     **H.**  **No Reduction in Sentence for Cooperation.**

9     As a condition of the terms of this Plea Agreement, the defendant agreed to full and complete

10  debriefs with the government regarding his criminal activities. Notwithstanding his agreement to

11  participate in those debriefs, the defendant understands and acknowledges that the government will not

12  make a motion in his case, pursuant to U.S.S.G. § 5K1.1, and the defendant agrees not to seek any

13  sentence reduction on the basis of the debriefs. The defendant agrees that the information he must

14  provide in the debriefs must be truthful or the government will have the remedies set forth in Part II.E of

15  this Agreement.

16      **III.**  **THE GOVERNMENT'S OBLIGATIONS**

17     **A.**  **Dismissals/Other Charges.**

18     The government agrees not to bring any other charges against the defendant arising from the

19  conduct outlined in the Factual Basis attached hereto as Exhibit A. The government also agrees not to

20  reinstate any dismissed count except if this Agreement is voided as set forth herein, or as provided in

21  paragraphs II.E (Violation of Plea Agreement by Defendant/Withdrawal of Pleas), VI.B (Estimated

22  Guideline Calculation), and VII.B (Waiver of Appeal and Collateral Attack) herein.

23     **B.**  **Recommendations.**

24      1.  Incarceration Range.

25     The government intends to recommend that the Court sentence the defendant to thirty years in

26  custody.

27      2.  Acceptance of Responsibility.

28     The government will recommend a two-level reduction (if the offense level is less than 16) or a

PLEA AGREEMENT     8

1   three-level reduction (if the offense level reaches 16) in the computation of his offense level if the

2   defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. §

3   3E1.1.  This includes the defendant meeting with and assisting the probation officer in the preparation of

4   the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging

5   in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the

6   preparation of the pre-sentence report or during the sentencing proceeding.

7       **C.**    <u>**Use of Information for Sentencing.**</u>

8       The government is free to provide full and accurate information to the Court and Probation,

9   including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate

10  statements or arguments by the defendant, his attorney, Probation, or the Court.  The defendant also

11  understands and agrees that nothing in this Plea Agreement bars the government from defending on

12  appeal or collateral review any sentence that the Court may impose.

13                   **IV.**    **ELEMENTS OF THE OFFENSE**

14      At a trial, the government would have to prove beyond a reasonable doubt the following

15  elements of the offense to which the defendant is pleading guilty.

16      **1.**    <u>**18 U.S.C. § 1349—Conspiracy to Commit Wire Fraud (Count One).**</u>

17      Although *not* elements of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349,

18  the elements of the underlying criminal offense (Wire Fraud, in violation of 18 U.S.C. § 1343) are:

19      a.    The defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan

20          for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

21

22      b.    The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with

23          money or property;

24      c.    The defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

25      d.    The defendant used, or caused to be used, an interstate wire communication to carry out

26          or attempt to carry out an essential part of the scheme.

27      Thus, to convict the defendant at trial on the charge of Conspiracy to Commit Wire Fraud, in

28  violation of 18 U.S.C. § 1349 (Count One), the government would have to prove beyond a reasonable

PLEA AGREEMENT               9

doubt that:

a.    Beginning at least as early as in or about March 2011, and ending in or about December 2018, there was an agreement between two or more people to commit wire fraud as charged in the Information; and

b.    Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

**2.    18 U.S.C. § 1957(a)—Money Laundering (Count Two).**

To convict the defendant at trial on the charge of Money Laundering, in violation of 18 U.S.C. § 1957(a), the government would have to prove beyond a reasonable doubt that:

a.    The defendant knowingly engaged or attempted to engage in a monetary transaction;

b.    The defendant knew the transaction involved criminally derived property;

c.    The property had a value greater than $10,000;

d.    The property was, in fact, derived from wire fraud, in violation of 18 U.S.C. § 1343; and

e.    The transaction occurred in the United States.

The defendant fully understands the nature and elements of the crimes charged in the Information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V.    MAXIMUM SENTENCE

**A.    Maximum Penalties.**

**1.    18 U.S.C. § 1349—Conspiracy to Commit Wire Fraud (Count One).**

The maximum sentence that the Court can impose on Count One is 20 years of incarceration, a fine of $250,000, a 3-year period of supervised release and a special assessment of $100.  By signing this Plea Agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct.  The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty.  The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

**2.    18 U.S.C. § 1957(a)— Money Laundering (Count Two).**

PLEA AGREEMENT                                          10

The maximum sentence that the Court can impose on Count Two is 10 years of incarceration, a fine of $250,000 or twice the value of the property involved in the transaction, a 3-year period of supervised release, and a special assessment of $100. By signing this Plea Agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

**B.**    **Violations of Supervised Release.**

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release imposed on Count One and Count Two and require the defendant to serve up to 3 additional years imprisonment.

## VI.    SENTENCING DETERMINATION

**A.**    **Statutory Authority.**

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B.**    **Stipulations Affecting Guideline Calculation.**

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

PLEA AGREEMENT                                    11

**(i)  Count One: 18 U.S.C. § 1349—Conspiracy to Commit Wire Fraud.**

    **1.  Base Offense Level:** The base offense level for the charges to which the defendant is pleading guilty is **7**. See U.S.S.G. §§ 2X1.1 and 2B1.1(a)(1).

    **2.  Specific Offense Characteristics:**

        a.  Thirty levels are added (**+30**) because the loss attributable to the defendant during the time period of his knowing involvement in the conspiracy and within the scope of his knowing involvement exceeded $550,000,000. Id. at (b)(1)(P).

        b.  Two levels are added (**+2**) because the offense involved 10 or more victims. Id. at (b)(2)(A).

        c.  Two levels are added (**+2**) because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. Id. at (b)(10)(C).

        d.  Two levels are added (**+2**) because the defendant derived more than $1 million in gross receipts from one or more financial institutions as a result of the offense. Id. at (b)(17)(A).

    **3.  Preliminary Offense Level:** The parties anticipate that the preliminary offense level will be **43**.

    **4.  Chapter Three Adjustments:**

        a.  Four levels are added (**+4**) because the defendant was an organizer and leader of a criminal activity that involved five or more participants and was otherwise extensive. U.S.S.G. § 3B1.1(a).

        b.  Two levels are added (**+2**) because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction and any relevant conduct, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct. U.S.S.G. § 3C1.1.

    **5.  Adjusted Offense Level:** The parties anticipate the adjusted offense level will be **49**.

**(ii)  Count Two: 18 U.S.C. § 1957(a)—Money Laundering.**

    **1.  Base Offense Level:** The base offense level for the charges to which the defendant is pleading guilty is **7**. See U.S.S.G. §§ 2S1.1(a)(1) and 2B1.1(a)(2).

    **2.  Specific Offense Characteristics:**

        a.  Thirty levels are added (**+30**) because the loss attributable to the defendant during the time period of his knowing involvement in the conspiracy and within the scope of his

1    knowing involvement exceeded $550,000,000. <u>Id.</u> at (b)(1)(P).

2    b.  Two levels are added (**+2**) because the offense involved 10 or more victims. <u>Id.</u> at
3        (b)(2)(A).

4    c.  Two levels are added (**+2**) because the offense involved sophisticated means and the
        defendant intentionally engaged in or caused the conduct constituting sophisticated
5        means. <u>Id.</u> at (b)(10)(C).

6    d.  Two levels are added (**+2**) because the defendant derived more than $1 million in gross
        receipts from one or more financial institutions as a result of the offense. <u>Id.</u> at
7        (b)(17)(A).

8
     e.  One level is added (**+1**) because the defendant was convicted under 18 U.S.C. § 1957.
9        U.S.S.G. § 2S1.1(b)(2)(A).

10   **3.  Chapter Three Adjustments:**

11   a.  Two levels are added (**+2**) because the defendant willfully obstructed or impeded, or
        attempted to obstruct or impede, the administration of justice with respect to the
12       investigation, prosecution, or sentencing of the instant offense of conviction and any
        relevant conduct, and the obstructive conduct related to the defendant's offense of
13       conviction and any relevant conduct. U.S.S.G. § 3C1.1.

14
15   **4.  Preliminary Offense Level:** The parties anticipate that the preliminary offense level
     will be **46**.
16
17   **1.  Grouping Multiple Counts:**

18   a.  The Counts in the Information to which the defendant is pleading guilty may be
        grouped together under U.S.S.G. § 3D1.2(d).
19
20   b.  The offense level applicable to the grouped Counts is **49**, which is the offense level
        corresponding to the aggregate quantity of loss, determined in accordance with
        Chapter Two and Parts A, B, and C of Chapter Three of the Sentencing Guidelines.
21       <u>See</u> U.S.S.G. § 3D1.3(b).

22   **2.** Three levels are subtracted (**-3**) if the defendant pleads guilty, accepts responsibility for
23   his offense, and the Specific Offense Level is above 16. U.S.S.G. § 3E1.1; <u>see also</u> Part III.B.2 above.

24   **3.  Adjusted Offense Level:** Given the stipulations above, the parties anticipate that the
25   adjusted offense level will be **46**.

26   **4.  Criminal History:** The parties agree and stipulate that the applicable criminal history
27   will be determined by the Court's probation officers. The parties estimate but do not stipulate that the

28

PLEA AGREEMENT                              13

1  defendant's criminal history category will be I, and that the Guidelines sentencing range will be no

2  less than Life in prison, subject, however, to the maximum statutory sentence possible for the offenses

3  of conviction (30 years). The defendant understands that if his criminal history category differs from

4  the parties' estimate, his Guidelines sentencing range may differ from that set forth here.

5        **C.**    **Departures or Other Enhancements or Reductions.**

6        The parties agree that they will not seek or argue in support of any other specific offense

7  characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"),

8  or cross-references, except that the government may move for a departure or an adjustment based on the

9  defendant's post-plea obstruction of justice (§3C1.1). Both parties agree not to move for, or argue in

10  support of, any departure from the Sentencing Guidelines.

11        The defendant also agrees that the application of the United States Sentencing Guidelines to his

12  case results in a reasonable sentence. The parties agree, however, that sentencing in this case will be

13  within the sound discretion of the Court. The defendant may request a sentence within the range of 25

14  years to 30 years and ask that the Court apply the sentencing factors under 18 U.S.C. §3553 to reach a

15  sentence of between 25 years to 30 years. But the defendant will not request that the Court apply the

16  sentencing factors to arrive at any sentence less than 300 months (25 years) in custody. The defendant

17  acknowledges that if the defendant requests or suggests in any manner a sentence less than 300 months

18  (25 years) in custody, that will be considered a violation of the Plea Agreement. The government's

19  remedies and remaining obligations in this Agreement shall be as outlined above in paragraph II.E.

20                        **VII.**    **WAIVERS**

21        **A.**    **Waiver of Constitutional Rights.**

22        The defendant understands that by pleading guilty he is waiving the following constitutional

23  rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to

24  be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative

25  defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of

26  conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to

27  testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be

28  compelled to incriminate himself.

PLEA AGREEMENT                        14

1    **B.    Waiver of Appeal and Collateral Attack.**

2    The defendant understands that the law gives the defendant a right to appeal his guilty plea,

3 conviction, and sentence.  The defendant agrees as part of his plea, however, to give up the right to

4 appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not

5 exceed the statutory maximum for the offenses to which he is pleading guilty (30 years), including if the

6 Court imposes consecutive terms on Counts One and Two.  The defendant understands that this waiver

7 includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's

8 conviction and guilty plea, including arguments that the statutes to which the defendant is pleading

9 guilty are unconstitutional, and any and all claims that the statement of facts attached to this Agreement

10 is insufficient to support the defendant's plea of guilty.  The defendant specifically gives up the right to

11 appeal any order of restitution the Court may impose.

12    Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if

13 one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the

14 statutory maximum for all Counts; and/or (2) the government appeals the sentence in the case.  The

15 defendant understands that these circumstances occur infrequently and that in almost all cases this

16 Agreement constitutes a complete waiver of all appellate rights.

17    In addition, regardless of the sentence the defendant receives, the defendant also gives up any

18 right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any

19 aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

20    Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever

21 attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of

22 the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.E

23 herein.

24    **C.    Waiver of Attorneys' Fees and Costs.**

25    The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

26 119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

27 investigation and prosecution of all charges in the above-captioned matter and of any related allegations

28 (including without limitation any charges to be dismissed pursuant to this Plea Agreement and any

PLEA AGREEMENT                                    15

1  charges previously dismissed).

2  **D.**    **Impact of Plea on Defendant's Immigration Status.**

3  The defendant recognizes that pleading guilty may have consequences with respect to his

4  immigration status if he is not a citizen of the United States.  Under federal law, a broad range of crimes

5  are removable offenses, including offenses to which the defendant is pleading guilty.  The defendant and

6  his counsel have discussed the fact that the charges to which the defendant is pleading guilty is an

7  aggravated felony, or a crime that is likely to be determined to be an aggravated felony under 8 U.S.C. §

8  1101(a)(43), and that while there may be arguments that the defendant can raise in immigration

9  proceedings to avoid or delay removal, it is virtually certain that the defendant will be removed.

10  Removal and other immigration consequences are the subject of a separate proceeding, however, and the

11  defendant understands that no one, including his attorney or the district court, can predict to a certainty

12  the effect of his conviction on his immigration status.  The defendant nevertheless affirms that he wants

13  to plead guilty regardless of any immigration consequences that his plea may entail, even if the

14  consequence is his automatic removal from the United States.

15  **VIII.    ENTIRE PLEA AGREEMENT**

16  Other than this Plea Agreement, no agreement, understanding, promise, or condition between the

17  government and the defendant exists, nor will such agreement, understanding, promise, or condition

18  exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and

19  counsel for the United States.

20  **IX.    APPROVALS AND SIGNATURES**

21  **A.**    **Defense Counsel.**

22  I have read this Plea Agreement and have discussed it fully with my client.  The Plea Agreement

23  accurately and completely sets forth the entirety of the agreement.  I concur in my client's decision to

24  plead guilty as set forth in this Plea Agreement.

25  Dated:  1/27/20

26  _____
    MALCOLM SEGAL
27  Attorney for Defendant

28

PLEA AGREEMENT                16

**B.**    **Defendant:**

I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement. In addition, no one has threatened or forced me in any way to enter into this Plea Agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: *1-22-20*

_____

JEFF CARPOFF
Defendant


**C.**    **Attorney for United States:**

I accept and agree to this Plea Agreement on behalf of the government.

Dated: *1/24/2020*

McGREGOR W. SCOTT
United States Attorney

_____

ANDRE M. ESPINOSA
Assistant United States Attorney

PLEA AGREEMENT                                    17

EXHIBIT "A"
Factual Basis for Plea

**The Carpoffs' Ponzi-like scheme**

From December 2009 through January 2019, Jeff Carpoff and Paulette Carpoff, husband and wife, owned and operated two closely related business entities, DC Solar Solutions, Inc. ("Solutions") and DC Solar Distribution, Inc. ("Distribution") (collectively "DC Solar"). While starting as a legitimate business, by at least 2011, DC Solar operated a Ponzi-like scheme that defrauded investors of approximately $1 billion through material misrepresentations and omissions related to the offer and sale of investments designed to generate profit and trigger significant tax benefits for investors. The conspirators induced victims to enter investment transactions organized around the manufacture and sale of solar energy equipment by Solutions, which the investors leased back to Distribution. The transactions imposed debt obligations on the investors in exchange for valuable tax benefits. As part of the transactions, Distribution promised to cover those debt obligations by earning revenue from sub-leasing the solar equipment to others. Yet Distribution never secured significant sub-leases or never earned more than a tiny percentage of the debt obligations it agreed to cover. As a result, the conspirators used Ponzi-like transfers of money paid by new investors to cover the obligations of existing investors, eventually causing massive losses. Between mid-2016 and February 2019, the headquarters for DC Solar was located in Benicia, California, in the Eastern District of California.

Jeff Carpoff ("Jeff") was the owner and operator of Solutions, and the Chief Executive Officer of DC Solar. Jeff organized and directed the conspiracy from its start in approximately March 2011, though December 2018. Jeff personally undertook and directed others to undertake acts intended to mislead investors about material facts, to conceal those lies, and to lull victims of the fraud. Among other things, Jeff: (a) caused the dissemination of materially false information to victims to induce them to invest in transactions with DC Solar and to lull them after those deals closed; (b) caused the use of later investor money to pay existing investor obligations arising out of the fraudulent transactions; (c) participated in an accounting fraud to conceal the Ponzi-like operation of DC Solar's transactions from victims and others; and (d) paid co-conspirators large sums to advance and conceal the conspiracy, including paying two co-conspirators over $1 million each for false contracts to deliver to investors.

1  Although they were co-conspirators, Jeff sometimes hid transactions related to the fraud from Paulette

2  and sometimes instructed individuals not to discuss certain aspects of the fraud with her.

3      Paulette Carpoff ("Paulette") was the owner and operator of Distribution, and the Chief

4  Operations Officer of DC Solar.  Paulette worked with Jeff to initiate and advance the conspiracy.

5  Paulette personally undertook and directed others to undertake acts intended to mislead investors about

6  material facts, to conceal those lies, and to lull victims of the fraud.  Among other things, Paulette: (a)

7  made and directed periodic, Ponzi-like transfers of new investor money to cover the debt obligations for

8  existing investors; (b) managed transfers from Solutions to certain third-party lessees to create the

9  appearance of legitimate lease agreements between those third party lessees and the investor in Fund 9;

10  caused a co-conspirator to make and deliver false Commissioning Reports that certified the existence of

11  some of the solar equipment the conspirators sold to investors but never built; and (c) concealed the

12  false nature of those Commissioning Reports and the true operation of DC Solar's Ponzi-like scheme

13  from investors and others.

14      Acts by Jeff and Paulette Carpoff, and acts by their co-conspirators, caused the execution of

15  dozens of interstate wire transfers of payments from victims of the fraud to accounts Jeff and Paulette

16  Carpoff controlled, totaling approximately $1 billion.  Jeff and Paulette Carpoff used that money to

17  support their lavish lifestyle during the nearly eight-year conspiracy.  Among other things, the Carpoffs

18  used proceeds of their fraud to purchase and invest in more than 150 luxury and collector vehicles,

19  luxury real estate in Lake Tahoe, Las Vegas, the Caribbean, Cabo San Lucas, Mexico, and elsewhere, a

20  suite at a professional football stadium, a subscription private jet service, and jewelry.  The Carpoffs

21  also used fraud proceeds to pay for a minor-league professional baseball team, a NASCAR racecar

22  sponsorship, a 2018 performance by an internationally known recording artist at a DC Solar holiday

23  party, and to make illicit payments to co-conspirators and others.  The Carpoffs not only made victims

24  of their corporate investor clients but also committed tax fraud based on tax benefits the Carpoff caused

25  those investors to pursue, knowing their fraudulent transactions did not support application of those

26  benefits.

27  ///

28  ///

**The Fraud Scheme**

**A.      DC Solar sells MSGs to generate profit and to trigger tax benefits.**

Directly and through subcontractors, DC Solar built mobile solar generators ("MSGs"), consisting primarily of solar panels placed on a wheeled-trailer. Distribution purported to lease those MSGs to third parties, including negotiating lease agreements and collecting payments. Jeff Carpoff and others acting at his direction touted the versatility of MSGs, and claimed there was a substantial market demand for MSGs.

DC Solar, through Jeff Carpoff, his co-conspirators, and others acting at their direction, solicited money from investors to purchase MSGs. A primary claim made to investors was that the purchase of MSGs carried favorable tax consequences, in addition to a small profit stream. The tax benefits included tax credits available for investment in alternative energy sources that permitted purchasers to claim tax credits of up to approximately 30% of the total investment, and permitted deductions for the depreciation of MSGs over a 5-year period. These tax benefits were significant. DC Solar structured transactions with investors to maximize the tax benefits. Among other deals, DC Solar sold MSGs to limited liability companies created specifically for such transactions. These companies were investment funds, sometimes called tax-equity funds, permitted under the federal tax code ("Funds").

**B.      Transaction financing structure and the materiality of promised lease revenue.**

Through the Funds, investors purchased MSGs from Solutions for $150,000 per MSG. Typically, investors paid approximately $45,000 per MSG in cash—approximately 30% of the overall unit price—and financed the balance with Solutions. The $45,000-per-unit price was the maximum amount of the tax credit investors could claim per unit. The transactions were structured so investors could immediately claim a dollar-for-dollar tax credit for the total they paid in cash to Solutions, per MSG. Investors could also claim depreciation for each MSG, for five years. To complete the transactions, the Funds delivered promissory notes to pay Solutions the remaining approximately 70% of the sales prices over time. DC Solar promised to pay off the investors' note obligations with revenues generated by the lease of MSGs by Distribution to third parties.

Pursuant to offers pitched to investors by Jeff Carpoff, his co-conspirators, and others acting at their direction, the Funds leased the MSGs purchased in each transaction to Distribution which, under the management of Paulette Carpoff, purported to lease the MSGs to third parties. Distribution was supposed to receive money from those third parties through lease payments. After deducting certain

1   fees, Distribution was to transfer the majority of the lease revenue to accounts for the Funds.  The

2   manager of the investment funds was to use the lease revenue sent by Distribution to pay the periodic

3   obligations on the notes held by Solutions, with a small profit paid to investors when applicable.[1]

4         The purported lease revenue from third parties was a material component of the transactions.

5   First, that projected lease revenue was a factor in valuing the MSGs at $150,000 per unit.  Second, the

6   lease revenue was the mechanism for the Funds to pay the remaining approximately 70% of the

7   purchase price for the MSGs.  Based on sales pitches by Jeff Carpoff, his co-conspirators, and others

8   acting at his direction, investors were primarily interested in the tax benefits offered through each

9   transaction and not actual ownership of the MSGs.  However, because the tax credits were capped at

10   30% of the value of the overall transaction, paying anything more than 30% of that value would

11   diminish the tax benefits—*i.e.*, the investors would pay more than the value of the tax credits.  By

12   paying off the 70% balance of the purchase price through revenue generated by leases Distribution

13   promised to generate from third parties, investors maximized the tax benefits without incurring more

14   debt or cost.  Failure of that mechanism after investors executed transactions would result in default on

15   the notes, collapse of the transactions, and failure of the tax credits.

16        **C.**    **Purportedly independent certification of the construction and operation of MSGs.**

17         Because DC Solar promised to lease MSGs associated with each transaction to third parties—

18   through Distribution—with little direct participation from the Funds or investors, the Funds and

19   investors did not take physical possession of those MSGs.  Rather, DC Solar represented to the Funds

20   and investors that it built MSGs for each transaction and those MSGs operated in a manner consistent

21   with regulations governing application of the tax credits the investors sought.  DC Solar made those

22   representations through written Commissioning Reports, purportedly prepared by an independent

23   engineer after a multi-point inspection of each MSG in each transaction.  Jeff Carpoff and Paulette

24   Carpoff, their co-conspirators, and others acting at their direction caused those Commissioning Reports

25   to include materially false information and to be delivered to investors.  In some instances, investors

26

27      [1] DC Solar also closed a variant of these tax-equity transactions that did not include financing through
Solutions.  Rather, in those sale-leaseback transactions, investors purchased MSGs outright, or relied on outside

28   financing.  In other material respects, the transactions mirrored the primary tax-equity transactions, including the
management of third-party lease contracts by Distribution, availability of post-transaction tax benefits, and a
profit stream.  Instead of using third-party lease revenue to pay a note obligation to Solutions, the purported
revenue was paid to the investor.

1  required completed Commissioning Reports as conditions for payment to support the transactions.  In

2  other instances, the conspirators caused delivery of the Commissioning Reports after payment to lull

3  investors to believe their MSGs existed and operated as required under the terms of the transactions.

4     **D.    Approximate investments and tax benefit totals associated with the transactions.**

5     Between March 2011 and December 18, 2019, at least twelve investors entered into transactions

6  with DC Solar through approximately thirty-four Funds.  Some investors invested through more than

7  one Fund.  The investors, through the Funds, collectively deposited by interstate wire transfer

8  approximately $759,400,000 into bank accounts for the Funds established for the transactions.  Further,

9  several financial institutions and other investors transferred collectively $152,700,000 to DC Solar as

10  part of related transactions for the purchase and lease of MSGs.  In total, DC Solar closed transactions

11  with Funds and others that contributed an aggregate of more than $912,000,000 to purchase MSGs.

12  Those transactions purportedly involved approximately 17,000 MSGs, at approximately $2.5 billion in

13  purported value.

14     Many investors have claimed tax credits and depreciation in connection with the transactions

15  premised on the revenue allegedly being earned by Distribution's leases of the MSGs to third parties.

16  The tax value of the tax credits and depreciation claimed by the Funds, up to and including the 2017 tax

17  year, is approximately $902,000,000.  This figure does not account for approximately $167,000,000 that

18  investors paid into tax equity transactions in 2018.

19     **E.    Operation of the "flip" deals that followed the tax equity transactions.**

20     The DC Solar structured nearly all of the tax-equity transaction so the investors owned 99% of

21  the associated Fund and the fund manager owned 1% of the Fund.  After five years, the ownership

22  structure flipped, with the fund manager owning 95% of the Fund and the investors owning 5%.  After

23  five years, investors had the option of selling their 5% ownership interest in the Fund to the fund

24  manager, and divesting their ownership interest in the MSGs.  This appealed to many investors because,

25  after five years, they could extract no further tax benefit from ownership of the MSGs.

26     At the end of a five-year term of a tax-equity transaction, DC Solar would arrange to sell certain

27  existing MSGs from those transactions to buyers in "flip" deals.  In one such transaction, Jeff Carpoff

28  and his co-conspirators, including Paulette Carpoff, and others acting at their direction, brokered a "flip"

deal with A Group and K Bank.  As part of that transaction, K Bank provided $27 million to A Group, a

1    private equity group, to finance the purchase of approximately 416 MSGs that were owned by two

2    Funds through earlier tax-equity transactions.  The $27 million from K Bank represented approximately

3    80% of the overall transaction.  A Group investors contributed the balance of the purchase price.  The

4    deal was completed through a special purpose entity called S-Sense.

5         Jeff Carpoff and his co-conspirators, including Paulette Carpoff, and others acting at their

6    direction, represented to A Group and K Bank that the 416 MSGs were leased to Telecom Company A

7    as part of an approximately 10-year fixed amount contract between Telecom Company A and

8    Distribution.  After the sale, S-Sense leased the MSGs back to Distribution to continue leasing them to

9    Telecom Company A as part of the purported existing contract between them.  Thereafter, DC Solar

10   assigned purported lease revenue generated by that lease with Telecom Company A to S-Sense as a

11   revenue and profit stream.

12        **F.      DC Solar's tax equity and other transactions were fraudulent.**

13        Jeff Carpoff, Paulette Carpoff, and their co-conspirators operated DC Solar as a Ponzi-like

14   scheme.  The conspirators knowingly misrepresented the existence of lease revenue from third parties—

15   an integral component in all of DC Solar's transactions—and caused others to unwittingly do so.  In

16   particular, the conspirators claimed Distribution generated tens of millions of dollars in lease revenue

17   from third parties, from long-term and short-term agreements with those third parties.  Over 90% of the

18   money Distribution claimed as lease revenue and which it used to pay the Funds' note obligations and

19   other payments to investors was actually derived from transfers of cash contributed to Solutions by later

20   investors in tax-equity and other transactions.  Solutions had nearly no other significant sources of

21   revenue.  Solutions was the primary source of income for Distribution, providing no less than

22   approximately 94% of all of the purported revenue Distribution claimed.  Thus, DC Solar merely paid

23   obligations due to older investors with money raised from those investors and later investors—contrary

24   to representations to investors made by Jeff Carpoff, Paulette Carpoff, their co-conspirators, and those

25   acting at their direction, that third-party lease revenue would pay those obligations.  Certain of

26   Distribution's existing third-party lease agreements were supported with separate side-agreements,

27   pursuant to which Solutions paid investor money to third parties, which the third parties returned in the

28   form of lease revenue.  These payments required approval by Paulette Carpoff.  Specifically, on or about

     July 21, 2015, and on or about November 2, 2015, Paulette Carpoff authorized and caused payments

1  from Solutions to KMHS, a third-party equipment rental company that purported to be leasing MSGs

2  sold to the investors in Fund 9.  Paulette Carpoff authorized and caused those and other similar

3  payments to create the appearance of a legitimate third-party lease supporting the Fund 9 tax equity

4  transactions when she knew there was no such legitimate lease.

5        The co-conspirators, including Jeff Carpoff and others acting at his direction, concealed the

6  absence of third-party lease revenue from investors through, among other means, false financial

7  statements they knowingly shared with investors.

8        **G.    The A Group/K Bank "flip" deal transaction was fraudulent.**

9        The A Group/K Bank "flip" deal was also a fraud.  Contrary to representation made by Jeff

10  Carpoff, his co-conspirators, and others acting at their direction, the purported "fixed-term lease"

11  between Telecom Company A and Distribution that supported the transaction was false.  Jeff Carpoff

12  paid two conspirators $1m each for the false contract.  In truth, certain as-needed leases with Telecom

13  Company A generated only a fraction of the millions in annual revenue Jeff Carpoff and his co-

14  conspirators claimed supported the A Group/K Bank deal.  The overwhelming majority of that purported

15  revenue derived from intercompany transfers of tax-equity investor money from Solutions to

16  Distribution.  In support of the transaction, and in furtherance of the fraud, Jeff Carpoff and his co-

17  conspirators knowingly caused a fraudulent estoppel agreement to be delivered to A Group/K Bank in

18  support of the transaction, which purported to assign lease revenue to A Group/K Bank, when that lease

19  agreement and the purported revenue associated with it did not exist.

20        **H.    The December 2018 searches and asset seizures, DC Solar's bankruptcy, and the**
            **MSG audit by investor-victims.**

21

22        In December 2018, law enforcement agents executed search warrants at DC Solar's headquarters

23  and elsewhere.  Agents also executed over 150 asset seizure warrants, resulting the seizure of

24  approximately $60,000,000 in personal property and liquid assets derived from the fraud.  During

25  execution of those warrants, agents recovered approximately $1.7 million in cash in Jeff Carpoff's office

26  safe and over $150,000 in cash in other locations throughout the office suite.

27        In February 2019, DC Solar entered Chapter 11 bankruptcy.  Thereafter, certain investor-victims

28  financed an independent audit of the existence and location of all MSGs DC Solar sold, based on

    information that DC Solar had not built the total number of MSGs it represented to investors were part

1  of the tax-equity and other transactions.  The audit confirmed the existence of approximately only 6,000

2  MSGs from the approximately 17,000 MSGs associated with sales to Funds in approximately thirty-four

3  tax-equity and other transactions.  Among others, none of the approximately 2,280 MSGs associated

4  with Fund 29, involving over $100,000,000 in cash paid by an investor in or about May 2017, were

5  located in the investor-victim audit.  Additionally, only approximately eighty-one of the 2,280 MSGs

6  associated with Fund 33, involving more than $90,000,000 in cash paid by the same investor in or about

7  July 2018, were located in the investor-victim audit.  Between November 30, 2016, and December 2018,

8  DC Solar closed tax equity transactions with investors in ten Funds, which paid more than $400 million

9  for approximately 9,155 MSGs.  The investor-victim audit recovered only 138 of those 9,155 MSGs.  In

10  spring 2018, Jeff Carpoff, in the presence of Paulette Carpoff, discussed with a co-conspirator an "exit

11  strategy" from the consequences of causing thousands of false Commissioning Reports to be delivered

12  to investors, including a plan to conceal the non-existent MSGs through buying them back and selling

13  the parts in false "paper" transactions.

14          **II.**   **Additional Specific Fast Supporting the Defendant's Guilty Plea**

15          **A.**   **The fraud conspiracy caused interstate wires transfers.**

16        Jeff Carpoff agrees that his conduct discussed herein, and that of his co-conspirators, caused

17  interstate wire communications in furtherance of the fraud scheme from investors and others, including

18  interstate Fedwire deposits of money from the investor-victim in the Fund 30 transaction, P Company,

19  based in Ohio, to bank accounts in California controlled by DC Solar.  Those interstate wire transactions

20  were reasonably foreseeable and include, among others, those set forth in the below table:

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

| Company Bank | Account No. | Date | Deposit Amount | Payor |
|---|---|---|---|---|
| H Bank | 5773XXX | 5/17/2017 | $15,063,692 | P Company |
| H Bank | 5773XXX | 7/20/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 8/24/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 8/29/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 9/25/2017 | $10,224,225 | P Company |
| H Bank | ending 2481 | 7/31/2017 | $14,744,692.31 | S-Sense related |
| H Bank | ending 2481 | 7/31/2017 | $3,753,307.69 | S-Sense related |
| H Bank | ending 2499 | 7/31/2017 | $12,638,307.69 | S-Sense related |
| H Bank | ending 2499 | 7/31/2017 | $3,201,692.31 | S-Sense related |

**B.    The conspiracy fueled countless monetary transactions in proceed of the fraud.**

Jeff Carpoff agrees that he knowingly engaged in and directed monetary transactions involving proceeds from the fraud conspiracy in amounts greater than $10,000, and that he knew that those transactions were, in fact, derived from the fraud conspiracy in which he participated. Those transactions also occurred in the United States. Those transactions include, among others, those set forth in the below table:

///
///
///
///
///
///
///
///
///
///
///

| Approximate Date | Description |
|---|---|
| January 23, 2017 | Deposit of a check (#298) for approximately $1,648,350 from an H Bank account ending in 3202, to support the purchase of luxury and collector vehicles at auction. |
| February 27, 2017 | Wire transfer of approximately $100,406.10 from an H Bank account ending in 2416, to support the purchase of a private jet travel. |
| May 15, 2017 | Deposit of a check (#315) for approximately $49,795 from an H Bank account ending in 2416, to support the purchase of jewelry. |
| June 16, 2017 | Wire transfer of approximately $3,572,979.47 from a CTB Bank account ending in 3430, to support the purchase of real property in Lake Tahoe, California. |
| August 7, 2017 | Wire transfer of approximately $500,000 from an H Bank account ending in 2416, to co-conspirator Ronald Roach. |
| August 7, 2017 | Wire transfer of approximately $500,000 from an H Bank account ending in 2416, to co-conspirator Individual 3. |
| August 11, 2017 | Wire transfer of approximately $350,000 from an H Bank account ending in 2416, to co-conspirator Individual 6. |
| August 22, 2017 | Wire transfer of approximately $350,000 from an H Bank account ending in 2416, to co-conspirator Ryan Guidry. |
| August 23, 2017 | Deposit of a check (#298) for approximately $135,508.88 from an H Bank account ending in 3202, to support the purchase of a 2018 Bentley Continental. |
| November 24, 2017 | Deposit of a check (#105) for approximately $1,000,000 from a JPM Bank account ending in 2373, to support the purchase of a 2007 Ford Shelby Super Snake. |
| December 20, 2017 | Wire transfer of approximately $522,598.07 from a CTB Bank account ending in 2542, to support the purchase of real property in Martinez, California. |
| June 8, 2018 | Wire transfer of approximately $939,208.48 from a CTB Bank account ending in 2732, to support the purchase of real property in Scottsdale, Arizona. |
| July 3, 2018 | Wire transfer of approximately $782,949, from a CTB Bank account ending in 1916, to support the purchase of a private suite at a professional football stadium. |
| August 31, 2018 | Wire transfer of approximately $1,056,562.12 from a CTB Bank account ending in 2542, to support the purchase of real property in Lafayette, California. |
| December 14, 2018 | Wire transfer of approximately $350,000 from a CTB Bank account ending in 1916, to pay an internationally known rapper to perform at a DC Solar holiday party. |

*I have read and carefully reviewed the Factual Basis for Plea with my attorney. I agree that as it concerns my conduct it is correct. I also agree that if this matter proceeded to trial, the United States could establish each of the facts contained within the Factual Basis for Plea beyond a reasonable doubt, and that those facts satisfy the elements of the offense to which I am pleading guilty.*

Dated: 1-22-20

JEFF CARPOFF
Defendant