Jeffrey L. Hartman, Esq.
Nevada Bar No. 1607
**HARTMAN & HARTMAN**
510 W. Plumb Lane, Suite B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818
notices@bankruptcyreno.com

Michael S. Budwick, Esq. #938777 - Admitted *Pro Hac Vice*
Solomon B. Genet, Esq. #617911- Admitted *Pro Hac Vice*
Gil Ben-Ezra, Esq. #118089 - Admitted *Pro Hac Vice*
Kevin C. Paule, Esq. #125276 - Admitted *Pro Hac Vice*
**MELAND BUDWICK, P.A.**
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
T: (305) 358-6363
F: (305) 358-1221
mbudwick@melandbudwick.com
sgenet@melandbudwick.com
gbenezra@melandbudwick.com
kpaule@melandbudwick.com

*Attorneys for Christina Lovato, Chapter 7 Trustee*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| In re | Lead Case No.: BK-19-50102-gs (Chapter 7) |
|---|---|
| DOUBLE JUMP, INC. | Substantively consolidated with: |
| Debtor. | |

| 19-50130-gs | DC Solar Solutions, Inc. |
| 19-50131-gs | DC Solar Distribution, Inc. |
| 19-50135-gs | DC Solar Freedom, Inc. |

**MOTION FOR ORDER (1) APPROVING COMPROMISE AND SETTLEMENT AGREEMENT WITH FALLBROOK SECURITIES CORPORATION AND FEI INVESTORS I, LLC AND (2) FOR AWARD OF CONTINGENCY FEE**

Hearing Date:   May 27, 2021
Hearing Time:  9:30 a.m.

Christina Lovato, the duly appointed and acting trustee ("*Trustee*") for the substantively consolidated chapter 7 estates of DC Solar Solutions, Inc. ("*Solutions*"), DC Solar Distribution, Inc. ("*Distribution*"), DC Solar Freedom, Inc. ("*Freedom*, and together with Solutions and Distribution, "*DC Solar*") and Double Jump, Inc. ("*DJ*," and together with DC Solar, the "*DC

1

*Solar Estate*") files her motion to approve a compromise and settlement with Fallbrook Securities Corporation ("*Fallbrook*") and FEI Investors I, LLC ("*FEI*, and with Fallbrook, the "*Fallbrook Parties*") pursuant to F.R.Bank.P. 9014 and 9019, and for payment of a contingency fee to special litigation counsel ("*Motion*"). The Motion is supported by the separately filed Declaration of Christina Lovato and is based upon the following discussion of facts and law. As permitted by F.R.Evid. 201, the Trustee also requests the Court take judicial notice of the papers on file in the DC Solar Estate.

## Factual Background

### A. Procedural Background

1. Prepetition, DC Solar was engaged in a business related to manufacturing, marketing, selling, and leasing mobile solar generators.

2. However, certain of DC Solar's insiders, including Jeff Carpoff and Paulette Carpoff ("*Carpoffs*"), were also perpetrating a Ponzi scheme ("*Carpoff Ponzi Scheme*").

3. On December 18, 2018, federal law enforcement raided DC Solar's business locations, effectively closing down DC Solar's operations.

4. In late January and early February 2019, the Debtors filed for chapter 11 relief before this Court, commencing these bankruptcy cases ("*Bankruptcy Cases*").

5. On March 22, 2019, this Court converted the Bankruptcy Cases to cases under chapter 7 and appointed the Trustee as chapter 7 trustee of the Debtors' estates.[1] The Bankruptcy Cases have been substantively consolidated.[2]

### B. Trustee's Claims Against the Fallbrook Parties

6. Within four years of the Petition Date, the Debtors transferred $3,555,575.00 to Fallbrook Securities ("*Fallbrook Transfers*").

7. Fallbrook is an investment bank / placement agent that assists entities in "tax equity" investments that reduce tax liability. Fallbrook worked with another entity to seek

---

[1] ECF Nos. 439 & 440.
[2] ECF No. 2613.

2

investors in the DC Solar tax equity transactions, was successful, and was paid by the Debtors (the Fallbrook Transfers) for bringing in those investors.

8. FEI was an investor that acquired certain MSGs in a DC Solar sponsored tax equity transaction. DC Solar paid FEI on a note per that transaction. DC Solar made a single payment of $25,740 within 90 days of the Petition Date ("**FEI Transfer**").

9. Fallbrook and FEI are affiliated.

10. The Trustee informally asserted avoidance claims against the Fallbrook Parties, including that (1) the Fallbrook Transfers were not in exchange for "value" or "reasonably equivalent value";[3] and (2) the FEI Transfer is avoidable as a preference.

11. The Parties (the Trustee, Fallbrook, and FEI) agreed to a judicial settlement conference before U.S. Bankruptcy Judge Zive and sought and obtained an Order from this Court directing and scheduling that conference.[4]

12. However, the Parties did not wait for the day of the settlement conference to begin settlement communications. As part of those communications, the Trustee requested, and Fallbrook confidentially provided, significant financial information regarding "collectability" of any resulting judgment. The Trustee relied on that information in her decision-making.

13. The Trustee also reviewed and considered numerous documents. These documents included those relating to: (1) the Transfers and the Fallbrook Parties; and (2) the Carpoff Ponzi Scheme more generally.

14. The Parties' informal settlement communications led to an agreement on the terms of a consensual resolution in the days prior to, and on the very day, that settlement conference briefs were due to Bankruptcy Judge Zive. The Parties immediately notified the applicable judicial personnel and sought an Order (which was entered) vacating the settlement conference.[5]

15. Subject to this Court's approval, the Trustee and the Fallbrook Parties have entered into an agreement on the terms of a settlement of claims and have executed the Stipulation of Settlement attached as **Exhibit 1** to the Trustee's Declaration ("**Settlement Agreement**").

---

[3] *See e.g., Hoffman v. Markowitz,* 746 F. App'x 641 (9th Cir. 2018).
[4] ECF Nos. 2504 & 2525.
[5] ECF Nos. 2649 & 2650.

3

16. The Trustee believes in her business judgment that the Settlement Agreement is in the best interests of the Debtors' Estate and should be approved.

## Settlement Terms

17. The key aspects of the Settlement Agreement, as more particularly described therein, are the following:

- Fallbrook shall pay the Trustee $275,000 ("**Settlement Payment**") within ten calendar days after the entry of a final non-appealable order approving this Settlement Agreement ("**Effective Date**").

- Fallbrook shall have an allowed unsecured claim against the DC Solar Estates ("**Fallbrook Claim**") in the amount of $275,000 pursuant to Sections 502(a) and 502(h) of the Bankruptcy Code.

- FEI shall have an allowed unsecured claim against the DC Solar Estates ("**FEI Claim**") in the amount of $119,500.83 pursuant to Sections 502(a) of the Bankruptcy Code.[6]

- Subject to and except for their obligations in this Settlement Agreement, the Trustee and the Fallbrook Parties shall each release and waive all claims against the other.

## Legal Discussion

18. F. R. Bank. P. 9019(a) provides in relevant part that "[o]n motion ... and after notice and a hearing, the court may approve a compromise or settlement."

19. In the Ninth Circuit, motions to approve a compromise and settlement agreement are reviewed under the four criteria set forth in In re A&C Properties, Inc., 784 F. 2d 1377, 1381 (9th Cir. 1986), cert. denied, 479 U.S. 854 (1986). Those criteria are: (1) likelihood of success on merits of the claims in the underlying litigation; (2) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (3) the difficulties, if any, to be

---

[6] This is the amount of FEI's cash-on-cash loss, per the Trustee's records. As reflected in the Settlement Agreement, FEI as a claim in excess of this amount which is disputed at this time and not resolved pursuant to this consensual resolution.

encountered in the matter of collection; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

20. Compromises are favored under the Bankruptcy Code, and approval of a compromise rests in the sound discretion of the Court. <u>Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc., v. Anderson</u>, 390 U.S. 414, 424 (1968). The bankruptcy court is afforded wide latitude in approving compromise agreements which it determines to be fair, reasonable, and adequate. <u>In re Woodson</u>, 839 F.2d 610 (9th Cir. 1988). The court need not conduct an exhaustive investigation into the claim sought to be compromised. <u>In re Walsh Construction, Inc.</u>, 699 F.2d 1325, 1328 (9th Cir. 1982).

21. The Trustee, in her informed business judgment, submits that approval of the Settlement Agreement is in the best interests of the Debtors' estates.

22. The Trustee notes that because Fallbrook and FEI are affiliated and have the same counsel, the Trustee communicated with them in a unified manner for efficiency purposes. And further, because the Trustee's claim against FEI is for a relatively small amount, and a far smaller dollar amount than her claim against Fallbrook, the Trustee's claims against Fallbrook were the driving force in her decision-making process.

**A. The Settlement Should Be Approved**

23. Based upon these principles, the Trustee submits that the Settlement Agreement falls well above the lowest point of the range of reasonableness and should be approved.

**Probability of Success in Litigation**

24. This consideration militates in favor of approval of the Settlement Agreement.

25. While the Trustee believes her potential claims are meritorious, all litigation presents risks. Here, among other potential defenses, Fallbrook could assert that value was given to the Debtors notwithstanding the <u>Hoffman</u> decision.

26. If this were proven to be true, Fallbrook would have a complete defense to the Trustee's claims given that, based on the Trustee's investigation, the Trustee does not challenge that Fallbrook received the Transfer in good faith.

27. The Trustee believes she has a strong preference claim against FEI, but again, all litigation has risks.

### Complexity of Litigation and Attendant Expense, Inconvenience and Delay

28. This consideration also militates in favor of approval of the Settlement Agreement.

29. While the Trustee's claims are typical claims litigated before this Court, and the Trustee's special counsel is compensated on a contingency-fee basis, the Trustee's claims would require probing of the intent of the Carpoffs – the Debtors' former insiders who have pled guilty to crimes – and thus the Debtors' estate would suffer the expense of prison-depositions (among other things). The Trustee may also require an expert witness in connection with proving her prima facie case, which would be a significant expense to the estate.

30. The Settlement Agreement addresses these concerns. The parties avoid litigating fact-specific claims with the associated expense and delay. Here, the DC Solar Estate gains meaningful benefit by resolving this matter pre-suit, without further risk, and before meaningful expenses are incurred.

### Collectability

31. Collectability is a significant factor militating in favor of approval of the Settlement Agreement.

32. The Trustee requested financial information from Fallbrook, received that information, requested additional information, and received that information (together, the "***Fallbrook Financial Information***").[7] The Trustee has relied on the Fallbrook Financial Information in agreeing to the Settlement Agreement.

33. The Fallbrook Financial Information revealed to the Trustee that Fallbrook does not have the financial wherewithal to pay a judgment in the amount of the Fallbrook Transfers. Furthermore, the Trustee's analysis was that much (if not all) of Fallbrook's assets would be utilized and dissipated through litigation defense costs.

---

[7] As noted above, the Fallbrook Financial Information is confidential.

34. The Trustee also considered the fact that Fallbrook is a defendant in other DC Solar-related litigation.[8] This too, places risk on the Trustee's ability to collect from Fallbrook and indicates non-revenue generating expenses which Fallbrook will suffer over time.

35. Thus, even if the Trustee prevailed on her claims, which she believes she would, there would be a meaningful risk of non-recovery even after the passage of time, delay, distraction, and expense to the Debtors' estate.

### Paramount Interest of Creditors

36. This is a significant consideration that militates in favor of approval of the Settlement Agreement.

37. The Settlement Agreement provides for a $275,000 payment, representing a small portion of the Transfers but a large portion of Fallbrook's ability to pay. This is a very good outcome when measured against the litigation risks, the costs and delay associated therewith, and the realistic ability of collection. Further, as a pre-suit resolution, the Trustee is monetizing her claim now and efficiently administering the estates for the benefit of creditors. The settlement also enables the Trustee and her counsel to focus on other substantial litigation claims against other third parties in these Bankruptcy Cases, which is a meaningful consideration given the Trustee expects litigation recoveries to provide the bulk of the recoveries to creditors.

38. For all the reasons discussed in this Motion, the Settlement Agreement favorably and immediately avoids litigation claims with meaningful risk. Thus, approval of the Settlement Agreement is in the paramount interest of creditors.

### Payment of Contingency Fee

39. Meland Budwick, P.A. ("*MB*"), as special litigation counsel, is to be compensated on a pure contingency fee basis of 25% of any recovery obtained.[9] The Trustee seeks allowance of, and authority to pay MB, a 25% contingency fee equal to $68,750 at the time the Trustee receives the Settlement Payment, without the need for further Court Order.

---

[8] *See e.g., Solar Eclipse Inv. Fund III, LLC et al. v. CohnReznick LLP et al.*, Case No. 19STCV45775 (Cal. Sup. Ct.) (defendants include Fallbrook and Fallbrook Credit Finance LLC).
[9] ECF Nos. 1490 and 1502.

40. Pursuant to 11 U.S.C. § 330(a), the bankruptcy court reviews the services the professional provided, and decides whether the requested compensation is reasonable. The Trustee submits that the requested contingency fee satisfies this standard.[10]

41. First, 25% is a materially lower percentage than often charged by commercial contingency counsel.[11] Second, the Court pre-approved the contingency fee arrangement one year ago after notice to all parties-in-interest.[12] Third, given the estate's limited assets when MB was retained, the contingency fee arrangement benefitted the estate by shifting material risk from the estate onto MB and ensures that MB's compensation is directly tied to performance and results achieved.[13] Fourth, MB has performed significant work (including formal and informal discovery) investigating and pursuing this and other claims in a high-quality and expeditious manner given the complexities of these cases and despite the limitations imposed by COVID-19.

42. Moreover, in a financial fraud case much of special counsel's investigatory function is to analyze the facts and circumstances related to a large number of potential targets to determine if claims do or do not exist. Here, counsel has invested substantial efforts and resources confirming the estate likely does not hold meritorious claims against many otherwise potential targets. Under the fee agreement, counsel receives no compensation for those efforts, even though they benefit the estate. The Trustee notes these efforts, for which counsel receives no compensation.

---

[10] Special counsel: (1) performed high-quality work; (2) addressed somewhat challenging factual and legal questions; (3) employed significant skill; (4) obtained a timely result; (5) performed its work efficiently; (6) drew upon a high level of capabilities and experience; and (7) was met with opposition by sophisticated counsel.

[11] See In re Private Asset Grp., Inc., 579 B.R. 534, 544-45 (Bankr. C.D. Cal. 2017); see also In re Pearlman, 2014 WL 1100223, *3 (Bankr. M.D. Fla. Mar. 20, 2014) ("Resting again on its independent judgment, the Court finds the 35% contingency fee to be reasonable and in line with similar non-bankruptcy rates.").

[12] See generally, In re Gurley, 379 B.R. 194, 201 (Bankr. M.D. Fla. 2007) (considering that the contingent fee arrangement was contemplated at the outset in determining a reasonable fee).

[13] Fann Contracting, Inc. v. Garman Turner Gordon LLP, 620 B.R. 141, 147 (D. Nev. 2020); see also, generally, In re Smart World Techs., LLC, 423 F.3d 166, 180 (2d Cir. 2005) ("Here, Smart World's counsel was retained on a contingency basis, meaning that Smart World's pursuit of its adversary claims would have subjected the bankruptcy estate to no risk, while allowing the estate to reap any potential award.").

**Conclusion**

43. Based upon the foregoing, the Trustee requests an order approving the Settlement Agreement as well as the contingency fee, and granting such other and further relief as this Court deems just and proper.

DATED: April 19, 2021.

**MELAND BUDWICK, P.A.**

/s/ *Michael S. Budwick*
Michael S. Budwick, Esq.
Solomon B. Genet, Esq.
Gil Ben-Ezra, Esq.
Kevin C. Paule, Esq.
(Each admitted *pro hac vice*)
Attorneys for Christina Lovato, Trustee

**HARTMAN & HARTMAN**

/s/ *Jeffrey L. Hartman*
Jeffrey L. Hartman, Esq.
Attorney for Christina Lovato, Trustee