Jeffrey L. Hartman, Esq.
Nevada Bar No. 1607
**HARTMAN & HARTMAN**
510 W. Plumb Lane, Suite B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818
notices@bankruptcyreno.com

Michael S. Budwick, Esq. #938777 – Admitted *Pro Hac Vice*
Solomon B. Genet, Esq. #617911 – Admitted *Pro Hac Vice*
Gil Ben-Ezra, Esq. #118089 – Admitted *Pro Hac Vice*
Kevin Paule, Esq. #125276 – Admitted *Pro Hac Vice*
**MELAND BUDWICK, P.A.**
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
T: (305) 358-6363
F: (305) 358-1221
mbudwick@melandbudwick.com
sgenet@melandbudwick.com
gbenezra@melandbudwick.com
kpaule@melandbudwick.com

Attorneys for Christina W. Lovato, Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>DOUBLE JUMP, INC.<br><br>Debtor.<br><br>—————————————<br>  X Affects DC Solar Solutions, Inc.<br>  X Affects DC Solar Distribution, Inc.<br>  X Affects DC Solar Freedom, Inc.<br>  X Affects Double Jump, Inc. | Lead Case No.: BK-19-50102-gs<br>(Chapter 7)<br><br>Substantively consolidated with:<br><br>19-50130-gs \| DC Solar Solutions, Inc.<br>19-50131-gs \| DC Solar Distribution, Inc.<br>19-50135-gs \| DC Solar Freedom, Inc.<br><br>**MOTION FOR ORDER APPROVING COMPROMISE AND SETTLEMENT AGREEMENT WITH HERITAGE BANK OF COMMERCE AND AWARD OF CONTINGENCY FEE**<br><br>**Hearing Date:  September 17, 2021**<br>**Hearing Time:  9:30 a.m.** |

Christina Lovato, the duly appointed and acting trustee ("***Trustee***") for the chapter 7 estates of DC Solar Solutions, Inc. ("***Solutions***"), DC Solar Distribution, Inc. ("***Distribution***"), DC Solar Freedom, Inc. ("***Freedom***," and together with Solutions and Distribution, "***DC Solar***") and Double Jump, Inc. ("***DJ***," and together with DC Solar, the "***DC Solar Estates***" or "***Debtors***") files this

motion to approve the compromise and settlement with Heritage Bank of Commerce ("**Heritage Bank**") pursuant to F.R.B.P. 9014 and 9019 ("**Motion**"). The Motion is supported by the separately filed Declaration of Christina Lovato. In addition, as permitted by F.R.E. 201, the Trustee requests that the Court take judicial notice of the court papers on file in these cases.

## I.    Background

### A.  General Background

1.    Prepetition, DC Solar was engaged in a business related to manufacturing, marketing, selling, and leasing mobile solar generators.

2.    However, certain of DC Solar's insiders, including Jeff Carpoff and Paulette Carpoff ("**Carpoffs**"), were also perpetrating a Ponzi scheme ("**Carpoff Ponzi Scheme**").[1]

3.    On December 18, 2018, federal law enforcement raided DC Solar's business locations ("**Raid**,") effectively closing down DC Solar's operations.

4.    In late January and early February 2019, the Debtors filed for chapter 11 relief before this Court, commencing these bankruptcy cases ("**Bankruptcy Cases**").

5.    On March 22, 2019, the Court converted the Bankruptcy Cases to cases under chapter 7 and appointed the Trustee as chapter 7 trustee of the Debtors' estates.[2] The Bankruptcy Cases have been substantively consolidated.[3]

### B.  The Trustee's Investigation

6.    Following her appointment, the Trustee engaged in a broad investigation including related to DC Solar's pre-petition activities and relationships with certain financial institutions. The Trustee has devoted significant resources to investigating DC Solar's pre-petition banking relationship with Heritage Bank.

7.    Beginning in January 2020, the Trustee served multiple Rule 2004 subpoenas on Heritage Bank,[4] followed by a series of meet-and-confers and other communications with Heritage

---

[1] *See generally, e.g., U.S.A. v. Carpoff*, Case No. 20-00017 (E.D.Ca.) [ECF No. 10]; Main Bankruptcy Case ECF No. 106-2.
[2] ECF Nos. 439-40.
[3] ECF No 2613.
[4] ECF Nos. 1597, 1943, 1947.

Bank. The Trustee has entered three protective orders governing the confidentiality of documents, including a category for "Attorney's Eyes Only."[5]

8.    Heritage Bank produced hundreds of thousands of pages of documents to the Trustee, in a rolling production. The Trustee reviewed and analyzed those documents. Heritage Bank designated nearly all (if not all) documents produced as confidential. The Trustee disagrees with certain of Heritage Bank's confidential designations and has prepared to litigate the validity of these designations if necessary.

9.    The Trustee also reviewed and analyzed other documents (millions of pages) related to the Carpoff Ponzi Scheme and Heritage Bank that she obtained informally and formally from parties other than Heritage Bank.

10.    After seeking and obtaining this Court's approval for the implementation of protocols to conduct Rule 2004 examinations remotely due to COVID-19,[6] the Trustee examined Heritage Bank through its former senior executive, Keith Wilton.[7] Thereafter, the Trustee examined another Heritage Bank senior executive.[8] Disagreements arose during the examinations regarding the scope and applicability of certain privileges. The Trustee has prepared to litigate the application of these privileges and to compel responses.

11.    The Trustee also reviewed and analyzed Heritage Bank's banking and account activity relating not only to DC Solar but also certain non-debtors that maintained accounts at Heritage Bank.

12.    The Trustee also informally interviewed multiple witnesses in connection with DC Solar's relationship with Heritage Bank.

13.    The Trustee has considered and evaluated the information from her investigation to assess potential claims she may assert against Heritage Bank. Given her role as an after-the-fact fiduciary, the Trustee's investigatory work was essential.

---

[5] ECF Nos. 1663, 2032, 2301.
[6] *See e.g.,* ECF Nos. 1734, 1795 & 1831.
[7] ECF No. 2069.
[8] ECF No. 2280.

### C.  Overview of Pertinent Portions of the Trustee's Investigation

14.     Given Heritage Bank's broad confidentiality designations, the Trustee is restricted in what she may detail publicly. Nevertheless, the Trustee presents the following non-confidential information to assist the Court and parties-in-interest in evaluating this Motion.

15.     Leading up to CY 2015, the Carpoffs primarily maintained their and their affiliates' depository relationships with First Republic Bank. Those relationships were briefly transitioned to Fremont Bank and then to Heritage Bank.

16.     From March 2015 through the third quarter of 2017, certain Carpoff-affiliated entities (including DC Solar) maintained depository and lending relationships with Heritage Bank. The Trustee asserts that the Carpoffs misused certain aspects of this relationship to perpetrate and further the Carpoff Ponzi Scheme.

17.     In connection with the various affiliated depository and lending relationships, certain former insiders of DC Solar communicated with Heritage Bank regarding DC Solar's purported business model.

18.     By not later than the summer of 2017, the Trustee believes that Heritage Bank identified certain "red flags" suggesting that the Carpoffs were engaged in wrongdoing. By August 2017, Heritage Bank terminated the depository relationship with the Carpoffs and their affiliated entities, resulting in the transition of that relationship to another bank.

19.     Further, based on the Trustee's investigation: (1) DC Solar had meaningful legitimate operations, and multiple employees (including those who held executive positions, served on the Board, held ownership interests, and had decision-making authority) who were innocent of wrongdoing; (2) Jeff Carpoff and other former DC Solar insider wrongdoers acted adversely to DC Solar when committing wrongdoing; (3) post-FBI raid in December 2018, new corporate governance – including a Chief Restructuring Officer – was instituted for DC Solar; and (4) the FBI raid was precipitated by a DC Solar senior executive who identified and reported Jeff Carpoff's wrongdoing to federal law enforcement.

### D.  The Trustee's Potential Claims, and the Mediation

20.    The Trustee informed Heritage Bank of her intent to assert certain potential tort claims against the bank, including negligence and aiding and abetting breach of fiduciary duty.

21.    The Trustee and Heritage Bank agreed to discuss whether a pre-suit consensual resolution was feasible. The parties agreed to a formal and confidential mediation facilitated by (retired) United States Bankruptcy Judge Randall Newsome.[9]

22.    Judge Newsome worked with the parties to implement procedures for the exchange of substantive mediation statements and other materials. Given that the Trustee had not yet sued Heritage Bank, to promote a meaningful mediation process, the Trustee set forth to Heritage Bank and Judge Newsome her view of the facts, applicable law, and the Trustee's potential claims. Heritage Bank disagrees with the Trustee's assertions and instead believes that it has solid defenses to each of the Trustee's potential claims.

23.    Over the course of several months, the parties undertook to persuasively communicate to one another and Judge Newsome the strengths and weaknesses of the claims and the risk of litigation. As a result, the parties and Judge Newsome engaged in a productive and meaningful dialogue detailing the Trustee's potential claims and Heritage Bank's potential defenses.

24.    The mediation session took place on May 11, 2021. While the parties did not reach a resolution that day, they agreed to keep the mediation open and continue to work with Judge Newsome in good faith.

25.    Two days later, on May 13, 2021, the parties agreed to the essential terms of a settlement and proceeded to work on the more fulsome documentation.

26.    Judge Newsome's experience, expertise, and assistance were essential to this outcome. The Trustee extends her appreciation to Judge Newsome for his time and efforts. The Trustee also extends her appreciation to Heritage Bank and its professionals for their efforts and professionalism throughout the mediation process.

---

[9] https://www.jamsadr.com/newsome/

### E.  The Settlement

27.    Subject to this Court's approval, the Trustee and Heritage Bank have reached an agreement as set forth in the Stipulation of Settlement attached to Trustee Lovato's supporting declaration as **Exhibit 1** ("*Settlement Agreement*"). The Trustee believes that the Settlement Agreement is in the best interests of the Debtors' estate and should be approved.

28.    The key aspects of the Settlement Agreement, as more particularly described in the Settlement Agreement, include the following:

- Heritage Bank will pay the Trustee $9,000,000 within ten days of the Effective Date.

- Heritage Bank broadly releases all claims against the Trustee, the Debtors and the Debtors' estate.

- The Trustee broadly releases all claims against Heritage Bank, and its current and former employees, officers, and directors, including the Estate's direct and derivative claims.

- The Trustee will neither encourage any party to commence, nor cooperate with any party that has commenced, litigation against Heritage Bank.

### II.    Law and Argument

29.    F.R.B.P. 9019(a) provides in relevant part that "[o]n motion ... and after notice and a hearing, the court may approve a compromise or settlement."

30.    In the Ninth Circuit, motions to approve a compromise and settlement agreement are reviewed under the four criteria set forth in *In re A&C Properties, Inc.*, 784 F. 2d 1377, 1381 (9th Cir. 1986), cert. denied, 479 U.S. 854 (1986). Those criteria are: (1) likelihood of success on merits of the claims in the underlying litigation; (2) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (3) the difficulties, if any, to be encountered in the matter of collection; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

31.    Compromises are favored under the Bankruptcy Code, and approval of a compromise rests in the sound discretion of the Court.[10] The bankruptcy court is afforded wide latitude in approving compromise agreements which it determines to be fair, reasonable, and

---

[10] *Prot. Committee for Ind. Stockholders v. Anderson*, 390 U.S. 414, 424 (1968).

adequate.[11] The court need not conduct an exhaustive investigation into the claim sought to be compromised.[12]

32.     The Trustee, in her informed business judgment, submits that approval of the Settlement Agreement is in the best interests of the Debtors' estate.[13]

**A.  The Settlement Should Be Approved**

33.     Based upon these principles, the Trustee submits that the Settlement Agreement falls well above the lowest point of the range of reasonableness and should be approved.

**Probability of success in litigation**

34.     This is a significant consideration that militates in favor of approval of the Settlement Agreement.

35.     While the Trustee believes her potential claims are meritorious, complex tort litigation of this nature inherently present material risk. Here, Heritage Bank is expected to argue that: (1) Heritage Bank has no duty to investigate or police its depositors' accounts for wrongdoing; (2) Heritage Bank did not have actual knowledge of the Carpoffs' or any other party's wrongdoing; (3) Heritage Bank timely and appropriately terminated the Carpoffs' banking relationship; and (4) the Trustee's claims are barred by the application of the *in pari delicto* equitable defense.[14]

36.     The Trustee can respond substantively to each of these items, although much is subject to the mediation privilege and confidentiality restrictions.

37.     But as to the final point, the Trustee's position is that the defense of unclean hands, under California law, is inapplicable for a series of reasons. For example, an explicit requirement for application of the California version of the defense is that the defendant must have suffered

---

[11] *In re Woodson*, 839 F.2d 610 (9th Cir. 1988).

[12] *In re Walsh Construction, Inc.*, 699 F.2d 1325, 1328 (9th Cir. 1982).

[13] *See In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) ("Although a court may not substitute the debtor's judgment for its own and instead must undertake its own, independent, reasoned analysis of the claims at issue, a court may nonetheless take into account the debtor's business judgment in recommending a settlement as well as the opinions of the debtor and the parties to the settlement.") (citing cases, citation removed).

[14] *See In re Delano Retail Partners, LLC*, 2014 WL 4966476, *5 (Bankr. E.D. Cal. Sept. 29, 2014) ("California law treats the in pari delicto doctrine as part of the doctrine of 'unclean hands.'").

injury by the wrongful conduct.[15] Here, that element is lacking. And the Court's substantial discretion as to whether to apply the defense under California law is directed, in material part, by matters of public policy[16] which militate against the defense's application to the Trustee.[17] Simply, this Court should not apply an equitable defense inequitably. Moreover, while the Trustee stands in the shoes of the debtor "*as of the commencement of the case*" under 11 U.S.C. §541, by that time, the Debtor's new management had ousted former management and assumed control; thus, the Trustee is freed from the sting of the former insiders' wrongdoing for purposes of the defense.[18] And even before the removal of the Carpoffs, the Raid – which resulted in the collapse of the Carpoff Ponzi Scheme – was precipitated by the actions of a DC Solar senior executive who learned of wrongdoing and contacted law enforcement as a whistleblower, stopping the Carpoffs' wrongdoing. For these and other reasons, the Trustee believes that the defense of "unclean hands" is inapplicable.

---

[15] *See e.g.,* 2 Cal. Affirmative Def. § 45:3 (2d ed.) ("[T]he party seeking to invoke the unclean hands doctrine must have been injured by the alleged wrongful conduct. A defendant who has profited from the wrongful conduct cannot invoke the maxim.") (emphasis added); *Fairbairn v. Fid. Investments Charitable Gift Fund*, 2020 WL 999752, *5 (N.D. Cal. Mar. 2, 2020).

[16] *Musnicki v. Janasi*, 2010 WL 367526, *4 (Cal. Ct. App. 2010) ("It is well settled that public policy may favor the nonapplication of the [unclean hands] doctrine as well as its application. Whenever an inequitable result would be accomplished by the application of the 'clean hands' doctrine the courts have not hesitated to reject it.") (citations omitted).

[17] *See e.g., FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir.1995) ("While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law."); *Mosier v. Stonefield Josephson, Inc.*, 2011 WL 5075551, *6 (C.D. Cal. Oct. 25, 2011) ("The Court finds persuasive the Receiver's assertion that allowing Stonefield to invoke the defense of [IPD/unclean hands] would frustrate the Court's plan by "diminishing the value of the asset pool held," thereby hurting innocent third-party creditors, while benefitting alleged an alleged wrongdoer."); *In re Agribiotech, Inc.*, 2005 WL 4122738, *8 (D. Nev. Apr. 1, 2005) ("The reasons for applying the equitable defenses in this case no longer exist, with the effect that an equitable defense may allow a wrongdoer to escape at the expense of innocent creditors.").

[18] *See e.g., Glob. Money Mgmt., L.P. v. McDonnold*, 2008 WL 11337623, *9 (S.D. Cal. Feb. 27, 2008); *In re Palm Beach Fin. Partners*, 588 B.R. 633, 647 (Bankr. S.D. Fla. 2018) (rejecting the *in pari delicto* defense, reasoning that removal of pre-petition wrongdoing debtor-management "had the same effect as appointment of the receiver"); *see also O'Melveny*, 61 F.3d at 19.

38.     Heritage Bank does not agree with the Trustee's factual assertions or her legal assessment.

39.     The Trustee acknowledges there is material litigation risk as to the balance of the defenses expected to be raised by Heritage Bank at summary judgment or at trial.

**<u>Complexity of litigation and attendant expense, inconvenience and delay</u>**

40.     This is a significant consideration that militates in favor of approval of the Settlement Agreement.

41.     Litigation against Heritage Bank would be legally and factually complex. The Trustee analyzed a significant amount of decisional law addressing claims against financial institutions in connection with Ponzi and other fraudulent schemes, focusing on California law. Naturally, every fact-situation is different and requires independent analysis and application of unique facts.

42.     Here, the Trustee would seek to plead and prove the breadth of the banking relationship between Heritage Bank and the Carpoffs (and their affiliates) and Heritage Bank's actions and inactions in connection with those relationships. Further, given the mechanics of the Carpoff Ponzi Scheme, the Trustee would perform an extensive forensic analysis of the account activity, to seek to demonstrate Heritage Bank's knowledge and involvement. Further, the Trustee would have to plead and then prove the specific knowledge of the different Heritage Bank agents for certain of her potential claims. Moreover, the Trustee would have to plead and prove the facts supporting DC Solar's damages and (for certain claims) a causal nexus between the wrongdoing and the damages.

43.     There would also be contested and complex legal items. Besides discovery issues, such as the scope and breadth of the SAR (suspicious activity report) privilege which the Trustee expects would be heavily contested and among the most important items for the Trustee to develop the evidence, the Trustee's prosecution of her potential claims would require (for example) a deep analysis into a bank's responsibility to its customer (as opposed to a non-customer). The Trustee's position is that decisional law treats these situations distinctly.

44.     Further, the settlement eliminates significant expense, inconvenience, and delay.

45.     As to "expense," while the Trustee's special counsel is compensated on a contingency fee basis, prosecution of the Trustee's potential claims against Heritage Bank would require (at least) two expert consultants / witnesses, who would (among other things) review, consider, and potentially opine on matters related to: (1) banking standards and practice; (2) the account activity at Heritage Bank; (3) the Carpoff Ponzi Scheme; and (4) DC Solar's damages. Further, the Trustee's forensic accountants (paid on an hourly basis) performed significant work assisting the Trustee in understanding banking activity and transactions to aid in evaluating her potential claims, and that would continue and intensify if the Trustee commenced litigation. And the Trustee's general counsel (paid on an hourly basis) is a key part of the team, and his fees would continue post-commencement of litigation.

46.     Heritage Bank would certainly retain its own expert(s), possibly requiring the Trustee to provide a rebuttal expert(s). A litigation of this magnitude would require many depositions and associated travel costs (including for depositions taken in prisons where Zoom or telephonic appearances are typically prohibited). A jury trial would involve significant expense, including for jury consultants.

47.     As a result, the potential expenses to the Estate would be quite substantial. The settlement benefits the estate by avoiding those expenses.

48.     "Inconvenience and delay" are also significant concerns, and approval of the Settlement Agreement addresses these items in a manner favorable to the Estate. For instance, trial might not occur for more than two (or more) years given the complexity of the issues, the number of fact-witnesses and their locations, expert witnesses, confidentiality and privilege disputes, scope of fact discovery (*e.g.,* SAR issues) and dispositive motion practice. And should a jury trial take place, absent consent, that would occur before the U.S. District Court, potentially adding to delays and inconvenience.

49.     The Settlement Agreement addresses these concerns and provides a significant immediate financial benefit to the Estate. The Trustee submits that a pre-suit $9,000,000 recovery is an outstanding result for the estate and creditors.

**Collectability**

50.     Collectability does not appear to be an issue with respect to Heritage Bank.

**Paramount interest of creditors**

51.     This is a significant consideration that militates in favor of approval of the Settlement Agreement.

52.     The Settlement Agreement provides a $9,000,000 payment to the Debtors' estate, representing a significant recovery, eliminating the risks and delays that accompany litigation against a financial institution based on tort claims in connection with a Ponzi scheme.

53.     The Trustee submits that this is an excellent outcome when measured against potential defenses and litigation risks, as well as the associated costs. As a pre-suit resolution, the Trustee is efficiently administering the estates for the benefit of creditors. The settlement enables the Trustee and her professionals to turn to other substantial litigation claims against other third parties in these bankruptcy cases, which is a meaningful consideration given the Trustee expects litigation recoveries to provide the bulk of the recoveries to creditors. This will also enable the Trustee to minimize the ultimate timeline necessary to complete the administration of these consolidated cases.

54.     Furthermore, that the parties' settlement was reached with the able assistance of Judge Newsome as the mediator / facilitator via an arms-length process, evinces the fairness of the proposed settlement.[19]

55.     For all the reasons discussed in this motion, approval of the Settlement Agreement is in the paramount interest of creditors.

---

[19] *See In re Trib. Co.*, 464 B.R. 126, 155 (Bankr. D. Del.), on rec'd in part, 464 B.R. 208 (Bankr. D. Del. 2011), aff'd sub nom. 587 B.R. 606 (D. Del. 2018), aff'd sub nom. 972 F.3d 228 (3d Cir. 2020), and aff'd in part sub nom. 587 B.R. 606 (D. Del. 2018), and aff'd sub nom. 972 F.3d 228 (3d Cir. 2020) ("[I]n assessing the fairness of proposed settlement, a court may consider the extent that the settlement is truly the product of arms-length bargaining …"); *see also Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, *6 (S.D.N.Y. Dec. 18, 2019) ("The active involvement of experienced and independent mediators in the negotiation of the Settlement is strong evidence of the absence of any collusion and further supports the presumption of fairness.").

### III.    Payment of Contingency Fee

56.    Meland Budwick, P.A. ("**MB**"), as special litigation counsel, is to be compensated on a pure contingency fee basis of 25% of any recovery obtained.[20] Here, based on this settlement agreement and accompanying recovery by the Debtors' estate, the amount is equal to $2,250,000 ("**Contingency Fee**").

57.    Since MB's retention in December 2019, the firm has been reimbursed for certain out-of-pocket costs and has received a 25% contingency fee on certain matters that have been consensually resolved and approved by the Court once the applicable settlement payment was made.[21] The Trustee seeks allowance of and authority to pay MB the Contingency Fee, at the time the Trustee receives the settlement payment and without further Court Order.

58.    Pursuant to 11 U.S.C. § 330(a), the bankruptcy court reviews the services the professional provided, and decides whether the requested compensation is reasonable. The Trustee submits that the requested Contingency Fee satisfies this standard.[22]

59.    First, 25% is a materially lower percentage than often charged by commercial contingency counsel.[23] Second, the Court pre-approved the contingency fee arrangement after notice to all parties in interest. Third, given the limited assets of the estates when MB was retained, the contingency fee arrangement benefitted the estates by shifting material risk from the estates onto MB which immediately invested enormous resources investigating and pursuing claims for

---

[20] ECF Nos. 1490 and 1502.

[21] *See generally,* docket.

[22] MB: (1) performed high-quality work; (2) addressed challenging factual and legal questions, including in the investigation-phase; (3) employed significant skill, which was required; (4) obtained an excellent and timely result; (5) performed its work efficiently; (6) drew upon a high level of capabilities and experience; and (7) was met with significant opposition by sophisticated counsel.

[23] *See In re Private Asset Grp., Inc.*, 579 B.R. 534, 544-45 (Bankr. C.D. Cal. 2017) ("Outside of bankruptcy, contingency fees are often 33 percent or, if there is an appeal, 40 percent."); *In re Pearlman*, 2014 WL 1100223, *3 (Bankr. M.D. Fla. Mar. 20, 2014) ("Resting again on its independent judgment, the Court finds the 35% contingency fee to be reasonable and in line with similar non-bankruptcy rates.").

the Estate's benefit.[24] Fourth, the contingency fee arrangement ensures that MB's compensation is merit-based and directly tied to performance and results. Fifth, the contingency fee arrangement applies to an array of Estate claims, and uniform application is in accord with that agreement. Sixth, MB has performed significant work (including formal and informal discovery) investigating and pursuing this and other claims in a high-quality and expeditious manner given the complexities of this Bankruptcy Case and despite the challenges imposed by COVID-19.

60.    Significantly, MB was charged with considering and investigating claims against hundreds of potential targets. MB invested substantial resources to vet claims against potential targets, ultimately recommending to the Trustee which claims are meritorious and which should not be brought. As a result, MB's efforts included determining the Trustee does not hold claims against those potential targets. The contingency fee agreement does not provide for MB to be compensated for these significant efforts that benefitted the Estate. Rather, these efforts are part of the basket of services MB provides to the Trustee and the Estate.

61.    Finally, MB has provided services to assist in administrative aspects of these cases, including the pursuit of substantive consolidation, review of certain significant claims, and matters related to MSG sales. MB did not seek any compensation for that work, which was substantial and benefitted the estate.

### V. Conclusion

62.    Based upon the foregoing, the Trustee requests an order approving the Settlement Agreement and Contingency Fee and granting such other and further relief as this Court deems just and proper.

DATED: July 21, 2021.                    **MELAND BUDWICK, P.A.**

*/s/ Michael S. Budwick*
Michael S. Budwick, Esq.
Attorneys for Christina Lovato, Trustee

---

[24] *Fann Contracting, Inc. v. Garman Turner Gordon LLP*, 620 B.R. 141, 147 (D. Nev. 2020); *see also, generally, In re Smart World Techs.*, LLC, 423 F.3d 166, 180 (2d Cir. 2005) ("Here, Smart World's counsel was retained on a contingency basis, meaning that Smart World's pursuit of its adversary claims would have subjected the bankruptcy estate to no risk, while allowing the estate to reap any potential award.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HARTMAN & HARTMAN**

*/s/ Jeffrey L. Hartman*
Jeffrey L. Hartman, Esq.
Attorneys for Christina Lovato, Trustee