Jeffrey L. Hartman, Esq.
Nevada Bar No. 1607
**HARTMAN & HARTMAN**
510 W. Plumb Lane, Suite B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818
notices@bankruptcyreno.com

Michael S. Budwick, Esq. #938777 – Admitted *Pro Hac Vice*
Solomon B. Genet, Esq. #617911 – Admitted *Pro Hac Vice*
Gil Ben-Ezra, Esq. #118089 – Admitted *Pro Hac Vice*
Kevin Paule, Esq. #125276 – Admitted *Pro Hac Vice*
**MELAND BUDWICK, P.A.**
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
T: (305) 358-6363
F: (305) 358-1221
mbudwick@melandbudwick.com
sgenet@melandbudwick.com
gbenezra@melandbudwick.com
kpaule@melandbudwick.com

Attorneys for Christina W. Lovato, Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>DOUBLE JUMP, INC.<br><br>Debtor.<br><br>__X__ Affects DC Solar Solutions, Inc.<br>__X__ Affects DC Solar Distribution, Inc.<br>__X__ Affects DC Solar Freedom, Inc.<br>__X__ Affects Double Jump, Inc. | Lead Case No.: BK-19-50102-gs<br>(Chapter 7)<br><br>Substantively Consolidated with:<br><br>\| 19-50130-gs \| DC Solar Solutions, Inc. \|<br>\| 19-50131-gs \| DC Solar Distribution, Inc. \|<br>\| 19-50135-gs \| DC Solar Freedom, Inc. \|<br><br>**MOTION FOR ORDER APPROVING COMPROMISE AND SETTLEMENT AGREEMENT WITH SOLAR ECLIPSE FUND IX, LLC AND FOR AWARD OF CONTINGENCY FEE**<br><br>**Hearing Date: September 17, 2021**<br>**Hearing Time: 9:30 a.m.** |

Christina Lovato, the duly appointed and acting trustee ("*Trustee*") for the chapter 7 estates of DC Solar Solutions, Inc. ("*Solutions*"), DC Solar Distribution, Inc. ("*Distribution*"), DC Solar Freedom, Inc. ("*Freedom*, and together with Solutions and Distribution, "*DC Solar*") and Double Jump, Inc. ("*DJ*," and together with DC Solar, the "*DC Solar Estate*" or "*Debtors*") files this motion to approve the compromise and settlement with Solar Eclipse Fund IX, LLC ("*Fund IX*")

1

pursuant to F.R.B.P. 9014 and 9019 and payment of a contingency fee to special litigation counsel ("***Motion***"). The Motion is supported by the separately filed Declaration of Christina Lovato and is based upon the following discussion of facts and law.

### I. Factual Background

**A. Procedural Background**

1. Prepetition, DC Solar was engaged in a business related to manufacturing, marketing, selling, and leasing mobile solar generators.

2. However, certain of DC Solar's insiders, including Jeff Carpoff and Paulette Carpoff ("***Carpoffs***"), were also perpetrating a Ponzi scheme ("***Carpoff Ponzi Scheme***"). The Carpoff Ponzi Scheme is generally described in certain court papers filed in this Bankruptcy Case and in other federal courts.[1]

3. On December 18, 2018, federal law enforcement raided DC Solar's business locations, effectively closing down DC Solar's operations.

4. In late January and early February 2019, the Debtors filed for chapter 11 relief before this Court, commencing these bankruptcy cases ("***Bankruptcy Cases***").

5. On March 22, 2019, this Court converted the Bankruptcy Cases to cases under chapter 7 and appointed the Trustee as chapter 7 trustee of the Debtors' estates.[2] The Bankruptcy Cases have been substantively consolidated.[3]

**B. The Trustee's Potential Claims and the Parties' Settlement Communications**

6. Fund IX purchased 619 MSGs from Solutions. However, unlike nearly every other fund/buyer of MSGs from Solutions, Fund IX did not contemporaneously lease those MSGs to Distribution. Rather, Fund IX leased those 619 MSGs directly to KMH Systems, Inc. ("***KMH***")[4] and Ahern Rentals, Inc. ("***Ahern***").

---

[1] See e.g., Main Bankruptcy Case ECF Nos. 106-2 & 2613; *see also, e.g., U.S.A. v. Carpoff*, 20-00017 (E.D.Ca.) [ECF No. 10].
[2] ECF Nos. 439 & 440.
[3] ECF No. 2613.
[4] Post-petition, KMH was placed into receivership. *See* Case No. 20-00740 (N.D.Ill.).

2

7. The Trustee asserts that DC Solar made millions of dollars in transfers to KMH and Ahern, and then each of those two entities made millions of dollars in transfers to Fund IX. DC Solar never made a transfer directly to Fund IX.

8. On February 13, 2020, Fund IX and Solar Eclipse Fund Holding IX, LLC filed proofs of claim in each of the Debtors' bankruptcy case (collectively, the "**DC Solar Proofs of Claim**").[5] The DC Solar Proofs of Claim assert various claims against DC Solar, including in respect of Fund IX's purchase of the 619 MSGs and certain agreements between Fund IX and DC Solar.

9. The Trustee has investigated the relationship between DC Solar and Fund IX, in connection with the Carpoff Ponzi Scheme, including through bank records and other documents and witness interviews and testimony.

10. The Trustee investigated whether she had claims against Fund IX sounding in avoidance. The Trustee and Fund IX disagreed as to their competing rights in the 619 MSGs purchased by Fund IX from Solutions.

11. The Trustee and Fund IX agreed to engage in settlement discussions. In part due to timing and expense, the parties proceeded without a mediator but agreed to a fixed process for the exchange of information and positions. The parties also agreed to a tolling agreement ("**Tolling Agreement**") in respect of the Trustee's Potential Claims (as defined in the parties' Tolling Agreement).

12. For months, the parties communicated (confidential under F.R.E. 408 and otherwise by agreement) regarding their substantive positions and agreed to several extensions of the Tolling Agreement.

---

[5] Fund IX's proofs of claim include Claim Nos. 92-1 (Solutions), 29-1 (Double Jump), 44-1 (Distribution), 11-1 (Freedom). Solar Eclipse Fund Holding IX, LLC's proofs of claim include Claim Nos. 89-1 (Solutions), 27-1 (Double Jump), 43-1 (Distribution), and 10-1 (Freedom). Nothing herein affects the proofs of claim Fund IX or Solar Eclipse Fund Holding IX, LLC filed in the Debtors' Real Estate Cases. The Real Estate Debtors include: 140 Mason Circle, LLC, 475 Channel Road, LLC, Brandy Boy Properties LLC, Dog Blue Properties LLC, Dora Dog Properties LLC, and Park Road LLC.

13. Following these settlement negotiations, subject to this Court's approval and without any admission of liability by either party, the Trustee and Fund IX have reached agreement on the terms of a settlement of their claims against each other and have executed the Stipulation of Settlement ("**Settlement Agreement**"). The Settlement Agreement is attached as **Exhibit 1** to the Trustee's Declaration in support of this Motion.

14. The Trustee, in her informed business judgment, submits that approval of the Settlement Agreement is in the best interests of the Debtors' estate.[6]

## II. Settlement Terms

15. The key aspects of the Settlement Agreement, as more particularly described therein, are the following:

- The proceeds from the sale of the Fund IX MSGs,[7] as reflected in the Second Amended Report of Sale **[ECF No. 2520]**, shall be allocated as follows: $496,404.94 to Fund IX and $212,744.98 to the Trustee. Of the $496,404.94:

  o The Trustee shall pay Fund IX $421,944.20.
  o The Trustee shall withhold $74,460.74.

- Fund IX's ownership of the Remaining Fund IX MSGs shall be unencumbered by the Trustee, and the Trustee is entitled to 20% of the net amount from any future sale of these MSGs by Fund IX.

- Fund IX shall have allowed claims (1) in the amount of $36,603,202.13, representing its cash-on-cash loss, and (2) in the amount of $74,460.74 per section 502(h) of the Bankruptcy Code.

- Subject to and except for their obligations in this Settlement Agreement, the Trustee and the Fund IX shall each release and waive all claims against the other as well as certain released parties.

---

[6] *See In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) ("Although a court may not substitute the debtor's judgment for its own and instead must undertake its own, independent, reasoned analysis of the claims at issue, a court may nonetheless take into account the debtor's business judgment in recommending a settlement as well as the opinions of the debtor and the parties to the settlement.") (citing cases, citation removed).

[7] Defined terms not defined in the Motion have the definitions as in the Settlement Agreement.

### III. Legal Discussion

16. Fed. R. Bank. P. 9019(a) provides in relevant part that "[o]n motion ... and after notice and a hearing, the court may approve a compromise or settlement."

17. In the Ninth Circuit, motions to approve a compromise and settlement agreement are reviewed under the four criteria set forth in In re A&C Properties, Inc., 784 F. 2d 1377, 1381 (9th Cir. 1986), cert. denied, 479 U.S. 854 (1986). Those criteria are: (1) likelihood of success on merits of the claims in the underlying litigation; (2) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (3) the difficulties, if any, to be encountered in the matter of collection; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

18. Compromises are favored under the Bankruptcy Code, and approval of a compromise rests in the sound discretion of the Court.[8] The bankruptcy court is afforded wide latitude in approving compromise agreements which it determines to be fair, reasonable, and adequate.[9] The court need not conduct an exhaustive investigation into the claim sought to be compromised.[10]

19. The Trustee, in her informed business judgment, submits that approval of the Settlement Agreement is in the best interests of the Debtors' estates.[11]

**A. The Settlement Should Be Approved**

20. Based upon these principles, the Trustee submits that the Settlement Agreement falls well above the lowest point of the range of reasonableness and should be approved.

---

[8] *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc., v. Anderson*, 390 U.S. 414, 424 (1968).
[9] *In re Woodson*, 839 F.2d 610 (9th Cir. 1988).
[10] *In re Walsh Construction, Inc.*, 699 F.2d 1325, 1328 (9th Cir. 1982).
[11] *See In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) ("Although a court may not substitute the debtor's judgment for its own and instead must undertake its own, independent, reasoned analysis of the claims at issue, a court may nonetheless take into account the debtor's business judgment in recommending a settlement as well as the opinions of the debtor and the parties to the settlement.") (citing cases, citation removed).

**Probability of success in litigation**[12]

21.   This is a significant consideration that militates in favor of approval of the Settlement Agreement.

22.   While the Trustee believes her potential avoidance claims have merit, all litigation presents risk. As an example of that risk here, the Trustee's potential claims face the fundamental hurdle that no Debtor entity made a transfer directly to Fund IX. Thus, Fund IX asserts that, to the extent the Trustee has any viable claims under Section 548 of the Bankruptcy Code, Fund IX would be entitled to the defenses under Section 550(b) of the Bankruptcy Code as a "subsequent transferee." The Trustee faces significant risk on this issue, based on her investigation and the structure of the transactions, as well as the money-flow.  And flowing from this issue, the Trustee has material risk on whether she can avoid and recover the transfers from Fund IX.  Indeed, Fund IX could credibly assert that its diligence, including in requiring a direct connection with the end-user (not through Distribution), evinces its good faith.

23.   If Fund IX established its good faith (whether the Trustee or Fund IX had the burden), because Fund IX provided "value" to the Debtor in exchange for the transfers, Fund IX would arguably have a complete defense to the Trustee's avoidance claims.

24.   As to the MSG allocation, the Trustee's position (that the Debtors' estate has a security interest in the MSGs) also has risk.  For example, Fund IX could challenge the Trustee's rights to assert the Debtors' security interest in the MSGs because Jeff Carpoff did perpetrate a Ponzi scheme.

25.   The terms of the consensual resolution before the Court provides an agreed-to allocation and payment allocated to avoidance which is well within the range of reasonableness given the risks involved.

---

[12] For the avoidance of doubt, nothing in the Settlement Agreement or this Motion constitutes an admission by either the Trustee or Fund IX with respect to the claims asserted against each party, as to which all rights are reserved pending the Court's entry of an order approving the Settlement Agreement and the parties' performance thereunder.

**Complexity of litigation and attendant expense, inconvenience and delay**

26. This is a significant consideration that also militates in favor of approval of the Settlement Agreement.

27. The Trustee's potential avoidance claims would be typical claims often asserted in this Court, but the Trustee's investigation into the roles of both KMH and Ahern (an entity with multiple connections to DC Solar) reflects that the claims would nonetheless be factually complex. Indeed, the Trustee has asserted a claim against KMH and is investigating claims against Ahern. Moreover, the Trustee and Fund IX disagree about aspects of KMH and Ahern's roles, which would be (the Trustee expects) hotly litigated.

28. Further, KMH's unrelated receivership proceedings would necessarily cause delay.

29. Further, proving the Trustee's rights in the MSGs would be fact-intensive, especially given the complex tax equity structures underlying the DC Solar transactions.

30. While the Trustee's special counsel is compensated on a contingency-fee basis, the Trustee's prosecution of these claims would be accompanied by significant costs. Among other things, the Trustee would utilize an expert on solvency, and possibly a forensic expert to explain the relationship of the parties and the flow-of-funds. Moreover, the Trustee would have costs to probe the intent and knowledge of the Carpoffs – the Debtors' former insiders who have pled guilty to crimes – such as arranging for and attending prison-depositions (where zoom and telephonic attendance is generally not allowed). And finally, the MSG allocation issues would be litigated not by special counsel but by the Trustee's general bankruptcy counsel, who is paid on an hourly basis.

31. The Settlement Agreement addresses these concerns. The parties avoid litigating fact-specific claims with the associated expense and delay of doing so. Here, there is meaningful benefit to the estates in resolving this matter pre-suit, without further risk, and before meaningful expenses are incurred.

**Collectability**

32. The Trustee believes that collectability may be an issue with Fund IX, based on the structure of the transaction and Fund IX's role, but does not have transparency into this issue and did not take this item into meaningful account in reaching the Settlement Agreement.

**Paramount interest of creditors**

33. This is a significant consideration that militates in favor of approval of the Settlement Agreement.

34. The Settlement Agreement provides for a meaningful financial result for the estate, both in the MSG allocation and the withheld amount as settlement consideration. This is a very good outcome when measured against potential defenses and litigation risks, as well as the costs and delay associated therewith. As a pre-suit resolution, the Trustee is eliminating delay in monetizing her claims and rights, and efficiently administering the estate for the benefit of creditors. The settlement also enables the Trustee and her counsel to focus on other litigation claims and matters in these Bankruptcy Cases, which is a meaningful consideration given the Trustee expects litigation recoveries to provide the bulk of the recoveries to creditors.

35. The Trustee was guided, in part and within her business judgment, by the United States Supreme Court's directive in the original Ponzi scheme case, that "equality is equity, and this is the spirit of bankruptcy law."[13] In a landmark compromise in these Bankruptcy Cases, months ago, the Trustee resolved her claims against a series of other Funds (the majority of creditors in these Bankruptcy Cases) for allowed claims on a cash-on-cash basis, repayment of preference exposure, an MSG allocation akin to what is being presented for approval here, and repayment of a portion of transfers to the transferee to address avoidance exposure.[14]

36. Here, through the Settlement Agreement presented to the Court for approval, the Trustee has similarly obtained recovery in settlement of her asserted claims, an MSG allocation akin to that previously approved by the Court and negotiated for the allowance of claims on a cash-on-cash basis. The Trustee is expeditiously administering the estate for the benefit of creditors, utilizing equal treatment as a guidepost.

---

[13] *Cunningham v. Brown*, 265 U.S. 1, 13 (1924); *see also Hayes v. FPI Nursery Partners 1984-I*, 922 F.2d 844 (9th Cir. 1991); *SEC v. Bivona*, 2017 WL 4022485, *6 (N.D. Cal. Sept. 13, 2017) ("There are few hard-and-fast rules for how courts should exercise their equitable discretion in such circumstances, but one deeply engrained principle holds that where multiple people have been victimized, all victims of the fraud be treated equally.) (notations omitted).
[14] ECF No. 2481.

37. For all the reasons discussed in this Motion, the Settlement Agreement favorably and immediately avoids litigation claims with meaningful risk and is in accord with fundamental bankruptcy policy. Thus, approval of the Settlement Agreement is in the paramount interest of creditors.

### IV. Payment of Contingency Fee

38. Meland Budwick, P.A. ("**MB**"), as special litigation counsel, is to be compensated on a pure contingency fee basis of 25% of any recovery obtained.[15] The Trustee seeks allowance of, and authority to pay MB, a 25% contingency fee equal to $18,615.18 at the time the Trustee receives the Settlement Payment, without the need for further Court Order. This is based on the $74,460.74 withheld from Fund IX's MSG allocation as settlement consideration. MB does not seek any contingency fee on the MSG allocation.

39. Pursuant to 11 U.S.C. § 330(a), the bankruptcy court reviews the services the professional provided and decides whether the requested compensation is reasonable. The Trustee submits that the requested contingency fee satisfies this standard.[16]

40. First, 25% is a materially lower percentage than often charged by commercial contingency counsel.[17] Second, the Court pre-approved the contingency fee arrangement after notice to all parties in interest. Third, given the limited assets of the estates when MB was retained, the contingency fee arrangement benefitted the estates by shifting material risk from the estates onto MB which immediately invested enormous resources investigating and pursuing claims for the Estate's benefit.[18] Fourth, the contingency fee arrangement ensures that MB's compensation is

---

[15] ECF Nos. 1490 and 1502.

[16] Special counsel: (1) performed high-quality work; (2) addressed somewhat challenging factual and legal questions; (3) employed significant skill; (4) obtained a timely result; (5) performed its work efficiently; (6) drew upon a high level of capabilities and experience; and (7) was met with significant opposition by sophisticated counsel.

[17] *See In re Private Asset Grp., Inc.*, 579 B.R. 534, 544-45 (Bankr. C.D. Cal. 2017) ("Outside of bankruptcy, contingency fees are often 33 percent or, if there is an appeal, 40 percent."); *In re Pearlman*, 2014 WL 1100223, *3 (Bankr. M.D. Fla. Mar. 20, 2014) ("Resting again on its independent judgment, the Court finds the 35% contingency fee to be reasonable and in line with similar non-bankruptcy rates.").

[18] *Fann Contracting, Inc. v. Garman Turner Gordon LLP*, 620 B.R. 141, 147 (D. Nev. 2020); *see also, generally, In re Smart World Techs.*, LLC, 423 F.3d 166, 180 (2d Cir. 2005) ("Here, Smart

merit-based and directly tied to performance and results. Fifth, the contingency fee arrangement applies to an array of Estate claims, and uniform application is in accord with that agreement. Sixth, MB has performed significant work (including formal and informal discovery) investigating and pursuing this and other claims in a high-quality and expeditious manner given the complexities of this Bankruptcy Case and despite the challenges imposed by COVID-19.

41. Significantly, MB was charged with considering and investigating claims against hundreds of potential targets. MB invested substantial resources to vet claims against potential targets, ultimately recommending to the Trustee which claims are meritorious and which should not be brought. As a result, MB's efforts included determining the Trustee does not hold claims against those potential targets. The contingency fee agreement does not provide for MB to be compensated for these significant efforts that benefitted the Estate. Rather, these efforts are part of the basket of services MB provides to the Trustee and the Estate.

42. Finally, MB has provided services to assist in administrative aspects of these cases, including the pursuit of substantive consolidation, review of certain significant claims, and related to MSG sales. MB did not seek any compensation for that work, which was substantial and benefitted the estate.

---

World's counsel was retained on a contingency basis, meaning that Smart World's pursuit of its adversary claims would have subjected the bankruptcy estate to no risk, while allowing the estate to reap any potential award.").

## V. Conclusion

43. Based upon the foregoing, the Trustee requests an order approving the Settlement Agreement as well as the contingency fee and granting such other and further relief as this Court deems just and proper.

DATED: July 21, 2021.

**MELAND BUDWICK, P.A.**

*/s/ Solomon B. Genet*
Michael S. Budwick, Esq.
Solomon B. Genet, Esq.
Gil Ben-Ezra, Esq.
Kevin Paule, Esq.
Attorneys for Christina W. Lovato, Trustee

**HARTMAN & HARTMAN**

*/s/ Jeffrey L. Hartman*
Jeffrey L. Hartman, Esq.
Attorneys for Christina W. Lovato, Trustee