Jeffrey L. Hartman, Esq.
Nevada Bar No. 1607
**HARTMAN & HARTMAN**
510 W. Plumb Lane, Suite B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818
notices@bankruptcyreno.com

Michael S. Budwick, Esq. #938777 – Admitted *Pro Hac Vice*
Solomon B. Genet, Esq. #617911 – Admitted *Pro Hac Vice*
Gil Ben-Ezra, Esq. #118089 – Admitted *Pro Hac Vice*
**MELAND BUDWICK, P.A.**
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
T: (305) 358-6363
F: (305) 358-1221
mbudwick@melandbudwick.com
sgenet@melandbudwick.com
gbenezra@melandbudwick.com

Attorneys for Christina W. Lovato, Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>DOUBLE JUMP, INC.<br><br>   Debtor.<br><br>  X  Affects DC Solar Solutions, Inc.<br>  X  Affects DC Solar Distribution, Inc.<br>  X  Affects DC Solar Freedom, Inc.<br>  X  Affects Double Jump, Inc. | Lead Case No.: BK-19-50102-gs<br>(Chapter 7)<br><br>Substantively consolidated with:<br><br>\| 19-50130-gs \| DC Solar Solutions, Inc. \|<br>\| 19-50131-gs \| DC Solar Distribution, Inc. \|<br>\| 19-50135-gs \| DC Solar Freedom, Inc. \|<br><br>**MOTION FOR ORDER APPROVING COMPROMISE AND SETTLEMENT AGREEMENT WITH CRESTMARK, A DIVISION OF METABANK, N.A. AND FOR AWARD OF CONTINGENCY FEE**<br><br>Hearing Date:  September 17, 2021<br>Hearing Time: 9:30 a.m. |

Christina Lovato, the duly appointed and acting trustee ("***Trustee***") for the chapter 7 estates of DC Solar Solutions, Inc. ("***Solutions***"), DC Solar Distribution, Inc. ("***Distribution***"), DC Solar Freedom, Inc. ("***Freedom***, and together with Solutions and Distribution, "***DC Solar***") and Double Jump, Inc. ("***DJ***," and together with DC Solar, the "***Estates***" or the "***Debtors***") files this motion to approve the compromise and settlement reached with Crestmark, a division of MetaBank, National Association ("***Crestmark***") pursuant to F.R.B.P. 9014 and 9019 and the payment of a contingency

fee to special litigation counsel ("**Motion**"). The Motion is supported by the separately filed Declaration of Christina Lovato and is based upon the following discussion of facts and law.

## I. Factual Background

### A. Procedural Background

1. Prepetition, DC Solar was engaged in a business related to manufacturing, marketing, selling, and leasing mobile solar generators.

2. However, certain of DC Solar's insiders, including Jeff Carpoff and Paulette Carpoff ("**Carpoffs**"), were also perpetrating a Ponzi scheme ("**Carpoff Ponzi Scheme**").

3. On December 18, 2018, federal law enforcement raided DC Solar's business locations, effectively closing down DC Solar's operations.

4. In late January and early February 2019, the Debtors filed for chapter 11 relief before this Court, commencing these bankruptcy cases ("**Bankruptcy Cases**").

5. On March 22, 2019, this Court converted the Bankruptcy Cases to cases under chapter 7 and appointed the Trustee as chapter 7 trustee of the Debtors' Estates.[1] The Bankruptcy Cases have been substantively consolidated.[2]

### B. Trustee's Claims

6. On or around August 9, 2018, DC Solar entered its third sale-leaseback transaction with Crestmark ("**Crestmark 3 Transaction**"). In the first two DC Solar-Crestmark sale-leaseback transactions, Solutions sold MSGs to Crestmark for full cash payments, which were contemporaneously leased to Distribution.

---

[1] ECF Nos. 439 & 440.

[2] ECF No. 2613.

{02659924.DOCX.}2

7. In the Crestmark 3 Transaction, however, DC Solar International Inc. ("*DC Int'l*"), an entity based in Nevis, West Indies, was the seller of the MSGs per the Transaction documents, which Crestmark submits was done at the request of DC Solar. As part of the Transaction, Distribution opened a certificate of deposit ("*CD*") with Crestmark in the amount of $1.92 million and purported to provide Crestmark with a security interest in the CD. Following closing, Distribution made a transfer of $4,762,274 to Crestmark (including the amount of the CD). Crestmark transferred $549,000 of those funds to a service provider employed by DC Solar, leaving a remainder of $4,213,274.

8. Between September and December 2018, Distribution paid Crestmark $240,000 in lease payments pursuant to the Crestmark 3 Transaction. Accordingly, Distribution transferred to Crestmark a total of $4,453,274 pursuant to the Crestmark 3 Transaction, inclusive of the CD ("*Transfers*").

9. After the Trustee was appointed, she investigated the relationship between DC Solar and Crestmark, and the money transfers made in connection with each of Crestmark's sale-leaseback transactions with DC Solar.

10. As part of her investigation, the Trustee took a F.R.B.P. 2004 of Larry Pearce, Executive Vice President and President of Crestmark's Joint Venture Business Unit and Vendor Finance business unit, respectively.

11. Thereafter, the Trustee communicated to Crestmark her position that the Transfers were avoidable and recoverable under Sections 548 and 550 of the Bankruptcy Code.

12. The Trustee and Crestmark communicated regarding their differing positions of fact and law. The Trustee and Crestmark then agreed to communicate regarding the potential of a consensual resolution; substantive negotiations followed.

13. Among other things, Crestmark provided the Trustee with information that Crestmark submits supports its good faith and other legal positions and defenses in connection with the Crestmark 3 Transaction as well as first two Crestmark-DC Solar transactions.

14. Following these settlement negotiations, and subject to this Court's approval, the Trustee and Crestmark reached an agreement on the terms of a settlement of their claims and have executed the Stipulation of Settlement ("**Settlement Agreement**"), which is attached as **Exhibit 1** to the declaration of Christina Lovato filed in support of this Motion.

15. The Trustee believes that the Settlement Agreement is in the best interests of the Debtors' estates and should be approved.

## II.    Settlement Terms

16. The key aspects of the Settlement Agreement, as more particularly described therein,[3] are the following:

- Crestmark shall pay the Trustee $2,226,700 ("**Settlement Payment**") within 10 calendar days after the entry of a final non-appealable order approving this Settlement Agreement ("**Effective Date**").

- Crestmark shall have an allowed unsecured claim against the DC Solar Estates in the amount of the Settlement Payment pursuant to Section 502(h) of the Bankruptcy Code ("**Allowed Claim**").

- Crestmark filed the following proofs of claims in these Bankruptcy Cases in connection with the Crestmark 3 Transaction: (a) claim number 15-1 filed in the Distribution Bankruptcy Case; (b) claim number 50-1 filed in the Solutions Bankruptcy Case ("**Claim 50-1**"); and (c) claim number 4-1 filed in the Freedom Bankruptcy Case (collectively the "**Crestmark 3 Claims**"). Claim 50-1 is filed in the amount of $8,299,847.39.

- Crestmark also filed proofs of claims in these Bankruptcy Cases in connection with other sale and leaseback transactions unrelated to the Crestmark 3 Transaction (collectively with the Crestmark 3 Claims, the "**Crestmark Claims**"). The Trustee may contest and seek to disallow some or all of the Crestmark Claims, which are

---

[3] This Motion contains a mere summary of the terms of the Settlement Agreement; however, the terms of the Settlement Agreement shall control.

{02659924.DOCX.}4

not being allowed or disallowed pursuant to the Settlement Agreement. The Trustee and Crestmark preserve all of their respective rights, claims, and defenses to pursue the allowance or disallowance of the Crestmark Claims.

- Upon the Effective Date and full payment of the Settlement Payment, Crestmark will have a general unsecured claim under 11 U.S.C. § 502(h) in the amount of $2,226,700.00, such that the 50-1 Claim shall be equal to $2,226,700 ("**Allowed Portion**"), plus that portion of the currently filed 50-1 Claim for $8,299,847.39 as may be ultimately allowed.

- The Trustee and the Debtors' Estates shall be deemed to release: (a) any and all interests in any of the MSGs acquired by Crestmark, specifically the titles to the 24 MSGs identified in Exhibit A to the Settlement Agreement; and (b) any and all interests in the CD.

- The Trustee and Crestmark shall exchange mutual and general releases, excepting: (a) their respective rights and obligations under the Settlement Agreement; (b) Crestmark's right to prosecute and defend the allowance of the Crestmark Claims; and (c) the Trustee's right to object to and seek the disallowance of the Crestmark Claims, save and except for the Allowed Portion.

### III.    Legal Discussion

17.    Fed. R. Bank. P. 9019(a) provides in relevant part that "[o]n motion ... and after notice and a hearing, the court may approve a compromise or settlement."

18.    In the Ninth Circuit, motions to approve a compromise and settlement agreement are reviewed under the four criteria set forth in In re A&C Properties, Inc., 784 F. 2d 1377, 1381 (9th Cir. 1986), cert. denied, 479 U.S. 854 (1986). Those criteria are: (1) likelihood of success on merits of the claims in the underlying litigation; (2) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (3) the difficulties, if any, to be encountered in the matter of collection; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

19.   Compromises are favored under the Bankruptcy Code, and approval of a compromise rests in the sound discretion of the Court.[4] The bankruptcy court is afforded wide latitude in approving compromise agreements which it determines to be fair, reasonable, and adequate.[5] The court need not conduct an exhaustive investigation into the claim sought to be compromised.[6]

20.   The Trustee, in her informed business judgment, submits that approval of the Settlement Agreement is in the best interests of the Debtors' Estates.[7]

**A.  The Settlement Should Be Approved**

21.   Based upon these principles, the Trustee submits that the Settlement Agreement falls well above the lowest point of the range of reasonableness and should be approved.

**Probability of success in litigation**

22.   This is a significant consideration that militates in favor of approval of the Settlement Agreement.

23.   While the Trustee believes her potential claims are meritorious, all litigation presents risks. Here, the Trustee's position is that Crestmark lacked "good faith" in its receipt of the Transfers, all in connection with the Crestmark 3 Transaction. In response, Crestmark asserts that not only had it already concluded two very similar transactions with DC Solar, but that it

---

[4] Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc., v. Anderson, 390 U.S. 414, 424 (1968).

[5] In re Woodson, 839 F.2d 610 (9th Cir. 1988).

[6] In re Walsh Construction, Inc., 699 F.2d 1325, 1328 (9th Cir. 1982).

[7] In re NII Holdings, Inc., 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) ("Although a court may not substitute the debtor's judgment for its own and instead must undertake its own, independent, reasoned analysis of the claims at issue, a court may nonetheless take into account the debtor's business judgment in recommending a settlement as well as the opinions of the debtor and the parties to the settlement.") (citing cases, citation removed).

conducted commercially reasonable due diligence on the Crestmark 3 Transaction as well, demonstrating "good faith" under Section 548(c) of the Code and applicable decisional law.

24. If Crestmark's position were accepted, Crestmark would arguably have a complete defense to the Trustee's claims given that, based on the Trustee's investigation, the Trustee does not presently challenge that Crestmark received the Transfers for "value".

25. The Settlement Agreement addresses these concerns, with a meaningful and immediate payment to the Debtors' Estates.

**Complexity of litigation and attendant expense, inconvenience and delay**

26. This is a significant consideration that also militates in favor of approval of the Settlement Agreement.

27. While the Trustee's claims are typical claims litigated before this Court, the Crestmark 3 Transaction, as well as the first two Crestmark-DC Solar transactions, are factually complex. In addition, the discovery process would likely trigger complex legal issues, including regarding the extent of the SAR (suspicious activity report) privilege, which is not fully resolved in the Ninth Circuit.

28. Moreover, while the Trustee's special counsel is compensated on a contingency-fee basis, the Trustee's prosecution of these claims would be accompanied by significant costs. These costs would include at least one expert consultant / witness (on Ponzi schemes and insolvency) and possibly another regarding the appropriate level of due diligence that Crestmark should have conducted in connection with the Crestmark 3 Transaction. This would be a significant expense to the Debtors' Estates.

29. Further, the Trustee would have to bear the costs necessary to probe of the intent of the Carpoffs – who have pled guilty to crimes – such as arranging for and attending prison-depositions (where Zoom and telephonic appearance is usually not feasible).

30. The Settlement Agreement addresses these concerns. The parties avoid litigating fact-specific claims with the associated expense and delay of doing so. Here, there is meaningful benefit to the Estates in resolving this matter pre-suit and before meaningful expenses are incurred.

### Collectability

31. Collectability is not an issue with Crestmark.

### Paramount interest of creditors

32. This is a significant consideration that militates in favor of approval of the Settlement Agreement.

33. The Settlement Agreement provides for an immediate $2,226,700 payment, representing approximately 50% of the Transfers. This is a very good outcome when measured against potential defenses and litigation risks, as well as the costs and delay associated therewith. As a pre-suit resolution, the Trustee is eliminating delay in monetizing her claims and efficiently administering the Estates for the benefit of creditors. The settlement also enables the Trustee and her counsel to focus on other substantial litigation claims against other third parties in these Bankruptcy Cases, which is a meaningful consideration given the Trustee expects litigation recoveries to provide the bulk of the recoveries to creditors.

34. For all the reasons discussed in this Motion, the Settlement Agreement favorably and immediately avoids litigation claims with meaningful risk. Thus, approval of the Settlement Agreement is in the paramount interest of creditors.

### IV. Payment of Contingency Fee

35. Meland Budwick, P.A. ("**MB**"), as special litigation counsel, is to be compensated on a pure contingency fee basis of 25% of any recovery obtained.[8] The Trustee seeks allowance of, and authority to pay MB, a 25% contingency fee equal to $556,675 at the time the Trustee receives the Settlement Payment, without the need for further Court Order.

36. Pursuant to 11 U.S.C. § 330(a), the bankruptcy court reviews the services the professional provided, and decides whether the requested compensation is reasonable. The Trustee submits that the requested contingency fee satisfies this standard.[9]

37. First, 25% is a materially lower percentage than often charged by commercial contingency counsel.[10] Second, the Court pre-approved the contingency fee arrangement after notice to all parties in interest. Third, given the limited assets of the Estates when MB was retained, the contingency fee arrangement benefitted the Estates by shifting material risk from the Estates onto MB which immediately invested enormous resources investigating and pursuing claims for the Estates' benefit.[11] Fourth, the contingency fee arrangement ensures that MB's compensation is

---

[8] ECF Nos. 1490 and 1502.

[9] Special counsel: (1) performed high-quality work; (2) addressed somewhat challenging factual and legal questions; (3) employed significant skill; (4) obtained a timely result; (5) performed its work efficiently; (6) drew upon a high level of capabilities and experience; and (7) was met with significant opposition by sophisticated counsel.

[10] See In re Private Asset Grp., Inc., 579 B.R. 534, 544-45 (Bankr. C.D. Cal. 2017) ("Outside of bankruptcy, contingency fees are often 33 percent or, if there is an appeal, 40 percent."); In re Pearlman, 2014 WL 1100223, *3 (Bankr. M.D. Fla. Mar. 20, 2014) ("Resting again on its independent judgment, the Court finds the 35% contingency fee to be reasonable and in line with similar non-bankruptcy rates.").

[11] Fann Contracting, Inc. v. Garman Turner Gordon LLP, 620 B.R. 141, 147 (D. Nev. 2020); see also, generally, In re Smart World Techs., LLC, 423 F.3d 166, 180 (2d Cir. 2005) ("Here, Smart World's counsel was retained on a contingency basis, meaning that Smart World's pursuit of its adversary claims would have subjected the bankruptcy estate to no risk, while allowing the estate to reap any potential award.").

merit-based and directly tied to performance and results. Fifth, the contingency fee arrangement applies to an array of the Estates' claims, and uniform application is in accord with that agreement. Sixth, MB has performed significant work (including formal and informal discovery) investigating and pursuing this and other claims in a high-quality and expeditious manner given the complexities of this Bankruptcy Case and despite the challenges imposed by COVID-19.

38. Significantly, MB was charged with considering and investigating claims against hundreds of potential targets. MB invested substantial resources to vet claims against potential targets, ultimately recommending to the Trustee which claims are meritorious and which should not be brought. As a result, MB's efforts included determining the Trustee does not hold claims against those potential targets. The contingency fee agreement does not provide for MB to be compensated for these significant efforts that benefitted the Estate. Rather, these efforts are part of the basket of services MB provides to the Trustee and the Estate.

39. Finally, MB has provided services to assist in administrative aspects of these cases, including the pursuit of substantive consolidation, review of certain significant claims, and matters related to MSG sales. MB did not seek any compensation for that work, which was substantial and benefitted the estate.

## V. Conclusion

40. Based upon the foregoing, and after notice and hearing, the Trustee requests an order approving the Settlement Agreement and the contingency fee, and granting such other and further relief as this Court deems just and proper.

DATED: July 23, 2021.

                               **MELAND BUDWICK, P.A.**

                               */s/ Michael S. Budwick*
                               Michael S. Budwick, Esq.
                               Solomon B. Genet, Esq.
                               Gil Ben-Ezra, Esq.
                               Attorneys for Christina W. Lovato, Trustee

                               **HARTMAN & HARTMAN**

                               */s/ Jeffrey L. Hartman*
                               Jeffrey L. Hartman, Esq.
                               Attorneys for Christina W. Lovato, Trustee