Jeffrey L. Hartman, Esq.
Nevada Bar No. 1607
**HARTMAN & HARTMAN**
510 W. Plumb Lane, Suite B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818
notices@bankruptcyreno.com

Michael S. Budwick, Esq. #938777 – Admitted *Pro Hac Vice*
Solomon B. Genet, Esq. #617911 – Admitted *Pro Hac Vice*
Gil Ben-Ezra, Esq. #118089 – Admitted *Pro Hac Vice*
**MELAND BUDWICK, P.A.**
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
T: (305) 358-6363
F: (305) 358-1221
mbudwick@melandbudwick.com
sgenet@melandbudwick.com
gbenezra@melandbudwick.com

Attorneys for Christina W. Lovato, Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>DOUBLE JUMP, INC.<br><br>    Debtor.<br><br>  X Affects DC Solar Solutions, Inc.<br>  X Affects DC Solar Distribution, Inc.<br>  X Affects DC Solar Freedom, Inc.<br>  X Affects Double Jump, Inc. | Lead Case No.: BK-19-50102-gs<br>(Chapter 7)<br><br>Substantively Consolidated with:<br><br>   19-50130-gs   DC Solar Solutions, Inc.<br>   19-50131-gs   DC Solar Distribution, Inc.<br>   19-50135-gs   DC Solar Freedom, Inc.<br><br>**MOTION FOR ORDER (1) APPROVING COMPROMISE AND SETTLEMENT AGREEMENT WITH RADIAN GENERATION LLC; AND (2) FOR AWARD OF CONTINGENCY FEE**<br><br>Hearing Date:  October 28, 2021<br>Hearing Time: 2:00 p.m. |

Christina Lovato, the duly appointed and acting trustee ("*Trustee*") for the substantively consolidated chapter 7 estates of DC Solar Solutions, Inc. ("*Solutions*"), DC Solar Distribution, Inc. ("*Distribution*"), DC Solar Freedom, Inc. ("*Freedom"*, and together with Solutions and Distribution, "*DC Solar*") and Double Jump, Inc. ("*DJ*," and together with DC Solar, the "*Estate*") files this motion to approve the compromise and settlement with Radian Generation, LLC ("*Radian*" or "*Target*") pursuant to F.R.B.P. 9014 and 9019 and payment of a contingency fee to

1

special litigation counsel ("*Motion*"). The Motion is supported by the separately filed Declaration of Christina Lovato and is based upon the following discussion of facts and law.

## I. Factual Background

### A. Procedural Background

1. Prepetition, DC Solar was engaged in a business related to manufacturing, marketing, selling, and leasing mobile solar generators ("*MSGs*").

2. However, certain of DC Solar's insiders, including Jeff Carpoff and Paulette Carpoff ("*Carpoffs*"), were also perpetrating a Ponzi scheme ("*Carpoff Ponzi Scheme*").

3. On December 18, 2018, federal law enforcement raided DC Solar's business locations, effectively closing down DC Solar's operations.

4. In late January and early February 2019, the Debtors filed for chapter 11 relief before this Court, commencing these bankruptcy cases ("*Bankruptcy Cases*").

5. On March 22, 2019, this Court converted the Bankruptcy Cases to cases under chapter 7 and appointed the Trustee as chapter 7 trustee of the Debtors' estates.[1] The Estates have been substantively consolidated.[2]

### B. Trustee's Claims

6. On August 14, 2014, DC Solar and the Target entered a contract for asset management and consultant services, in connection with the MSGs. From March 19, 2015 - December 10, 2018, Solutions transferred $344,569.78 to the Target ("*Transfers*") in connection with that contract.

7. The Trustee asserts that DC Solar made the Transfers in furtherance of the Ponzi scheme and that the Target received the Transfers lacking "good faith,"[3] as that term is defined under applicable law. And thus, the Transfer is avoidable and recoverable by the Trustee under Sections 544 and 548 of the Code. The Target disagrees.

---

[1] ECF Nos. 439 & 440.
[2] ECF No. 2613.
[3] *See e.g., In re Ag. Research and Technology Group, Inc.*, 916 F.2d 528 (9th Cir. 1990).

2

8. The Trustee has reviewed and considered numerous documents. These documents included those relating to (1) the Transfers and the Target; and (2) the Carpoff Ponzi Scheme more generally, and the Carpoffs' efforts to loot DC Solar for their own personal benefit.

9. The Trustee has communicated with the Target regarding the possibility of a consensual resolution, and the Parties' differing positions of fact and law.

10. Following these settlement negotiations, and subject to this Court's approval, the Trustee and the Target reached an agreement on the terms of a settlement of their claims and have executed a Stipulation of Settlement ("***Settlement Agreement***"). A copy of the Settlement Agreement is attached to the contemporaneously filed declaration of Christina Lovato. The Trustee believes that the Settlement Agreement is in the best interests of the Debtors' estates and should be approved.

## II.    Settlement Terms

11. The key aspects of the Settlement Agreement, as more particularly described therein, are the following:

- The Target shall pay the Trustee $150,000 ("***Settlement Payment***") within fifteen days of the Court entering an Order approving the Settlement Agreement.

- The Target shall have an allowed unsecured claim against the Estate in the amount of $19,500.00 in connection with the Target's claim [#56] filed in Solutions' bankruptcy case.

- Subject to and except for their obligations in this Settlement Agreement, the Trustee and the Target shall each release and waive all claims against the other.

## III.    Legal Discussion

12. Fed. R. Bank. P. 9019(a) provides in relevant part that "[o]n motion ... and after notice and a hearing, the court may approve a compromise or settlement."

13. In the Ninth Circuit, motions to approve a compromise and settlement agreement are reviewed under the four criteria set forth in *In re A&C Properties, Inc.*, 784 F. 2d 1377, 1381 (9th Cir. 1986), cert. denied, 479 U.S. 854 (1986). Those criteria are: (1) likelihood of success on merits of the claims in the underlying litigation; (2) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (3) the difficulties, if any, to be

3

encountered in the matter of collection; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

14. Compromises are favored under the Bankruptcy Code, and approval of a compromise rests in the sound discretion of the Court.[4] The bankruptcy court is afforded wide latitude in approving compromise agreements which it determines to be fair, reasonable, and adequate.[5] The court need not conduct an exhaustive investigation into the claim sought to be compromised.[6]

15. The Trustee, in her informed business judgment, submits that approval of the Settlement Agreement is in the best interests of the Debtors' estates.[7]

### A. The Settlement Should Be Approved

16. Based upon these principles, the Trustee submits that the Settlement Agreement falls well above the lowest point of the range of reasonableness and should be approved.

### Probability of success in litigation

17. This is a significant consideration that militates in favor of approval of the Settlement Agreement.

18. While the Trustee believes her potential claims are meritorious, all litigation presents risks. Here, among other potential defenses, the Target may assert that it was not on inquiry notice of the fraudulent nature of the transactions, or of DC Solar's insolvency, and that any information it gained in its contractual asset-management capacity was standard commercial activity. More specifically, the Trustee would assert that a forbearance agreement entered between DC Solar and one of its MSG-buyers, and the surrounding communications, rendered the Target

---

[4] *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc., v. Anderson*, 390 U.S. 414, 424 (1968).
[5] *In re Woodson*, 839 F.2d 610 (9th Cir. 1988).
[6] *In re Walsh Construction, Inc.*, 699 F.2d 1325, 1328 (9th Cir. 1982).
[7] *See In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) ("Although a court may not substitute the debtor's judgment for its own and instead must undertake its own, independent, reasoned analysis of the claims at issue, a court may nonetheless take into account the debtor's business judgment in recommending a settlement as well as the opinions of the debtor and the parties to the settlement.") (citing cases, citation removed).

4

on "inquiry notice" such that it lacked good faith. And the Target would presumably respond that this is contrary to standard business conduct.

19. If the Target's defense was accepted, the Target would arguably have a complete defense to the Trustee's claims given that, based on the Trustee's investigation, the Trustee does not challenge that the Target received the Transfers for value.

**Complexity of litigation and attendant expense, inconvenience and delay**

20. This is a significant consideration that also militates in favor of approval of the Settlement Agreement.

21. While the Trustee's claims are typical claims litigated before this Court, and the Trustee's special counsel is compensated on a contingency-fee basis, the Trustee's prosecution of its claims against the Target would be accompanied by significant costs. These costs include those necessary to probe of the intent of the Carpoffs – the Debtors' former insiders who have pled guilty to crimes – such as arranging for and attending prison-depositions. These costs also potentially include an expert witness on (1) financial aspects of the Debtors' operation, including that Carpoff perpetrated a Ponzi scheme through the Debtors; and (2) standard practice in the asset management industry in connection with tax equity transactions.

22. The Settlement Agreement addresses these concerns. The parties avoid litigating fact-specific claims with the associated expense, inconvenience, and delay of doing so. Here, there is meaningful benefit to the estates in resolving this matter at the early stages of the litigation, without further risk, and before meaningful expenses are incurred.

**Collectability**

23. Collectability is not an issue with the Target.

**Paramount interest of creditors**

24. This is a significant consideration that militates in favor of approval of the Settlement Agreement.

25. The Settlement Agreement provides for a $150,000 payment, representing a material portion of the Transfers. And while the Target will receive an allowed claim in the amount of its filed claim, the Target gains no 502(h) claim against the Estate. This is a very good outcome

when measured against potential defenses and litigation risks, as well as the costs and delay associated therewith. By resolving the Trustee's claims pre-suit, the Trustee is eliminating delay in monetizing her claims and efficiently administering the estates for the benefit of creditors. The settlement also enables the Trustee and her counsel to focus on other substantial litigation claims against other third parties in these Bankruptcy Cases, which is a meaningful consideration given the Trustee expects litigation recoveries to provide the bulk of the recoveries to creditors.

26. For all the reasons discussed in this Motion, the Settlement Agreement favorably and immediately avoids litigation claims with meaningful risk. Thus, approval of the Settlement Agreement is in the paramount interest of creditors.

### IV. Payment of Contingency Fee

27. Meland Budwick, P.A. ("**MB**"), as special litigation counsel, is to be compensated on a pure contingency fee basis of 25% of any recovery obtained.[8] The Trustee seeks allowance of, and authority to pay MB, a 25% contingency fee equal to $37,500 at the time the Trustee receives the Settlement Payment, without the need for further Court Order.

28. Pursuant to 11 U.S.C. § 330(a), the bankruptcy court reviews the services the professional provided, and decides whether the requested compensation is reasonable. The Trustee submits that the requested contingency fee satisfies this standard.[9]

29. First, 25% is a materially lower percentage than often charged by commercial contingency counsel.[10] Second, the Court pre-approved the contingency fee arrangement after notice to all parties in interest. Third, given the limited assets of the estates when MB was retained, the contingency fee arrangement benefitted the estates by shifting material risk from the estates

---

[8] ECF Nos. 1490 and 1502.

[9] Special counsel: (1) performed high-quality work; (2) addressed somewhat challenging factual and legal questions; (3) employed significant skill; (4) obtained a timely result; (5) performed its work efficiently; (6) drew upon a high level of capabilities and experience; and (7) was met with significant opposition by sophisticated counsel.

[10] *See In re Private Asset Grp., Inc.*, 579 B.R. 534, 544-45 (Bankr. C.D. Cal. 2017) ("Outside of bankruptcy, contingency fees are often 33 percent or, if there is an appeal, 40 percent."); *In re Pearlman*, 2014 WL 1100223, *3 (Bankr. M.D. Fla. Mar. 20, 2014) ("Resting again on its independent judgment, the Court finds the 35% contingency fee to be reasonable and in line with similar non-bankruptcy rates.").

onto MB which immediately invested enormous resources investigating and pursuing claims for the Estate's benefit.[11] Fourth, the contingency fee arrangement ensures that MB's compensation is merit-based and directly tied to performance and results. Fifth, the contingency fee arrangement applies to an array of Estate claims, and uniform application is in accord with that agreement. Sixth, MB has performed significant work (including formal and informal discovery) investigating and pursuing this and other claims in a high-quality and expeditious manner given the complexities of this Bankruptcy Case and despite the challenges imposed by COVID-19.

30. Significantly, MB was charged with considering and investigating claims against hundreds of potential targets. MB invested substantial resources to vet claims against potential targets, ultimately recommending to the Trustee which claims are meritorious and which should not be brought. As a result, MB's efforts included determining the Trustee does not hold claims against those potential targets. The contingency fee agreement does not provide for MB to be compensated for these significant efforts that benefitted the Estate. Rather, these efforts are part of the basket of services MB provides to the Trustee and the Estate.

31. Finally, MB has provided services to assist in administrative aspects of these cases, including the pursuit of substantive consolidation, review of certain significant claims, and matters related to MSG sales. MB did not seek any compensation for that work, which was substantial and benefitted the Estate. MB also does not seek a contingency fee or compensation for the Target's waiver of any Section 502(h) claim against the Estate.

---

[11] *Fann Contracting, Inc. v. Garman Turner Gordon LLP*, 620 B.R. 141, 147 (D. Nev. 2020); *see also, generally, In re Smart World Techs.*, LLC, 423 F.3d 166, 180 (2d Cir. 2005) ("Here, Smart World's counsel was retained on a contingency basis, meaning that Smart World's pursuit of its adversary claims would have subjected the bankruptcy estate to no risk, while allowing the estate to reap any potential award.").

## V. Conclusion

32. Based upon the foregoing, the Trustee requests an order approving the Settlement Agreement as well as the contingency fee and granting such other and further relief as this Court deems just and proper.

DATED: September 27, 2021.

**MELAND BUDWICK, P.A.**

*/s/ Solomon B. Genet*
Michael S. Budwick, Esq.
Solomon B. Genet, Esq.
Gil Ben-Ezra, Esq.
Attorneys for Christina W. Lovato, Trustee

**HARTMAN & HARTMAN**

*/s/ Jeffrey L. Hartman*
Jeffrey L. Hartman, Esq.
Attorneys for Christina W. Lovato, Trustee