Jeffrey L. Hartman, Esq.
Nevada Bar No. 1607
**HARTMAN & HARTMAN**
510 W. Plumb Lane, Suite B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818
notices@bankruptcyreno.com

Michael S. Budwick, Esq. #938777 – Admitted *Pro Hac Vice*
Solomon B. Genet, Esq. #617911 – Admitted *Pro Hac Vice*
Gil Ben-Ezra, Esq. #118089 – Admitted *Pro Hac Vice*
**MELAND BUDWICK, P.A.**
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
T: (305) 358-6363
F: (305) 358-1221
mbudwick@melandbudwick.com
sgenet@melandbudwick.com
gbenezra@melandbudwick.com

Attorneys for Christina W. Lovato, Chapter 7 Trustee

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| In re | Lead Case No.: BK-19-50102-gs (Chapter 7) |
|---|---|
| DOUBLE JUMP, INC. | Substantively Consolidated with: |
| Debtor. | |

| 19-50130-gs | DC Solar Solutions, Inc. |
| 19-50131-gs | DC Solar Distribution, Inc. |
| 19-50135-gs | DC Solar Freedom, Inc. |

_X_ Affects DC Solar Solutions, Inc.
_X_ Affects DC Solar Distribution, Inc.
_X_ Affects DC Solar Freedom, Inc.
_X_ Affects Double Jump, Inc.

**MOTION FOR ORDER (1) APPROVING COMPROMISE AND SETTLEMENT AGREEMENT WITH NULEAF CAPITAL INVESTORS GROUP, LLC; AND (2) FOR AWARD OF CONTINGENCY FEE**

**Hearing Date: October 28, 2021**
**Hearing Time: 2:00 p.m.**

Christina Lovato, the duly appointed and acting trustee ("*Trustee*") for the substantively consolidated chapter 7 estates of DC Solar Solutions, Inc. ("*Solutions*"), DC Solar Distribution, Inc. ("*Distribution*"), DC Solar Freedom, Inc. ("*Freedom*", and together with Solutions and Distribution, "*DC Solar*") and Double Jump, Inc. ("*DJ*," and together with DC Solar, the "*Estate*"), files this motion to approve the compromise and settlement with NuLeaf Capital Investors Group, LLC ("*NuLeaf*" or "*Defendant*") pursuant to F.R.B.P. 9014 and 9019 and

1

payment of a contingency fee to special litigation counsel ("**Motion**"). The Motion is supported by the separately filed Declaration of Christina Lovato and is based upon the following discussion of facts and law.

## I. Factual Background

### A. Procedural Background

1. Prepetition, DC Solar was engaged in a business related to manufacturing, marketing, selling, and leasing mobile solar generators.

2. However, certain of DC Solar's insiders, including Jeff Carpoff and Paulette Carpoff ("**Carpoffs**"), were also perpetrating a Ponzi scheme ("**Carpoff Ponzi Scheme**").

3. On December 18, 2018, federal law enforcement raided DC Solar's business locations, effectively closing down DC Solar's operations.

4. In late January and early February 2019, the Debtors filed for chapter 11 relief before this Court, commencing these bankruptcy cases ("**Bankruptcy Cases**").

5. On March 22, 2019, this Court converted the Bankruptcy Cases to cases under chapter 7 and appointed the Trustee as chapter 7 trustee of the Debtors' estates.[1] The Estate has been substantively consolidated.[2]

### B. Trustee's Claims

6. On or about December 18, 2015, Solutions transferred $490,000 to the Defendant ("**Transfer**").

7. On January 19, 2021, the Trustee filed her complaint ("**Complaint**") commencing Adversary Case No. 21-5014-GS (Bankr. D. Nev.) against the Defendant ("**Adversary**").

8. In her Complaint, the Trustee asserted that the Debtors neither received "value" nor "reasonably equivalent value" in exchange for the Transfer. And thus, the Transfer is avoidable and recoverable under Section 544 of the Code as both actually and constructively fraudulent.

---

[1] ECF Nos. 439 & 440.
[2] ECF No. 2613.

2

9. The Trustee's position is that in exchange for the Transfer, a Carpoff-affiliate named JPC Group Investments, LLC obtained an ownership interest in the Defendant ("***Interest***"), and that the Debtors received no value in exchange for the Transfer.

10. Prior to commencing the Adversary, the Trustee reviewed and considered numerous documents. These documents included those relating to (1) the Transfer and the Defendant; and (2) the Carpoff Ponzi Scheme more generally, and (3) the Carpoffs' efforts to loot DC Solar for their own personal benefit.

11. After commencing the Adversary, the Defendant filed a motion to dismiss, the Trustee filed a response, the Defendant filed a reply, this Court held a hearing, and this Court entered an Order on the motion; the Trustee thereafter filed an amended complaint.[3]

12. Also, after commencing the Adversary, the Trustee communicated with the Defendant regarding the possibility of a consensual resolution, and the Parties' differing positions of fact and law. The parties continued to exchange documents and information. As one example, the Trustee learned that after the commencement of the Bankruptcy Cases, a party closely affiliated with the Defendant purchased the Interest in exchange for a payment of $100,000.

13. On July 30, 2021, with agreement of the Parties, this Court entered its Amended Order Scheduling Settlement and Status Conference [ECF No. 27] in the Adversary, directing a judicial settlement conference before U.S. Bankruptcy Judge Christopher D. Jaime to take place by zoom on August 27, 2021 ("***Settlement Conference***").

14. Prior to the Settlement Conference, the Trustee and the Defendant exchanged offers for resolution of the Adversary.

15. At the Settlement Conference, and subject to this Court's approval, the Trustee and the Defendant reached an agreement on the terms of a settlement of the Adversary and any other claims. Thereafter, the Trustee and Defendant negotiated and then executed a Stipulation of Settlement ("***Settlement Agreement***"). A copy of the Settlement Agreement is attached to the

---

[3] Adversary, ECF Nos. 7, 10, 11, 14, 15, 21, 25.

3

contemporaneously filed declaration of Christina Lovato. The Trustee believes that the Settlement Agreement is in the best interests of the Estate and should be approved.

## II. Settlement Terms

16. The key aspects of the Settlement Agreement, as more particularly described therein, are the following:

- The Defendant shall pay the Trustee $230,000 ("**Settlement Payment**") pursuant to the Settlement Agreement, in installment payments, with the first payment being made on October 27, 2021 (provided that the Court has entered an Order approving the Settlement Agreement by that date).

- The Defendant waives all claims against the Debtors and the Estate, including under Section 502(h) of the Bankruptcy Code.

- Subject to and except for their obligations in this Settlement Agreement, the Trustee and the Defendant shall each release and waive all claims against the other.

## III. Legal Discussion

17. Fed. R. Bank. P. 9019(a) provides in relevant part that "[o]n motion ... and after notice and a hearing, the court may approve a compromise or settlement."

18. In the Ninth Circuit, motions to approve a compromise and settlement agreement are reviewed under the four criteria set forth in *In re A&C Properties, Inc.*, 784 F. 2d 1377, 1381 (9th Cir. 1986), cert. denied, 479 U.S. 854 (1986). Those criteria are: (1) likelihood of success on merits of the claims in the underlying litigation; (2) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (3) the difficulties, if any, to be encountered in the matter of collection; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

19. Compromises are favored under the Bankruptcy Code, and approval of a compromise rests in the sound discretion of the Court.[4] The bankruptcy court is afforded wide latitude in approving compromise agreements which it determines to be fair, reasonable, and

---

[4] *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc., v. Anderson*, 390 U.S. 414, 424 (1968).

adequate.[5] The court need not conduct an exhaustive investigation into the claim sought to be compromised.[6]

20. The Trustee, in her informed business judgment, submits that approval of the Settlement Agreement is in the best interests of the Debtors' estates.[7]

21. Furthermore, that the parties' settlement was reached with the able assistance of Judge Jaime as the mediator / facilitator further supports that the proposed settlement was fairly reached and should be approved.[8]

**A. The Settlement Should Be Approved**

22. Based upon these principles, the Trustee submits that the Settlement Agreement falls well above the lowest point of the range of reasonableness and should be approved.

**Probability of success in litigation**

23. This factor militates in favor of approval of the Settlement Agreement.

24. While the Trustee believes her claims are meritorious, all litigation presents risks. Here, among other potential defenses, the Defendant asserts that the Debtors did not make the Transfer with the intent to hinder, delay, or defraud creditors. Indeed, the Defendant was successful in this argument at the motion-to-dismiss stage of the litigation, and as a result the Trustee was directed to (and did) file an amended complaint.[9]

---

[5] *In re Woodson*, 839 F.2d 610 (9th Cir. 1988).
[6] *In re Walsh Construction, Inc.*, 699 F.2d 1325, 1328 (9th Cir. 1982).
[7] *See In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) ("Although a court may not substitute the debtor's judgment for its own and instead must undertake its own, independent, reasoned analysis of the claims at issue, a court may nonetheless take into account the debtor's business judgment in recommending a settlement as well as the opinions of the debtor and the parties to the settlement.") (citing cases, citation removed).
[8] *See In re Trib. Co.*, 464 B.R. 126, 155 (Bankr. D. Del.), on rec'd in part, 464 B.R. 208 (Bankr. D. Del. 2011), aff'd sub nom. 587 B.R. 606 (D. Del. 2018), aff'd sub nom. 972 F.3d 228 (3d Cir. 2020), and aff'd in part sub nom. 587 B.R. 606 (D. Del. 2018), and aff'd sub nom. 972 F.3d 228 (3d Cir. 2020) ("[I]n assessing the fairness of proposed settlement, a court may consider the extent that the settlement is truly the product of arms-length bargaining …"); *see also Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, *6 (S.D.N.Y. Dec. 18, 2019) ("The active involvement of experienced and independent mediators in the negotiation of the Settlement is strong evidence of the absence of any collusion and further supports the presumption of fairness.").
[9] Adversary, ECF Nos. 7, 10, 11, 14, 15, 21, 25.

25. The Defendant also challenged the Trustee's allegation that Carpoff perpetrated a Ponzi scheme through the Debtors; while the Trustee prevailed at the motion-to-dismiss stage, the Trustee believes that the Defendant intended to make that argument again at later stages of the litigation. Moreover, the Trustee expects that the Defendant would have argued that the Transfer did provide some benefit to the Debtors. And the Trustee expects that the Defendant would have argued that the $100,000 payment offset certain recoveries available to the Trustee.

26. While the Trustee believes she would have defeated these arguments, at least in material part, she does recognize some risk. And, if certain of the Defendant's arguments were accepted, the Defendant would arguably have a complete defense to the Trustee's claims given that, based on her investigation, the Trustee does not challenge that the Defendant received the Transfer in good faith.

**Complexity of litigation and attendant expense, inconvenience and delay**

27. This is a significant consideration that also militates in favor of approval of the Settlement Agreement.

28. While the Trustee's claims are typical claims litigated before this Court, the Defendant did not file a proof of claim in these Bankruptcy Cases and thus would have the right to a jury trial. For this reason and others, while the Trustee's special counsel is compensated on a contingency-fee basis, the Trustee's prosecution of this Adversary would be accompanied by significant costs. These costs include those necessary to probe the intent of the Carpoffs – the Debtors' former insiders who have pled guilty to crimes – such as arranging for and attending prison-depositions. These costs also potentially include an expert witness on the financial aspects of the Debtors' operation, including that Carpoff perpetrated a Ponzi scheme through the Debtors. And a jury trial is often accompanied by certain costs (*e.g.,* travel, a jury consultant) and delay.

29. The Settlement Agreement addresses these concerns. The parties avoid litigating fact-specific claims with the associated expense, inconvenience, and delay of doing so. Here, there is meaningful benefit to the estates in resolving this matter at the early stages of the litigation, without further risk, and before meaningful expenses are incurred.

### Collectability

30. Collectability was not an issue with respect to reaching the Settlement Agreement.

### Paramount interest of creditors

31. This is a significant consideration that militates in favor of approval of the Settlement Agreement.

32. The Settlement Agreement provides for a $230,000 payment, in installment payments, representing a material portion of the Transfer - and an even greater percentage of the Transfer if the $100,000 payment is considered. And the Defendant gains no § 502(h) or other claim against the Estate. This is a very good outcome when measured against potential defenses and litigation risks, as well as the costs and delay associated therewith. By resolving at this early stage of the Adversary, the Trustee is eliminating delay in monetizing her claims and efficiently administering the estates for the benefit of creditors. The settlement also enables the Trustee and her counsel to focus on other substantial litigation claims against other third parties in these Bankruptcy Cases, which is a meaningful consideration given the Trustee expects litigation recoveries to provide the bulk of the recoveries to creditors.

33. Furthermore, that the parties' settlement was reached with the able assistance of Judge Jaime as the mediator / facilitator via an arms-length process, evinces the fairness of the proposed settlement.

34. For all the reasons discussed in this Motion, the Settlement Agreement favorably and immediately avoids litigation claims with meaningful risk. Thus, approval of the Settlement Agreement is in the paramount interest of creditors.

### IV.    Payment of Contingency Fee

35. Meland Budwick, P.A. ("**MB**"), as special litigation counsel, is to be compensated on a pure contingency fee basis of 25% of any recovery obtained.[10] The Trustee seeks allowance of, and authority to pay MB, a 25% contingency fee equal to $57,500 at the time the Trustee receives the Settlement Payment (payment of the percentage of the contingency fee as the Trustee receives each installment payment), without the need for further Court Order.

---

[10] ECF Nos. 1490 and 1502.

36. Pursuant to 11 U.S.C. § 330(a), the bankruptcy court reviews the services the professional provided, and decides whether the requested compensation is reasonable. The Trustee submits that the requested contingency fee satisfies this standard.[11]

37. First, 25% is a materially lower percentage than often charged by commercial contingency counsel.[12] Second, the Court pre-approved the contingency fee arrangement after notice to all parties in interest. Third, given the limited assets of the estates when MB was retained, the contingency fee arrangement benefitted the estates by shifting material risk from the estates onto MB which immediately invested enormous resources investigating and pursuing claims for the Estate's benefit.[13] Fourth, the contingency fee arrangement ensures that MB's compensation is merit-based and directly tied to performance and results. Fifth, the contingency fee arrangement applies to an array of Estate claims, and uniform application is in accord with that agreement. Sixth, MB has performed significant work (including formal and informal discovery) investigating and pursuing this and other claims in a high-quality and expeditious manner given the complexities of this Bankruptcy Case and despite the challenges imposed by COVID-19.

38. Significantly, MB was charged with considering and investigating claims against hundreds of potential targets. MB invested substantial resources to vet claims against potential targets, ultimately recommending to the Trustee which claims are meritorious and which should not be brought. As a result, MB's efforts included determining the Trustee does not hold claims against those potential targets. The contingency fee agreement does not provide for MB to be

---

[11] Special counsel: (1) performed high-quality work; (2) addressed somewhat challenging factual and legal questions; (3) employed significant skill; (4) obtained a timely result; (5) performed its work efficiently; (6) drew upon a high level of capabilities and experience; and (7) was met with significant opposition by sophisticated counsel.

[12] *See In re Private Asset Grp., Inc.*, 579 B.R. 534, 544-45 (Bankr. C.D. Cal. 2017) ("Outside of bankruptcy, contingency fees are often 33 percent or, if there is an appeal, 40 percent."); *In re Pearlman*, 2014 WL 1100223, *3 (Bankr. M.D. Fla. Mar. 20, 2014) ("Resting again on its independent judgment, the Court finds the 35% contingency fee to be reasonable and in line with similar non-bankruptcy rates.").

[13] *Fann Contracting, Inc. v. Garman Turner Gordon LLP*, 620 B.R. 141, 147 (D. Nev. 2020); *see also, generally, In re Smart World Techs.*, LLC, 423 F.3d 166, 180 (2d Cir. 2005) ("Here, Smart World's counsel was retained on a contingency basis, meaning that Smart World's pursuit of its adversary claims would have subjected the bankruptcy estate to no risk, while allowing the estate to reap any potential award.").

compensated for these significant efforts that benefitted the Estate. Rather, these efforts are part of the basket of services MB provides to the Trustee and the Estate.

39. Finally, MB has provided services to assist in administrative aspects of these cases, including the pursuit of substantive consolidation, review of certain significant claims, and matters related to MSG sales. MB did not seek any compensation for that work, which was substantial and benefitted the Estate. MB also does not seek a contingency fee or compensation for the Defendant's waiver of any Section 502(h) claim (or any other claim) against the Estate.

### V. Conclusion

40. Based upon the foregoing, the Trustee requests an order approving the Settlement Agreement as well as the contingency fee and granting such other and further relief as this Court deems just and proper.

DATED: September 27, 2021.

**MELAND BUDWICK, P.A.**

*/s/ Solomon Genet*
Michael S. Budwick, Esq.
Solomon B. Genet, Esq.
Gil Ben-Ezra, Esq.
Attorneys for Christina W. Lovato, Trustee/Plaintiff

**HARTMAN & HARTMAN**

*/s/ Jeffrey L. Hartman*
Jeffrey L. Hartman, Esq.
Attorneys for Christina W. Lovato, Trustee/Plaintiff