Jeffrey L. Hartman, Esq.
Nevada Bar No. 1607
**HARTMAN & HARTMAN**
510 W. Plumb Lane, Suite B
Reno, Nevada 89509
T: (775) 324-2800
F: (775) 324-1818
notices@bankruptcyreno.com

Michael S. Budwick, Esq. #938777 – Admitted *Pro Hac Vice*
Solomon B. Genet, Esq. #617911 – Admitted *Pro Hac Vice*
Gil Ben-Ezra, Esq. #118089 - Admitted *Pro Hac Vice*
**MELAND BUDWICK, P.A.**
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
T: (305) 358-6363
F: (305) 358-1221
mbudwick@melandbudwick.com
sgenet@melandbudwick.com
gbenezra@melandbudwick.com

Attorneys for Christina W. Lovato, Chapter 7 Trustee

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>DOUBLE JUMP, INC.<br><br>Debtor.<br><br>Affects:<br>☒ DC Solar Solutions, Inc.<br>☒ DC Solar Distribution, Inc.<br>☒ DC Solar Freedom, Inc.<br>☒ Double Jump, Inc. | Lead Case No.: BK-19-50102-gs<br>(Chapter 7)<br><br>Substantively consolidated with: |

| 19-50130-gs | DC Solar Solutions, Inc. |
|---|---|
| 19-50131-gs | DC Solar Distribution, Inc. |
| 19-50135-gs | DC Solar Freedom, Inc. |

| | |
|---|---|
| CHRISTINA W. LOVATO,<br><br>Plaintiff,<br><br>v.<br><br>NIXON PEABODY LLP,<br><br>Defendant. | Adversary No.:<br><br><br>**ADVERSARY COMPLAINT** |

Christina Lovato, in her capacity as the chapter 7 trustee ("***Trustee***") for the bankruptcy estates of DC Solar Solutions, Inc. ("***Solutions***"), DC Solar Distribution, Inc. ("***Distribution***"), DC Solar Freedom, Inc. ("***Freedom***"), and Double Jump, Inc. ("***DJ***," and together with Solutions, Distribution, and Freedom, "***DC Solar***" or the "***Debtors***"), sues Nixon Peabody LLP ("***Nixon Peabody***" or "***Nixon***") and alleges:

**INTRODUCTION**

Forrest Milder, Esq., one of the country's foremost legal experts in tax advantaged transactions and a Nixon Peabody senior partner, assisted Jeff Carpoff in perpetrating a massive Ponzi scheme through and upon DC Solar, causing DC Solar hundreds of millions of dollars in damages. The Trustee brings this action to recover on behalf of the DC Solar estate.

Mr. Milder and Nixon served a vital role. They devised and implemented the highly sophisticated tax advantaged renewable energy investments that served as the cash-engine for Carpoff's scheme. While the investments brought in massive revenues, they also placed unsustainable financial obligations upon Solutions and Distributions. By no later than a series of events between April 2016 to March 2, 2017, Mr. Milder acquired actual knowledge that Carpoff was lying to investors, manipulating financial information, pretending to lease most of the MSGs (defined below), and paying investors through a circular flow of money sourced from other investors. And yet, Mr. Milder continued to stand shoulder-to-shoulder with Carpoff, vouching for him and the investment, and closing transactions which Mr. Milder knew would harm his clients: Solutions and Distribution.

Nixon had a duty of "undivided loyalty" to its clients: Solutions and Distribution. An attorney's duty of undivided loyalty is designed to assure the attorney's absolute and exclusive commitment to the client. This foundational requirement of the attorney-client relationship exists to benefit and protect the client and enhance the public's confidence in the legal profession.

Nixon disregarded this basic responsibility. Nixon violated its professional, fiduciary, and ethical obligations, causing harm to its clients: Solutions and Distribution.

**I.    BACKGROUND**

1.    In 2009, Jeff Carpoff – a capable mechanic with a high school diploma but no college degree – founded DC Solar to manufacture, sell, and lease mobile solar generators, an environmentally friendly product, as an entrepreneurial venture.

2.    Solutions and Distribution engaged in some legitimate operations and had some non-wrongdoing employees, including in senior positions. However, by 2011, Carpoff also began to perpetrate a Ponzi scheme through and upon Solutions and Distribution.

2

3. From October 2010 to December 2018, Nixon continuously served as Solutions' and Distribution's outside counsel closing more than $2 billion in transactions. Led by senior partner Mr. Milder, a nationally recognized expert in the billion-dollar marketplace for renewable energy transactions, Nixon educated, counseled, and directed Solutions and Distribution in connection with Solutions' sponsoring over thirty tax equity transactions, and related matters.

4. Solutions and Distribution relied heavily on Nixon, given their lack of meaningful experience in sophisticated business transactions, let alone the specialized area of tax equity. Nixon: (1) taught Solutions and Distribution what to do and how to do it, including structuring the investments and transactions; (2) performed tax, corporate, and securities-related professional services; (3) marketed the investment opportunity to potential investors; and (4) vouched for Solutions, Distribution, Carpoff, and the investment in the marketplace.

5. Yet, Nixon repeatedly breached its duties, failing to protect its clients, Solutions and Distribution.

- Nixon violated its internal policies by representing Solutions and Distribution without written, executed engagement agreements. Nixon's disregard for basic and critical documentation contributed to its breach of duties and its intentional wrongdoing.

- Nixon violated the Rules of Professional Conduct, violated its internal policies, and breached its duties by accepting clients adverse to Solutions and Distribution without informed consent and a written conflict waiver. Nixon's representation of those other clients conflicted with its representation of Solutions and Distribution.

- Nixon saw clear and repeated Red Flags, from which Nixon knew or should have known that Carpoff was engaged in wrongdoing and harming Solutions and Distribution in connection with the transactions that Nixon structured, oversaw, marketed, and closed.

- And by no later than a series of events from April 2016 to March 2, 2017, Nixon obtained actual knowledge that Carpoff was lying about core elements of the business and transactions with investors and harming Solutions and Distribution, including by moving money in a circular fashion in classic Ponzi scheme style.

6. Despite the Red Flags and actual knowledge that its clients were being harmed, Nixon continued to violate its duties to Solutions and Distribution. From April 2017 to December 2018, Nixon closed at least seven Solutions-sponsored tax equity transactions with an aggregate face value exceeding $700 million. Each transaction drove Solutions and Distribution deeper into

insolvency. Had Nixon acted properly, Carpoff would not have looted more than $90 million from Solutions and Distribution during that period.

7.      Nixon failed in its fiduciary and professional duties, including its duties of care, good faith, loyalty, to avoid conflicts, diligence, competence, and to protect, all owed to its clients: Solutions and Distribution. And Nixon joined and knowingly and substantially assisted in Carpoff's wrongdoing upon Solutions and Distribution.

8.      Nixon was motivated by its desire to reap millions of dollars in legal fees, enhance and protect its professional work and stature, and advance its close, special relationship with and allegiance to Carpoff.

**II.      PARTIES**

9.      The Trustee is the chapter 7 bankruptcy trustee for the Debtors and their substantively consolidated estates. The Trustee has the capacity to commence this action by way of, among other things, 11 U.S.C. § 323.

10.      At all material times, Solutions, Distribution, and Freedom were incorporated and headquartered in California.

11.      Nixon is a global Am Law 100 law firm with offices spanning the United States, Europe, and Asia, including in California.

12.      Mr. Milder is an attorney, a Nixon partner since 2004, and Nixon's authorized agent acting within the scope of his authority. Mr. Milder's resume from Nixon's website is attached as **Exhibit 1**. Nixon was responsible for supervising Mr. Milder and his colleagues and is responsible for their wrongdoing related to DC Solar.  In 2018, Mr. Milder's charged $980 per hour.

**III.      JURISDICTION**

13.      This Bankruptcy Court has jurisdiction over this Bankruptcy Case and this adversary proceeding under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H) and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

14.      The Trustee consents to the entry of final orders and judgments by this Court.

4

## IV.    FACTUAL BACKGROUND ALLEGATIONS

### A.    DC Solar and the Carpoff Ponzi Scheme

15.    DC Solar had, at all material times, certain legitimate business operations.

16.    From no later than on or around 2010 through 2018, DC Solar was engaged in a business related to manufacturing, marketing, selling, and leasing mobile solar generators ("***MSGs***"). Freedom was created on June 12, 2015.

17.    Generally, the business purported to operate as follows. Solutions would manufacture and sell MSGs for $150,000 each. The buyers were typically tax-equity funds, 99% owned by a financial investor seeking federal investment tax credits. The buyers would pay Solutions a $45,000 down-payment (30% of the total purchase price) and execute a promissory note for the remaining balance. The buyers would lease the MSGs to Solutions-affiliate Distribution, which in turn sub-leased the MSGs to an end-user/sub-lessee. The end-user's/sub-lessee's lease payments were intended to cover the interest payments on the promissory note.

18.    After five years, ownership of the buyer would be (largely) transferred from the investor to the managing member, an entity affiliated with or controlled by Carpoff.

19.    Freedom's role was to market, brand, and advertise the MSGs and DC Solar. Freedom was a California benefit corporation that promoted the social-conscious nature of solar energy. Freedom was also, at times, an end user of MSGs.

20.    DC Solar had significant professional, operational, and other expenses.

21.    For certain years, Solutions had its financial statements audited by an auditing firm.

22.    The financial investor that acquired the majority stake in the buyer sought to take advantage of valuable tax benefits related to the purchase, use and depreciation of the MSGs.

23.    Over the years, Solutions closed over two dozen transactions, purportedly selling over 15,000 MSGs and generating hundreds of millions of dollars of revenue.

24.    Distribution sub-let numerous MSGs, for example, in a sub-lease transaction with T-Mobile, USA, Inc. ("***T-Mobile***"). In CY 2012, Distribution initiated and completed a formal vendor process, and entered into a Field Services Agreement with T-Mobile ("***FSA***").  Following numerous layers of internal approvals, T-Mobile designated Distribution as a T-Mobile "preferred

vendor." T-Mobile regularly utilized DC Solar services through approximately March 2018. Distribution provided T-Mobile regular services over this time-period, for which T-Mobile rendered payment. For example, Distribution placed MSGs at sites where cell-phone towers were not working, charging less than diesel generators while operating more quietly and cleanly. Distribution maintained the MSGs to ensure they were operating in good working order.

25.    Freedom placed MSGs on university campuses and other locations and worked towards branding and other marketing and revenue generating opportunities.

26.    Solutions manufactured MSGs it sold in the marketplace.

27.    However, Carpoff, a DC Solar-insider with material but not exclusive control over DC Solar, was also perpetrating a Ponzi scheme ("***Carpoff Ponzi Scheme***") through and upon DC Solar. At all material times, Carpoff lived in California.

28.    Carpoff caused the DC Solar entities to transfer monies obtained from new investors to cover obligations owed to earlier investors. This was contrary to Carpoff's representations to financial investors that sub-lessee revenue would pay those obligations. For example, while Carpoff (directly and indirectly) communicated to the financial investors that DC Solar had manufactured over 15,000 MSGs, the actual number was far less. Moreover, Carpoff claimed that DC Solar had a series of sub-lessees willing to pay to utilize the MSGs, but some sub-leases were real while others were not.

29.    Carpoff funneled proceeds from new investors to previous investors, cultivating an illusion that a legitimate profitable business opportunity existed to induce further investment.

30.    Further, Carpoff looted DC Solar to, among other things, fund his lavish lifestyle, including through casino gambling, the use of private jets, the purchase of real and personal property (such as an automobile collection), and to pay-off co-conspirators and make marketing and other payments to third parties. This was intended to further the Carpoff Ponzi Scheme, including to benefit from the scheme and create the perception that DC Solar was profitable.

31.    Because of the harm Carpoff inflicted upon DC Solar through his wrongdoing, including the liabilities he created for DC Solar, DC Solar was insolvent at all material times.

**B.  Non-Carpoff DC Solar Insiders**

32.    Certain DC Solar-insiders besides Carpoff were also wrongdoers and acted with some or complete knowledge of the Carpoff Ponzi Scheme. These wrongdoers, like Carpoff, acted adversely to DC Solar.

33.    Certain DC Solar-insiders other than Carpoff, including those who were at certain times owners, officers, or held executive or management-level positions with differing levels of control and authority over one or more of the Debtors, were without knowledge of the Carpoff Ponzi Scheme and Carpoff's wrongdoing. Had any known of the wrongdoing, each could have stopped it. A few examples follow.

34.    Daniel Briggs was Freedom's Vice President of Product Development in 2017 and became Freedom's President prior to the Raid (defined below). Before the Raid: Julie Muraco and Eric Sirotkin were Freedom shareholders and members of its Board of Directors (Mr. Sirotkin was also an officer). Before the Raid: (1) Michael Horan was Solutions' Chief Technology Officer; (2) Sebastian Jano was Solutions' Director of Project Finance; and (3) Joshua Daggs was a Solutions accountant with access to DC Solar's financial information. Before joining Solutions, Mr. Jano worked for a financial investor that had invested with Solutions through a Fund.

35.    Some decision-makers at DC Solar did not know about Carpoff's wrongdoing. At least one DC Solar decision-maker could have stopped the wrongdoing had that person known about it. Had some DC Solar employees been presented with facts of other DC Solar insiders' wrongdoing, they would have taken steps to stop that wrongdoing.

36.    The DC Solar insider wrongdoers concealed their wrongdoing from the DC Solar insider non-wrongdoers.

37.    Had some of the Funds (defined below) or the investors in the Funds been presented with facts indicating certain DC Solar insiders' wrongdoing, they could and would have taken steps to stop that wrongdoing - and accomplished this goal.

**C.  The Raid Through the Debtors' Bankruptcy Filing**

38.    After a particular DC Solar senior executive discovered that certain other DC Solar insiders were committing wrongdoing, he left DC Solar's employ. This person discussed with

another former DC Solar employee about how to stop the wrongdoing, and both took active steps to do so. At least one of them became a "whistleblower" with federal law enforcement, resulting in the Raid.

39.    On December 18, 2018, federal law enforcement raided DC Solar's business locations ("***Raid***").

40.    Between the Raid and the Petition Date (defined below), DC Solar made certain material corporate governance changes. A few examples follow.

41.    Mr. Briggs became the President of Solutions and Distribution, while remaining the President of Freedom. DC Solar retained GlassRatner Advisory & Capital Group LLC and designated Seth R. Freeman (Glass Ratner employee) as chief restructuring officer ("***CRO***") with material authority. The CRO had access to and control over substantially all the Debtors' books and records and computer servers (that had either not been taken or had been returned by federal law enforcement), and other DC Solar operations and property.

42.    Between January 31 and February 5, 2019 ("***Petition Date***"), Solutions, Distribution and Freedom filed voluntary chapter 11 petitions commencing the above-captioned bankruptcy cases. Mr. Briggs signed the voluntary petitions for Solutions, Distribution and Freedom, in his capacity as President and CEO for each.

43.    On March 22, 2019, the Debtors' chapter 11 bankruptcy cases were converted to chapter 7 and the Trustee was appointed as chapter 7 trustee.

## V.    NIXON'S ROLE AND WRONGDOING

### A.    The Solutions-Sponsored Tax Advantaged Transactions

44.    With certain exceptions, the Solutions-sponsored tax equity transactions typically purported to operate as follows:

- Solutions would sell MSGs to a buyer (an investment fund), often named "Solar Eclipse Investment Fund __", which would pay 30% of the purchase price in cash and Solutions would take back a note for the remaining 70%.

- The buyer / Fund was majority owned by a financial investor and minority owned by its "managing member," which held a material level of control.
    - Both the buyer / Fund and its managing member contracted to outsource their responsibilities to Distribution.

8

- o  The buyer / Fund never took possession of the MSGs nor was responsible for their operation, maintenance, or upkeep.

- The buyer, upon purchase of the MSGs, would contemporaneously lease the MSGs to Distribution. Distribution would contemporaneously sub-lease the MSGs to an end-user.

After the closing of the transaction, the money-flow purportedly was as follows:

- The end-user / sub-lessee would pay rent to Distribution; and then

- Distribution would pay rent to the Buyer; and then

- The Buyer would pay on the note to Solutions.

45.    Although it received revenue, the buyer/Fund did not seek or obtain a material cash-profit on the investment; its cash payments from Distribution were at or around the note payments due to Solutions. Rather, its primary financial motivation (and the source of its profit) was the favorable tax benefits flowing to the financial investor as the Fund's majority owner.

46.    Each transaction was supported by a projection of cash flows to be paid by the end-user(s). The projection supported the purchase price and the corresponding tax credits.

**B.  Solutions' and Distribution's Retention of Nixon**

47.    In 2009, Carpoff was a capable mechanic with a high school diploma but no college degree. Carpoff created the MSG and understood its technical aspects. However, Carpoff had neither meaningful experience in nor an understanding of sophisticated business transactions, let alone tax equity transactions.

48.    Solutions (created on July 30, 2009) and Distribution (created on September 29, 2010) were start-up companies in the MSG-related business. Carpoff was a senior executive.

49.    Nixon is a premier law firm with a specialty in sophisticated transactional matters. At all material times, Mr. Milder was among the firm's lead partners for sophisticated transactions where developers (a/k/a "sponsors") of projects utilize tax equity, *i.e.,* third-party investment is driven by favorable tax benefits.

50.    By October 20, 2010, Nixon agreed to accept Solutions as a client. Around the same time, Nixon also accepted Distribution as a client.

51.     Nixon did not require a retainer from Solutions or Distribution.

52.     Nixon understood Solutions' and Distribution's purported business model, knew they were a start-up operation, and knew they and Carpoff had no meaningful experience in nor an understanding of sophisticated business transactions, let alone tax equity transactions.

53.     Nixon understood that Solutions and Distribution were taking entrepreneurial risk with this venture and that the MSGs were in the early stages of commercialization.

54.     Nixon knew that Solutions and Distribution could offer tax advantaged investments through sophisticated business transactions only with the participation and assistance of a specialist in the field, *i.e.,* Nixon, taking the lead.

**C. Nixon Failed to Properly Document its Representations and Conflicted Representation of Solutions and Distribution**

55.     Nixon failed to properly document its representation of Solutions and Distribution, was conflicted in those representations, and did not properly account for those conflicts.

56.     Over time, Nixon represented: (1) Solutions; (2) Distribution; and (3) the managing member of each Fund. The managing members were: (i) Solarmore Investment Services, Inc. ("***Solarmore   Investment***"); (ii) Solarmore   Management   Services,   Inc.   ("***Solarmore Management***"); and (iii) Halo Management Services, LLC ("***Halo Management***," and with Solarmore Investment and Solarmore Management, the "***Managing Member(s)***").

57.     Nixon understood that the Managing Member owed a fiduciary duty to the financial-investor and the Fund.

58.     Nixon also represented certain of the Funds (discussed below).

59.     Carpoff had material but not exclusive control over Solutions, Distribution, the Managing Member, and the Fund (through the Managing Member). Thus, Carpoff had significant control over each side of the transaction.

60.     Nixon never executed an engagement agreement with any of the following of its clients: Solutions, Distribution, Solarmore Investment, Solarmore Management, Halo Management, and any of the Funds. This violated Nixon's standard practice and internal policies.

61.     Nixon never obtained written conflict waivers or informed consent between and

10

among the following of its clients: Solutions, Distribution, Solarmore Investment, Solarmore Management, Halo Management, and any of the Funds. This violated Nixon's standard practice and internal policies, and the Rules of Professional Conduct.

62.     Nixon knew that the affiliated nature of the entities participating in the transactions, and the entities' roles, required it to employ a higher level of scrutiny for wrongdoing (especially given that Nixon represented the seller, the lender, the buyer, the buyer's managing member, and the lessee/sub-lessor).

63.     Nixon failed to adequately advise Solutions and Distribution to put in place appropriate checks, balances, and oversight features to mitigate the risks for abuse given that one person – Carpoff – had significant control over all sides of the transaction.

64.     Nixon was required to give its undivided loyalty and the highest standards of fiduciary obligations, including to avoid conflicts, to Solutions and Distribution but did not. Rather, Nixon represented clients – such as the Managing Members and some of the Funds – with interests that conflicted with those of Solutions and Distribution.

### D. Nixon Represented Some of the Funds, Which Were Parties in Conflict with Solutions and Distribution, Without Obtaining Written and Informed Consent

65.     At times, Nixon represented some of the Funds. Nixon did not execute engagement agreements with these clients and failed adequately to inform Solutions or Distribution of the conflicts of interest by virtue of these representations or obtain the informed written consent by Solutions or Distributions to waive such conflicts, to the extent they were waivable.

66.     The following, as examples, demonstrate Nixon's representation of at least some of the Funds.

67.     First, Nixon wrote letters stating that some of the Funds were Nixon's clients. Two examples are attached as **Composite Exhibit 2**.

68.     Second, on at least one occasion in 2017, Nixon publicly filed a court paper identifying a particular Fund as its client.

69.     Third, some of the Funds have stated in a public filing that "*Nixon Peabody and [Mr.] Milder were retained by [some of the Funds] to provide legal opinions in connection with*

*the DC Solar Transactions*."

70.     Fourth, some of the Funds paid legal fees to Nixon.

71.     Fifth, each of Nixon's Transaction Opinions (defined below) was addressed to a particular Fund (as well as the investor in that fund).

72.     Sixth, Nixon represented the Managing Members, each of which (as Nixon knew) owed a fiduciary duty to one or more of the Funds.

### E.  Nixon Undertook a Very Broad Scope of Representation of Solutions and Distribution

73.     Nixon assumed a very broad scope of representation of Solutions and Distribution. It was a general representation. Among other things, Solutions and Distribution retained Nixon to educate, direct, counsel, and advise them in connection with the wide spectrum of issues relating to Solutions serving as a sponsor of (and Distribution as a participant in and Solutions also as a lender in) tax advantaged transactions. The representation included related issues, such as any government challenge.

74.     Nixon had the expertise and willingness to teach Solutions and Distribution everything about tax advantaged transactions and provide them with the requisite credibility in the marketplace, including by marketing and offering the investment opportunities.

75.     Nixon's broad scope of representation is evidenced by, among other things, the scope of services it performed and was expected to perform, and items reasonably and readily apparent to it. Further, Nixon had a duty to protect its client in every possible way.

#### a.  Nixon's Role in the First Transaction

76.     Nixon's role in connection with Solutions' first tax advantaged transaction evince Nixon's broad scope of representation throughout and the depth of its involvement.

77.     In this first transaction, the financial investor was Sherwin-Williams Co. and the buyer / Fund was "Solar Eclipse Investment Fund III, LLC."

78.     On December 9, 2010, Mr. Milder wrote to Carpoff:

> I've enclosed a closing checklist for this transaction, which is undoubtedly longer than you were contemplating.  While there is a lot of stuff here, it isn't something that we "dreamt up"; a list like this, with about this many documents is in every tax

credit transaction. We can certainly have a conversation with [Sherwin Williams] and find out what his expectations are; to date, his attitude has been totally unlike anything I have ever seen, but then I've only been doing this for 30 years.

Nixon was the teacher while Solutions, Distribution, and Carpoff were Nixon's students.

79.    On December 14, 2010, Mr. Milder wrote to Carpoff:

…**Sherwin Williams seems to not care whether there is any diligence, although they have indicated a desire for an [Nixon] tax opinion.  That puts the burden on us** to take many steps and ask for documents that we normally provide to the investor, and expect THEM to review.

As we have discussed, this becomes **exceedingly awkward, as we have to tell you to scale back their requirements based on our experience and knowledge of the law and the industry**.  This is why I said that [Sherwin Williams] should only have a 99% interest at the start (not the 99.99% that they were willing to have), why I thought they should have a regular cash distribution (not the nothing they seem to want), a 5% back end (not the 1% they were willing to take), and a put/call for fair market value (and not the nominal amount that they are happy to accept).  **I hate to be scaling back any favorable parts of your deal when the investor doesn't seem to care**. And, in **a normal situation**, I would just sit back and let the investor tell us what would make them happy, and count on THEIR counsel to reign them in where their needs were less than usual opinion standards.

(caps in original, other emphasis added).

Mr. Milder structured the transaction, directing what its terms should and should not be. That Mr. Milder advised Solutions to scale back favorable deal-points offered by the investor highlights his dominant role. Indeed, Mr. Milder knew that the investor (adverse to Solutions, Nixon's client) was relying on Nixon for advice and diligence, which Mr. Milder described as "*exceedingly awkward*" and not "a *normal situation*." Nonetheless, Nixon went forward.

80.    On December 16, 2010, Nixon circulated first drafts of transactional documents for this transaction.

81.    On December 30, 2010, Mr. Milder wrote to Carpoff:

If your firm has done numbers for tax credit deals several times before, then great. But if not, then please don't forget that this is not a matter of me explaining to a CPA, no matter how smart he is, **what I need**.  I'm not an accountant, nor am I an expert in spreadsheets. I don't prepare numbers. **I review the accountant's numbers, and I look for oddities and things that don't seem to work.**

(emphasis added).

13

Mr. Milder then directed Solutions to a replacement accounting firm, Novogradac & Co. (with whom Mr. Milder had a close professional relationship), which Solutions hired. Nixon's broad representation included leading Solutions' professional team and reviewing Solutions' other professionals' work to address "*oddities*" and ensure the deal "*work[ed]*" for Solutions.

82.    Nixon closed the first Solutions-sponsored transaction in March 2011.

**b. Nixon's Corporate and Securities Roles**

83.    For all (or nearly all) of the transactions, Nixon was counsel to each of: (1) Solutions; (2) Distribution; and (3) the Managing Member (which owed a fiduciary duty to the respective financial investor and the Fund); including in connection with each of:

- The financial investor's investment in the Fund – made up of the Managing Member and the financial investor – that was the contract counter party for Solutions and Distribution;

- The LLC agreement executed by the Managing Member and the financial investor, governing their relationship as co-owners of the Fund (the LLC); and

- The Fund's participation in owning, operating, leasing, and maintaining the MSGs.

84.    For all (or nearly all) of the transactions, a "Notice of Transaction Pursuant to Corporations Code Section 25102(f)" was filed with the State of California, which identified the "Securities Offered or Sold" as "Interest-Limited Liability Company," *i.e.,* the interests in the Funds purchased by the financial investor as part of the transaction.

85.    Nixon represented its clients on offering and securities-issues in connection with the transactions. For example, Nixon represented Solutions (the sponsor) in connection with the investor-member's investment in the Fund.

86.    And Nixon worked on corporate matters in connection with the transactions, such as structuring the various entities, addressing the ownership of various entities, and drafting and editing transactional documents.

87.    Nixon also represented some of the Funds (as discussed).

### c. Nixon's Marketing and Participation in Solutions' Marketing of the Investment Opportunity to Potential Investors

88. Nixon marketed and offered, and participated in Solutions' marketing and offering, the investment opportunity to potential investors. Nixon intended to, and did, make the investors comfortable with Solutions, Carpoff, and the investment.

89. This was especially important given: (1) Nixon's (Mr. Milder's) premier stature in the marketplace; and (2) Solutions' and Carpoff's meaningfully non-existent track record.

90. Nixon's first work-product for Solutions, written by Mr. Milder, was a November 1, 2010 memorandum describing the investment opportunity ("***Nixon 2010 Marketing Memo***"). Nixon wrote the Nixon 2010 Marketing Memo "*to assist [Solutions] in marketing*" the investments by sharing it with potential investors. As Nixon intended, Solutions delivered the Nixon 2010 Marketing Memo to potential investors as part of its marketing efforts to solicit investments.

91. On May 24, 2011, Solutions emailed Mr. Milder to approve the marketing package and messaging it had been using to solicit potential investors:

Forrest [Milder],

This is what I have been sending out to elicit interest in the ITC transactions.
Is this Okay?

Brian Caffrey
Director of Sales
DC Solar Solutions []

["***ITC***" refers to the "Solar Income Tax Credit."]

92. The Solutions marketing package attached to the May 24th email states: "*DC Solar works with NIXON PEABODY LAW FIRM*" (caps in original) a "*leading tax authority on solar project finance transactions,*" and describes Nixon as Solutions' "*team partner*." Solutions' marketing package included the Nixon 2010 Marketing Memo and a Mr. Milder-authored article regarding tax benefits in renewable energy transactions.

93. On August 10, 2011 (three months later) ("***August 10, 2011 Email***"), Solutions' Director of Sales emailed a potential investor, copying Mr. Milder:

I wish to thank you both very much for your time and interest in DC Solar and our

15

Investment Tax Credit program. We are very excited at the prospect of doing business with such a time honored and respected company such as Norfolk Southern. In the interest of good information **I have attached the resumes of Mr. Forrest Milder of Nixon Peabody Law**, and Mr. Steve Tracy of Novogradac Accounting. **We feel their presence on our team speaks to the credibility and integrity of our ITC programs, and to the purposeful, responsible effort of our CEO, Mr. Jeff Carpoff to provide the very best for our business partners.**

(emphasis added).

To emphasize Mr. Milder's "*presence on [Solutions'] team,*" Mr. Milder's resume was placed on DC Solar letterhead and stationery. The August 10, 2011 Email (with Mr. Milder's resume as an attachment but without other attachments) is attached as **Exhibit 3.**

94.    Solutions distributed the Nixon 2010 Marketing Memo and Mr. Milder's resume on DC Solar letterhead and stationery to its outside placement agent to disseminate to potential investors as part of Solutions' investment offering materials.

95.    On October 7, 2013, Nixon provided Solutions with an updated memorandum on the investment opportunity, again, to continue to "*assist [Solutions] in marketing*" the investments ("***Nixon 2013 Marketing Memo***"). Nixon provided the Nixon 2013 Marketing Memo to Solutions and Solutions' outside placement agent to use in offering the investments to potential investors.

96.    Solutions maintained a public website to facilitate Solutions' marketing to potential investors.

97.    Solutions' website identified Nixon and Mr. Milder as its counsel, at times displaying a picture of Mr. Milder. Carpoff and Solutions promoted and leveraged Nixon's and Mr. Milder's name, prominence, and image to enhance their credibility to potential investors. Nixon knew this.

98.    In fact, in August 2013, Ron Roach (an accountant and Carpoff co-conspirator) informed the IRS at an in-person meeting that Solutions "*advertises*" its affiliation with Nixon and Mr. Milder in marketing its tax advantaged investment opportunity to potential investors, including through its website. By December 2014, Nixon knew this.

99.    The Nixon name, logo, and relationship with Solutions remained on Solutions' website as part of Solutions' "advertis[ing]" for years. Nixon knew this.

16

100.    Solutions shared Nixon's Transaction Opinions from earlier transactions with potential investors in future Solutions-sponsored transactions (redacted as to certain identifying information) as part of its marketing efforts. Nixon knew this.

101.    At least one entity considering doing business with Solutions or Carpoff requested a reference from Nixon, which Nixon provided. At least one potential investor (that later invested) sought Nixon's subjective "*impression*" of Carpoff, which Nixon shared.

102.    Nixon vouched for Solutions, Distribution, and Carpoff in the marketplace. Nixon's repeated "stamp of approval," as a leading expert in the field, was essential to the marketing and offering of the investment opportunity.

### d.    Nixon was the Gatekeeper

103.    Nixon was the "gatekeeper," serving as the reputational intermediary for Carpoff and Solutions into the investor / securities marketplace. Nixon had the ability to thwart Carpoff's misconduct by withholding its support and other essential services for the transaction.

104.    Nixon's representation of Solutions, Distribution, and the wide range of other players in connection with the transactions, and knowledge of the players and their sophistication and experience (or lack thereof), enhanced its gatekeeper function.

105.    Solutions and Distribution retained Nixon to serve in this gatekeeper role, and many (if not all) investors and Funds relied on Nixon in this role. The Solutions-sponsored transactions would not have closed unless Nixon served in this role.

### e.    Nixon's Transaction Opinions

106.    Nixon's scope of representation included issuing its "opinion" (sometimes referred to as a "tax opinion" but in fact far broader) on the transaction ("***Transaction Opinion***"). Nixon issued its Transaction Opinion at the closing of the transaction, reflecting Nixon's approval and endorsement of the transaction.

107.    All (or nearly all) of the investors and Funds required and relied upon a Transaction Opinion from Nixon, absent which they would not have made their investment and closed each particular transaction. Nixon knew this.

108.    Nixon performed a great deal of due diligence on Solutions and the transaction in order to issue its Transaction Opinion. As examples, Nixon reviewed the relevant entities' operating documents, leases, management contracts, and financial projections.

109.    In issuing its Transaction Opinions, Nixon was required to ensure that its representations and assumptions were reasonable, and to reject any representation or assumption that was unreasonable or conflicted with actual facts (or where appropriate, obtain clarification or supporting information).

110.    In connection with all (or nearly all) of the Transaction Opinions, Nixon represented that (1) the MSG-purchase price of $150,000 was appropriate under the circumstances; (2) the MSG would be leased to end users; (3) lease revenue would be used to pay the Fund to pay Solutions; and (4) the financial models reflected the terms and conditions of the transactions.

### f.    Nixon and Carpoff Had a Close and Special Relationship

111.    The close and special relationship between Nixon and Carpoff contributed to Nixon's poor judgment and wrongdoing. A few examples evincing this relationship follow.

112.    First, as reflected in the August 10, 2011 Email (¶93 above and **Exhibit 3)**.

113.    Second, on May 7, 2012, Carpoff wrote to Mr. Milder:

**You are the most important piece to our success and I brag on you daily**.  I would never ever take the word of another Tax attorney over you or even consider having anybody but you represent me.. **After all, you are the world famous Forrest Milder…I can't do this without you and would not even try**.
(sic, and emphasis added).

114.    Third, on November 6, 2012, Carpoff and Mr. Milder emailed each other:

- From Carpoff to Mr. Milder:

I just wanted to take a minute thank you for all your hard work on the USB deal and hope to another one soon? **You are very special to me and wanted to once again thank you for believing in me**.

- A few hours later, Mr. Milder responded:

Thanks, and **as you know, I think you are the best of the best.**
(sic, and emphasis added).

115.     Fourth, Carpoff routinely flattered Mr. Milder with superlatives. As examples, on (1) December 10, 2010; (2) October 12, 2011; (3) December 22, 2011; (4) May 7, 2012; (5) October 17, 2012; and (6) December 17, 2013; Carpoff referred to Mr. Milder in writing (emails to Mr. Milder) as the "*World Famous Forrest Milder*" or similar language.

116.     Fifth, Nixon nurtured this close and special relationship as Mr. Milder basked in the gratification of his ego. Mr. Milder: (1) did not correct Carpoff's adulation, including those using superlatives; and (2) described Carpoff to others in glowing terms, including as a "*great American success story.*"

117.     Sixth, Nixon ignored its own policies and practices by representing multiple Carpoff-affiliated entities without adequate engagement agreements or conflict waivers, closing transactions each year from 2011 to 2018.

118.     Seventh, Nixon's marketing of and vouching for the investment opportunity is atypical for sponsor's counsel in a tax equity transaction. Nixon placed its "seal of approval" on the investment and Carpoff. Nixon vouched for Carpoff's character, bona fides, and integrity. Nixon sanctioned Carpoff's use of its name and logo in its advertising and marketing.

119.     Eighth, Nixon's tax equity group is selective in its acceptance of clients. It is atypical for Nixon to accept a client with no meaningful track-record or sophistication in the tax equity marketplace seeking to perform large and complex transactions.

120.     Ninth, atypically, Nixon did not require a retainer from Solutions or Distribution.

121.     Tenth, over the years Mr. Milder shared meals with Carpoff (at least) approximately ten or twelve times, usually in California.

**g.  The Transactions**

122.     From 2011 to 2018, Nixon represented Solutions and Distribution in connection with over thirty transactions, including (closing date and face-amount):

- March 23, 2011          $28.8 million transaction.
- December 16, 2011       $33.6 million transaction.
- October 31, 2012        $15 million transaction.
- December 21, 2012       $22.5 million transaction.
- March 27, 2013          $37.5 million transaction.

- December 16, 2013     $16.5 million transaction.
- December 23, 2013     $20.25 million transaction.
- March 28, 2014     $34 million transaction.
- June 20, 2014     $34 million transaction.
- September 19, 2014     $15 million transaction.
- December 12, 2014     $30 million transaction.
- December 18, 2014     $30 million transaction.
- March 18, 2015     $34 million transaction.
- March 10, 2015     $25.8 million transaction.
- July 17, 2015     $45 million transaction.
- December 15, 2015     $18.75 million transaction.
- August 19, 2015     $171 million transaction.
- December 23, 2015     $26 million transaction.
- February 29, 2016     $16.8 million transaction.
- March 22, 2016     $33.75 million transaction.
- May 10, 2016     $342 million transaction.
- April 29, 2016     $16.8 million transaction.
- November 29, 2016     $99.6 million transaction.
- December 28, 2016     $45 million transaction.
- January 27, 2017     $16.8 million transaction.
- May 2, 2017     $342 million transaction.
- May 17, 2017     $198.9 million transaction.
- July 5, 2017     $16.8 million transaction.
- June 30, 2017     $64.5 million transaction.
- June 15, 2018     $198.9 million transaction.
- July 16, 2018     $342 million transaction.
- November 29, 2018     $48.75 million transaction.

(together, the "***Transactions***").

123.    All (or nearly all) of the Transactions required Nixon to issue a Transaction Opinion and perform the accompanying due diligence and other responsibilities.

124.    All (or nearly all) of the investors and Funds relied on Nixon, including its role, seal of approval, and representations, in entering the Transactions. Carpoff needed Nixon to perform these roles, or else the Transactions would not have closed.

**F. Before April 2016 to March 2017: Nixon saw Red Flags of Wrongdoing, and Knew or Should Have Known That Carpoff was a Wrongdoer**

125.    Leading up to April 2016 to March 2, 2017, Nixon identified red flags of wrongdoing by Carpoff ("***Red Flags***").

### a. Nixon Knew or Should Have Known that Carpoff was Misrepresenting the Financial Projections Upon which the Transactions were Based

126.    Nixon knew or should have known that Carpoff was misrepresenting financial projections upon which the transactions were based.

127.    For example, on March 15, 2011, seven days before the close of the first Nixon-counseled and Solutions-sponsored tax advantaged transaction, Mr. Milder described to Carpoff and Novogradac (Solutions' accounting firm) a "*fundamental problem*" with the transaction and financial projections:

> [A]t one point, it appeared that $800 per month was a reasonable rent [for an MSG], while Jeff [Carpoff] now expects to get $950 for the [MSG] units.

128.    The next day, March 16, 2011, Novogradac told Mr. Milder that, in support of the financial projections, Carpoff claimed to be able to lease the MSGs: (1) in bulk at $1200 per MSG; and (2) on a retail / unit-by-unit basis at $1800 per MSG.

129.    This was a huge increase over and above the 15.7% increase Mr. Milder had questioned the day before. Mr. Milder recognized Carpoff was lying, writing to him:

> Jeff – do you REALLY think you can rent all 192 [MSGs] without any "vacancies" for more th[a]n double what was originally projected? I think we ALL [should] invest!

130.    Nixon never received a substantive explanation.

### b. Nixon Knew of Should Have Known that the MSG-Sale Price was Fictional and Over-Stated

131.    The $150,000 MSG-sale price was integral to each transaction and each investor's decision to invest because, among other things, it dictated the amount of the investor's tax benefit.

132.    Nixon knew the $150,000 price was fictional and overstated. Nixon knew this sale-price was approximately 2.5 times the cost to construct an MSG, which Nixon described as a "*significant markup*" "*bound to get the IRS's attention*" and "*tough*" to defend in the event of a challenge by the IRS.

133.     And Nixon knew that the sale price for each MSG never changed. The MSG-price remained precisely the same at $150,000 for every (or nearly every) transaction, every year for many years, somehow immune to inflation or market-forces.

134.     In December 2014, the IRS wrote to Mr. Milder in connection with Nixon's representation of Solutions and the applicable Fund:

> **[I]t is the Government's position that all evidence in this case indicate the value of the [MSG], which directly correlates to the amount of the tax credits and depreciation deduction, was greatly inflated for the purpose of tax avoidance.** **Moreover, the underlying financial transactions have no economic substance;** and, as such, for these reasons, the deduction and tax credits have been disallowed and the gross valuation misstatement penalty applies.

(emphasis added).

135.     Nonetheless, Nixon continued to close transactions premised on the $150,000 per MSG sale price.

### c.  Nixon Asked Carpoff For Evidence of "*Real Sales*"

136.     For years Nixon sought proof from Carpoff that Solutions had sold an MSG for $150,000 to an unrelated third party to support that pricing. Nixon described these as "*real*" sales or sales to "*real*" or "*true*" third parties. Nixon used this description because it believed the $150,000 sale price to investors seeking tax benefits to be fictional and overstated.

137.     On December 1, 2010, before the first transaction closed, Mr. Milder challenged Carpoff regarding the $150,000 purchase price and asked for support:

> **I remember you originally telling me that the units went for $100,000 a piece,** that you had sold some of the units for $100,000, with the markup being $30,000 on your $70,000 cost. **Indeed, I remember specifically discussing these numbers on our first call,** and I observed that your markups were far more realistic than Mobile Power's. **However, today, you said $150,000, meaning that your markup has gone from 43% to 115%.**
>
> Has the price changed, and **do you have any illustrative sales of the units to true third parties for $150,000**?

(emphasis added).

138.     On October 17, 2014, Mr. Milder wrote to Carpoff to convey his belief that the $150,000 purchase price was artificial and fictional:

[W]e do have one possible strategy that I mention from time-to-time, and I'll mention it again now -- selling a few units [MSGs] for $150,000 to **real third parties (and I don't mean Lou! That transaction also has Jeff [Carpoff] on both sides, even if the one side is as a manager.) Over the years, I have said how great it would be if we had a few sales to a movie studio, or NASA, or somebody**. **"Hey IRS! See this bill of sale?** The US Government bought some of these units for $150k, and who's a better judge of their value than that?"

(emphasis added).  A copy of this October 17th email is attached as **Exhibit 4**.

139.    Twenty months later, on June 1, 2016, Mr. Milder wrote to Carpoff, with the subject-line: "IMPORTANT -- PLEASE READ." Mr. Milder lamented the lack of "*real sales*" at a $150,000 price imploring Carpoff at long last to provide proof of any:

**I have been hearing for a long time about a few past sales of individual units for $150,000 each,** and the high likelihood of new sales to the US government for $150,000.  **I have also suggested that it would be great to have a sale or two to** a movie production company, or **someone** else obvious that would support our position.  **NOW IS THE TIME! … We really need this now.**
                                                    ***
Anyway, my guess is that [the IRS] engineer is going to do the same thing – **he's pretty likely to conclude that the units are worth way less than $150,000. Again, some REAL SALES would be great here.**

(emphasis added, caps original). A copy of this June 1st email is attached as **Exhibit 5**.

140.    Two weeks later, on June 30, 2016, Mr. Milder again wrote to Carpoff:

Sales of Units to the US.  **We discussed about a month ago the possibility of a closing on the sale of a dozen or so units to the US government for $150,000**. Obviously, this would be very supportive of our position on valuation.  **Where is that transaction? Please give me some kind of update** on when it is expected to close and what the sales price will be.

(emphasis added).

141.    Nixon never received proof of a "*real*" sale to the US government.

### d.  Nixon Worked with Carpoff to Feign Compliance with Tax Requirements

142.    Nixon advised Carpoff of the tax requirement that the Managing Member (*i.e.,* the managing member of the Fund, which owned 1% of the Fund) itself must be owned 21% or more by a party unrelated to Solutions for the Funds / investors to receive the tax benefits that drove the transactions. This is referred to as the "***Unrelated Party Requirement***".

143.    Carpoff knew that compliance with the Unrelated Party Requirement put his fraud at risk, because the "unrelated party" would have visibility into and authority over the transactions and flow-of-funds. Thus, Carpoff used strawmen or related parties to feign compliance.

144.    Nixon knew or should have known these persons were strawmen or related parties and therefore: (1) the Transactions did not comply with tax law; and (2) Carpoff's representations were false. And thus, that Solutions and Distribution were being harmed with every transaction.

145.    Nixon worked with Carpoff to conceal the use of strawmen and related parties, even though Mr. Milder understood that this deception was "*putting lipstick on a pig.*"  **Exhibit 4**.

(i)    Patrick Moore / Solarmore Investments

146.    Patrick Moore served as an "owner" of Solarmore Investments but was Carpoff's strawman. Solarmore Investments was the Managing Member for certain Funds in the first series of transactions.

147.    In early December 2010, in connection with the first Solutions-sponsored tax advantaged transaction, Mr. Milder explained the Unrelated Party Requirement to Carpoff and advised Carpoff to divest himself of 21% of Solarmore Investments. As the Managing Member, Solarmore Investments would own just 1% of the Fund.

148.    Carpoff misunderstood. Carpoff mistakenly believed that Mr. Milder had directed him to sell 21% of Solutions – his primary business – to the unrelated third party. Thus, Carpoff transferred 21% of Solutions to Patrick Moore.

149.    On December 17, 2010, Mr. Milder asked "*to see the documentation on the 21% guy and know who the guy is.*" That day, Carpoff caused Mr. Milder to receive the stock certificate and stock purchase agreement reflecting Carpoff's sale of 21% of Solutions to Patrick Moore.

150.    On February 9, 2011 – two months later – Mr. Milder and Carpoff recognized the mistake. Mr. Milder wrote to Carpoff:

> I am sorry for the confusion. … For what it's worth, I can honestly say that I simply wouldn't have suggested that a client sell 21% of his business just so he could achieve a tax result, unless the client told me in no uncertain terms that he understood and was willing to do it. The fact that no one jumped up and down and said "Does Jeff [Carpoff] really have to sell 21% of his business" is consistent with that view.

24

151.    To remedy his mistake, Carpoff simply swapped Patrick Moore's ownership interest from: (a) 21% of Solutions; to (b) 21% of Solarmore Investments.

152.    Nixon knew this. Indeed, Solutions and Solarmore Investments were both Nixon clients. Nixon understood that: (1) Patrick Moore was a strawman; and (2) Carpoff was willing to manufacture facts to achieve a tax result.

153.    In certain of its Transaction Opinions, Nixon states that: (1) it represents Solarmore Investments; (2) Carpoff has represented that Patrick Moore owns 21% of Solarmore Investments; and (3) Patrick Moore "*is under no obligation to act as the agent of [Solutions] or otherwise act on behalf of [Solutions]."* But Nixon knew that Patrick Moore was just a strawman.

> (ii)    Carl Jansen / Solarmore Management

154.    Carl Jansen was as an owner of Solarmore Management, which was the Managing Member for certain Funds in a later series of transactions.

155.    Mr. Milder had interacted directly with Carl Jansen and knew that Carl Jansen was or had been a Solutions' executive who worked on, among other things, financial projections and relationships with potential investors. Mr. Milder received communications and documents reflecting that Carl Jansen was on the "*DC Solar Team*" and served as Solutions' "*Vice President of Sales and Distributions*."

156.    Nonetheless, in Nixon's Transaction Opinion dated June 20, 2014, delivered to the investor and the Fund to induce them to invest, Nixon represented that: (1) Solarmore Management is Nixon's client; (2) Carl Jansen owns 21% of Solarmore Management; and (3):

> **Jeff Carpoff has represented to us that Carl Jansen is not related to … [Solutions]** (either directly or through constructive ownership), **has no interest in the activities of … [Solutions]** (other than indirectly through his interest in the Managing Member), **nor does he have any financial or other interest, nor is he under any obligation to act as the agent of [Solutions] or otherwise act on behalf of [Solutions].**

(emphasis added).

Nixon knew this was false and misleading.

157.    In early December 2014 (six months later), Mr. Milder advised Carpoff to sell his 79% interest in Solarmore Management to Carl Jansen, making Carl Jansen the 100% owner.

158.    On December 9, 2014, a Carpoff agent wrote to Mr. Milder:

Thanks for the education yesterday about Solarmore [Management] and the At-Risk Rules.  You need not give any more thought to the "S" corp versus "C" corp options. **We are going to transfer Jeff[ Carpoff's] 79% interest in Solarmore to Carl Jansen.  Carl [Jansen] will be the 100% owner of Solarmore and Solarmore will hire Jeff [Carpoff] to perform any necessary services.** (emphasis added).

159.    Yet, Nixon issued its Transaction Opinion dated December 18, 2014 – nine days later – misrepresenting to the investor and the Fund that "*[Carl Jansen] is **completely unrelated to the other parties to the transaction.***" (emphasis added). Nixon knew this was false.

160.    On December 11, 2015, Mr. Milder wrote to Carpoff, with the subject line of "*address of the DC Solar entities*:"

I notice that while the Fund has Carl Jansen as its "send to the attention of", and the "Company" has Jeff Carpoff as its person, **they both have the same address!  For much of the same reason that we changed the names of the people who sign for each company, we might think about a second address for Carl [Jansen].** I think **that would look significantly better.** (emphasis added).

### (iii)    Peter Rosselli / Halo Management

161.    Peter Rosselli served as the "owner" of Halo Management and was Carpoff's strawman. Halo Management was the Managing Member for certain Funds in the third series of transactions.

162.    Nixon issued a Transaction Opinion on December 28, 2016, and similar ones for certain transactions thereafter, where Nixon represented Solutions, Distribution, and Halo Management (as the Managing Member).

163.    Nixon knew that Peter Roselli was Halo Management's manager and 100% owner. Yet, Nixon never communicated directly with Peter Rosselli. Rather, Nixon communicated with Halo Management solely through Carpoff (directly or indirectly).

164.    In the applicable Transaction Opinion(s), Nixon wrote (in sum or substance):

The Managing Member is owned by Peter Rosselli, who is completely unrelated to the other parties to the transaction.

***

26

Jeff Carpoff has represented to us … that Peter Rosselli is not related to …[Solutions], nor is he under any obligation to act as the agent of [Solutions] or otherwise act on behalf of [Solutions].

165.    Nixon parroted Carpoff's representations regarding Nixon's own client, Halo Management, never communicating directly with Peter Rosselli.

166.    Had Nixon communicated directly with Peter Roselli, Peter Rosselli would have told the truth: he (1) had a business relationship with and financial obligations to Carpoff; and (2) was a nominee owner of Halo Management serving as Carpoff's strawman.

167.    Nixon knew or should have known that Carpoff's representations were false and misleading.

168.    Nixon failed to adequately communicate with its client, Halo Management.

**e.    Nixon Learns that Solutions is Alleged to have Made "Serious and Fraudulent Misrepresentations about its Leasing Operations"**

169.    On March 10, 2014, Vik Mehrotra of VCM Ltd. Mauritius emailed Carpoff, copying Mr. Milder:

**We are very concerned about DC Solar's total default on its obligations** for which the beneficiary has called in the Letters of Credit; and given what was represented to VCM, which was confirmed on the internet, **DC Solar has made serious and fraudulent misrepresentations concerning its leasing operations** which has caused a financial hardship to VCM Ltd. as a result of the default fees, interest and other expenses due from VCM Ltd. as there are no funds remaining in the Letter of Credit accounts from which these fees can be paid.

(emphasis added).

170.    Concerned, Mr. Milder emailed Carpoff: "*Seems that you might want to respond if this is untrue.*" Carpoff did respond. But Mr. Milder was unsatisfied, and wrote:

I saw Jeff [Carpoff]'s response.  I was observing that it is a bit understated, saying "and not worthy of a response".  It seems to me that you might want to send a stern response.  [Mr. Mehrotra's] letter has an awful lot of detail about the product, the offtakers, etc., that gives it an air of credibility that could be damaging to business.

171.    Nixon neither investigated nor followed up on Vik Mehrotra's assertion that "*DC Solar has made serious and fraudulent misrepresentations concerning its leasing operations.*"

### f.  Carpoff's Dispute with John Messer, and the Messer Litigation

172.  Beginning in 2011, Nixon worked directly with John Messer as Solutions' insider and representative. Nixon knew that John Messer was: (1) a 21% owner of Solutions; (2) a Solutions officer (Vice President); (3) on Solutions' Board of Directors; (4) an attorney; and (5) involved in substantive Solutions-related matters.

173.  Nixon learned that Carpoff and John Messer had gotten into a dispute. Nixon ordered a litigation report from a third-party provider.

174.  On June 25, 2014, Nixon received the litigation report, which reflected that John Messer had brought two lawsuits against Carpoff: (1) in February 2013 ("***Feb. 2013 Messer Litigation***") and (2) in December 2013 ("***Dec. 2013 Messer Litigation***," and with the Feb. 2013 Messer Litigation, the "***Messer Litigation***").

175.  Nixon obtained the court docket for each of the Messer Litigation matters and the complaint for the Dec. 2013 Messer Litigation.

176.  John Messer's complaint commencing the Dec. 2013 Messer Litigation described the Feb. 2013 Messer Litigation (in part) as follows:

On February 19, 2013, [JOHN MESSER] filed suit against Defendants DC SOLAR [SOLUTIONS], JEFFREY CARPOFF, PAULETTE CARPOFF and ARI LAUER, Esq. in the Contra Costa County Superior Court, case number MSC13-00412, which was assigned to the Honorable Steve K. Austin. The Complaint filed in said action was for:

(1)    Demand for Accounting; Inspection of Records;
(2)    Misappropriation of Corporate Assets;
(3)    Damages (Breach of Fiduciary Duty);
(4)    Conflict of Interest; Breach of Fiduciary Duty;
(5)    Involuntary Dissolution of Corporation.

(emphasis in original).

177.  In the complaint commencing the Feb. 2013 Messer Litigation, John Messer:

- Alleged that Carpoff had "*misappropriated, mismanaged and misallocated [Solutions'] corporate funds, by utilizing the corporate accounts for their own direct personal expenses and by making financial decisions which are not in the interests of [Solutions]."*

And

- Identified specific examples of Carpoff's looting of Solutions' funds, including:

- o Material disbursements to Carpoff family members, such as Carrie Carpoff (sister) and Ken Carpoff (father); and
- o $235,000 to Patrick Moore (Carpoff's strawman, and a former owner of Solutions and owner of Solarmore Investments, Nixon clients).

178.    The docket for the Feb. 2013 Messer Litigation reflected that John Messer had moved for the appointment of a receiver for Solutions, supported by his publicly filed declaration dated May 13, 2013 ("***Messer Declaration***").

179.    John Messer swore in the Messer Declaration, among other things, that:

> **There has been corporate misappropriation of funds, misuse of funds, misrepresentation by the Carpoffs** to wit diversion for personal expenses, payments to Carpoffs for nonauthorized (non-documented) payments, transfers to other entities controlled by the Carpoffs and various other transactions which have resulted in the facts hereinafter stated. **The appointment of a Receiver is necessary to prevent the further misappropriation of funds and other abuses of the majority shareholder** to the detriment of my interests as a minority shareholder.

(emphasis added).

John Messer also swore in the Messer Declaration that:

- "*Jeff Carpoff ... continually takes cash out of the DC Solar company account at First Republic [Bank] without documented reason or explanation.*"

- Carpoff wrote checks from Solutions to Patrick Moore: (1) $185,000 on April 11, 2011; (2) $4,300 on May 6, 2011; and (3) $30,000 on September 22, 2011.

John Messer also swore in the Messer Declaration that:

> On December 30, 2011, a check was made payable to Efficient Energy Distributions, Inc. in the amount of $331,000.00. **Efficient Energy is a company of Patrick Moore, a friend of Jeff Carpoff.** The Memo on the check says "Hayes Insurance Deal." **Efficient Energy was not on the disbursement list from the closing [of this Solutions-sponsored transaction] and there is no reason for this check other than misrepresentation and misappropriation by the Carpoffs for their own benefit and the benefit of their friends.** It was not disclosed to me that Efficient Energy was in any way eligible for any payment under the Hayes deal. Another seemingly inappropriate check to Efficient Energy Distributions, Inc. in the amount of $50,000 made on the DC Solar Account at [First Republic Bank] dated December 28, 2012.

(emphasis added).

180.    Nixon did not seek further information regarding the Messer Litigation.

### G. April 2016 to March 2017: Nixon Had Actual Knowledge that Carpoff was Committing Wrongdoing

181.    Throughout its engagement, Nixon understood that Solutions' and Distribution's business model was premised upon the marketing and sub-leasing of the MSGs to third party end users, giving rise to payments: (1) on the sub-lease, from the end user to Distribution; (2) on the lease, from Distribution to the Fund; and then (3) on the note, from the Fund to Solutions.

182.    This money-flow was integral to Solutions' and Distribution's purported business model and served as the support for the $150,000 per MSG sale price and associated favorable tax benefit (driving the investor's decision to invest).

183.    By no later than a series of events from April 2016 to March 2, 2017, Nixon gained actual knowledge that Solutions and Distribution were failing to meaningfully sub-lease the MSGs and that Distribution had limited end user revenue. Nixon learned that Distribution's primary source of revenues was Solutions, its affiliate. Thus, Nixon knew that Carpoff had caused Solutions and Distribution to engage in a circular flow of monies that contradicted the business model.

184.    As a result, Nixon knew that Carpoff was misleading and lying to investors, engaging in wrongdoing, failing to operate Solutions and Distribution in a proper and safe manner, and harming Solutions and Distribution with each successive transaction. Yet, Nixon continued to represent Solutions and Distribution just as it did before.  The chronology, in part, is as follows.

185.    On April 7, 2016, the IRS sent a detailed draft report ("***IRS April 2016 Report***") explaining the IRS's investigation into and conclusions about a Solutions-sponsored and Nixon-counseled tax advantaged transaction that closed in December 2011. The IRS delivered its report to Ron Roach, Carpoff's outside accountant and co-conspirator in the Carpoff Ponzi Scheme.

186.    Within days, Ron Roach forwarded the IRS April 2016 Report to Mr. Milder, as counsel to Solutions, the Managing Member, and the Fund.

187.    The IRS April 2016 Report reads in part as follows:

[The Fund] purchased [the MSGs] from [] Solutions on December 16, 2011.  [The Fund] then leased the [MSGs] to [] Distribution for $190,400 per month ($2,284,800 per year).  **In March of 2011, [] Distribution entered into a "Re-Rent" agreement with [] Solutions, where both parties agreed that [] Distribution would sub-lease to [] Solutions an unspecified amount of [MSGs].**

Based on the rent paid by [] Solutions to [] Distribution in 2011 and 2012 ($199K per month in 2011 and $331K per month in 2012), it appears that the following took place with respect to the [MSGs]:

(1)    It was sold by [] Solutions to Solar Eclipse on December 16, 2011,
(2)    It was [] then leased to [] Distribution[] starting in December of 2011,
(3)    It was sub-leased by [] Distribution back to [] Solutions in 2011 and 2012, **completely closing the circle.**

**Per the Re-Rent Agreement, [] Solutions would also re-rent the [MSGs] it leased from [] Distribution "to its own customers".** However, [] Solutions only claimed $11,152 of gross rental income on its 2011 return, and zero rental income on its 2012 return. [] **Solutions reported all of its rental payments to [] Distribution under Cost of Goods Sold.**

In addition, Solarmore Investments received a loan in the amount of $961,500 from [] Solutions. This is significant since it likely helped finance Solarmore's $111,000 initial capital contribution into [the Fund]. **This further demonstrates the circular nature of the transaction.**

\*\*\*

Courts view related party loans with scrutiny. Some of the factors subject to this scrutiny are the source of the repayments and identity of interest between the creditor and owner. **Upon examination, the [IRS] determined that the loan was a mere circular movement of money used to prop up a vastly overstated purchase price in order to impermissibly maximize the energy credit.**

[The Fund] repays its loan with the rental income it receives from [] Distribution. [] Distribution pays its rental fees with the rental fees that it receives from [] Solutions, which was the original lender. [] **Solutions is in effect paying rent to [the Fund] to cover the payments it is making on the note owned by [the Fund]. So [] Solutions is ultimately the source of the loan repayments on its own note.**

\*\*\*

Given that several months prior to the December [2011 MSG] asset sale, an agreement had been reached between [] Distribution and [] Solutions for Solutions to re-rent the [MSG] equipment, **it seems pretty clear that Mr. Carpoff knew that he would not be able to find a substantial number of third party sub-lessees to cover the rent that was being paid by Distribution to [the Fund].** This is compounded by the fact that the Re-Rent agreement stated that [] Solutions would re-rent the equipment to "its own customers," when Solutions only reported $11,552 of rent income in 2011 and zero in 2012.

(emphasis added).

188.    Nixon knew that the IRS's description of the Re-Rent Agreement and the flow-of-funds contradicted Solutions' and Distribution's business model as Carpoff and Nixon had been representing it.

31

189.    On May 7, 2016, Ron Roach sent the Re-Rent Agreement to Mr. Milder.

190.    Nixon knew the Re-Rent Agreement was bogus. Not only had the IRS just explained this in the IRS April 2016 Report, but the Re-Rent Agreement provided for Solutions to rent the MSGs from Distribution and then "*to [Solutions'] own customers.*" Mr. Milder knew this (1) was contrary to Solutions' and Distribution's business model; and (2) made no sense - after all, Distribution could have leased those same MSGs to those same customers.

191.    Mr. Milder focused on this item. Just weeks later, on June 1, 2016, Mr. Milder wrote to Carpoff with the subject-line: "IMPORTANT -- PLEASE READ":

> **The [IRS April 2016 R]eport … observes that [Distribution] has only a small amount of income from leasing the units. … [I]t leaves me wondering … why the [IRS] agent thinks that DC Solar had so little income.  I would think that with the funds we have closed, there would be a LOT of cash flow, with Distribution both collecting a lot of rental income from [end users],** and paying a lot of rent to the funds. Similarly, [Solutions] should have a lot of income from the now several years of payments on the notes it holds from the sales of hundreds/thousands of units. **Ron [Roach] has told us he would assemble data to show the successful business, but we haven't seen anything.  Where does this stand?**

(emphasis added, caps original).  **Exhibit 5**.

192.    Later that month, on June 30, 2016, Mr. Milder memorialized by email a conversation with Carpoff:

> <u>Documenting Revenues</u>. The Hays people really want to see documentation of the revenue streams received on their equipment. **Jeff [Carpoff] and I have discussed that the revenue stream is not very good** …

(emphasis added).

"The Hays people" ("*Hays*") refers to the financial investor in that Fund.

193.    From his direct discussions with Carpoff, Mr. Milder knew that Distribution was failing to lease the MSGs in a manner consistent with the business model and not producing the requisite third party revenues. Mr. Milder understood that revenues were coming from Solutions (in a circular flow) rather than from end users.

194.    On June 30, 2016, Mr. Milder asked Carpoff for a document which explained what "*went wrong*" in the relationship with the MSG end user, to share with Hays.

195.    On June 30, 2016, Mr. Milder had a phone call with Hays, whereby Mr. Milder would "*reach out to Ron [Roach] to follow-up on the lease/revenue streams...*"

196.    Nixon continued to follow-up, seeking information related to Distribution's leasing operations, its performance / underperformance, the "*not very good*" revenue, what "*went wrong,*" and "*why the [IRS] thinks that DC Solar had so little income.*" As examples:

- On July 5 and 6, 2016, Hays followed up by email to Jeff Carpoff, Ron Roach, and Mr. Milder, seeking "*the lease/revenue stream,*" and noting that "*it's been an outstanding issue for at least a couple of months.*"

- On July 13, 2016, Ron Roach told Mr. Milder that he would provide the "*status of detailed sublease reporting.*"

- On July 18, 2016, Ron Roach sent Mr. Milder the Fund sub-lease activity for 2012 and 2013.

- On July 30, 2016, Ron Roach sent Mr. Milder Distribution's "Sales by Customer Summary Report" for 2014 and 2015.

- On August 1, 2016, Mr. Milder was sent a spreadsheet with the "re-rent" income per the Re-Rent Agreement (monies sourced from Solutions into Distribution).

197.    On January 30, 2017, the IRS sent Mr. Milder the final IRS report ("***IRS Jan. 2017 Report***"), including communicating much of (in sum or substance) the information quoted above from the IRS April 2016 Report, including stating as follows:

> **The fact that the equipment was re-rented back to DC Solar** adds to the peculiar circumstances of this transaction and **emphasizes the circularity** of and relatedness of the various parties in this transaction. The [IRS] thus believes that while the lease itself validly conveys the property to the lessee, **the lease payments themselves are overstated and ultimately part of a circular flow of funds that begin and end with DC Solar Solutions. The circular flow of funds encompasses both the lease payments and the purported financing between [the Fund] and DC Solar Solutions.**

(emphasis added).

198.    Two weeks later, on February 15, 2017, Mr. Milder broadly asked: "*What efforts has DC Solar Distribution made to sublease the units since 2012?*"

199.    Two days later, on February 17, 2017, Carpoff responded to Mr. Milder with a discussion of "*a number of near misses*" and other failures without identifying any successes.

200.    On February 22, 2017, Mr. Milder pressed further, asking Ron Roach for "*the [percentage] of third party leases [when] compared to the master lease*." Ron Roach responded that he would provide the "*sub-lease activity*" in a few days.

201.    On March 2, 2017, Ron Roach sent an email ("***March 2, 2017 Email***") to Mr. Milder and Hays. A copy is attached as **Exhibit 6**.

202.    The March 2, 2017 Email spelled out that only a small percentage of Distribution's sublease revenue came from end users. And that the large majority came from Solutions via the re-rent payments (*i.e.,* a circular flow of money beginning and ending with Solutions).

203.    In the March 2, 2017 Email, Ron Roach told Mr. Milder that:

- In 2013, re-rent revenue was $1.5 million while third party sublease revenue was $300,000.

- In 2014, re-rent revenue was $14 million while third party sublease revenue was $321,000.

- In 2015, re-rent revenue was $30.5 million while third party sublease revenue was $1.4 million.

- In 2016, re-rent revenue was $61.5 million while third party sublease revenue was $2 million.

204.    Mr. Milder understood that from 2013 to 2016 Carpoff caused (in large part) a circular flow of money (Solutions-to-Distribution and classified as "re-rent" payments) not sourced from end users, violating DC Solar's business model and contradicting Carpoff's representations to investors and the Funds.

205.    Mr. Milder saw that: (1) the circular flow of funds; (2) the inability to lease MSGs; and (3) Solutions serving as the source of the loan repayments on its own notes; all as previously identified by the IRS, had snowballed exponentially. And as a result, Solutions and Distribution were unable to comply with their business obligations and were spiraling deeper into debt with each transaction.

206.    After demanding in his June 1, 2016 email (**Exhibit 5**) data showing a "*successful business*," and then posing a series of follow-up questions, Mr. Milder finally received hard data showing the opposite. (**Exhibit 6**).

207.     Mr. Milder knew that Distribution's primary revenue source was its sister company, Solutions (both Nixon clients). Mr. Milder knew that Carpoff, with material control over all sides of the transaction, was effectuating a circular flow of money contradicting the business model.

208.     On March 29, 2017, Mr. Milder, Ron Roach, and others convened a conference call and discussed: (1) the March 2, 2017 Email; (2) the IRS April 2016 Report and the IRS Jan. 2017 Report; and (3) the Re-Rent Agreement.

209.     Ron Roach expected that Nixon's knowledge of the circular movement of monies, in detail and year-over-year, contradicting Carpoff's representations to investors, would bring an end to the Carpoff Ponzi Scheme. Ron Roach thought it was "game over."

210.     Ron Roach expected Nixon to withdraw and not represent Solutions or Distribution in future transactions, effectively preventing DC Solar from closing any more transactions.

211.     Ron Roach was wrong. Nixon continued to represent Solutions and Distribution without interruption, continued to lend Carpoff its name and credibility, and continued to assist in further transactions. The Carpoff Ponzi Scheme continued.

**H. Nixon Continues to Advise-on and Close Transactions, Misleading Investors and Causing Injury to Solutions and Distribution**

212.     For a series of transactions that closed after March 2, 2017, Nixon – counsel to Solutions and Distribution – joined with Carpoff to misrepresent to investors and Funds that Distribution's revenue was sourced from leasing MSGs to end users. By participating in these false and misleading representations, Nixon harmed Solutions and Distribution.

213.     For example, in connection with a May 2017 $342 million transaction, Nixon issued a Transaction Opinion to the investor and the Fund, writing (in part):

> The [MSGs] will consist primarily of trailers, racking systems, solar panels, a battery backup system, the charge controller, and inverters. **The [MSGs] will be leased to [Distribution] which will then sub-lease [the MSGs] to other users.**

(emphasis added).

Nixon knew this statement to be false. Nixon knew Distribution was unable to meaningfully lease the MSGs to "*other users.*" Nixon knew Distribution was largely sub-leasing the MSGs to Solutions per the bogus Re-Rent Agreement.

35

214.    Nixon made substantively identical false statements in the Transaction Opinions, delivered to the investor and Fund, in connection with (among others): (1) May 2017 $198.9 million transaction; (2) June 2017 $64.5 million transaction; (3) July 2017 $16.8 million transaction; (4) June 2018 $198.9 million transaction; and (5) July 2018 $342 million transaction.

**I.    Nixon Further Assists, and Covers-up, Carpoff's Wrongdoing**

215.    Nixon assisted Carpoff's wrongdoing in other ways, such as concealing and covering up what it knew. Nixon also never corrected its prior statements, which it knew to be false and misleading.

216.    On October 13, 2016, Mr. Milder had a phone call with Progressive (an investor) and its counsel, Jerry Breed. They asked Mr. Milder "*to confirm that there hasn't been any challenge by the IRS of the valuation of the units or the deal structure.*"

217.    Of course, Mr. Milder knew that the IRS April 2016 Report asserted a "*mere circular movement of money used to prop up a vastly overstated purchase price in order to impermissibly maximize the energy credit.*" Thus, the IRS had challenged both the "*valuation of the units*" and the "*deal structure.*"

218.    On October 19, 2016, six days later, Mr. Milder wrote to Carpoff:

About a half hour ago, I got a voice mail from **Jerry Breed (representing Progressive) on the audit issue again.** He said that Progressive appreciates that the IRS has been known to challenge valuations of solar projects, but **they want to know if there are any valuation issues specifically for DC Solar projects. When I spoke with them last week, I did my best to make it sound like a generic problem, but any dancing around the issue sounds like, well, dancing around the issue,** and I guess that they are still wondering.
***
[] Jerry [Breed's]'s voice mail makes it sound like **someone in the chain still isn't through exploring this issue. I'll have a conversation with him if you like, but I think that you will do a better job of limiting what you disclose than we will.** So, I'm not going to call Jerry [Breed] back until and unless I get the go ahead from you.

(emphasis added).

Nixon not only assisted, but counseled Carpoff how to effectively deceive Progressive.

219.    In July 2017, a private equity firm ("**PE Firm**") was considering an 8-figure transaction connected to Carpoff/DC Solar. Mr. Milder was informed that the PE Firm was "*pretty spooked*" by the pending IRS audit, placing the potential transaction "*on life support*."

220.    Help was requested from Nixon: "*Hopefully Dr. Milder can bring the patient back*."

221.    "*Dr. Milder*" got to work. On July 5, 2017, "*Dr. Milder*" ghostwrote an email to the PE Firm to allay some of the PE Firm's concerns.

222.    Nixon also knew that the PE Firm wanted to confirm that the MSGs to be acquired in the transaction would be leased to Distribution and then sub-leased to an end user. Although Mr. Milder knew that Carpoff had been lying about this exact item, Mr. Milder concealed the truth from the PE Firm.

223.    The PE Firm entered the 8-figure transaction. Had "*Dr. Milder*" refused to advance Carpoff's lies, the PE Firm would not have entered this transaction, which caused damages to Solutions and Distribution.

## J.   Nixon's Actions and Inactions Caused Harm to Solutions and Distribution

224.    Nixon's actions and inactions was a substantial factor in bringing about the harm to Solutions and Distribution: their clients. Nixon's actions and inactions substantially assisted Carpoff in harming Solutions and Distribution.

225.    Nixon's actions and inactions caused Solutions and Distribution to suffer harm with every transaction. Nixon's actions and inactions prolonged Solutions' and Distribution's corporate life through increased liabilities, unsustainable obligations, and bad debt, and through the dissipation of corporate assets. Nixon's actions and inactions harmed the value of corporate property. Nixon's actions and inactions caused Solutions and Distribution to expend corporate assets that would not have been spent had the entities not engaged in further transactions.

226.    The investors and the Funds relied on Nixon, their actions, and inactions. They relied on Nixon's seal of approval and role as gatekeeper, along with the credibility it provided. The transactions (some if not all) would not have happened without Nixon serving in these roles.

227.    The transactions (some if not all) would not have happened had Nixon complied with the Rules of Professional Conduct, including regarding: (1) conflict waivers; (2) diligence; (3) competence; and (4) communication.

228.    Nixon failed to properly identify and stop Carpoff's looting and misrepresentations. Nixon should have stopped assisting with new transactions and should have withdrawn from representing Solutions and Distributions. Instead, Nixon covered-up and assisted Carpoff in his wrongdoing. Nixon continued to represent Solutions and Distribution, and worked with Carpoff in connection with closing transactions, after it knew or should have known of Carpoff's wrongdoing. And Nixon failed to follow-up on the Messer Litigation.

229.    Solutions' and Distribution's injury includes that arising from and reflected in: (1) Carpoff's looting of DC Solar; (2) Solutions and Distribution wrongly incurring liabilities and other obligations; (3) the dissipation of Solutions' and Distribution's assets; and (4) the aggravation of Solutions' and Distribution's insolvency and wrongful prolonging of their life.

**K.    Nixon's Benefit and Motivation**

230.    Nixon benefitted and profited, and was neither harmed nor prejudiced, from its representation of Solutions and Distribution and its relationship with Carpoff and DC Solar.

231.    From 2010 to 2018, Nixon opened Carpoff-related matters under the "Solutions" client-classification and was paid (at least) $2.9 Million in fees. Nixon attorneys staffing these matters were among Nixon's highest hourly-rate attorneys, charging at the highest-end of national hourly rates at great profit to the law firm.

232.    In 2018 Nixon charged: (1) $980/hour for Mr. Milder; (2) $955/hour for James Duffy; and (3) $935/hour for James Brady; for Carpoff-related legal services.

233.    Nixon sent its bills to California for payment.

234.    Nixon considers client origination in determining partner compensation. Although Mr. Milder did not originate Nixon's relationship with Carpoff, as the relationship grew, he was rewarded with a large share of the origination credit for Carpoff-related matters.

235.    Nixon (through its fees and client-base) and Mr. Milder (through his increased compensation) were financially motivated to ignore and commit wrongdoing. They were also

motivated to protect their reputations and relationships and avoid liability for the structure and transactions they led and engineered. To withdraw or change their approach would cast a spotlight on past transactions and their past conduct.

236.    Nixon was also motivated and enticed to ignore and commit wrongdoing due to its close and special relationship with and allegiance to Carpoff.

237.    Mr. Milder's hubris also contributed to Nixon's misconduct, including ignoring and committing wrongdoing.

### L.  Additional Points

238.    Nixon accepted payment from persons or entities other than Solutions or Distribution as payment for services Nixon performed for representing Solutions and Distribution without proper accommodation for same.

239.    In connection with Nixon's representation of Solutions related to IRS audit matters, Nixon failed to adequately accommodate for the fact that Nixon had a legal or professional interest in the subject matter of the representation, *i.e.,* defending the propriety of the transactional structure that Nixon created and implemented.

240.    In the course of perpetrating his scheme, Carpoff committed tax fraud based on the federal tax benefits he caused investors to receive, knowing the transactions did not support those benefits. By no later than March 2017, Mr. Milder equally knew and knowingly participated in those fraudulent transactions.

241.    Neither Carpoff nor any other DC Solar wrongdoing former insider will receive a recovery or benefit from this litigation or a distribution in the bankruptcy case.

242.    At all material times, Carpoff and other DC Solar wrongdoing former insiders were acting: (1) adversely to DC Solar; (2) out of self-interest; and/or (3) primarily seeking to benefit persons or entities other than DC Solar through their actions.

243.    Had Nixon properly advised and counseled its clients, Solutions and Distribution, and acted in accordance with its fiduciary, professional, and other obligations, Solutions and Distribution would not have suffered damages or the extent of damages they suffered.

244.    Had Nixon complied with the applicable Rules of Professional Conduct, Solutions and Distribution would not have suffered damages or the extent of damages they suffered.

245.    Had Nixon advised the DC Solar insider non-wrongdoers or the investors of Carpoff's wrongdoing, each would have: (1) blown the whistle; (2) stopped Carpoff's wrongdoing from continuing; (3) stopped any further transactions; and (4) stopped the harm upon DC Solar.

246.    Nixon was in a unique position, including as a gatekeeper, to protect Solutions and Distribution, its clients, from the injuries they suffered.

247.    Nixon enabled—and played an integral and causal role—in Carpoff's wrongdoing after Nixon knew or should have known of that wrongdoing, including by failing to stop and instead helping Carpoff's wrongdoing.

248.    Nixon enabled—and played a causal role—in Carpoff's wrongdoing by violating the applicable Rules of Professional Conduct and by breaching its duty of undivided loyalty and other duties to Solutions and Distribution, including by not properly obtaining written conflict waivers and informed consent from the appropriate parties.

249.    Solutions and Distribution suffered damages from Carpoff's wrongdoing well into 2017 and 2018, including through: (1) Carpoff's continued looting; and (2) increased corporate liabilities and unsustainable obligations.

250.    Nixon's wrongful conduct reflects oppression, fraud, and malice towards Solutions and Distribution. It extended over a long period of time. Despite many opportunities, and its growing knowledge (including from the IRS), Nixon failed to revise and instead continued its wrongful conduct. Nixon's wrongful conduct was, at times, due to its extreme recklessness and intentional acts. Nixon should be punished and deterred from future wrongdoing.

## CLAIMS FOR RELIEF

### COUNT I
### (PROFESSIONAL MALPRACTICE)

251.    The Trustee re-alleges paragraphs 1 through 250 as if fully stated herein.

252.    Solutions and Distribution had an attorney-client relationship with Nixon, which began in October 2010. Nixon was retained on a general representation, and the scope of the

retention was very broad. Nixon continuously maintained this attorney-client relationship through at least December 2018.

253.    Nixon's duties included:

- A duty of care, including to exercise the knowledge, skill, and ability ordinarily exercised by other similarly situated lawyers.

- As a specialist in sophisticated business transactions, and because it held itself out as such a specialist, Nixon owed a special duty to act with the knowledge, skill, and ability ordinarily exercised by other specialists.

- To protect Solutions and Distribution in every possible way, including from insider misconduct or looting.

- To protect Solutions and Distribution from the liability which could flow from promulgating a false or misleading offering or marketing communication or transaction opinion to investors or potential investors.

- To appropriately guide, counsel, advise, disclose information, and take all other appropriate items to and for the benefit of Solutions and Distribution in connection with the entire spectrum of the Solutions-sponsored tax-advantaged investments, including corporate, tax and securities matters, and to protect it against liability.

- Ensure that its representations and assumptions in the Transaction Opinions were reasonable, and to reject any representation or assumption that was unreasonable or conflicted with actual facts (or where appropriate, obtain clarification or supporting information).

- To alert Solutions and Distribution to problems and potential problems reasonably or readily apparent.

- To consider and advise Solutions and Distribution of any matters they overlooked and/or should have pursued or investigated to avoid prejudicing their interests.

254.    Nixon owed further and expanded duties to Solutions and Distribution because Nixon: (1) had knowledge of facts that Carpoff was utilizing Nixon's services in furtherance of wrongdoing; (2) was the gatekeeper and reputational intermediary for Solutions and Distribution, providing them with the Nixon "seal of approval" and vouching for them in the investor marketplace; (3) worked on securities and offering transactions for Solutions and Distribution; (4)

marketed and participated in the marketing and offering of Solutions' investment opportunity; (5) had a close and special relationship with Carpoff; and (6) issued the Transaction Opinions.

255.    Nixon's duties included the duty to investigate, warn, protect, and avoid assisting in wrongdoing, all owing to Solutions and Distribution.

256.    Nixon knew or should have known, and then actually knew, that Carpoff was engaged in wrongdoing, including harming Solutions and Distribution with each transaction, incurring unsustainable obligations and liabilities and burdens flowing from false representations seeking investments, and which they could otherwise not pay or meet.

257.    Nixon breached its duties to Solutions and Distribution by, among other things:

- Failing to investigate or follow up on the Red Flags.

- Permitting and enabling Carpoff and the other wrongdoing former insiders to misrepresent Solutions' and Distribution's financial status and the accurate role(s) and relationship(s) of multiple players in the transactions.

- Permitting and enabling Solutions and Distribution to use Nixon (name and logo and Mr. Milder) as a "seal of approval," and otherwise vouching for Solutions and Distribution, in the marketplace.

- Failing to protect Solutions and Distribution from Carpoff's wrongdoing.

- Failing to prevent Carpoff and other wrongdoing insiders from operating Solutions and Distribution in a way that violated their own business model, offering and marketing materials, documents, and otherwise representations to investors, and in a way that violated tax law (either by them or other entities in connection with the transactions).

- Failing to inform and disclose to DC Solar's insider non-wrongdoers Carpoff's misconduct and deceit.

- Failing to make a reasonable, independent investigation to detect, correct and prevent false or misleading offering and marketing materials.

- Failing to ensure that its representations and assumptions in the Transaction Opinions were reasonable, and to reject any representation or assumption that was unreasonable or conflicted with actual facts (or where appropriate, obtain clarification or supporting information).

- Disseminating or participating in disseminating Transaction Opinions and other marketing or offering materials that it knew or should have known to be false and misleading.

- Failing to make an appropriate and reasonable effort to independently verify the facts set forth in the Transaction Opinions, and upon which Nixon's opinion was based.

- Working on and closing transactions where it knew or should have known investors would be misled and relying on false information.

258. Nixon's negligent acts were below the standard of care for comparable attorneys who practice in the community, especially attorneys, like Nixon, who are specialists.

259. Nixon's breach of duties was a substantial factor in causing damages to Solutions and Distribution. Nixon's breach of duties was the proximate cause of the damages sought in this action. There was a proximate causal connection between the breach and the resulting injury.

260. Solutions' and Distribution's damages include being encumbered with obligations and liabilities, the misuse of company assets, the looting of company assets, and aggravating company insolvency and wrongfully prolonging its life.

261. Had Nixon not breached its duties, Solutions and Distribution would not have suffered these damages or the extent of these damages.

262. Nixon and Mr. Milder were financially and otherwise motivated to assist, conceal, and ignore wrongdoing and commit wrongdoing.

**COUNT II**
**(BREACH OF FIDUCIARY DUTY)**

263. The Trustee re-alleges paragraphs 1 through 250 as if fully stated herein.

264. Solutions and Distribution had an attorney-client relationship with Nixon, which began in October 2010. Nixon was retained on a general representation, and the scope of the retention was very broad. Nixon continuously maintained this attorney-client relationship through at least December 2018.

265. Nixon owed fiduciary duties to Solutions and Distribution. Nixon was duty bound to act with the utmost good faith for the undivided benefit of and with undivided loyalty to Solutions and Distribution.

266.    Nixon's duties included:

- To protect Solutions and Distribution in every possible way.

- To act with undivided loyalty and good faith to and for Solutions and Distribution, and to not act or participate in acts against their interests.

- To avoid conflicts in its representations of Solutions and Distribution.

- To comply with all applicable rules of professional conduct, including those related to conflict of interest.

- To provide full disclosure to Solutions and Distribution.

- To protect Solutions and Distribution from the liability which could flow from promulgating a false or misleading offering or otherwise marketing communication or transaction opinion to potential investors.

- To ensure that its representations and assumptions in the Transaction Opinions were reasonable, and to reject any representation or assumption that was unreasonable or conflicted with actual facts (or where appropriate, obtain clarification or supporting information).

- To appropriately guide, counsel, advise, disclose information, and take all other appropriate items to and for the benefit of Solutions and Distribution in connection with the entire spectrum of the Solutions-sponsored tax-advantaged investments, including corporate, tax and securities matters, and to protect it against liability.

- To alert Solutions and Distribution to problems reasonably or readily apparent.

- To consider and advise Solutions and Distribution of matters each may have overlooked and/or should have pursued to avoid prejudicing their interests.

267.    Nixon owed further and expanded duties to Solutions and Distribution because Nixon: (1) had knowledge of facts that Carpoff was utilizing Nixon's services in furtherance of wrongdoing; (2) was the gatekeeper and reputational intermediary for Solutions and Distribution, providing them with the Nixon "seal of approval" and vouching for them in the investor marketplace; (3) worked on securities and offering transactions for Solutions and Distribution; (4) marketed and participated in the marketing and offering of Solutions' investment opportunity; (5) had a close and special relationship with Carpoff; and (6) issued the Transaction Opinions.

268. Nixon's duties included the duty to investigate, warn, protect, avoid conflicts, and avoid assisting in wrongdoing, all owing to Solutions and Distribution.

269. Nixon knew or should have known, and then by no later than March 2017 knew, that Carpoff was engaged in wrongdoing, including harming Solutions and Distribution with each transaction, incurring unsustainable obligations and liabilities and burdens flowing from false representations seeking investments, and which they could otherwise not pay or meet.

270. Nixon breached its duties to Solutions and Distribution by, among other things:

- Failing to investigate or follow up on the Red Flags.

- Looking out for Carpoff's interests, as opposed to Solutions and Distribution.

- Failing to comply with the applicable Rules of Professional Conduct, including regarding conflicts of interest.

- Permitting and enabling Carpoff and the other wrongdoing former DC Solar insiders to misrepresent Solutions' and Distribution's financial status and the role and relationship of multiple players in the transactions.

- Wrongly providing Solutions and Distribution with, and permitting and enabling Solutions and Distribution to use, the Nixon "seal of approval," and otherwise participating in Solutions' marketing efforts.

- Failing to protect Solutions and Distribution from Carpoff's wrongdoing.

- Failing to prevent, and enabling, Carpoff and the other wrongdoing insiders from operating Solutions and Distribution in a way that violated their own documents, offering materials and otherwise representations to the Funds and investors, and in a way that violated tax law (either by them or other entities in connection with the transactions).

- Failing to stop Carpoff's looting of and otherwise harming Solutions and Distribution.

- Failing to inform and disclose to DC Solar's insider non-wrongdoers Carpoff's misconduct and deceit.

- Failing to make a reasonable, independent investigation to detect, correct and prevent false or misleading offering and marketing materials.

- Failing to ensure that its representations and assumptions in the Transaction Opinions were reasonable, and to reject any representation or assumption that was unreasonable or

conflicted with actual facts (or where appropriate, obtain clarification or supporting information).

- Issuing Transaction Opinions it knew or should have known to be false and misleading, and working on and closing transactions where it knew or should have known investors would be misled and relying on false information.

271.    Nixon violated applicable Rules of Professional Conduct. For example, Nixon never obtained informed consent and a written conflict waiver from Solutions and Distribution. And Nixon wrongly looked out for Carpoff's personal interests, and those of its other clients, and itself, thereby failing to provide undivided loyalty to Solutions and Distribution.

272.    Nixon's breach of duties was a substantial factor in causing damages to Solutions and Distribution. Nixon's breach of duties was the proximate cause of the damages sought in this action. There was a proximate causal connection between the breach and the resulting injury.

273.    Solutions' and Distribution's damages include being encumbered with obligations and liabilities, and misuse of company assets, the looting of company assets, and aggravating company insolvency and wrongfully prolonging its life.

274.    Had Nixon not breached its duties, Solutions and Distribution would not have suffered these damages or the extent of these damages.

275.    Nixon and Mr. Milder were financially and otherwise motivated to assist, conceal, and ignore wrongdoing and commit wrongdoing.

### COUNT III
### (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY)

276.    The Trustee re-alleges paragraphs 1 through 250 as if fully stated herein.

277.    Carpoff owed fiduciary duties to Solutions and Distribution, as an owner, officer, board member and/or person with a material level of control. Nixon knew that Carpoff served in these roles and owed fiduciary duties to Solutions and Distribution.

278.    Solutions and Distribution had an attorney-client relationship with Nixon, which began in October 2010. Nixon was retained on a general representation, and the scope of the retention was extraordinarily broad. Nixon continuously maintained this attorney-client relationship through at least December 2018.

279. Nixon also had a close and special relationship with Carpoff.

280. Carpoff breached his duties to Solutions and Distribution by (among other things): (1) looting Solutions; (2) causing Solutions and Distribution to enter transactions and take on financial and operational burdens which were not in their best interests; and (3) exposing Solutions and Distribution to liabilities flowing from disseminating a false or misleading offering or otherwise marketing communication or representation to potential and actual investors.

281. Nixon had actual knowledge of these breaches of duties by no later than March 2017, due to among other things: (1) its knowledge of how the business model was supposed to work; (2) its failure to comply with the Rules of Professional Conduct, including regarding conflicts; (3) the Red Flags, including in connection with: (i) the Managing Members and their insiders; (ii) the Messer Litigation; (iii) Mr. Mehrotra's allegations; and (iv) the orchestrating of the MSG sale-price; and (4) the series of events from April 2016 to March 2017, including in connection with the (i) IRS April 2016 Report; (ii) Re-Rent Agreement; and (iii) March 2, 2017 Email.

282. Nixon substantially assisted and encouraged Carpoff's breach of duty to Solutions and Distribution by, among other things: (1) continuing to represent Solutions and Distribution, and the other Carpoff-affiliates, while conflicted and without proper accommodation for same; (2) serving as the gatekeeper for Solutions into the investor-marketplace; (3) working towards and closing further transactions, whereby Solutions and Distribution would be wrongly burdened by obligations and liabilities; (4) issuing its Transaction Opinions; (5) staying silent and assisting in concealment, including by not correcting prior misrepresentations and with regard to Progressive/Jerry Breed; (6) violating the Rules of Professional Conduct; (7) working to salvage the PE Firm-transaction; and (8) concealing information from and misleading investors.

283. Through this conduct, Nixon breached its independent duties to its clients, Solutions and Distribution.

284. Nixon intentionally participated in Carpoff's breach of fiduciary duty with knowledge of the object to be attained.

285.   Nixon knew it had conflicts of interest and chose to ignore them (violating its fiduciary duties) and rendered advice and assistance (actions and inactions) that knowingly aided and abetted Carpoff's wrongdoing and their harm upon DC Solar.

286.   Nixon's conduct was a substantial factor in causing harm to Solutions and Distribution. Without Nixon's substantial assistance, transactions would not have closed and the harm would not occurred.

287.   The harm includes that arising from and reflected in: (1) Carpoff's looting of DC Solar, particularly Solutions; (2) Solutions and Distribution wrongly incurring liabilities and other obligations; (3) the dissipation of Solutions' and Distribution's assets; and (4) aggravating Solutions' and Distribution's insolvency and fraudulently prolonging its life.

288.   Nixon and Mr. Milder were financially and otherwise motivated to assist, conceal, and ignore Carpoff's breach of his fiduciary duties.

**COUNT IV**
**(BREACH OF FIDUCIARY DUTY BY CARPOFF AND**
**NIXON IS LIABLE AS A CO-CONSPIRATOR)**

289.   The Trustee re-alleges paragraphs 1 through 250 as if fully stated herein.

290.   Carpoff owed fiduciary duties to Solutions and Distribution, as he was an owner, officer, board member and had a material level of control. Nixon knew that Carpoff served in these roles and owed fiduciary duties to Solutions and Distribution.

291.   Carpoff breached his fiduciary duties to DC Solar and Nixon is responsible for the harm because Nixon was a co-conspirator.

292.   Nixon owed fiduciary duties, including undivided loyalty and good faith, to Solutions and Distribution, due to their attorney-client relationship. Nixon assumed expanded duties because of its knowledge and scope of its work.

293.   Nixon had a close and special relationship with Carpoff.

294.   Nixon's duties included the duty to investigate, warn, protect, avoid conflicts, and the avoid assisting in wrongdoing, all owing to Solutions and Distribution.

295.    Nixon knew it had conflicts of interest and chose to ignore those conflicts (violating its fiduciary duties) and rendering advice and assistance (action and inaction) that knowingly assisted the Carpoff's wrongdoing and their harm upon DC Solar.

296.    Nixon acquired actual knowledge of Carpoff's unlawful objective by no later than March 2017 from (among other things): (1) its knowledge of how the business model was supposed to work; (2) its failure to comply with the Rules of Professional Conduct, including regarding conflicts; (3) the Red Flags, including in connection with: (i) the Managing Members and their insiders; (ii) the Messer Litigation; (iii) Mr. Mehrotra's allegations; and (iv) the orchestrating of the MSG sale-price; and (4) the series of events from April 2016 to March 2017, including in connection with the (i) IRS April 2016 Report; (ii) Re-Rent Agreement; and (iii) March 2, 2017 Email.

297.    Nixon knew that the bulk of Distribution's revenues came in a circular manner from Solutions rather than third party end users in contradiction to the stated business model. As a result, Nixon understood Carpoff was placing unsustainable obligations on Solutions and Distribution and these clients were being harmed by every successive transaction.

298.    Nixon intended to conspire with Carpoff to join a common plan or design.

299.    Nixon tacitly if not explicitly conspired with Carpoff to join a common plan or design as of no later than March 2, 2017.

300.    Nixon and Mr. Milder were financially and otherwise motivated to assist, conceal, and ignore Carpoff's breach of his fiduciary duties.

301.    Nixon knowingly participated in the Carpoffs' breach of their fiduciary duty in multiple ways, including by: (1) continuing to represent Solutions and Distribution, and the other Carpoff-affiliates, while conflicted and without proper accommodation for same; (2) serving as the gatekeeper for Solutions into the investor-marketplace; (3) working towards and closing further transactions, whereby Solutions and Distribution would be wrongly burdened by obligations and liabilities; (4) issuing its Transaction Opinions; (5) staying silent and assisting in concealment, including by not correcting prior misrepresentation and with regard to Progressive/Jerry Breed; (6)

violating the Rules of Professional Conduct; (7) working to salvage the PE Firm-transaction; and (8) concealing information from investors (such as Progressive).

302.    Nixon never withdrew from the conspiracy.

303.    The harm includes that arising from and reflected in: (1) Carpoff's looting of DC Solar, particularly Solutions; (2) Solutions and Distribution incurring liabilities and other obligations; (3) the dissipation of Solutions' and Distribution's assets; and (4) aggravating Solutions' and Distribution's insolvency and fraudulently prolonging its life.

304.    Nixon is vicariously, and jointly and severally, liable for all acts committed by the Carpoffs in furtherance of the conspiracy, including the harm upon Solutions and Distribution.

305.    An essential part of Carpoff's wrongdoing was that non-conspirators not know that he was a liar and a crook and making misrepresentations to investors. Nixon joined in this corrupt purpose by knowingly concealing and assisting in Carpoff's misrepresentations. Nixon knew about this unlawful objective and agreed and intended to aid in its commission.

## COUNT V
### (CONSTRUCTIVE FRAUUDLENT TRANSFER)
**11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) or 3439.05
and 3439.07 or other applicable state law**

306.    The Trustee re-alleges paragraphs 1 through 250 as if fully stated herein.

307.    Solutions made the transfers identified on **Exhibit 7** ("*Transfers*").

308.    Solutions did not receive reasonably equivalent value in exchange for the Transfers and was insolvent at the time of each of the Transfers.

309.    Solutions was insolvent at the time of each of the Transfers.

310.    The Transfers were for payment of legal fees, which were not earned.

311.    Nixon ignored wrongdoing and committed wrongdoing, was disloyal, and breached its duties to Solutions and Distribution, including fiduciary, of care, of undivided loyalty, to act in good faith, and to avoid conflicts. Nixon failed to protect Solutions and Distribution in every possible way, failed to comply with the Rules of Professional Conduct, and knowingly and intentionally harmed Solutions and Distribution. Nixon joined and assisted Carpoff in harming Solutions and Distribution.

312.    Carpoff perpetrated the Carpoff Ponzi Scheme through DC Solar and other entities. At the time of each of the Transfers, because of the Carpoff Ponzi Scheme and the claims of and obligations to the buyers of MSGs, Solutions: (1) was engaged (and was continuing to engage) in a business or transaction for which Solutions' remaining property was unreasonably small; and (2) intended to incur or believed that it would incur debts beyond its ability to pay.

**COUNT VI**
**(CONSTRUCTIVE FRAUDULENT TRANSFER)**
**11 U.S.C. §§ 548(a)(1)(B)**

313.    The Trustee re-alleges paragraphs 1 through 250 as if fully stated herein.

314.    Solutions made certain of the Transfers within two years of the Petition Date ("***2 Year Transfers***").

315.    Solutions did not receive reasonably equivalent value in exchange for the Transfers and was insolvent at the time of each of the Transfers.

316.    Solutions was insolvent at the time of each of the Transfers.

317.    These Transfers were for the payment of legal fees, which were not earned.

318.    Nixon ignored wrongdoing and committed wrongdoing, was disloyal, and breached its duties to Solutions and Distribution, including fiduciary, of care, of undivided loyalty, to act in good faith, and to avoid conflicts. Nixon failed to protect Solutions and Distribution in every possible way, failed to comply with the Rules of Professional Conduct, and knowingly and intentionally harmed Solutions and Distribution. Nixon joined and assisted Carpoff in harming Solutions and Distribution.

319.    Carpoff perpetrated the Carpoff Ponzi Scheme through DC Solar and other entities. At the time of each of the Transfers, because of the Carpoff Ponzi Scheme and the claims of and obligations to the buyers of MSGs, Solutions: (1) was engaged (and was continuing to engage) in a business or transaction for which Solutions' remaining property was unreasonably small; and (2) intended to incur or believed that it would incur debts beyond its ability to pay.

**COUNT VII**
**(11 U.S.C. § 550)**

320.    The Trustee re-alleges paragraphs 1 through 250 as if fully stated herein.

51

321.    The Trustee is entitled to avoid the Transfers pursuant to 11 U.S.C. §§ 544 and 548. *See* Counts V and VI above.

322.    The Defendant is the initial transferee of the Transfers. Therefore, once avoided, the Trustee may recover the Transfers from the Defendant.

## COUNT VIII
## (DISALLOWANCE OF CLAIM)

323.    The Trustee re-alleges paragraphs 1 through 250 as if fully stated herein.

324.    Nixon filed proof of claim number 34-1 in Solutions' bankruptcy case, asserting a claim in the amount of $111,223.95 ("***Nixon POC***") for Nixon's "*legal services*."

325.    The bankruptcy estates have been substantively consolidated.

326.    The Nixon POC should be disallowed. Solutions did not receive value in exchange for Nixon's "*legal services*."

327.    Nixon ignored wrongdoing and committed wrongdoing, was disloyal, and breached its duties to Solutions and Distribution, including fiduciary, of care, of undivided loyalty, to act in good faith, and to avoid conflicts. Nixon failed to protect Solutions and Distribution in every possible way, failed to comply with the Rules of Professional Conduct, and knowingly and intentionally harmed Solutions and Distribution. Nixon joined and assisted Carpoff in harming Solutions and Distribution.

328.    The Nixon POC should also be disallowed under 11 U.S.C. § 502(d), due to Nixon's liability pursuant to Counts V-VII above.

**WHEREFORE**, the Trustee prays for and demands order and judgment against the Defendant as follows:

(1) Count I:      Actual, compensatory, and consequential damages in an amount to be proven at trial; punitive damages; and other damages as permitted by law.

(2) Count II:     Actual, compensatory, and consequential damages in an amount to be proven at trial; punitive damages; and other damages as permitted by law.

(3) Count III:     Actual, compensatory, and consequential damages in an amount to be proven at trial; punitive damages; and other damages as permitted by law.

(4) Count IV:    Actual, compensatory, and consequential damages in an amount to be proven at trial; punitive damages; and other damages as permitted by law.

(5) Count V.    Avoiding the Transfers under 11 U.S.C. §544 and California Civil Code §§ 3439.04 and 3439.07, and any other relief the circumstances may require under the latter, or under other applicable state law.

(6) Count VI:    Avoiding the 2 Year Transfers under 11 U.S.C. §548(a)(1)(A).

(7) Count VII:    A judgment in the amount of the Transfers and the 2 Year Transfers.

(8) Count VIII:    An order disallowing the Nixon POC.

In addition, and to the extent entitled under applicable law, the Trustee prays and demands that the following is added to the judgment amount: interest both before and after the commencement of this Action.

In addition, the Trustee requests from the Court any such other and further relief that this Court deems just and proper.

DATED: October 25, 2021.    **MELAND BUDWICK, P.A.**
*/s/ Michael S. Budwick*
Michael S. Budwick, Esq.
Solomon B. Genet, Esq.
Gil Ben-Ezra, Esq.
*Attorneys for Christina W. Lovato, Trustee*

**HARTMAN & HARTMAN**
*/s/ Jeffrey L. Hartman*
Jeffrey L. Hartman, Esq.
*Attorneys for Christina W. Lovato, Trustee*





HOME > TEAM

# FORREST DAVID MILDER

Forrest David Milder is one of our lead tax partners when it comes to tax credits and other tax-advantaged investments. He has a national practice that emphasizes the development of renewables, affordable housing, historic and new markets tax credit projects as well as resolving disputes with the IRS.

## WHAT DO YOU FOCUS ON?

### "Outside-the-box" solutions

My practice emphasizes structuring and bringing to closure many kinds of tax-advantaged projects, both for investors and those who need their investment. I have advised on an exceptionally wide range of ventures, with sizes from hundreds of thousands

## CONTACT

**Forrest David Milder**

Partner

**Boston**

Phone: 617-345-1055

Fax: 866-947-2387

## SERVICES

**EXHIBIT 1**

of dollars to hundreds of millions. I am especially known for "outside-the-box" solutions. For example, I developed a technique that facilitated more than one hundred million dollars of renewable facilities qualifying for government grants, even though the projects were nominally owned by the government and bond-financed. I enabled another client to obtain a more than $50 million state credit as the first user of a new program by working with the applicable agency even before it had published any rules.

### IRS dispute resolution

I have resolved four different multi-million dollar disputes with the IRS with the taxpayer having zero liability, and several others with only minimal adjustments. On one occasion I worked with clients and others to get the applicable Tax Code provision changed, thereby ending the audit.

### Tax-advantaged investment

I have worked with countless developers and investors to close hundreds of transactions involving the low-income housing tax credit, including everything from standard ventures to "80-20" deals and "lease pass-throughs" that also involve the historic tax credit. I have written tax opinions enabling a client with an innovative renewable technology to close more than $150 million of tax credit investments.

### Industry thought leadership

I work hard to stay at the forefront of the industries in which I am involved. For example, I am very active in the Solar Energy Industry Association's Tax Committee, and I authored part of its recent proposal to the IRS on the solar tax credit regulations. I've also written more than 60 published articles about renewable energy, including solar, geothermal, biomass, water-based, and wind. In addition, I am a former chair of both the American Bar Association's 7,000-member Forum on Affordable Housing and Community Development and the 3,000-member MIT Enterprise Forum of Cambridge. I'm the vice-chair of the historic tax credit coalition, and I was a major participant in helping to shape the IRS's safe harbor on that credit. I've authored what is generally considered the best known treatise on housing and historic tax credits.

Energy
Real Estate & Community Development
Community Development Finance
Energy Project Finance
Tax Controversies & Litigation
Government Relations & Public Policy
Energy Project Agreements
Renewable Energy
Energy Project Permitting
Tax
Higher Education
Opportunity Zones

## EDUCATION

Boston University, LL.M.
Harvard Law School, J.D.
Massachusetts Institute of Technology, S.B., *Phi Beta Kappa*
Massachusetts Institute of Technology, S.M.

## ADMISSIONS

Massachusetts
U.S. District Court, District of Massachusetts
U.S. Court of Appeals, First Circuit
U.S. Supreme Court
U.S. Tax Court
U.S. Court of Federal Claims

## RECOGNITION

Forrest was selected, through a peer-review survey, for inclusion in *The Best Lawyers in America*© 2020 in the field of

# WHAT DO YOU SEE ON THE HORIZON?

From my vantage point, I note two things of particular importance. First, it is invaluable to be connected to both those who literally write the law and also my colleagues across the country who help interpret it. In this way, I can anticipate what is coming, how others will handle it and be sure that our clients have a role in how the rules are written and applied. Second, flexibility is the key to survival. "That's how we've always done it in the past" is a thing of the past. Today's opportunities belong to those who are fastest at matching their business to the ever-changing economic and legal landscape.

# RECOGNITION AS AN AUTHOR

Forrest is the author or co-author of many articles on tax advantaged investments and related matters, as well as the BNA treatise, "Rehabilitation Tax Credit and Low Income Housing Tax Credit." He has appeared many times on the front page of *The Wall Street Journal* (in its weekly "Tax Report" column), as well as in *The Boston Globe*, *Banker & Tradesman*, *The Boston Business Journal*, *Mass High Tech*, and *Massachusetts Lawyers Weekly* with comments on recent and proposed tax legislation. He writes a monthly column on renewable energy, entitled "The Current," for the *Novogradac Journal of Tax Credits*.

# PRESENTATIONS

- "Renewable Energy Opportunity Zones," EUCI Renewable Energy Opportunity Zones Conference, New Orleans, LA, November 13, 2019

- "Opportunity Zones and Renewable Energy," Novogradac 2019 Financing Renewable Energy Tax Credits Conference, Washington, DC, November 8, 2019

- "Tax Issues and Structuring Trends Session," Novogradac 2019 Financing Renewable Energy Tax Credits Conference,

Tax Law. Forrest has been listed in *Best Lawyers* since 2013.

Forrest has been selected by his peers for inclusion in *The Best Lawyers in America©* 2017 for Tax Law in Boston, MA. He has been listed in *Best Lawyers* since 2013.

Forrest has been listed several times in "Marquis's Who's Who in American Law" and in *Boston Magazine's* "Massachusetts Super Lawyers" and "New England Super Lawyers."

# AFFILIATIONS

Forrest is a member of the American and Boston bar associations and is the former chair of the MIT Enterprise Forum of Cambridge. He was the 2009–2010 chair of the American Bar Association's 7000-member Forum on Affordable Housing and Community Development Law and he runs the Forum's "listserv" via which nearly 1,000 participants discuss issues relevant to affordable housing and community development.

Washington, DC, November 7, 2019

- "Real Estate," Novogradac 2019 Opportunity Zones Fall
Conference, Chicago, IL, October 24, 2019

- "Solar Industry Trends—From Utility Scale to Residential,"
Novogradac 2019 Financing Renewable Energy Tax Credits
Spring Conference, San Francisco, CA, May 23, 2019

- "IRS Treasury Discussion on Low-Income Housing and
Historic Credits and Tax Reform Issues," 2019 Annual Meeting
& Conference of the Forum on Affordable Housing &
Community Development Law, Washington, DC, May 22, 2019

- "Deep Dive into OZ Guidance Part II, " Novogradac 2019
Opportunity Zones Spring Conference, Denver, CO, April 25,
2019

- "IRS & Treasury Updates, an ITC for Storage, & More," SEIA
Finance & Tax Seminar, New York, NY, February 28, 2019

- "Opportunity Zones and the Preservation Community,"
National Trust for Historic Preservation, Preservation
Leadership Forum, January 17, 2019

- "Basic overview of Opportunity Zones," Novogradac Tax
Credit Housing Finance Conference, Las Vegas, NV, November
29, 2018

- "Overcoming Tax and Legal Obstacles," Novogradac 2018
Opportunity Zones Conference, New Orleans, LA, October 2,
2018

- Presentation on opportunity zones, Chase Opportunity Zones
Luncheon, Washington, DC, September 7, 2018

# MEDIA CLIPS

### INSIGHT: Highlights of the final Opportunity Zone regulations

*Bloomberg Tax* | January 06, 2020
Boston Community Development Finance partner Forrest Milder
wrote this contributed article analyzing the recently finalized IRS
regulations governing opportunity zones.

### First take on final OZ regulations

*Affordable Housing Finance* | December 26, 2019
Boston Community Development Finance partner Forrest Milder
wrote this contributed article analyzing the final IRS regulations
governing opportunity zones, the tax-advantaged investment
opportunity created by Congress in 2017.

### Opportunity Zone investing—How is debt handled in determining the basis step-up after 10 years?

*Bloomberg Tax* | May 15, 2019
Boston Community Development Finance partner Forrest Milder
wrote this contributed article explaining the math behind
determining the fair market value of a qualified opportunity fund
partnership interest after 10 years.

---

IDEAS

## TREASURY GIVES FAVORABLE RESPONSE TO SENATORS' REQUEST FOR "BEGUN CONSTRUCTION" EXTENSION
*ENERGY ALERT* | 05.08.20

## INCOME TAX RISKS REQUIRE REAL PROPERTY OWNERS TO TREAD CAREFULLY IN STRUCTURING THEIR MORTGAGE LOAN WORKOUTS
*TAX ALERT* | 04.30.20

## CONGRESS ALLOWS A LARGER DEDUCTION FOR PROJECT-LEVEL INTEREST EXPENSE
*ENERGY LAW ALERT* | 04.14.20

## NEW IRS RULE ON AMENDED RETURNS CAN AFFECT LIHTC PARTNERSHIPS
*COMMUNITY DEVELOPMENT FINANCE ALERT* | 04.14.20

## RESPONDING TO INCOME TAX CHANGES UNDER THE CORONAVIRUS AID, RELIEF, AND ECONOMIC SECURITY ACT (CARES)
*TAX LAW ALERT* | 03.31.20

## QOZ FINAL REGULATIONS: PRIVATE EQUITY AND REAL ESTATE FUNDS SHOULD OFFER PARALLEL STRUCTURES TO ACCOMMODATE QOZ INVESTORS
*OPPORTUNITY ZONES ALERT* | 02.27.20

QOZ FINAL REGULATIONS: NEW OPPORTUNITIES FOR ESTATE PLANNING
*OPPORTUNITY ZONE & ESTATE PLANNING ALERT* | 01.29.20

FINAL REGULATIONS FOR OPPORTUNITY ZONES . . . TREASURY CONTINUES TO FAVOR REAL ESTATE
*OPPORTUNITY ZONES ALERT* | 12.24.19

MAKING SENSE OF THE TIMETABLES AND GRACE PERIODS IN OPPORTUNITY ZONE INVESTING
*OPPORTUNITY ZONES ALERT* | 10.31.19

PRESS

SIXTEEN NIXON PEABODY ATTORNEYS NAMED "LAWYERS OF THE YEAR" BY THE BEST LAWYERS IN AMERICA© FOR 2019
08.15.18

NIXON PEABODY REPRESENTS DEVELOPER IN NEW AFFORDABLE HOUSING COMPLEX IN DOWNTOWN BOSTON
01.25.18

EVENTS

OPPORTUNITY ZONES HOT TOPICS WEBINAR
06.11.20 | WEBINAR

OPPORTUNITY ZONES HOT TOPICS
11.21.19 | WEBINAR

WEBINAR: OPPORTUNITY ZONES HOT TOPICS
06.17.19 | WEBINAR

IPED CONFERENCE: OPPORTUNITY ZONES
03.04.19 | WASHINGTON, DC

TALKS

NOVOGRADAC 2018 OPPORTUNITY ZONES CONFERENCE
10.01.18 | NEW ORLEANS, LA



**NIXON PEABODY**

ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

100 Summer Street
Boston, Massachusetts 02110-2131
(617) 345-1000
Fax: (617) 345-1300

February 14, 2014

**VIA FACSIMILE & FIRST CLASS MAIL**
**(415) 659-9779**

Montage Services, Inc.
140 Geary Street, Suite 1000
San Francisco, California 94108

> RE:    **USB DC Solar Fund II, LLC** (the "Client")
> Request dated:  January 29, 2014 (the "Client's Request")
> Fiscal Year End:  December 31, 2012
> Effective Date:  February 14, 2014

Ladies and Gentlemen:

The Client has, by the Client's Request, asked that we furnish you with certain information in connection with your examination of its financial statements as of its Fiscal Year End.

**I.    Nature of Response**

We have during the past year represented the Client only in connection with certain specific matters, and have not been engaged for any other purpose.  Our response includes only those clients of the firm that are specifically included in the Client's Request.

Our response to the Client's Request is limited as described in Exhibit A attached hereto.

The information herein is furnished as of the Fiscal Year End, and as of the Effective Date specified above, and we disclaim any undertaking to advise you of changes therein or of other information which may subsequently thereto come to our attention.

Our response may omit matters involving amounts that are less than those specified in the Client's Request or, if no amounts were specified in the Client's Request, that we do not believe to be material.

14859226.1                                                                                                          059202/000001

**COMPOSITE EXHIBIT 2**

Montage Services, Inc.
February 14, 2014
Page 2

## II.    Overtly Threatened or Pending Litigation

Subject to the terms of Part I of this letter, we advise you that we were not, as of the Fiscal Year End or the Effective Date, engaged to give substantive attention to, or represent the Client in connection with, loss contingencies coming within the scope of clause (a) of Paragraph 5 of the American Bar Association Statement of Policy Regarding Lawyers' Responses to Auditors' Requests for Information (December 1975).

## III.    Other Matters

As of the Fiscal Year End, the Client was not indebted to us for services or expenses, and had accumulated approximately $30,654.00 in unbilled fees for services and expenses.

Very truly yours,

*Nixon Peabody LLP*

Attachment:  Exhibit A

cc:     Paulette Carpoff
        COO

14859226.1                                                                                          059202/000001

## EXHIBIT A

Our response is limited by, and in accordance with, the ABA Statement of Policy Regarding Lawyers' Responses to Auditors' Requests for Information (December 1975) (the "ABA Statement"). Without limiting the generality of the foregoing, the limitations set forth in the ABA Statement on the scope and use of the response (Paragraphs 2 and 7) are specifically incorporated herein by reference, and any description of any loss contingencies is qualified in its entirety by Paragraph 5 of the ABA Statement and the accompanying Commentary (which is an integral part of the Statement).

Unless the Client's Request has specifically identified another matter and specifically requested us to comment on it, our response contains information only with respect to loss contingencies involving overtly threatened or pending litigation, and we have not, even if the Client's Request contains a general request that we do so, commented on any matters other than loss contingencies involving overtly threatened or pending litigation, such as gain contingencies, contractually assumed obligations (including guarantees), encumbrances, unasserted claims and assessments, or any other matters which might have an effect on the Client's financial statements.

We have endeavored to determine whether services performed for the Client since the beginning of the Fiscal Year involved substantive attention in the form of legal consultation or legal representation concerning overtly threatened or pending litigation (i) by reviewing our records for active litigation matters being handled by us for the Client, (ii) by reviewing, in appropriate cases, time records for services that we have rendered to the Client since the beginning of the Fiscal Year, and (iii) by consulting with attorneys currently in our firm as to matters contained in our records; but, beyond that, no review has been made of any of the Client's transactions or other matters for the purpose of identifying loss contingencies to be described in the response. If our response is an update of a response that we have already furnished you for the Fiscal Year, we have, instead of following the procedures described in the preceding sentence, reviewed our records for matters opened since the date as of which the previous response was prepared and have consulted with those attorneys currently in our firm who were judged most likely to have knowledge of new matters or developments in matters reported in the prior response.

Consistent with the last sentence of Paragraph 6 of the ABA Statement and pursuant to the Client's understanding that whenever, in the course of performing legal services for the Client with respect to a matter recognized to involve an unasserted possible claim or assessment that may call for financial statement disclosure, we have formed a professional conclusion that the Client must disclose or consider disclosure concerning such possible claim or assessment, we, as a matter of professional responsibility to the Client, will so advise the Client and will consult with the Client concerning the question of such disclosure and the applicable requirements of Statement of Financial Accounting Standards No. 5 (now contained in FASB Accounting Standards Codification Subtopic 450-20). Consistent with the second paragraph above, however, our response contains information with respect to any such matter only if the Client's Request has specifically identified such a matter and specifically requested us to comment on it; a statement in the Client's Request that it has informed you that we have not advised it that there are any such matters is not such a specific identification or request for comment.

Our response is furnished solely for your information in connection with your examination of the financial statements of the Client. Neither it nor its contents may be disclosed to or relied on by others, or quoted in whole or in part, or otherwise referred to in any financial statement of the Client or any related documents, or filed with any governmental agency or other person, without our prior written consent.

(11/10)



NIXON PEABODY LLP
ATTORNEYS AT LAW    677 Broadway 10th Floor
Albany, NY 12207-2996
NIXONPEABODY.COM    (518) 427-2650
@NIXONPEABODYLLP   Fax: (518) 427-2666

June 9, 2015

**VIA E-MAIL & FIRST CLASS MAIL**
**wendy@montage-services.com**

Montage Services, Inc.
281 Ellis Street
San Francisco, California 94102

Attention: Wendy Zhang

> RE:    **Solar Eclipse Investment Fund X, LLC** (the "Client")
> Request dated:  May 21, 2015 (the "Client's Request")
> Fiscal Year End:  December 31, 2014
> Effective Date:  June 9, 2015

Ladies and Gentlemen:

The Client has, by the Client's Request, asked that we furnish you with certain information in connection with your examination of its financial statements as of its Fiscal Year End.

### I.    Nature of Response

We have during the past year represented the Client only in connection with certain specific matters, and have not been engaged for any other purpose. Our response includes only those clients of the firm that are specifically included in the Client's Request.

Our response to the Client's Request is limited as described in Exhibit A attached hereto.

The information herein is furnished as of the Fiscal Year End, and as of the Effective Date specified above, and we disclaim any undertaking to advise you of changes therein or of other information which may subsequently thereto come to our attention.

Our response may omit matters involving amounts that are less than those specified in the Client's Request or, if no amounts were specified in the Client's Request, that we do not believe to be material.

Montage Services, Inc.
June 9, 2015
Page 2

## II.     Overtly Threatened or Pending Litigation

Subject to the terms of Part I of this letter, we advise you that we were not, as of the Fiscal Year End or the Effective Date, engaged to give substantive attention to, or represent the Client in connection with, loss contingencies coming within the scope of clause (a) of Paragraph 5 of the American Bar Association Statement of Policy Regarding Lawyers' Responses to Auditors' Requests for Information (December 1975).

## III.     Other Matters

As of the Fiscal Year End, the Client was not indebted to us for services or expenses, billed or unbilled.

Very truly yours,

Nixon Peabody LLP

Attachment:  Exhibit A

cc:     Jeff Carpoff
        Chief Executive Officer

## EXHIBIT A

Our response is limited by, and in accordance with, the ABA Statement of Policy Regarding Lawyers' Responses to Auditors' Requests for Information (December 1975) (the "ABA Statement"). Without limiting the generality of the foregoing, the limitations set forth in the ABA Statement on the scope and use of the response (Paragraphs 2 and 7) are specifically incorporated herein by reference, and any description of any loss contingencies is qualified in its entirety by Paragraph 5 of the ABA Statement and the accompanying Commentary (which is an integral part of the Statement).

Unless the Client's Request has specifically identified another matter and specifically requested us to comment on it, our response contains information only with respect to loss contingencies involving overtly threatened or pending litigation, and we have not, even if the Client's Request contains a general request that we do so, commented on any matters other than loss contingencies involving overtly threatened or pending litigation, such as gain contingencies, contractually assumed obligations (including guarantees), encumbrances, unasserted claims and assessments, or any other matters which might have an effect on the Client's financial statements.

We have endeavored to determine whether services performed for the Client since the beginning of the Fiscal Year involved substantive attention in the form of legal consultation or legal representation concerning overtly threatened or pending litigation (i) by reviewing our records for active litigation matters being handled by us for the Client, (ii) by reviewing, in appropriate cases, time records for services that we have rendered to the Client since the beginning of the Fiscal Year, and (iii) by consulting with attorneys currently in our firm as to matters contained in our records; but, beyond that, no review has been made of any of the Client's transactions or other matters for the purpose of identifying loss contingencies to be described in the response. If our response is an update of a response that we have already furnished you for the Fiscal Year, we have, instead of following the procedures described in the preceding sentence, reviewed our records for matters opened since the date as of which the previous response was prepared and have consulted with those attorneys currently in our firm who were judged most likely to have knowledge of new matters or developments in matters reported in the prior response.

Consistent with the last sentence of Paragraph 6 of the ABA Statement and pursuant to the Client's understanding that whenever, in the course of performing legal services for the Client with respect to a matter recognized to involve an unasserted possible claim or assessment that may call for financial statement disclosure, we have formed a professional conclusion that the Client must disclose or consider disclosure concerning such possible claim or assessment, we, as a matter of professional responsibility to the Client, will so advise the Client and will consult with the Client concerning the question of such disclosure and the applicable requirements of Statement of Financial Accounting Standards No. 5 (now contained in FASB Accounting Standards Codification Subtopic 450-20). Consistent with the second paragraph above, however, our response contains information with respect to any such matter only if the Client's Request has specifically identified such a matter and specifically requested us to comment on it; a statement in the Client's Request that it has informed you that we have not advised it that there are any such matters is not such a specific identification or request for comment.

Our response is furnished solely for your information in connection with your examination of the financial statements of the Client. Neither it nor its contents may be disclosed to or relied on by others, or quoted in whole or in part, or otherwise referred to in any financial statement of the Client or any related documents, or filed with any governmental agency or other person, without our prior written consent.

(11/10)
059202/000006

4823-2024-1187.1

| | |
|---|---|
| **From:** | Brian Caffrey <BCaffrey@dcsolarsolutionsmfg.com> |
| **Sent:** | Wednesday, August 10, 2011 10:54 PM |
| **To:** | lindsay.russell@nscorp.com; Scott F. Wilkinson (scott.wilkinson@nscorp.com) |
| **Cc:** | Jeff Carpoff; Milder, Forrest; jansen.carl9@gmail.com |
| **Subject:** | Follow Up and Thank You |
| **Attachments:** | RESUMEFMST.pdf |

Gentlemen,

I wish to thank you both very much for your time and interest in DC Solar and our Investment Tax Credit program. We are very excited at the prospect of doing business with such a time honored and respected company such as Norfolk Southern. In the interest of good information I have attached the resumes of Mr. Forrest Milder of Nixon Peabody Law, and Mr. Steve Tracy of Novogradac Accounting. We feel their presence on our team speaks to the credibility and integrity of our ITC programs, and to the purposeful, responsible effort of our CEO, Mr. Jeff Carpoff to provide the very best for our business partners. I also included news clippings regarding the ongoing investment in renewables by such companies as Google as an anecdote to the popularity, viability, and growth expectations of renewable energy, especially solar.

Please do not hesitate if you have any additional questions or need our help in any way.

Best regards ~

**Brian P. Caffrey**
**Director Of Sales**
**DC Solar Solutions & Manufacturing, Inc.**
**135 Mason Circle, Suite A**
**Concord, CA. 94520**
**Office Ph: 925-203-1088**
**Cell Ph: 847-902-0683**
**Fax Ph: 925-798-3673**
**Email: bcaffrey@dcsolarsolutionsmfg.com**
**Website: www.dcsolarsolutionsmfg.com**

**EXHIBIT 3**

NP0004280

# Forrest David Milder Tax Counsel

## DC Solar Solutions » A Clean Energy Company

Forrest David Milder is a partner at Nixon Peabody, LLC, a Global 100 law firm, which is an established firm in the area of renewable energy transactions and federal tax credits.

Forrest Milder has more than 30 years' experience in tax-advantaged investments including the tax credits that apply to affordable housing, energy, new markets and historic rehabilitation, as well as the tax treatment of partnerships and LLCs, tax-exempt organizations, business formation, operation and disposition, tax-exempt bonds, and other structured financial products.

Mr. Milder regularly addresses the tax consequences of project development using equity and debt, and he has rendered dozens of tax opinions to leading institutional investors, including DC Solar Solutions, MMA, Centerline, Apollo, Sun America, Column, Aegon, Fannie Mae, NEF, Bank of America, the Massachusetts Housing Equity Fund and others. He has also provided tax advice and rendered the opinions for the raising of several billion dollars using REMICs and other trust vehicles.

Forrest Milder was the 2009-2010 Chair of the American Bar Association's Forum on Affordable Housing and Community Development where he also ran the association's listserv computer-discussion group. He is a frequent speaker, and the author of numerous tax articles as well as the BNA treatise on low income and historic tax credits. He was a Lecturer in Law at Boston University Law School from 1990-95, and a guest lecturer at the University of Michigan Law School in 2002.

Mr. Milder has been listed several times in "Marquis's Who's Who in American Law" and in Boston Magazine's "Massachusetts Super Lawyers." He has also been recognized as a "New England Super Lawyer" in Tax law based on a peer-review survey by Boston Magazine (2004, 2005, 2006, 2007).

### Admissions
Mr. Milder is admitted to practice in Massachusetts, as well as before the United States District Court for the District of Massachusetts, the First Circuit Court of Appeals, the United States Supreme Court, the United States Tax Court, and the United States Court of Federal Claims.

### Education
Boston University, LL.M.
Harvard Law School, J.D.
Massachusetts Institute of Technology, S.M.
Massachusetts Institute of Technology, S.B. (Phi Beta Kappa)

### Affiliations
Mr. Milder is the author of the treatise Rehabilitation Tax Credit and Low Income Housing Tax Credit, published by the Bureau of National Affairs. He is a member of the Boston Bar Association is the former chair of the MIT Enterprise Forum of Cambridge. For several years, he was a lecturer at Boston University School of Law.



SolarIncentives
INVESTING TODAY
FOR TOMORROW

## DC Solar Solutions » A Clean Air Company

| From: | Milder, Forrest |
|---|---|
| Sent: | Friday, October 17, 2014 10:04 PM |
| To: | Ari Lauer; Jeff Carpoff; Ron Roach |
| Subject: | RE: DC Solar |

Guys –

I left Ari a message, but here are my basic thoughts –

The IRS agent is troubled about four things, in particular –

(1) The first year's payments in the audited fund were made about 9 months late; this should be easy enough to correct. Nothing really to "tweak;" this is just a matter of not giving the IRS obvious things on which to base their case that the parties didn't act in the ways that third parties would. It should be easy enough to assure that all of the i-dotting and t-crossing gets taken care of in the future, and I heartily recommend that you have policies in place for this purpose.

(2) A very large number of units are sitting on Jeff's property. In other words, regardless of the argument that we make about the property being leased to SOMEONE, she really wanted it leased to a THIRD PARTY, and not to an affiliate of the guy who built the units. This is really a business point. I am not on the ground with you guys, and I don't know what the true state of leasing activities is. However, if Jeff is just building units and collecting them, figuring that sooner or later, he will sublease them to the Aherns of the world, then I see the agent's point. If, in fact, the units do get placed into ACTUAL SERVICE before the end of the year, then there really shouldn't be an issue. Regardless, the OPTICS are much better if the agent sees the units actually in use somewhere. **(By the way, in the case of the units owned by the fund that is being audited, do you have records that look professional and show particular serial numbers at off-site locations in the first year? That would be a big help in showing that the units were operational in the tax year that we claimed the credits and depreciation.)**

(3) The IRS hates related party transactions, so much so that even the agent's report incorrectly talks about Jeff dealing with himself, and leaving out the 99% interest held by Sherwin and other investors. So, an optimal thing would be to have documents signed by people with different names who work for different companies. A lot of this is just "putting lipstick on a pig," but it would take away one of the features that seemed to get the agent's attention.

(4) The mark-up. Of course, for the early deals, we had an appraisal done by someone with a pretty "used car" sounding name, and now we are using, and for the audit, we will have, an appraisal from a much better recognized and regarded person. Still, markups of 2-1/2 times are just bound to get the IRS's attention. Aside from me presenting the better appraisal and some analysis of cases with markups, this is a tough one. The IRS is used to markups that are comparable to development fees, i.e., 5-20%, not 100-150%. Of course, if a unit sells for $75,000 instead of $150,000, then it generates a $22K credit, instead of a $45K one, and that's a lot of money. Here, we do have one possible strategy that I mention from time-to-time, and I'll mention it again now - - selling a few units for $150,000 to real third parties (and I don't mean Lou! That transaction also has Jeff on both sides, even if the one side is as a manager.) Over the years, I have said how great it would be if we had a few sales to a movie studio, or NASA, or somebody. "Hey IRS! You see this bill of sale? The US Government bought some of these units for $150K, and who's a better judge of their value than that?"

Let me know what you think. I didn't send these to Brian, because I wanted to get your reaction first. I don't want him chasing after you to do things that are hard or impossible.

**EXHIBIT 4**

NP0050463



*Forrest*

**Forrest David Milder**
Partner
T 617-345-1055 | C 617-824-0803 | F 866-947-2387
Nixon Peabody LLP | 100 Summer Street | Boston, MA 02110-2131
nixonpeabody.com | @nixonpeabodyLLP

This email message and any attachments are confidential. If you are not the intended recipient, please immediately reply to the sender and delete the message from your email system. Thank you.

**From:** Ari Lauer [mailto:alauer@lauerlaw.com]
**Sent:** Friday, October 17, 2014 10:12 AM
**To:** Milder, Forrest
**Cc:** Jeff Carpoff; Ron Roach; Brian Power; Shane Carpenter
**Subject:** Fwd: DC Solar

Forrest,

See Brian Power's email below.

Ari

Sent from my iPhone

Begin forwarded message:

> **From:** "Brian M. Power" <Brian.M.Power@sherwin.com>
> **Date:** October 17, 2014 at 9:57:47 AM EDT
> **To:** Ari Lauer <alauer@lauerlaw.com>
> **Cc:** Jeff Carpoff <jeff@dcsolarsolutionsmfg.com>, Ron Roach <ron@ronroachcpa.com>, Shane
> Carpenter <Shane.Carpenter@sherwin.com>
> **Subject: Re: FW: DC Solar**
>
> Ari,
>
> That's great, thank you. In light of the ongoing audit of our first investment, I am curious as to whether
> Forrest has any thoughts as to whether there is anything we could to tweak the structure to placate the
> IRS should this fund be subject to an audit. Can we get him to weigh in on this?
>
> Thanks again,
>
> Brian
>
> Brian M. Power
> Tax Counsel
> The Sherwin-Williams Company
> 101 Prospect Ave., NW, 1220 Guildhall
> Cleveland, Ohio 44115
> (216) 566-2640 (direct)
> (216) 566-2392 (facsimile)
> brian.m.power@sherwin.com

2

| From: | Milder, Forrest |
| Sent: | Wednesday, June 01, 2016 8:55 PM |
| To: | Jeff Carpoff (jeff@dcsolarsolutionsmfg.com); Ronald J. Roach; Ari J. Lauer (alauer@lauerlaw.com) |
| Subject: | IMPORTANT -- PLEASE READ |

This is an email about the audits.  I ask that you please read it all the way through and get back to me with your thoughts.  Thanks!

As to the Hayes audit,

1. Deloitte has become more visible and active.  There is a large team of people interested in the outcome.  This the audit where we were originally presented with a notice of proposed adjustment based on the very technical "at risk" rules.  I wrote a comprehensive response, to which the auditor responded that he was going to produce a SECOND notice of proposed adjustment.  I haven't seen an auditor do this before, but, as you know, the auditor recently produced a 3-part notice -- (A) essentially, the deal structure so insulates the investor from the ups and downs of the investment, that he should not be considered a "partner" so that he isn't entitled to the tax credits; (B) our appraisal is not believable, and the actual value of the units is closer to $30,000 than $150,000; (C) because the tax credit guarantees are being provided by a person who is related to the person who gets the proceeds of selling the units, there is a $50,000 penalty for not calling the transaction to the IRS's attention.  We have technical arguments about the $50,000 penalty, and it is much smaller than the others, so I'm going to set that one aside.

2. As to the deal structure issues, in the aftermath of the <u>Boardwalk Hall</u> case that I have previously described to you, the IRS has respectable arguments for their position.  Of course, nearly all of our deals are structured to have "ups " and "downs," but I'm not positive about the Hayes transaction, and it had letters of credit, and a few other features that we don't do anymore.  Still, that may be a problem for THAT transaction.

3. As to the appraisal, the IRS engineer has observed that the units are really 2400 watt units, not 20,000 watt units.  This is the first that I have heard of this; I thought that even our appraiser treated these as 20,000 watt units.  Of course, this is a big deal; if the IRS thinks that $7/watt is high, but "believable", you can understand why they might think that $70/watt is astonishing and not believable.  I am hoping that you can shed some light on this.  In any case, it seems important that we get Lauren to work on looking at the engineer's report and analyzing why she is correct, and it is wrong.  Can I have your approval?

4. I have been hearing for a long time about a few past sales of individual units for $150,000 each, and the high likelihood of new sales to the US government for $150,000.  I have also suggested that it would be great to have a sale or two to a movie production company, or someone else obvious that would support our position.  NOW IS THE TIME!  The agent's report says that he, too, has heard about the other sales, but that he didn't get any backup.  We really need this now.

5. The Agent's report also observes that the subtenant has only a small amount of income from leasing the units.  Of course, he would have reached this conclusion based on his audit of DC Solar, not the Hayes partnership.  But, it leaves me wondering what happened in that audit (I was not at all involved in that audit), and why the agent thinks that DC Solar had so little income.  I would think that will all the funds we have closed, there would be a LOT of cash flow, with Distribution both collecting a lot of rental income from its tenants, and paying a lot of rent to the funds.  Similarly, Manufacturing should have a lot of income from the now several

**EXHIBIT 5**

NP0098163

years of payments on the notes it holds from the sales of hundreds/thousands of units. Ron has told us that he would assemble data to show the successful business, but we haven't seen anything. Where does this stand?

6. Finally, the agent is giving us a very short window (it ends next week) to have a call to discuss his reports.

7. I want to make sure that everyone appreciates what is at stake here – <u>VALUATION</u>: if the IRS successfully challenges the valuation of the units, we could lose 70% or more of the tax credits, and it isn't clear how we wouldn't lose them for EVERY OTHER DEAL. They all rely on a similar appraisal. Presumably, the IRS engineers are going to recognize the DC Solar systems, and reach the same result for units held by another fund. <u>IS HAYES A PARTNER</u>: If the IRS successfully challenges whether Hayes is a partner, most of the other deals are on better ground – they tend to not have letters of credit backing up your obligations to Hayes, and they have other features that make them look better. Still, this won't be good, and it could amount to millions of dollars.

8. The Deloitte people have been asking Ron for some support for various positions that they have suggested, and Ron has said that he has to get Jeff's approval. I agree with that, but I want to emphasize that we can't sit on these things. This is serious stuff and we need for you to at least have Ron collect what they ask for and share it with me, so that we can decide whether to give it to Hayes's accountants. And we have to do it quickly, or we're just going to lose the IRS case. If you want to set up a process for the 2/3/4 of us to talk great, but it has to happen regularly and fast. The results of not getting a good defense to the IRS can be catastrophic.

As to the Sherwin Williams Audit (Fund 3) --

1. The Agent is after me to give him an extension of the time to prepare their report. I gave him a pretty hard time about this not being "fair;" he has had our revised appraisal for at least 10 months, and here he is asking for still more time. Of course, if we don't give him more time, then he will just close out the case. We really have to give him more time, or else we won't be able to go to appeals. "Damned if you do; damned if you don't". We both know that this is the case, but I wanted to convey to him how ridiculously frustrating it is for him to sit on our case and then ask for more time. As you may have heard, when John Martin (the auditor in the Hayes matter) told us that we had to get him an answer quickly, and I asked for two weeks, his initial reaction was "no."

2. Anyway, my guess is that his engineer is going to do the same thing – he's pretty likely to conclude that the units are worth way less than $150,000. Again, some REAL SALES would be great here.

3. Regardless, I need to tell him whether we are going to extend the statute; I presume that you want me to say yes, but please let me know. Or give me a call, and we can discuss it.

Thanks. Let me know what you think.

 *Forrest*

**Forrest David Milder**
Partner
T 617-345-1055 | C 617-824-0803 | F 866-947-2387
Nixon Peabody LLP | 100 Summer Street | Boston, MA 02110-2131
nixonpeabody.com | @nixonpeabodyLLP

This email message and any attachments are confidential. If you are not the intended recipient, please immediately reply to the sender and delete the message from your email system. Thank you.

NP0098164

| | |
|---|---|
| **From:** | ronroachcpa@gmail.com on behalf of Ronald J. Roach <ron@ronroachcpa.com> |
| **Sent:** | Thursday, March 02, 2017 7:44 PM |
| **To:** | Joseph Housman |
| **Cc:** | Milder, Forrest; Ari J. Lauer (alauer@lauerlaw.com); Holsten, Michael (US - Minneapolis); JEliason@foley.com; Hecimovich, Gary (US - Washington D.C.); Frericks, Thomas Paul (US - Minneapolis) |
| **Subject:** | Re: summary of rents |
| **Attachments:** | DC Solar Distribution 2013 Sub-Lease Activity.pdf; DC Solar Distribution 2014 Sub-Lease Activity.pdf; DC Solar Distribution 2015 Sub-Lease Activity.pdf; DC Solar Distribution 2016 Sub-Lease Activity.pdf |

All,

I attached the DC Solar Distribution sub-lease activity for years 2013-2016.  The following are the amounts paid by DC Solar Solutions, Inc. to DC Solar Distribution, Inc. on a re-rent basis for each of those years:

2013 -  $ 1,595,370
2014 -   13.975,770
2015 -   30,562,024
2016 -   61,545,737

Thanks,

Ron


On Thu, Mar 2, 2017 at 5:25 AM, Joseph Housman <jhousman@hayscompanies.com> wrote:

Ron – I haven't seen any of this come across yet.  Can you send it this morning so everyone can review in advance of the call this afternoon?


Forrest have you submitted a request for extension yet or do you have a draft you want us to review?  Also, will we have a first draft from you of the 60-day letter response this week (sans valuation from Lauren)?


Ari – have you reached out to Lauren's firm to request workpapers yet?  Sounds like she has not.  Would it be best for you to request through their legal department?


Thanks all

Joe

1

**EXHIBIT 6**

NP0113765

**Joseph Housman**
<u>(612) 758-8550</u>
Hays Companies of Minneapolis



All. Together. Certain.

**From:** Ronald J. Roach [mailto:<u>ron@ronroachcpa.com</u>]
**Sent:** Friday, February 24, 2017 12:50 PM
**To:** Joseph Housman <<u>jhousman@hayscompanies.com</u>>
**Cc:** Milder, Forrest <<u>fmilder@nixonpeabody.com</u>>; Ari J. Lauer (<u>alauer@lauerlaw.com</u>) <<u>alauer@lauerlaw.com</u>>; Holsten, Michael (US - Minneapolis) <<u>mholsten@deloitte.com</u>>; <u>JEliason@foley.com</u>
**Subject:** Re: summary of rents

Hi Joe,

I will have responses on both sub-lease activity and audit issue relevance by next Tuesday so everyone has a chance to digest prior to our call on Wednesday next week.

Best,

Ron

On Fri, Feb 24, 2017 at 7:02 AM, Joseph Housman <<u>jhousman@hayscompanies.com</u>> wrote:

Forrest, one of the questions you asked on the call was what the % of third party leases was compared to the master lease.  Let me know if you would like to have a brief call to walkthrough this schedule I sent on Wednesday.

Ron – have you made any progress with filling in the gaps for 2015-2016 to complete this picture?  Would it help for the three of us to discuss the schedule to move it forward to eliminate some of my guess-work?

NP0113766

Also I think we had a few other follow-ups from Wednesday to check in on.

1)   Did you (Ron and Ari) get a chance to discuss the "other entity IRS Exam issues" and whether they had any relevance to the fund exam.  Has Forrest been filled in on those and is it something we should share with the rest of the group?

2)   I think Forrest is working on a letter to request extension

3)   What is status of valuation – has engagement letter been signed?  Workpapers requested?  Further conversations with Lauren to move the process forward?

4)   I think Forrest you said you were targeting a first draft for the rest of the response by early next week.  Is that still on track?


I'm open today except for 11:30-1pm and 3-3:30pm central if easier to give a call.  Thanks

Joe


**Joseph Housman**
**(612) 758-8550**
Hays Companies of Minneapolis



All. Together. Certain.


**From:** Joseph Housman
**Sent:** Wednesday, February 22, 2017 3:53 PM
**To:** 'Ronald J. Roach' <ron@ronroachcpa.com>; Milder, Forrest <fmilder@nixonpeabody.com>
**Cc:** Ari J. Lauer (alauer@lauerlaw.com) <alauer@lauerlaw.com>; 'Holsten, Michael (US - Minneapolis)' <mholsten@DELOITTE.com>; Joseph Housman <jhousman@hayscompanies.com>
**Subject:** summary of rents


Forrest – as discussed, here's a starting point (although admittedly has holes in it) for purposes of thinking about what's happening outside of our view of the fund……also admittedly I have not looked at this in any detail since last July, but think the data points should be self-explanatory for what we're trying to get perspective of.


First attached is the schedule I started when we had discussions with Ron (specifically on 3rd party leases).

NP0113767

Second attached is the email from Ron dated 7/18/16 that shows the sub-lease activity related to our fund for 2012-2013 (which Ron indicated is harder to obtain for late years because of the pooled concept).

The other email was from Ron dated 7/29 that had the tax returns and other source documents. It's 10MB so I will send that separately.

Thanks

Joe

**Joseph Housman | Director of Tax**
Email: jhousman@hayscompanies.com
Direct: (612) 758-8550 | Fax: (612) 758-8473 | Mobile: (612) 919-4513
Hays Companies of Minneapolis
IDS Center Suite 700, 80 South 8th Street | Minneapolis | MN | 55402



All Together Certain.

This communication is intended only for the recipient(s) named above; may be confidential and/or legally privileged; and, must be treated as such in accordance with state and federal laws. If you are not the intended recipient, you are hereby notified that any use of this communication, or any of its contents, is prohibited. If you have received this communication in error, please return it to the sender and delete the message from your computer system.

--

Ronald J. Roach Accountancy Corporation

101 Rudgear Drive

Walnut Creek, CA 94596

925-746-7777 Fax 925-407-2882

NP0113768

Securities offered through Securities America, Inc., A Registered Broker/Dealer, Member FINRA/SIPC. Advisory services offered through Securities America Advisors, Inc. Trading instructions sent via email may not be honored. Please contact my office at 925-746-7777 or Securities America, Inc. at 800-747-6111 for all buy/sell orders. Please be advised that all communications regarding trades in your account are for informational purposes only. You should continue to rely on conformations and statements received from the custodian(s) of your assets. The text of this communication is confidential, and use by any person who is not the intended recipient is prohibited. Any person who receives this communication in error is requested to immediately destroy the text of this communication without copying or further dissemination. Your cooperation is appreciated.

This communication is intended only for the recipient(s) named above; may be confidential and/or legally privileged; and, must be treated as such in accordance with state and federal laws. If you are not the intended recipient, you are hereby notified that any use of this communication, or any of its contents, is prohibited. If you have received this communication in error, please return it to the sender and delete the message from your computer system.

--
Ronald J. Roach Accountancy Corporation
101 Rudgear Drive
Walnut Creek, CA 94596
925-746-7777 Fax 925-407-2882

Securities offered through Securities America, Inc., A Registered Broker/Dealer, Member FINRA/SIPC. Advisory services offered through Securities America Advisors, Inc. Trading instructions sent via email may not be honored. Please contact my office at 925-746-7777 or Securities America, Inc. at 800-747-6111 for all buy/sell orders. Please be advised that all communications regarding trades in your account are for informational purposes only. You should continue to rely on conformations and statements received from the custodian(s) of your assets. The text of this communication is confidential, and use by any person who is not the intended recipient is prohibited. Any person who receives this communication in error is requested to immediately destroy the text of this communication without copying or further dissemination. Your cooperation is appreciated.

NP0113769

## Sales by Customer Summary
### January through December 2013

| | Jan - Dec 13 |
|---|---|
| California Diesel and Power | 14,100.00 |
| Cedar Creek Transport LLC | 1,870.00 |
| Consolidated Solar, LLC | 89,190.00 |
| Eva Santos | 2,250.00 |
| Fifth Street Gaming | 15,000.00 |
| First Friday Las Vegas, LLC | 400.00 |
| Inland Valley Construction | 2,200.00 |
| Land Of Plenty Productions | 5,000.00 |
| SolarMaid | 410.00 |
| T-Mobile**SAC Region | 10,888.00 |
| T-Mobile**SF Region | 153,611.94 |
| Triple B Construction, LLC | 3,300.00 |
| Turner Construction Company | 6,959.80 |
| **TOTAL** | 305,179.74 |

NP0113770

# Sales by Customer Summary
## January through December 2014

| | Jan - Dec 14 |
|---|---|
| **ACS** | |
| ACS-Relay for Life Vallejo | 600.00 |
| **Total ACS** | 600.00 |
| | |
| **California Diesel and Power** | 800.00 |
| **Consolidated Solar, LLC** | 64,320.00 |
| **Eva Santos** | 3,000.00 |
| **First Friday Las Vegas, LLC** | 2,100.00 |
| **STC Netcom, Inc** | |
| Silver Lake | 2,900.00 |
| **Total STC Netcom, Inc** | 2,900.00 |
| | |
| **T-Mobile**SF Region** | |
| BA00328A | 3,720.21 |
| BA00338A | 991.56 |
| BA00339A | 1,991.56 |
| BA00348A | 3,000.00 |
| BA00366A | 982.68 |
| BA00368A | 987.11 |
| BA00369A | 1,000.00 |
| BA00373A | 1,000.00 |
| BA00386A | 2,000.00 |
| BA00388A | 1,000.00 |
| BA00389A | 1,000.00 |
| BA00398A | 2,000.00 |
| BA00409A | 1,000.00 |
| BA00419A | 982.68 |
| BA00422A | 1,000.00 |
| BA00429 | 2,000.00 |
| BA00434A | 982.68 |
| BA00439A | 992.00 |
| BA00445A | 982.68 |
| BA00478A | 1,000.00 |
| BA00491A | 1,000.00 |
| BA00494A | 982.68 |
| BA00498A | 1,991.56 |
| BA00905A | 1,000.00 |
| BA00911A | 1,000.00 |
| BA01217A | 992.00 |
| BA01229A | 980.00 |
| BA01233A | 6,182.09 |
| BA01264A | 1,000.00 |
| BA01322A | 2,974.68 |
| BA01703A | 7,182.09 |
| BA02038A | 1,000.00 |

# DC Solar Distribution Inc

## Sales by Customer Summary
### January through December 2014

| | Jan - Dec 14 |
|---|---|
| BA02053A | 1,961.80 |
| BA02072A | 1,000.00 |
| BA02102A | 980.00 |
| BA02125A | 1,000.00 |
| BA02126A | 991.56 |
| BA02129A | 3,012.94 |
| BA02135A | 980.00 |
| BA02761A | 1,992.00 |
| BA02770A | 1,000.00 |
| BA02952A | 982.68 |
| BA10022A | 1,000.00 |
| BA10090D | 1,000.00 |
| BA10428Z | 1,000.00 |
| BA10461A | 13,565.43 |
| BA10585A | 1,000.00 |
| BA11196 | 13,565.43 |
| BA12037 | 1,000.00 |
| BA12762 | 1,000.00 |
| BA41334A | 1,000.00 |
| BA41446A | 1,000.00 |
| BA42650A | 1,000.00 |
| BA51973A | 982.68 |
| BA51975B | 2,000.00 |
| BA51976A | 2,000.00 |
| BA51996A | 992.00 |
| MZ86506A | 1,000.00 |
| MZ86518A | 1,000.00 |
| MZ86539A | 1,000.00 |
| MZ86596A | 1,000.00 |
| MZS0686A | 1,224.02 |
| SF03052A | 993.78 |
| SF03061 | 1,000.00 |
| SF03062A | 1,000.00 |
| SF03106 | 2,967.93 |
| SF03131A | 1,000.00 |
| SF03169 | 1,000.00 |
| SF03180A | 982.68 |
| SF04351A | 1,000.00 |
| SF04364A | 1,000.00 |
| SF04507A | 980.00 |
| SF04554A | 2,000.00 |
| SF04576A | 1,000.00 |
| SF04599A | 1,000.00 |
| SF04720A | 4,980.00 |
| SF04741A | 1,000.00 |

NP0113772

## Sales by Customer Summary
### January through December 2014

| | Jan - Dec 14 |
|---|---|
| SF05704A | 1,000.00 |
| SF05705A | 1,000.00 |
| SF05717A | 981.80 |
| SF05721A | 993.78 |
| SF05723A | 1,000.00 |
| SF05734A | 991.56 |
| SF05798A | 992.00 |
| SF05888A | 1,000.00 |
| SF05898A | 2,966.68 |
| SF0852 | 1,000.00 |
| SF0853 | 1,000.00 |
| SF0854 | 1,000.00 |
| SF0855 | 1,000.00 |
| SF13112Z | 2,000.00 |
| SF1411 | 1,000.00 |
| SF1413 | 1,000.00 |
| SF1418 | 1,000.00 |
| SF14938Z | 1,000.00 |
| SF15073C | 1,000.00 |
| SF53190A | 980.00 |
| SF53925A | 1,000.00 |
| SF70083M | 982.68 |
| SF70138M | 1,983.11 |
| SF70214M | 991.56 |
| SF70659M | 993.78 |
| SF71886M | 1,000.00 |
| T-Mobile**SF Region - Other | 71,406.92 |
| **Total T-Mobile**SF Region** | 239,297.06 |
| | |
| T-Mobile**So Cal Region | |
| IE24586A | 5,200.00 |
| IE95011A | 1,500.00 |
| **Total T-Mobile**So Cal Region** | 6,700.00 |
| | |
| **Triple B Construction, LLC** | 1,800.00 |
| Worth a "Dam" | 200.00 |
| **TOTAL** | 321,717.06 |

# Sales by Customer Summary
## DC Solar Distribution, Inc
### January through December 2015

| | Jan - Dec 15 |
|---|---|
| AC Contractors | 6,244.00 |
| Allstar Tent and Events | 2,180.00 |
| Avila Construction | 3,982.50 |
| City of Irvine | 28,913.60 |
| Consolidated Solar, LLC | 45,760.00 |
| Eva Santos | 3,000.00 |
| **Frizzie Corp** | |
|    Outside Lands (Golden Gate Park) | 6,000.00 |
| **Total Frizzie Corp** | 6,000.00 |
| | |
| Golden Voice LLC | 45,000.00 |
| JFC Construction Inc. | 21,512.00 |
| King Solarman, Inc. | 777,600.00 |
| San Manuel Amphitheater | 100,171.11 |
| Sheriffs Benefit Rodeo | 500.00 |
| **STC Netcom, Inc** | |
|    Auburn Airport | 11,312.00 |
|    Lakeview RWC | 4,510.00 |
|    STC Netcom, Inc - Other | 12,072.00 |
| **Total STC Netcom, Inc** | 27,894.00 |
| | |
| Susan Davis | 1,725.00 |
| **T-Mobile**SAC Region** | |
|    SF03465 | 1,000.00 |
| **Total T-Mobile**SAC Region** | 1,000.00 |
| | |
| **T-Mobile**SF Region** | |
|    BA00328A | 2,000.00 |
|    BA00354A | 1,000.00 |
|    BA00362A | 1,000.00 |
|    BA00386A | 1,535.20 |
|    BA00400A | 2,000.00 |
|    BA00406A | 1,000.00 |
|    BA00408A | 1,000.00 |
|    BA00409A | 1,000.00 |
|    BA00418A | 1,000.00 |
|    BA00419A | 1,000.00 |
|    BA00429 | 3,000.00 |
|    BA00436A | 1,427.50 |
|    BA00444A | 2,000.00 |
|    BA00449A | 2,106.60 |
|    BA00477A | 665.00 |
|    BA00484A | 980.00 |
|    BA00496 | 6,922.09 |
|    BA00498A | 2,000.00 |

# Sales by Customer Summary

## DC Solar Distribution Inc

### January through December 2015

|                | Jan - Dec 15 |
|----------------|-------------:|
| BA00901A       | 2,000.00     |
| BA00902A       | 1,000.00     |
| BA00903A       | 1,000.00     |
| BA00907A       | 1,000.00     |
| BA00920A       | 1,000.00     |
| BA00922A       | 807.50       |
| BA01233A       | 395.00       |
| BA01262A       | 1,000.00     |
| BA01298A       | 5,967.62     |
| BA01311A       | 1,000.00     |
| BA01319A       | 7,577.09     |
| BA01332A       | 1,000.00     |
| BA01392A       | 7,916.09     |
| BA01747A       | 5,922.09     |
| BA02049A       | 1,000.00     |
| BA02075A       | 1,000.00     |
| BA02092A       | 1,000.00     |
| BA02101A       | 983.11       |
| BA02113A       | 12,387.53    |
| BA02119A       | 1,000.00     |
| BA02378A       | 1,000.00     |
| BA02388A       | 6,922.09     |
| BA02963A       | 1,030.00     |
| BA03078A       | 1,000.00     |
| BA10010A       | 1,000.00     |
| BA10011B       | 1,000.00     |
| BA10013A       | 6,922.09     |
| BA10022A       | 1,006.00     |
| BA10025A       | 5,922.09     |
| BA10087B       | 2,000.00     |
| BA104282       | 1,000.00     |
| BA10801Z       | 1,000.00     |
| BA11785Z       | 1,000.00     |
| BA12029A       | 1,000.00     |
| BA12030        | 1,000.00     |
| BA12541Z       | 1,000.00     |
| BA50070A       | 1,000.00     |
| BA51976A       | 3,006.30     |
| BA51978C       | 5,922.09     |
| BA51987A       | 1,000.00     |
| CSUH COW       | 1,000.00     |
| SF03046A       | 1,000.00     |
| SF03059A       | 1,000.00     |
| SF03082A       | 2,000.00     |
| SF03096A       | 1,000.00     |

# Sales by Customer Summary

### January through December 2015

| | Jan - Dec 15 |
|---|---|
| SF03135A | 1,000.00 |
| SF03165A | 1,000.00 |
| SF03225A | 1,000.00 |
| SF03268A | 1,000.00 |
| SF04363A | 1,299.80 |
| SF04501A | 1,000.00 |
| SF04507A | 1,000.00 |
| SF04508A | 1,000.00 |
| SF04552A | 1,000.00 |
| SF04554A | 1,000.00 |
| SF04562A | 2,000.00 |
| SF04572A | 1,535.20 |
| SF04621A | 2,440.20 |
| SF04720A | 4,969.15 |
| SF04741A | 1,000.00 |
| SF04932A | 1,000.00 |
| SF04936A | 2,000.00 |
| SF04953A | 1,000.00 |
| SF04983A | 1,000.00 |
| SF05604A | 2,139.60 |
| SF05607A | 1,000.00 |
| SF05701A | 1,000.00 |
| SF05704A | 2,000.00 |
| SF05711A | 2,235.20 |
| SF05723A | 3,516.00 |
| SF05739A | 1,000.00 |
| SF05743A | 1,000.00 |
| SF05799A | 2,000.00 |
| SF05804A | 1,000.00 |
| SF05812A | 1,000.00 |
| SF05889A | 1,000.00 |
| SF05898A | 1,000.00 |
| SF13017C | 1,000.00 |
| SF13063A | 459.00 |
| SF13104A | 1,000.00 |
| SF14155A | 1,000.00 |
| SF14968A | 2,000.00 |
| SF14971Z | 1,000.00 |
| SF14992A | 1,000.00 |
| SF15049A | 3,000.00 |
| SF15052F | 1,000.00 |
| SF15090A | 1,000.00 |
| SF15106A | 1,000.00 |
| SF23217A | 3,945.84 |
| SF24658B | 1,000.00 |

# Sales by Customer Summary
### January through December 2015

| | Jan - Dec 15 |
|---|---|
| **SF24667A** | 1,000.00 |
| **SF40831B** | 1,000.00 |
| **SF40832A** | 2,000.00 |
| **SF40834B** | 1,000.00 |
| SF40961 | 1,153.00 |
| SF43584 | 3,945.84 |
| **SF53470A** | 981.00 |
| SF54399A | 1,114.00 |
| **SF70144M** | 1,000.00 |
| **SF70177M** | 1,018.00 |
| **SF70220M** | 1,516.00 |
| **SF70269M** | 5,922.09 |
| **SF70310M** | 1,000.00 |
| SF70602m | 1,130.00 |
| **SF70656M** | 1,000.00 |
| **SF70804M** | 1,000.00 |
| **SF70857M** | 1,000.00 |
| **SF71038M** | 1,000.00 |
| **SF71625M** | 2,152.92 |
| **SF71684M** | 1,000.00 |
| **SF71686M** | 1,000.00 |
| **SF71857M** | 6,367.50 |
| **SF71952M** | 2,044.49 |
| **SF71953M** | 2,000.00 |
| T-Mobile**SF Region - Other | 79,455.09 |
| **Total T-Mobile**SF Region** | 324,663.00 |
| | |
| **T-Mobile**So Cal Region** | |
| Temecula Balloon and Wine Festival | 2,050.00 |
| **Total T-Mobile**So Cal Region** | 2,050.00 |
| | |
| **UCLA** | 550.00 |
| **Woodbridge High School** | 15,000.00 |
| Worth a "Dam" | 200.00 |
| **TOTAL** | 1,413,945.21 |

NP0113777

# DC Solar Distribution Inc

## Sales by Customer Summary
### January through December 2016

|  | Jan - Dec 16 |
|---|---|
| **Ahern** | 38,628.07 |
| **Allstar Tent and Events** | 5,780.00 |
| **Bay Area Screen Print** | 1,587.45 |
| **Central Contra Costa Sanitary District** | 550.00 |
| **ChargePoint** | 930.00 |
| **City of Irvine** | |
| **Winter Wonderland** | 880.00 |
| **Total City of Irvine** | 880.00 |
|  | |
| **Colleges** | |
| Cabrillo College | 195,253.30 |
| CSU Northridge | 318,004.74 |
| Mills College | 160,382.50 |
| Shasta College | 71,263.00 |
| **Total Colleges** | 744,903.54 |
| **Dyson & Womack** | 1,790.00 |
| **Food Bank of Contra Costa & Solano** | 190.00 |
| **Golden Voice LLC** | 59,825.00 |
| **Insomniac** | 2,100.00 |
| **Intuit Quickbooks** | 0.99 |
| **King Solarman, Inc.** | 777,600.00 |
| **Martinez Chamber of Commerce** | |
| Martinez Marina | 380.00 |
| Martinez Chamber of Commerce - Other | 380.00 |
| **Total Martinez Chamber of Commerce** | 760.00 |
|  | |
| **Mr. Bones** | 1,990.00 |
| **OC Fair & Event Center** | 4,200.00 |
| **Phoenix International Raceway** | 8,475.00 |
| **Quality Telecom Inc** | 3,220.00 |
| **Relay for Life** | |
| El Cerrito | 190.00 |
| Martinez Junior High School | 190.00 |
| Oakley | 950.00 |
| St. Vincent High School | 1,395.00 |
| Vacaville | 930.00 |
| **Total Relay for Life** | 3,655.00 |
|  | |
| **SAC Wireless** | 7,520.00 |
| **San Manuel Amphitheater** | 39,954.70 |
| **Sheriffs Benefit Rodeo** | 780.00 |
| **Signature Group Investments** | 1,390.00 |
| **Simon Construction Inc** | 2,150.00 |
| **Southern California Edison** | 2,300.00 |
| **Stanford University** | 380.00 |

## Sales by Customer Summary
### January through December 2016

|  | Jan - Dec 16 |
|---|---|
| **Sun First Solar** | 465.00 |
| **Susan Davis** | 4,600.00 |
| **T-Mobile**SAC Region** | |
| SC06128A | 983.11 |
| SC06147A | 980.00 |
| SC06174A | 1,000.00 |
| SC06211A | 1,000.00 |
| SC06530A | 983.11 |
| SC06675A | 1,000.00 |
| SC06995A | 980.00 |
| SC07020A | 1,000.00 |
| SC07111A | 1,000.00 |
| SC07223A | 1,961.34 |
| SC07229A | 980.00 |
| SC07239A | 2,000.00 |
| SC07560A | 2,000.00 |
| SC08610A | 980.00 |
| SC08626A | 1,000.00 |
| SC08634A | 2,000.00 |
| SC08651A | 1,000.00 |
| SC08653A | 980.00 |
| SC08731A | 1,000.00 |
| SC08749A | 1,000.00 |
| SC08767A | 1,000.00 |
| SC09205A | 1,000.00 |
| SC09605A | 1,000.00 |
| SC09621A | 980.00 |
| SC15410A | 2,000.00 |
| SC15422A | 980.00 |
| SC15425A | 980.00 |
| SC40140A | 1,000.00 |
| SC55435B | 2,824.34 |
| SC55445A | 1,000.00 |
| SC90172M | 980.00 |
| SC90328M | 2,000.00 |
| SF03465 | 987.11 |
| **Total T-Mobile**SAC Region** | 40,559.01 |
| | |
| **T-Mobile**SF Region** | |
| BA00209A | 2,963.55 |
| BA00305A | 980.00 |
| BA00317A | 1,000.00 |
| BA00321A | 1,967.11 |
| BA00324A | 2,000.00 |
| BA00328A | 980.00 |

## Sales by Customer Summary
### January through December 2016

| | Jan - Dec 16 |
|---|---|
| BA00337A | 1,000.00 |
| BA00362A | 2,960.00 |
| BA00363A | 1,000.00 |
| BA00379A | 980.00 |
| BA00386A | 19,982.40 |
| BA00399A | 1,000.00 |
| BA00403A | 1,000.00 |
| BA00406A | 987.11 |
| BA00408A | 980.00 |
| BA00410A | 980.00 |
| BA00422A | 1,000.00 |
| BA00423A | 1,000.00 |
| BA00444A | 987.11 |
| BA00463A | 980.00 |
| BA00483A | 980.00 |
| BA00498A | 996.44 |
| BA01115A | 1,000.00 |
| BA01195D | 3,930.22 |
| BA01234A | 980.00 |
| BA01252A | 996.44 |
| BA01254A | 1,000.00 |
| BA01272A | 1,000.00 |
| BA01296A | 1,000.00 |
| BA01305 | 980.00 |
| BA01314A | 1,983.11 |
| BA01318A | 1,983.11 |
| BA01319A | 980.00 |
| BA01322A | 980.00 |
| BA01350A | 980.00 |
| BA01714A | 980.00 |
| BA02009A | 1,000.00 |
| BA02016A | 1,000.00 |
| BA02044A | 1,000.00 |
| BA02051A | 980.00 |
| BA02053A | 980.00 |
| BA02073A | 980.00 |
| BA02076A | 1,000.00 |
| BA02092A | 983.11 |
| BA02113A | 19,982.40 |
| BA02124A | 1,000.00 |
| BA02142A | 1,000.00 |
| BA02144A | 980.00 |
| BA02147A | 996.44 |
| BA02161A | 980.00 |
| BA02162A | 996.44 |

NP0113780

# Sales by Customer Summary
## January through December 2016

|  | Jan - Dec 16 |
| --- | --- |
| **BA02163A** | 980.00 |
| **BA02164A** | 980.00 |
| **BA02265A** | 1,000.00 |
| **BA02934A** | 1,980.00 |
| **BA02943A** | 983.11 |
| **BA02953A** | 996.44 |
| **BA10001A** | 980.00 |
| **BA10007C** | 1,000.00 |
| **BA10010A** | 1,084.00 |
| **BA10027A** | 1,000.00 |
| **BA10054A** | 5,231.62 |
| **BA10428Z** | 1,967.11 |
| **BA10452A** | 1,000.00 |
| **BA10461A** | 980.00 |
| **BA11014A** | 1,000.00 |
| **BA12006A** | 980.00 |
| **BA12042A** | 980.00 |
| **BA12045A** | 1,960.00 |
| **BA12478B** | 1,000.00 |
| **BA12552Z** | 980.00 |
| **BA12558A** | 980.00 |
| **BA20300A** | 980.00 |
| **BA21694A** | 1,000.00 |
| **BA22515B** | 980.00 |
| **BA22635** | 987.11 |
| **BA22909A** | 996.44 |
| **BA41334A** | 980.00 |
| **BA50067A** | 980.00 |
| **BA51975B** | 980.00 |
| **BA51988B** | 1,983.11 |
| **BA80480B** | 1,980.00 |
| **BA92068W** | 1,960.00 |
| **SC07223A** | 987.11 |
| **SF03010A** | 2,122.92 |
| **SF03041A** | 3,945.84 |
| **SF03052A** | 980.00 |
| **SF03076A** | 2,122.92 |
| **SF03097A** | 3,075.46 |
| **SF03098A** | 1,000.00 |
| **SF03133A** | 2,122.92 |
| **SF03145A** | 2,122.92 |
| **SF03146A** | 3,034.38 |
| **SF03148A** | 3,034.38 |
| **SF03151A** | 1,211.46 |
| **SF03172A** | 1,000.00 |

# Sales by Customer Summary
## January through December 2016

| | Jan - Dec 16 |
|---|---|
| SF03270A | 3,034.38 |
| SF03271A | 3,034.38 |
| SF03281A | 3,034.38 |
| SF03462A | 3,034.38 |
| SF04501A | 1,000.00 |
| SF04504A | 980.00 |
| SF04534A | 1,980.00 |
| SF04563A | 1,116.02 |
| SF04593A | 1,000.00 |
| SF04716A | 10,860.00 |
| SF04720A | 6,026.42 |
| SF04801A | 980.00 |
| SF04896A | 196.00 |
| SF04927A | 996.44 |
| SF04942A | 980.00 |
| SF04956a | 5,821.20 |
| SF04965A | 980.00 |
| SF04966A | 98.00 |
| SF05607A | 1,250.68 |
| SF05609A | 980.00 |
| SF05713A | 1,960.00 |
| SF05717A | 996.44 |
| SF05727A | 1,000.00 |
| SF05739A | 1,000.00 |
| SF05794A | 1,000.00 |
| SF05798A | 987.11 |
| SF05826A | 1,983.55 |
| SF05888A | 1,980.00 |
| SF05898A | 1,980.00 |
| SF13113A | 4,149.84 |
| SF13176H | 3,034.38 |
| SF14155A | 980.00 |
| SF14979ZA | 1,000.00 |
| SF14990A | 186.20 |
| SF15002A | 1,000.00 |
| SF15041C | 996.44 |
| SF15048A | 98.00 |
| SF15050A | 98.00 |
| SF15151B | 1,000.00 |
| SF15606A | 980.00 |
| SF23200C | 1,211.46 |
| SF23214A | 3,034.38 |
| SF40833A | 3,912.00 |
| SF40834B | 1,000.00 |
| SF40863 | 1,996.44 |

## DC Solar Distribution Inc

# Sales by Customer Summary
### January through December 2016

| | Jan - Dec 16 |
|---|---|
| SF40864D | 980.00 |
| SF40872A | 980.00 |
| SF40958A | 983.11 |
| SF40959A | 980.00 |
| SF53572B | 3,034.38 |
| SF53613A | 984.44 |
| SF54399A | 1,980.00 |
| SF70010M | 2,120.20 |
| SF70202M | 2,980.00 |
| SF70250 | 1,000.00 |
| SF70692M | 1,000.00 |
| SF70805M | 1,960.45 |
| SF71314M | 1,000.00 |
| SF71418M | 980.00 |
| SF71665M | 1,000.00 |
| Tellworks Warehouse | 196.00 |
| T-Mobile**SF Region - Other | 23,191.75 |
| Total T-Mobile**SF Region | 298,241.09 |
| | |
| Terry Hines & Associates | 12,045.00 |
| TJS Construction | 1,680.00 |
| UCLA | 2,335.00 |
| Worth a "Dam" | 200.00 |
| TOTAL | 2,071,664.85 |

NP0113783

| | |
|---|---|
| **From:** | ronroachcpa@gmail.com on behalf of Ronald J. Roach <ron@ronroachcpa.com> |
| **Sent:** | Thursday, March 02, 2017 7:44 PM |
| **To:** | Joseph Housman |
| **Cc:** | Milder, Forrest; Ari J. Lauer (alauer@lauerlaw.com); Holsten, Michael (US - Minneapolis); JEliason@foley.com; Hecimovich, Gary (US - Washington D.C.); Frericks, Thomas Paul (US - Minneapolis) |
| **Subject:** | Re: summary of rents |
| **Attachments:** | DC Solar Distribution 2013 Sub-Lease Activity.pdf; DC Solar Distribution 2014 Sub-Lease Activity.pdf; DC Solar Distribution 2015 Sub-Lease Activity.pdf; DC Solar Distribution 2016 Sub-Lease Activity.pdf |

All,

I attached the DC Solar Distribution sub-lease activity for years 2013-2016. The following are the amounts paid by DC Solar Solutions, Inc. to DC Solar Distribution, Inc. on a re-rent basis for each of those years:

2013 -  $ 1,595,370
2014 -   13.975,770
2015 -   30,562,024
2016 -   61,545,737

Thanks,

Ron


On Thu, Mar 2, 2017 at 5:25 AM, Joseph Housman <jhousman@hayscompanies.com> wrote:

Ron – I haven't seen any of this come across yet. Can you send it this morning so everyone can review in advance of the call this afternoon?


Forrest have you submitted a request for extension yet or do you have a draft you want us to review? Also, will we have a first draft from you of the 60-day letter response this week (sans valuation from Lauren)?


Ari – have you reached out to Lauren's firm to request workpapers yet? Sounds like she has not. Would it be best for you to request through their legal department?


Thanks all

Joe

1

**EXHIBIT 6**

NP0113765

| Clear Date | Transferor | Transferee | Cash Disbursements |
|---|---|---|---|
| 07/31/15 | DC Solar Solutions, Inc. | Nixon Peabody LLP | $ 3,015.00 |
| 01/19/16 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 50,451.50 |
| 07/11/16 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 40,672.00 |
| 09/14/16 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 12,492.50 |
| 09/14/16 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 2,147.50 |
| 03/13/17 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 13,681.50 |
| 04/24/17 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 17,672.00 |
| 07/26/17 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 71,811.50 |
| 08/10/17 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 33,697.63 |
| 09/08/17 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 44,507.95 |
| 10/10/17 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 2,068.00 |
| 11/27/17 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 4,349.42 |
| 12/11/17 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 470.00 |
| 01/24/18 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 846.00 |
| 03/06/18 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 490.00 |
| 04/09/18 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 2,940.00 |
| 05/01/18 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 5,292.00 |
| 08/22/18 | DC Solar Solutions, Inc. | Nixon Peabody LLP | 980.00 |
| **Total Cash Disbursements** | | | $ 307,584.50 |

**EXHIBIT 7** Page 1 of 1