Jeffrey L. Hartman, Esq.
Nevada Bar No. 1607
**HARTMAN & HARTMAN**
510 W. Plumb Lane, Suite B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818
notices@bankruptcyreno.com

Michael S. Budwick, Esq. #938777 – Admitted *Pro Hac Vice*
Solomon B. Genet, Esq. #617911 – Admitted *Pro Hac Vice*
Gil Ben-Ezra, Esq. #118089 – Admitted *Pro Hac Vice*
**MELAND BUDWICK, P.A.**
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
T: (305) 358-6363
F: (305) 358-1221
mbudwick@melandbudwick.com
sgenet@melandbudwick.com
gbenezra@melandbudwick.com

Attorneys for Christina W. Lovato, Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>DOUBLE JUMP, INC.<br><br>Debtor. | Lead Case No.: BK-19-50102-gs<br>(Chapter 7)<br><br>Substantively consolidated with: |

| 19-50130-gs | DC Solar Solutions, Inc. |
|---|---|
| 19-50131-gs | DC Solar Distribution, Inc. |
| 19-50135-gs | DC Solar Freedom, Inc. |

**MOTION FOR ORDER (1) APPROVING COMPROMISE AND SETTLEMENT AGREEMENT WITH NOVOGRADAC & COMPANY LLP; AND (2) FOR AWARD OF CONTINGENCY FEE**

**Hearing Date:   June 9, 2022**
**Hearing Time:  9:30 a.m.**

Christina Lovato, the duly appointed and acting trustee ("***Trustee***") for the chapter 7 estates of DC Solar Solutions, Inc. ("***Solutions***"), DC Solar Distribution, Inc. ("***Distribution***"), and DC Solar Freedom, Inc. ("***Freedom***," and with Solutions and Distribution, "***DC Solar***") and Double Jump, Inc. ("***DJ***," and together with DC Solar, the "***Estate***") files this motion to approve the compromise and settlement with Novogradac & Company LLP ("***Novogradac***") pursuant to F.R.B.P. 9014 and 9019 ("***Motion***"). The Motion is supported by the separately filed Declaration of Christina Lovato.

1

# I.    Background

### A.  General Background

1.      Prepetition, DC Solar was engaged in a business related to manufacturing, marketing, selling, and leasing mobile solar generators ("**MSGs**").

2.      Investors that purchased MSGs from Solutions were generally motivated by, among other things, certain federal tax benefits associated with an investment in solar energy. Jeff Carpoff worked with others to design tax-equity investment ("**ITC**") transactions that would enable investors to claim tax benefits based on the MSGs' $150,000 purchase price.

3.      Typically, and generally, the ITC transactions were designed such that DC Solar's investors would purchase MSGs from Solutions, contemporaneously lease them to Distribution, and Distribution would then sublease them to third parties. Most of DC Solar's investors were special purpose limited liability companies ("**Funds**") that financed approximately 70% of their purchase by issuing a promissory note to Solutions. The Funds would use the lease revenue from Distribution to make monthly note payments to Solutions.

4.      In this structure, Distribution could supposedly sublease the MSGs at a sufficiently high volume and rate to enable Distribution to meet its lease obligations to the investors, which would support the $150,000 purchase price.

5.      However, Distribution did not sufficiently sublease the MSGs to third parties and many of the MSGs "purchased" by investors were never manufactured.

6.      Rather, certain of DC Solar's insiders, such as Jeff Carpoff, were also perpetrating a Ponzi scheme ("**Carpoff Ponzi Scheme**"),[1] harming DC Solar with every transaction.

7.      Indeed, one of the primary ways Carpoff concealed Distribution's inability to meet investor expectations was by causing Solutions to transfer monies to Distribution, which Distribution then used to make its monthly payment obligations to investors (the Funds would then use those monies to make the monthly note payments).

---

[1] *See generally, e.g., U.S.A. v. Carpoff*, Case No. 20-00017 (E.D.Ca.) [ECF No. 10]; Main Bankruptcy Case ECF No. 106-2.

8.      On December 18, 2018, federal law enforcement raided DC Solar's business locations ("**Raid**,") effectively closing down DC Solar's operations.

9.      In late January and early February 2019, the Debtors filed for chapter 11 relief before this Court, commencing these bankruptcy cases ("**Bankruptcy Cases**").

10.     On March 22, 2019, the Court converted the Bankruptcy Cases to cases under chapter 7 and appointed the Trustee as chapter 7 trustee of the Debtors' estates.[2] The Bankruptcy Cases have been substantively consolidated.[3]

**B.  The Trustee's Investigation**

11.     Following her appointment, the Trustee engaged in a broad investigation including related to DC Solar's pre-petition activities and relationships with certain professionals, including Novogradac. Per its website, Novogradac is a national professional services organization that consists of affiliates and divisions providing professional services that include certified public accounting, valuation, and consulting.

12.     The Trustee has devoted substantial resources investigating Novogradac's pre-petition relationship with DC Solar and other parties, including certain of the Funds.

**1.   The Trustee's Investigatory Steps**

13.     Beginning in March 2020, the Trustee served Rule 2004 discovery on Novogradac,[4] and had related communications with its counsel. Novogradac subsequently produced tens of thousands of pages of documents, including financial and tax equity-related information.

14.     The Trustee also issued multiple Rule 2004 subpoenas on other parties and agreed to protective orders in connection with document production, which were approved by this Court.[5]

15.     The Trustee reviewed and analyzed these and other documents as part of her analysis of the financial and consulting services that Novogradac provided to DC Solar, as well as to others in connection with DC Solar. The Trustee investigated the complex issues related to the ITC transactions as they: (1) were represented to perform; and (2) actually performed.

---

[2] ECF Nos. 439-40.
[3] ECF No 2613.
[4] ECF Nos. 1731, 1820, & 2074.
[5] *See* Main Case docket, *passim*.

16.    The Trustee investigated the relationships between Novogradac and other DC Solar outside professionals.

17.    The Trustee's investigation included informal interviews with multiple persons about, among other things, DC Solar's relationship with Novogradac.

18.    After seeking and obtaining this Court's approval for the implementation of protocols to conduct Rule 2004 examinations remotely due to COVID-19,[6] the Trustee examined Novogradac under oath, through its authorized representative.[7]

19.    The Trustee has considered and evaluated the information from her investigation to assess potential claims she may assert against Novogradac. Given her role as an after-the-fact fiduciary, the Trustee's investigatory work was essential.

**2.    Certain Results of the Trustee's Investigation**

20.    The Trustee presents the following non-confidential information to assist the Court and parties-in-interest in evaluating this Motion.

21.    DC Solar's lead outside professional for the tax equity transactions was the law firm of Nixon Peabody, LLP ("***Nixon***"). DC Solar retained Nixon in mid-late 2010, prior to DC Solar's first ITC transaction. Nixon quickly introduced Carpoff to Novogradac as an accounting firm with an expertise in providing financial projections and other support for ITC transactions, and Novogradac, too, was involved with DC Solar at its early stages.

22.    Novogradac's role, generally and among other things, was to work on the financial projections for the ITC transactions in conjunction with DC Solar's other professionals, such that the transactions would enable the investors to obtain favorable tax benefits.

23.    Novogradac, alongside other outside professionals, lent credibility to the ITC transactions. Carpoff used the professionals' reputations to market the investments to investors.

24.    Novogradac worked on and signed off on many of the ITC transactions' structure and financial projections where it knew or should have known that false assumptions were used to

---

[6] *See e.g.,* ECF Nos. 1734, 1795 & 1831.
[7] ECF No. 2157

inflate the MSGs' purchase price. The inflated assumptions created the impression that the transactions complied with the Tax Code when they did not.

25.    Investors relied on Novogradac's professional work product in deciding to enter those certain ITC transactions.

26.    On June 9, 2017, while Novogradac was working on a specific DC Solar-sponsored tax equity transaction which had not yet closed, the well-known "Law360" publication (www.Law360.com) published an article ("*Article*") titled "*Solar Co. Challenging Millions in IRS Adjustments*." The Article reported that the Internal Revenue Service ("*IRS*") had audited Fund III's[8] tax equity investment with DC Solar and concluded that the MSG-purchase price was "*concocted using circular flows of money [that did] not reflect the true cost basis or the true value of the energy property*."

27.    Novogradac read the Article no later than June 13, 2017. Novogradac was concerned.

28.    At or around this time and following its review of the Article, Novogradac asked for the IRS documentation regarding the IRS audit of the Fund III transaction, but Novogradac never received it.

29.    At or around this time and following its review of the Article, Novogradac communicated with Nixon, among others.

30.    By June 15, 2017, Novogradac communicated to Carpoff that it was ceasing work on all Carpoff-connected projects.

31.    Yet, after a somewhat short period of time, DC Solar not only closed the transaction on which Novogradac had been working, but Novogradac restarted, at least to some extent, working on DC Solar ITC transactions.

32.    After June 15, 2017, DC Solar closed at least six transactions totaling in the aggregate hundreds of millions of dollars.

33.    Novogradac disputes some or all of the Trustee's presentation of the facts.

---

[8] "*Fund III*" means Solar Eclipse Investment Fund III, LLC, the investor in the first DC Solar-sponsored ITC transaction.

### C. The Trustee's Potential Claims, and the Two Mediations

34.    The Trustee informed Novogradac of her intent to assert tort claims against Novogradac, including potentially: (1) breach of duty to DC Solar; and (2) aiding and abetting Jeff Carpoff's breach of his duties to DC Solar.

35.    After some communications, the Trustee and Novogradac agreed to explore a pre-suit consensual resolution. The parties agreed to a formal and confidential mediation facilitated by John DeGroote of DeGroote Partners, LLC. *See* www.degrootepartners.com.

36.    Mr. DeGroote worked with the parties to implement procedures for the exchange of substantive mediation statements and other materials. Given that the Trustee had not sued Novogradac, to promote a meaningful mediation process, the Trustee presented to Novogradac and Mr. DeGroote her view of the facts, applicable law, and the Trustee's potential claims.

37.    The parties undertook to persuasively communicate to one another, and Mr. DeGroote, the strengths and weaknesses of the potential claims and defenses.

38.    The formal portion of the mediation session took place on July 1, 2021. This day of mediation did not result in a consensual resolution.

39.    Nevertheless, the parties continued to work in good faith, leaving the mediation open to facilitate communication. After back-and-forth over the following months, the parties agreed to a second formal mediation session, this time facilitated by Robert Meyer, Esq. from JAMS ADR. *See* www.jamsadr.com/meyer.

40.    Mr. Meyer worked with the parties to implement procedures for the exchange of substantive mediation statements and other materials. Given that the Trustee had not sued Novogradac, to promote a meaningful process, the Trustee presented to Novogradac and Mr. Meyer her view of the facts, applicable law, and the Trustee's potential claims.

41.    The parties undertook to persuasively communicate to one another, and Mr. Meyer, the strengths and weaknesses of the potential claims and defenses.

42.    The second day of formal mediation took place on March 7, 2022 and ended with an agreement as the material terms of a settlement. Since that time, the parties continued to work together in good faith and on the more fulsome documentation.

43.     Mr. Meyer's experience, expertise, and assistance were essential to this outcome. Mr. DeGroote, too, was very helpful in reaching this outcome. The Trustee extends her appreciation to Messrs. Meyer and DeGroote for their time and efforts.

44.     The Trustee also extends her appreciation to Novogradac and its professionals for their efforts and professionalism throughout the mediation process.

**D.  The Settlement**

45.     Subject to this Court's approval, the Trustee and Novogradac have reached an agreement as set forth in the agreement attached as __Exhibit 1__ to the Declaration of Christina Lovato in support of this motion ("***Settlement Agreement***"). The Trustee believes that the Settlement Agreement is in the best interests of the Debtors' estate and should be approved.

46.     The key aspects of the Settlement Agreement, as more particularly described in the Settlement Agreement, include the following:

- Novogradac will pay the Trustee $3,200,000.

- Novogradac and the Trustee will exchange mutual general releases.

## II.     __Law and Argument__

47.     F.R.B.P. 9019(a) provides in relevant part that "[o]n motion ... and after notice and a hearing, the court may approve a compromise or settlement."

48.     In the Ninth Circuit, motions to approve a compromise and settlement agreement are reviewed under the four criteria set forth in *In re A&C Properties, Inc.*, 784 F. 2d 1377, 1381 (9th Cir. 1986), cert. denied, 479 U.S. 854 (1986). Those criteria are: (1) likelihood of success on merits of the claims in the underlying litigation; (2) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (3) the difficulties, if any, to be encountered in the matter of collection; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

49.     Compromises are favored under the Bankruptcy Code, and approval of a compromise rests in the sound discretion of the Court.[9] The bankruptcy court is afforded wide latitude in approving compromise agreements which it determines to be fair, reasonable, and

---

[9] *Prot. Committee for Ind. Stockholders v. Anderson*, 390 U.S. 414, 424 (1968).

adequate.[10] A court need not conduct an exhaustive investigation into the claim sought to be compromised.[11]

50.    The Trustee, in her informed business judgment, submits that approval of the Settlement Agreement is in the best interests of the Debtors' estate.[12]

**A.  The Settlement Should Be Approved**

51.    Based upon these principles, the Trustee submits that the Settlement Agreement falls well above the lowest point of the range of reasonableness and should be approved.

**1.  Probability of Success in Litigation**

52.    This is a significant consideration that militates in favor of approval of the Settlement Agreement.

53.    While the Trustee believes her potential claims are meritorious, complex tort litigation of this nature present material risk. Here, Novogradac is expected to argue, among other things, that: (1) Novogradac owed no fiduciary duty to DC Solar; (2) Novogradac's professional role was limited to providing financial projections in the form of compilations, which is accompanied by, at most, a limited professional duty; (3) there are contractual limitations of liability; (4) Novogradac relied on DC Solar's other professionals, most notably Nixon; (5) Novogradac had no actual knowledge of Carpoff's wrongdoing (even if it should have known, which it also disputes); (6) Novogradac provided no substantial assistance after reading the Article; and (7) the Trustee's claims are barred by the application of the unclean hands (or *in pari delicto*) equitable defense.[13]

54.    The Trustee can respond substantively to each of these items, although much is subject to the mediation privilege and confidentiality restrictions.

---

[10] *In re Woodson*, 839 F.2d 610 (9th Cir. 1988).

[11] *In re Walsh Construction, Inc.*, 699 F.2d 1325, 1328 (9th Cir. 1982).

[12] *See In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) ("Although a court may not substitute the debtor's judgment for its own and instead must undertake its own, independent, reasoned analysis of the claims at issue, a court may nonetheless take into account the debtor's business judgment in recommending a settlement as well as the opinions of the debtor and the parties to the settlement.") (citing cases, citation removed).

[13] *See In re Delano Retail Partners, LLC*, 2014 WL 4966476, *5 (Bankr. E.D. Cal. Sept. 29, 2014) ("California law treats the in pari delicto doctrine as part of the doctrine of 'unclean hands.'").

55.     But at least some of Novogradac's arguments present litigation risk, and Novogradac has non-frivolous arguments on certain aspects of the first through sixth points above. For example, (1) Nixon was DC Solar's lead professional and gatekeeper to the investor marketplace that introduced Novogradac to Carpoff in the first place; (2) the Trustee expects she would have to present Novogradac's actual knowledge of Carpoff's wrongdoing relying in material part on the Article and the surrounding circumstances, in the face of Novogradac's denial of its knowledge; and (3) Novogradac's role was more limited in the post-Article time period relative to the pre-Article time period.

56.     As to the sixth point, however, the Trustee's position is that the defense of unclean hands, under California law, is inapplicable for a series of reasons. For example, an explicit requirement for application of the California version of the defense is that the defendant must have suffered injury by the wrongful conduct.[14] Here, that element is lacking. And the Court's substantial discretion as to whether to apply the defense under California law is directed, in material part, by matters of public policy[15] which militate against the defense's application to the Trustee.[16] Simply, this Court should not apply an equitable defense inequitably. Moreover, while the Trustee stands in the shoes of the debtor "*as of the commencement of the case*" under 11 U.S.C. §541, by that time, DC Solar's new management had ousted former management and assumed control; thus, the Trustee is freed from the sting of the former insiders' wrongdoing for purposes

---

[14] *See e.g.,* 2 Cal. Affirmative Def. § 45:3 (2d ed.) ("[T]he party seeking to invoke the unclean hands doctrine must have been injured by the alleged wrongful conduct. A defendant who has profited from the wrongful conduct cannot invoke the maxim.") (emphasis added); *Fairbairn v. Fid. Investments Charitable Gift Fund*, 2020 WL 999752, *5 (N.D. Cal. Mar. 2, 2020).

[15] *Musnicki v. Janasi*, 2010 WL 367526, *4 (Cal. Ct. App. 2010) ("It is well settled that public policy may favor the nonapplication of the [unclean hands] doctrine as well as its application. Whenever an inequitable result would be accomplished by the application of the 'clean hands' doctrine the courts have not hesitated to reject it.") (citations omitted).

[16] *See e.g., FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir.1995) ("While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law."); *Mosier v. Stonefield Josephson, Inc*., 2011 WL 5075551, *6 (C.D. Cal. Oct. 25, 2011) ("The Court finds persuasive the Receiver's assertion that allowing Stonefield to invoke the defense of [IPD/unclean hands] would frustrate the Court's plan by "diminishing the value of the asset pool held," thereby hurting innocent third-party creditors, while benefitting alleged an alleged wrongdoer.").

of the defense.[17] And even before the removal of the Carpoffs, the Raid–which resulted in the collapse of the Carpoff Ponzi Scheme–was precipitated by the actions of a DC Solar senior executive who learned of wrongdoing and contacted law enforcement as a whistleblower, stopping the Carpoffs' wrongdoing. For these and other reasons, the Trustee believes that the defense of unclean hands is inapplicable.

57.    Novogradac does not agree with much of the Trustee's factual assertions or her legal assessment.

58.    The Trustee acknowledges there is material litigation risk as to certain defenses expected to be raised by Novogradac at summary judgment or at trial.

**2.    Complexity of Litigation and Attendant Expense, Inconvenience and Delay**

59.    This is a significant consideration that militates in favor of approval of the Settlement Agreement.

60.    Litigation against Novogradac would be factually and legally complex. The Trustee has analyzed a significant amount of decisional law addressing claims against accounting, financial, and other professional firms in connection with Ponzi and other fraudulent schemes, focusing on California law. Naturally, every fact-situation is different and requires independent analysis and application of unique facts.

61.    Here, the Trustee would seek to plead and prove the breadth of the relationship between Novogradac and DC Solar, and Novogradac's relationship with DC Solar arising from its introduction by Nixon from near inception.

62.    The Trustee would also seek to plead and prove the financial and accounting role that Novogradac maintained in the ITC transactions. This is complex subject matter. For example, Novogradac's financial projections issued in connection with many of the ITC transactions could require a fair amount of in-depth analysis to review and understand. The Trustee may need to establish, among other things and dependent on the specific cause of action, that the financial

---

[17] *See e.g., Glob. Money Mgmt., L.P. v. McDonnold*, 2008 WL 11337623, *9 (S.D. Cal. Feb. 27, 2008); *In re Palm Beach Fin. Partners*, 588 B.R. 633, 647 (Bankr. S.D. Fla. 2018) (rejecting the *in pari delicto* defense, reasoning that removal of pre-petition wrongdoing debtor-management "had the same effect as appointment of the receiver"); *see also O'Melveny*, 61 F.3d at 19.

projections contained misrepresentations, that Novogradac had and breached its duties, and that the breach caused damages to DC Solar.

63.    And not only was the professional work complex, but the Trustee's claims would also be connected to the subject matter of the Carpoff Ponzi Scheme, a complex fraud which ran over the course of many years.

64.    The Trustee's understanding and presentation of her substantive case (through discovery, summary judgment, and trial) would require extensive analysis by the Trustee's hourly professionals, expert consultant(s), and expert witness(es). The Trustee expects that if this matter were to be litigated, she would require at least expert testimony on the Carpoff Ponzi Scheme and damages, and accounting and professional obligations, and the role of accounting professionals in the preparation and dissemination of financial projections.

65.    Further, the settlement eliminates significant expense, inconvenience, and delay.

66.    As to the attendant "expense," while the Trustee's special counsel is compensated on a contingency fee basis, prosecution of the Trustee's potential claims against Novogradac would require (at least) two expert consultants / witnesses, who would (among other things) review, consider, and potentially opine on matters related to: (1) professional standards; (2) the Carpoff Ponzi Scheme; and (3) DC Solar's damages. Expert consultants and witnesses can be, and often are, very expensive.

67.    The Trustee's forensic accountants (paid on an hourly basis) have performed significant work assisting the Trustee in investigating and understanding the Carpoff's Ponzi Scheme and DC Solar's deepening insolvency to aid in evaluating her potential claims; that work would intensify if the Trustee commenced litigation. And the Trustee's general counsel (paid on an hourly basis) is a key part of the team, and his fees would continue post-litigation.

68.    Novogradac would certainly retain its own expert(s), possibly requiring the Trustee to provide a rebuttal expert(s).

69.    A litigation of this magnitude would require many depositions and associated travel costs. At the very least, depositions of persons likely to be incarcerated—some of which may

extend beyond one day or seven hours—would need to take place in-person (Zoom or telephonic appearances are typically prohibited for depositions taken in prison). This would be expensive.

70. Additionally, Novogradac has not filed a proof of claim in these Bankruptcy Cases and therefore has preserved any jury trial right. A jury trial would involve significant expense, including for jury consultants.

71. As a result, the potential expenses to the Estate would be quite substantial. The settlement benefits the estate by avoiding those expenses.

72. "Inconvenience and delay" are also significant concerns, and approval of the Settlement Agreement addresses these items in a manner favorable to the Estate. For instance, trial might not occur for more than two (or more) years given the complexity of the issues, the number of fact-witnesses and their locations, expert witnesses, confidentiality and privilege disputes, scope of fact discovery, dispositive motion practice, and COVID-19. And should a jury trial take place, absent consent, that would (probably) occur before the U.S. District Court, potentially adding to delays and inconvenience.

73. The Settlement Agreement addresses these concerns and provides a significant immediate financial benefit to the Estate. The Trustee submits that a pre-suit $3,200,000 recovery is a very good result for the estate and its creditors.

**3. Collectability**

74. Collectability is a significant consideration that militates in favor of approval of the Settlement Agreement. The Trustee is limited by confidentiality restrictions but can and does submit to the Court the following items. First, the Trustee has probed the risks of the collectability of a judgment against Novogradac. Second, the Trustee does not believe that Novogradac would have the ability to pay a judgment in the full amount the Trustee would be seeking, should this matter proceed to trial.

75. Third, the Trustee has investigated other aspects of Novogradac's ability-to-pay an adverse judgment, related to insurance. While the Trustee obtained this information in a

1    confidential (mediation) setting, the Trustee submits to the Court that in her informed business

2    judgment, she believes that this also supports approval of the Settlement Agreement.[18]

3    ### 4. Paramount Interest of Creditors

4    76.    This is a significant consideration that militates in favor of approval of the

5    Settlement Agreement.

6    77.    The Settlement Agreement provides for a $3,200,000 payment to the Debtors'

7    estate, representing a significant recovery while eliminating the risk and delay that accompanies

8    litigation against a professional firm performing complex work and based on tort claims in

9    connection with a massive and complex Ponzi scheme.

10   78.    The Trustee submits that this is a very good outcome when measured against

11   potential defenses and other risks, as well as the associated costs. As a pre-suit resolution, the

12   Trustee is efficiently administering the estate for the benefit of creditors. The settlement also

13   enables the Trustee and her professionals to turn to other substantial litigation claims against other

14   parties in these bankruptcy cases, which is a meaningful consideration given the Trustee expects

15   litigation recoveries to provide the bulk of the recoveries to creditors. This will also enable the

16   Trustee to minimize the ultimate timeline necessary to complete the administration of these

17   consolidated cases.

18   79.    Furthermore, the parties' settlement was reached after two mediations, and with the

19   able assistance of two mediators (Messrs. DeGroote and Meyer), each via an arms-length process,

20   which evinces the fairness of the Settlement Agreement.[19]

21

22   [18] Novogradac has settled a lawsuit brought against it by DC Solar investors for an undisclosed
     amount. *See, e.g., GEICO Corp. et al. v. Solar Eclipse Inv. Fund III, LLC et al.,* Case No. 20-
23   014247-CA-01 (Circuit Court in and for Miami-Dade County, Florida), Receiver's Third 6-Month
     Status Report filed on Feb. 16, 2022, pgs. 7-8; *Solar Eclipse Inv. Fund III, LLC v. CohnReznick*
24   *LLP and Novogradac & Co., LLP, et al.*, Case No. 19STCV45775 (Superior Court of the State of
     California, County of Los Angeles), Plaintiffs' Notice of Application and Application for Order to
25   Seal References of Settlement Amount Between Plaintiffs and Novogradac & Company LLP filed
     on Feb. 4, 2022 & Court Order re: Application to Seal dated April 21, 2022.
26
     [19] *See In re Trib. Co.*, 464 B.R. 126, 155 (Bankr. D. Del.), on rec'd in part, 464 B.R. 208 (Bankr.
27   D. Del. 2011), aff'd sub nom. 587 B.R. 606 (D. Del. 2018), aff'd sub nom. 972 F.3d 228 (3d Cir.
     2020), and aff'd in part sub nom. 587 B.R. 606 (D. Del. 2018), and aff'd sub nom. 972 F.3d 228
28   (3d Cir. 2020) ("[I]n assessing the fairness of proposed settlement, a court may consider the extent

80.     For all the reasons discussed in this motion, approval of the Settlement Agreement is in the paramount interest of creditors.

### III.     Payment of Contingency Fee

81.     Meland Budwick, P.A. ("***MB***"), as special litigation counsel, is to be compensated on a pure contingency fee basis of 25% of any recovery obtained.[20]  Here, based on this settlement agreement and accompanying recovery by the Debtors' estate, the amount is equal to **$800,000** ("***Contingency Fee***").

82.     Since MB's retention in December 2019, the firm has been reimbursed for certain out-of-pocket costs and has received a 25% contingency fee on certain matters that have been consensually resolved and approved by the Court once the applicable settlement payment was made. The Trustee seeks allowance of and authority to pay MB the Contingency Fee, at the time the Trustee receives the settlement payment and without further Court Order.

83.     Pursuant to 11 U.S.C. § 330(a), the bankruptcy court reviews the services the professional provided, and decides whether the requested compensation is reasonable.  The Trustee submits that the requested Contingency Fee satisfies this standard.[21]

84.     First, 25% is a materially lower percentage than often charged by commercial contingency counsel.[22] Second, the Court pre-approved the contingency fee arrangement after notice to all parties in interest. Third, given the limited assets of the estates when MB was retained, the contingency fee arrangement benefitted the estates by shifting material risk from the estates

---

that the settlement is truly the product of arms-length bargaining …"); *see also Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, *6 (S.D.N.Y. Dec. 18, 2019) ("The active involvement of experienced and independent mediators in the negotiation of the Settlement is strong evidence of the absence of any collusion and further supports the presumption of fairness.").

[20] ECF Nos. 1490 and 1502.

[21] MB: (1) performed high-quality work; (2) addressed challenging factual and legal questions; (3) employed significant skill, which was required; (4) obtained a very good and timely result; (5) performed its work efficiently; (6) drew upon a high level of capabilities and experience; and (7) was met with significant opposition by sophisticated counsel.

[22] *See In re Private Asset Grp., Inc.*, 579 B.R. 534, 544-45 (Bankr. C.D. Cal. 2017) ("Outside of bankruptcy, contingency fees are often 33 percent or, if there is an appeal, 40 percent."); *In re Pearlman*, 2014 WL 1100223, *3 (Bankr. M.D. Fla. Mar. 20, 2014) ("Resting again on its independent judgment, the Court finds the 35% contingency fee to be reasonable and in line with similar non-bankruptcy rates.").

onto MB which immediately invested enormous resources investigating and pursuing claims for the estate's benefit.[23] Fourth, the contingency fee arrangement ensures that MB's compensation is merit-based and directly tied to performance and results. Fifth, the contingency fee arrangement applies to an array of estate claims, and uniform application is in accord with that agreement. Sixth, MB has performed significant work (including formal and informal discovery) investigating and pursuing this and other claims in a high-quality and expeditious manner given the complexities of this Bankruptcy Case and despite the challenges imposed by COVID-19.

85.    Significantly, MB was charged with considering and investigating claims against hundreds of potential targets. MB invested substantial resources to vet claims against potential targets, ultimately recommending to the Trustee which claims are meritorious and which should not be brought. As a result, MB's efforts included determining the Trustee does not hold claims against those potential targets. The contingency fee agreement does not provide for MB to be compensated for these significant efforts that benefitted the estate. Rather, these efforts are part of the basket of services MB provides to the Trustee and the estate.

86.    Finally, MB has provided services to assist in administrative aspects of these cases, including the pursuit of substantive consolidation, review of certain significant claims, and matters related to MSG sales. MB did not seek any compensation for that work, which was substantial and benefitted the estate.

---

[23] *Fann Contracting, Inc. v. Garman Turner Gordon LLP*, 620 B.R. 141, 147 (D. Nev. 2020); *see also, generally, In re Smart World Techs.*, LLC, 423 F.3d 166, 180 (2d Cir. 2005) ("Here, Smart World's counsel was retained on a contingency basis, meaning that Smart World's pursuit of its adversary claims would have subjected the bankruptcy estate to no risk, while allowing the estate to reap any potential award."); *In re Brooke Corp.*, 2013 WL 6782877, *6 (Bankr. D. Kan. Dec. 20, 2013); *In re Pericone*, 2009 WL 5217367, *10 (Bankr. E.D. La. Dec. 30, 2009).

1

## V. Conclusion

2      87.      Based upon the foregoing, the Trustee requests an order approving the Settlement

3  Agreement and Contingency Fee and granting such further relief as this Court deems just and

4  proper.

5          DATED: May 10, 2022.

                                                        **MELAND BUDWICK, P.A.**
6

7                                                       */s/ Solomon B. Genet*
                                                        Michael S. Budwick, Esq.
8                                                       Solomon B. Genet, Esq.
                                                        Gil Ben-Ezra, Esq.
9                                                       Attorneys for Christina Lovato, Trustee

10
                                                        **HARTMAN & HARTMAN**
11

12                                                      */s/ Jeffrey L. Hartman*
                                                        Jeffrey L. Hartman, Esq.
13                                                      Attorneys for Christina Lovato, Trustee

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28